MICHAEL A. KELLY, State Bar No. 71460
  MKelly@WalkupLawOffice.com
RICHARD H. SCHOENBERGER, State Bar No. 122190
  RSchoenberger@WalkupLawOffice.com
MATTHEW D. DAVIS, State Bar No. 141986
  MDavis@WalkupLawOffice.com
JADE SMITH-WILLIAMS, State Bar No. 318915
  JSmithWilliams@WalkupLawOffice.com
WALKUP, MELODIA, KELLY & SCHOENBERGER
650 California Street
San Francisco, CA  94108
Telephone:  415-889-2919
Facsimile:  415-391-6965

ALAN A. GREENBERG, State Bar No. 150827
  AGreenberg@GGTrialLaw.com
WAYNE R. GROSS, State Bar No. 138828
  WGross@GGTrialLaw.com
DEBORAH S. MALLGRAVE, State Bar No. 198603
  DMallgrave@GGTrialLaw.com
GREENBERG GROSS LLP
601 South Figueroa Street, 30th Floor
Los Angeles, CA  90017
Telephone:  213-334-7000
Facsimile:  213-334-7001

Attorneys for All Plaintiffs

JOHN K. DIPAOLO, State Bar No. 321942
  (admission to N.D. Cal. pending)
  dipaolojohn@uchastings.edu
General Counsel
Secretary to the Board of Directors
Hastings College of the Law
200 McAllister Street
San Francisco, CA  94102
Telephone:  415-565-4787
Facsimile:  415-565-4825

Attorney for Plaintiff HASTINGS COLLEGE OF THE LAW

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HASTINGS COLLEGE OF THE LAW, a public trust and institution of higher education duly organized under the laws and the Constitution of the State of California; FALLON VICTORIA, an individual; RENE DENIS, an individual; TENDERLOIN MERCHANTS AND PROPERTY ASSOCIATION, a | Case No. <br><br> **COMPLAINT FOR:** <br> 1. **Violation of Due Process (42 U.S.C. § 1983; U.S. Const. Amend. V/XIV);** <br> 2. **Violation of Equal Protection (42 U.S.C. § 1983; U.S. Const. Amend. V/XIV);** |

COMPLAINT

1  business association;
   RANDY HUGHES, an individual; and
2  KRISTEN VILLALOBOS, an
   individual;

3          Plaintiffs,

4      v.

5  CITY AND COUNTY OF SAN
      FRANCISCO, a municipal entity,

6

7          Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3.  **Violation of Due Process Clause, State-Created Danger Doctrine (42 U.S.C. § 1983; U.S. Const. Amend. XIV);**
4.  **Uncompensated Taking (42.U.S.C. § 1983; U.S. Const. Amend. V/XIV);**
5.  **Municipal Liability for Unconstitutional Custom or Policy (42 U.S.C. § 1983);**
6.  **Violation of Title II of the Americans with Disabilities Act (42 U.S.C. §§ 12131 *et seq.*);**
7.  **Violation of Section 504 of the Rehabilitation Act (29 U.S.C. §§ 794 *et seq.*);**
8.  **Negligence**
9.  **Public Nuisance (Cal. Civ. Code §§ 3490 *et seq.*);**
10. **Private Nuisance (Cal. Civ. Code §§ 3501 *et seq.*);**
11. **Violation of Mandatory Duty (Cal. Gov't Code § 815.6; Cal. Welf. & Inst. Code § 17000);**
12. **Deprivation of the Guarantee of Safety and the Pursuit of Happiness (Cal. Const. art. I § 1);**
13. **Inverse Condemnation (Cal. Const. art. I § 19);**
14. **Violation of California Disabled Persons Act (Cal. Civ. Code §§ 54 *et sea.*)**

## I.  INTRODUCTION

1.      San Francisco's Tenderloin neighborhood faces a desperate crisis.

2.      The Tenderloin is a culturally diverse community comprised of seniors, persons with disabilities, people of color, immigrants (documented and undocumented), individuals with low incomes, LGBTQ people, and families with children.  All of its residents—housed and unhoused—are being put at risk by the policies, actions, and inaction of the City and County of San Francisco.

3.      Even before the onset of the COVID-19 pandemic, the *de facto* policy of the City and County of San Francisco to use the Tenderloin community as a containment zone had resulted in a dramatic decline in the livability and safety of the neighborhood.  The deplorable conditions tolerated by the City in the Tenderloin are not permitted in other neighborhoods in San Francisco.  This is a matter of fundamental fairness; what is a city-wide problem should not be allowed to weigh disproportionately on a low-income working-class neighborhood.  San Francisco should be prohibited from abandoning a single neighborhood, in an apparent effort to spare other neighborhoods the burdens that confront the city at-large.

4.      The Tenderloin, always a community of tolerance and compassion, is now blighted; its sidewalks are unsanitary, unsafe, and often impassable.  Open-air drug sales and other criminal activity, plus crowds of drug users and sidewalk-blocking tents, pervade and threaten the health and lives of all of the Tenderloin's residents.  What has long been suffered in the Tenderloin has become insufferable.  The conditions now prevailing in the Tenderloin constitute a violation of the fundamental civil rights of those residing and working there.

5.      Small business owners, who reflect the cultural diversity of the neighborhood, face multiple challenges.  Their economic viability is threatened by generic COVID-19 business disruption, but they must also cope with an

existential risk to their future, as customers elect to patronize establishments where sidewalk conditions do not impose physical barriers to safe access.

6.      The pandemic has ominously exacerbated dangers and harms to those who live, work, and go to school in the Tenderloin, and it threatens to do so for years to come as successive waves of infection bring further death and despair.

7.      Plaintiffs make the factual allegations and assert the legal claims herein in an effort to compel the City and County of San Francisco to comply with the law.  Plaintiffs seek ultimately not to assign blame, but to obtain legally obligatory solutions.

## II.  JURISDICTION AND VENUE

8.      Plaintiffs assert the claims herein pursuant to 42 U.S.C. § 1983; the Americans with Disabilities Act, 42 U.S.C. §§ 12131 *et seq.* (the "ADA"); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 *et seq.* ("Section 504"); and the Fifth and Fourteenth Amendments of the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1367, 2201 & 2202.

9.      This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as they arise from the same case or controversy as Plaintiffs' federal claims.

10.      Plaintiffs seek only equitable and injunctive relief for their state law claims.  Accordingly, Plaintiffs need not submit a compensation claim with any local public entity pursuant to the California Tort Claims Act, Cal. Gov't Code §§ 810 *et seq.*[1]

/ / /

/ / /

---

[1]      *See Qwest Commc'ns Corp. v. City of Berkeley*, 146 F. Supp. 2d 1081, 1090-91 (N.D. Cal. 2001).

11.     The acts and omissions complained of herein occurred in the Northern District of California.  Accordingly, pursuant to 28 U.S.C. § 1391, venue is proper in this Judicial District.

### III.  INTRADISTRICT ASSIGNMENT

12.     A substantial part of the events or omissions that give rise to the claims asserted herein occurred in the City and County of San Francisco, and a substantial part of the property that is the subject of this action is situated in the City and County of San Francisco.

### IV.  PARTIES

**A.     Plaintiffs**

13.     Plaintiff HASTINGS COLLEGE OF THE LAW ("Hastings") is a public trust and institution of higher education duly organized under the laws and the Constitution of the State of California.  Hastings was established in 1878 and has been an American Bar Association-approved law school since 1939.  Hastings is located in the Tenderloin.  Hastings' administrative offices and some academic space are at 200 McAllister Street; classrooms and faculty offices are at 333 Golden Gate Avenue and 198 McAllister Street; and 100 McAllister Street—commonly known as "The Tower"—contains other offices and 252 units of student housing.

14.     Plaintiff FALLON VICTORIA is an individual and a manager of the Pierre Hotel, an SRO ("single-resident occupancy") facility that provides 86 units of permanent housing, with many units occupied by formerly homeless individuals.  The Pierre Hotel is located in the Tenderloin, on Jones Street between O'Farrell and Geary.

15.     Plaintiff RENE DENIS is an individual and, since 2008, the managing partner and part owner of Soluna Cafe and Lounge, a restaurant located in the Tenderloin, at 272 McAllister Street.

/ / /

16.     Plaintiff TENDERLOIN MERCHANT AND PROPERTY OWNERS (the "TMA") is an association of owners of businesses in the Tenderloin.  The TMA was established in 2019 to improve the conditions around their storefronts for the benefit of neighbors and customers.  TMA's membership reflects the diversity of the Tenderloin including its many immigrant owned businesses.

17.     Plaintiff RANDY HUGHES is an individual and a resident in the Tenderloin, at 380 Ellis Street, also known as the Cadillac Hotel.  The Cadillac Hotel consists of 156 units of permanent affordable rental housing for low-income individuals.  Plaintiff HUGHES is dependent on a wheelchair due to his physical disabilities.

18.     Plaintiff KRISTEN VILLALOBOS is an individual and a resident at an apartment building located on Golden Gate Avenue near the corner of Larkin Street.  She and her husband have lived in the Tenderloin for 12 years.

**B.     Defendant**

19.     Defendant CITY AND COUNTY OF SAN FRANCISCO ("Defendant" or the "City") is a municipal entity existing under the laws of the State of California, with the capacity to sue and be sued.

## V.  FACTUAL ALLEGATIONS

**A.     History of the Tenderloin Neighborhood**

20.     The "Tenderloin" is an approximately 50-city block neighborhood in downtown San Francisco that has been known by that name for more than a century.  Although not all authorities agree on the Tenderloin's precise metes and bounds, the trapezoid-shaped region is roughly bordered on the west by Van Ness Avenue, on the north by Post Street, on the east by Mason Street, and on the south by Market Street.

21.     For most of its existence, the Tenderloin has attracted residents from the working-class and lower income segments of San Francisco society.

The socioeconomic fortunes of the Tenderloin have waxed and waned significantly over the past 60 years.

22.     Specifically, the distinctive character of the Tenderloin experienced a sharp decline in the 1960s.  By 1971, the neighborhood was described by *The New York Times* as the "porn capital of the USA."[2]  Prostitution and illegal drug trafficking were open and notorious, and housing conditions deteriorated.[3]

23.     A decade later, in the early to mid-1980s, the Tenderloin enjoyed a brief revival.  Through the hard work, dedication, and inspiration provided by politicians and community leaders including then-Mayor Dianne Feinstein; the Reverend Cecil Williams of Glide Memorial United Methodist Church; and the late owner of the Cadillac Hotel, Leroy Looper, the Tenderloin attracted substantial fresh investment, particularly in its restaurants and other small businesses.[4]  New zoning regulations were enacted that protected the low-income character of the neighborhood.[5]

24.     Unfortunately, the Tenderloin's economic resurgence did not last.  By the late-1980s, several factors, including a cut in federal funding, an economic slump, and a lack of police department support, triggered another two-decade decline.[6]

/ / /

---

[2]     Randy Shaw, *After 40 Years, the Tenderloin at Another Crossroads*, San Francisco Chronicle (Feb. 23, 2020), https://www.sfchronicle.com/opinion/article/After-40-years-the-Tenderloin-at-another-15066015.php (referring to William Murray, *Porn Capital of America: San Francisco*, New York Times Magazine (Jan. 3, 1971), at 8-9).

[3]     *See generally* Randy Shaw, *The Tenderloin:  Sex, Crime, and Resistance in the Heart of San Francisco* 135-56 (2015) (Chapter 6:  1967-1977, The Tenderloin Hits Bottom).

[4]     Shaw, *S.F. Chronicle*, *supra* n.2.

[5]     *Id.*

[6]     *Id.*

25.     For a few years beginning in 2011, under the leadership of the late Mayor Ed Lee, the Tenderloin again experienced a revitalization.  New housing and restaurants opened, neighborhood parks were renovated, and the Tenderloin Museum was commissioned.[7]  But, again, the Tenderloin's prosperity did not last.

**B.     Current State of the Tenderloin**

26.     At present, more than 20,000 people are permanent residents of the Tenderloin, including 3,000 children.[8]  Indeed, the Tenderloin has the highest *per capita* concentration of children of any neighborhood in San Francisco.[9]  The Tenderloin's residents consist primarily of low-income and working class individuals, senior citizens, disabled people, and families with children.[10]

27.     By 2019, the condition of the Tenderloin sank to a new low.  The homeless population, which has long been present in the Tenderloin, swelled.  According to a 2019 study conducted by Applied Survey Research, the homeless count in San Francisco increased by almost 20% over the four years from 2015 to 2019, with most of that growth occurring over the last two years.[11]

28.     The recent influx of homeless people into the Tenderloin has created a variety of problems for all stakeholders—permanent residents,

---

[7]     *Id.*

[8]     Randy Shaw, *SF Turning Tenderloin into a Ghetto*, *BeyondChron* (Apr. 7, 2020), http://beyondchron.org/sf-turning-tenderloin-into-a-ghetto/.

[9]     Carrie Sisto, *Tenderloin Merchants Form New Association to Address Issues with Neighborhood's Alleys*, Hoodline (Nov. 13, 2019), https://hoodline.com/2019/11/tenderloin-merchants-form-new-association-to-address-issues-with-neighborhood-s-alleys.

[10]     Shaw, *BeyondChron*, *supra* n.8.

[11]     Applied Survey Research, *San Francisco Homeless Count & Survey 2019 Executive Summary*, San Francisco Department of Homelessness & Supportive Housing (2019), http://hsh.sfgov.org/wp-content/uploads/ExecutiveSummary_SanFrancisco2019.pdf.

businesses, schools, the police, and the homeless population itself (an estimated 39% of whom suffer from mental illness[12]).

29.     Open-air drug transactions are routinely tolerated in the Tenderloin. The easy availability of illegal drugs attracts users and intensifies the homelessness problem.  Some 42% of the homeless population are estimated to suffer from alcohol or drug addiction.[13]

30.     Sidewalks in the Tenderloin are now packed with tents, some of which contain as many as six individuals.  Displayed below is a photograph taken on April 11, 2020, that shows one such heavily occupied tent on the southeast corner of Jones and Golden Gate.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[12]     *Id.*

[13]     *Id.*

-7-
COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22



23      31.      According to a count conducted by Urban Alchemy (a non-profit

24 organization that provides litter reduction services in the Tenderloin and

25 adjacent neighborhoods of San Francisco to ensure safe, clean, and accessible

26 sidewalks and rights-of-way), the number of tents and makeshift shelters on

27 Tenderloin sidewalks grew from 158 on March 3, 2020, to 391 on May 1, 2020.

28 A chart illustrating the increase in the number of those tents and shelters on

Tenderloin sidewalks from December 10, 2019, to May 1, 2020, is set forth below.



32.     Those tents block the sidewalks in the Tenderloin, impeding pedestrians' travel.  They also serve as cover for drug dealers and others conducting nefarious activities.[14]  However, the San Francisco Police Department has been directed not to remove or disturb those tents, despite the facts that they block the sidewalks and shield criminals and despite the health risks that they pose to permanent residents, business owners, pedestrians, and homeless people themselves.[15]  Displayed below is a photograph of the corner of Golden Gate and Leavenworth, taken on April 27, 2020, that shows a line of such tents.

---

[14]     Phil Matier, *SF Homeless Tents, Once Seen as Problem, Now Seen as Path to Coronavirus Social Distancing*, San Francisco Chronicle (Apr. 12, 2020), https://www.sfchronicle.com/bayarea/philmatier/article/SF-homeless-tents-once-seen-as-problem-now-seen-15193812.php.

[15]     Shaw, *BeyondChron*, *supra* n.8.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



33.    According to Randy Shaw, executive director of the Tenderloin Housing Clinic,[16] "The Tenderloin has become a horror show.  Feces, drug

[16]    Mr. Shaw also co-founded and serves on the Board of Directors of Uptown Tenderloin, Inc., a nonprofit organization that in 2009 spearheaded the creation of the national Uptown Tenderloin Historic District.  Uptown Tenderloin, Inc. was the driving force behind the Tenderloin Museum, which opened in 2015.  Mr. Shaw is the editor of BeyondChron.org.

dealers and users, graffiti, tents and crowds on sidewalks dominate the landscape."[17]  As an example, displayed below is a photograph taken on April 16, 2020, that shows a crowd on the corner of Turk and Hyde Streets.



34.    The crisis in the Tenderloin presents an immediate and dire public health problem.

35.    The Tenderloin's crisis also presents an environmental problem, as the U.S. Environmental Protection Agency has recognized.  In a letter to

[17]    Shaw, *BeyondChron*, *supra* n.8.

Governor Gavin Newsom dated September 26, 2019, EPA Administrator Andrew R. Wheeler wrote:

> The EPA is aware of the growing homelessness crisis developing in major California cities, including Los Angeles and San Francisco, and the impact of this crisis on the environment. Indeed, press reports indicate that "piles of human feces" on sidewalks and streets in these cities are becoming all too common. The EPA is concerned about the potential water quality impacts from pathogens and other contaminants from untreated human waste entering nearby waters. San Francisco, Los Angeles and the state do not appear to be acting with urgency to mitigate the risks to human health and the environment that may result from the homelessness crisis.[18]

36.    The plight of the Tenderloin is aggravated by the NIMBY[19] attitude and behavior exhibited by many in San Francisco. That is, as the streets of other San Francisco neighborhoods improve, the condition of the Tenderloin deteriorates. As *San Francisco Chronicle* columnist Heather Knight recently observed, "Though city officials would never admit it, they've long treated the low-income neighborhood [of the Tenderloin] as a containment zone, tolerating everything from blatant drug dealing to open-air injection drug use to filthy sidewalks that wouldn't stand in wealthier parts of town.[20] Randy Shaw

---

[18]    Letter from Andrew R. Wheeler, Administrator, U.S. Environmental Protection Agency, to Gavin C. Newsom, Governor, State of California (Sep. 26, 2019), https://www.epa.gov/sites/production/files/2019-09/documents/9.26.19_letter-epa.pdf (footnotes omitted).

[19]    "Not In My Back Yard"

[20]    Heather Knight, *"The Problem Is Getting Worse": SF's Troubled Tenderloin Buckles under Weight of Coronavirus*, San Francisco Chronicle (Apr. 17, 2020),

similarly asserted, "in 2020, our 'progressive' city still maintains a double standard that bars activities in gentrified neighborhoods that it allows in the Tenderloin."[21]

## C.    Impact on Plaintiffs

37.    Plaintiff Hastings' facilities are on McAllister Street, Larkin Street, Hyde Street, and Golden Gate Avenue in the Tenderloin, and Hastings students, faculty, and staff have suffered from the deterioration of their community. Tent-blocked sidewalks, groups of addicts injecting themselves, the odors of smoked crystal methamphetamine and human waste, and open-air drug dealing immediately outside the Tower cause residents to fear for their safety; many are afraid to venture outside their building, particularly at night.

38.    Hastings spent $66,836 on increased safety and security in the first month following Public Health recommendations for the COVID-19 pandemic. Hastings expended that sum in addition to the $2.3 million that it spends annually on security; of this amount, half is spent on supplemental police—sworn peace officers provided under contract with UCSF—with the remainder spent on security guards controlling building access.  Hastings also spent $2,100 per week (annualized to $109,200) for extra cleaning services—power washing and trash pickup—from the Tenderloin Community Benefits district, over and above Hastings' annual property tax assessments.  Those tax assessments totaled $93,987 in 2019-20, an increase from $49,000 in the prior year.

39.    Students who decline offers of admission to Hastings often cite the neighborhood as a significant factor in their decisions.  One such student stated in a 2020 survey, "One of the big reasons I did not go to Hastings is the homeless population surrounding the campus.  I quite honestly did not feel safe

---

https://www.sfchronicle.com/bayarea/heatherknight/article/The-problem-is-getting-worse-SF-s-15206953.php.

[21]    Shaw, *S.F. Chronicle*, *supra* n.2.

and I could not imagine walking home alone at night.  I was looking forward to living in San Francisco, but was shocked by the magnitude of the drug use surrounding the campus. . . .  My family was harassed and approached by a drug dealer when walking around the campus.  I could not imagine attending school in a place where this is a daily occurrence."

40.     Another student who declined an offer of admission this year stated, "This was a really hard decision for me.  I felt that this school would have been an honor to attend.  However, I witnessed crime right outside the entrance when I visited.  While I appreciate the growth of not living in a bubble, I just didn't feel safe and was more stressed than I wanted to be walking back to my car."

41.     Litter and used needles are found every day around the Hastings parking garage.  Human feces and urine are found in the doorways.  Staff have to escort the homeless out of the garage regularly.  Thieves break into cars.

42.     Businesses in the Tenderloin have likewise suffered as a result of the neighborhood's decline.  Hastings' retail tenants Golden Era Restaurant and Philz Coffee have suffered crime and vandalism such as broken shop windows.

43.     Plaintiff VICTORIA has witnessed a drastic change in the conditions of the streets and sidewalks of the Tenderloin in recent months, and especially since the City enacted the emergency shelter-in-place ordinance in response to the COVID-19 pandemic.  She is an essential worker and continues to manage the Pierre Hotel during the pandemic.  When she walks from the BART station to the hotel, the sidewalks along her path are now crowded with tents, people, and belongings.  Sometimes she has to walk in the street, among car traffic, because the sidewalks are impassable.  Many of the people living on the streets and sidewalks openly urinate, defecate, and dump their trash on the sidewalks or between parked cars.  Illicit drug sales and hypodermic drug use have become rampant and are conducted in the open.  Many of the people

camping on and occupying the sidewalks do not adhere to social distancing rules for the pandemic; they congregate in large groups in close proximity, without masks; they do not make way for other people who live and work in the Tenderloin who are trying to use the sidewalks; they sometimes display hostile and threatening behavior.

44.    Plaintiff VICTORIA has on numerous occasions seen members of the San Francisco Police Department ("SFPD") simply look away when people on the streets and sidewalks of the Tenderloin commit crimes and engage in conduct that threatens the health and safety of others.  Plaintiff VICTORIA has made numerous calls and contacts to the City and its agencies, asking them to act, but to no avail.  The tenants of the Pierre Hotel, many of whom are elderly or have underlying health conditions, cannot safely venture outside of the hotel.  This means they cannot safely go to a store to buy food.  Plaintiff VICTORIA worries that the conditions of the sidewalks and streets of the Tenderloin jeopardize the health and safety of her employees and the residents of the hotel.

45.    On a personal level, Plaintiff VICTORIA is married with three children, and she worries that if she contracts COVID-19 because of the conditions of the sidewalks and streets of the Tenderloin, then she is putting her family at risk, including one of her children who suffers from asthma and allergies.

46.    Plaintiff DENIS has witnessed a drastic change in the conditions of the streets and sidewalks of the Tenderloin in recent months, and especially since the City enacted the emergency shelter-in-place ordinance in response to the COVID-19 pandemic.  A line of tents obstructs the sidewalk near the McAllister Street entrance of his restaurant, and they extend around the block and continue up Larkin Street.  Drug dealing and usage is rampant and conducted in plain view of even the SFPD.  Many of the people living on the sidewalk and street near Plaintiff DENIS' restaurant urinate, defecate, and throw

their used syringes and trash on the sidewalk and street.  Plaintiff DENIS has observed a group of these people using a puddle near the curb as a place to bathe and wash personal items.  Many of the people living on the street and sidewalk near his restaurant act hostilely and have threatened violence.

47.     While Plaintiff DENIS has kept his restaurant open for take-out and deliveries during the pandemic, he will likely have to close that aspect of the business because his clientele does not feel safe walking to his restaurants and delivery drivers are afraid to come to his restaurant.

48.     Members of the TMA have witnessed a drastic change in the conditions of the streets and sidewalks of the Tenderloin in front of and near their businesses in recent months, and especially since the City enacted the emergency shelter-in-place ordinance in response to the COVID-19 pandemic. The members of the TMA have lost a significant amount of business because the streets and sidewalks near their businesses are filthy and unsafe and, in some locations, literally impassable.

49.     Plaintiff HUGHES has witnessed a drastic change in the conditions of the streets and sidewalks of the Tenderloin in recent months, and especially since the City enacted the emergency shelter-in-place ordinance in response to the COVID-19 pandemic.  The sidewalks in front of his residence and nearby streets are now congested with tents and encampments.  The hygiene of the people living and congregating around the Cadillac Hotel is atrocious, with almost no one wearing masks or following social distancing rules.  Illicit drug sales and use are conducted openly and in the presence of the SFPD.  While Plaintiff HUGHES is fearful to leave the hotel because the conditions have become so unsafe, he must do so to shop, run necessary errands, and perform volunteer work.  Many of the people living and congregating on the sidewalks refuse to get out of the way and block his path as he tries to navigate through the neighborhood in his wheelchair.  He is afraid of being attacked for simply

"inconveniencing them" by trying to use his wheelchair on the sidewalk. Plaintiff HUGHES often has to detour out into the street and into traffic because the sidewalks are blocked.

50.     Plaintiff VILLALOBOS has witnessed a drastic change in the conditions of the streets and sidewalks of the Tenderloin in recent months, and especially since the City enacted the emergency shelter-in-place ordinance in response to the COVID-19 pandemic.  Now, drug dealers and drug users congregate in front of her apartment building and make it impossible for her or any others to enter or exit the building without walking very close to them.  She regards them as threatening and intimidating.  The people congregating in front of her building do not follow social distancing rules related to the pandemic, and the only ones who wear masks are the drug dealers.  However, now the drug dealers openly laugh and scoff at members of the SFPD who pass by.  Many of the sidewalks near her home are impassible due to tents, encampments, and congregations of filthy people, forcing her to walk in the street.  She and her husband will now walk blocks out of their way to avoid some of the especially bad streets and sidewalks.

51.     There are families with young children who live in Plaintiff VILLALOBOS' apartment building, and she feels especially distraught about their plight.  The families are afraid even to walk outside of the apartment building.  The children now play games in the common hallways of the building.

**D.     Effect of the COVID-19 Pandemic**

52.     On March 16, 2020, in response to the COVID-19 pandemic, Mayor London Breed directed San Francisco businesses to close and issued a citywide shelter-in-place order.[22]  The homeless population in the Tenderloin,

_____
[22]     Russell Berman, *The City That Has Flattened the Coronavirus Curve*, The Atlantic (Apr. 12, 2020),

however, have no place in which to shelter.  Homeless people are exempted from social distancing conventions.  Hastings officials are deeply concerned that a significant portion of the homeless population in the Tenderloin—who have never been tested and who lack the resources to comply with the public health guidance of sheltering in place, practicing social distancing, washing hands, and wearing face coverings—may have COVID-19, posing a greater risk to all Tenderloin residents and inviting a general spread of the virus.

53.    Despite the high risk of infection and other dangers posed to residents in the neighborhood and beyond, the City has yet to implement wide-scale testing for people living on the streets.

54.    Studies show that a primary cause of homelessness is loss of employment.[23]  The pandemic has caused a devastating increase in unemployment, in San Francisco and throughout the state and country.[24]  The homeless population in the Tenderloin has grown since the onset of the pandemic, and it will likely continue to grow.

55.    The explosive growth in the size of the Tenderloin's homeless population has likewise harmed its permanent residents.  Individuals and families living in SROs are terrified to go outside.  As Heather Knight explained, "Many families live in tiny single room occupancy hotels, sharing communal kitchens and bathrooms.  But to get outside for fresh air or to run

---

https://www.theatlantic.com/politics/archive/2020/04/coronavirus-san-francisco-london-breed/609808/; *see also* City & County of San Francisco, Dept. of Public Health, Order of the Health Officer No. C19-07 (Mar. 16, 2020), https://www.sfdph.org/dph/alerts/files/HealthOrderC19-07-%20Shelter-in-Place.pdf.

[23]    Applied Survey Research, *supra* n.11.

[24]    Adam Beam, *California's Unemployment Rate Soars, But Worst Yet to Come*, NBC Bay Area (Apr. 17, 2020), https://www.nbcbayarea.com/news/california/california-unemployment-rate-jumped-to-5-3-in-march/2274716/.

essential errands, they're faced with an impossible choice:  push through crowded sidewalks, social distancing be damned, or walk into traffic to get around the throngs."[25]

56.     On April 20, 2020, District 6 Supervisor Matt Haney transmitted a letter to Mayor Breed and other City officials regarding the Tenderloin's crisis.[26]  In his detailed letter, Supervisor Haney explained (among many other things) how Tenderloin residents are "uniquely vulnerable to the spread of COVID-19" and how the proliferation of tents on the sidewalks of the Tenderloin creates "extreme health hazards for everyone."[27]  Supervisor Haney closed his letter with a demand for "a specific, targeted intervention strategy from the City" to "slow the spread of the virus, save lives, and protect everyone in our city."[28]

57.     The TMA and Hastings were both co-signatories to Supervisor Haney's letter.[29]  Moreover, Hastings has repeatedly and insistently called upon the City and its police department to remedy the continuing deplorable conditions on Hastings' doorstep.  These efforts have been unavailing.

58.     The City's acts and omissions, whether intentional or negligent, that allow the Tenderloin to serve as the City's repository for its homeless population (as Supervisor Haney outlines in his letter and as Plaintiffs have detailed above) have created dire consequences for the Tenderloin's residents and businesses, including Plaintiffs.  The City's acts and omissions threaten Plaintiffs with the following specific consequences:  (a) an increased risk of

---

[25]     Knight, *supra* n.20.

[26]     Letter from Matt Haney, Supervisor, San Francisco District 6, to London Breed, Mayor, City of San Francisco, *et al.* (Apr. 20, 2020).

[27]     *Id.* at 1.

[28]     *Id.* at 4.

[29]     *Id.*

1  infection of COVID-19; (b) interference with their property rights; (c) loss of

2  their business, educational, and other opportunities; (d) interference with their

3  California constitutional right to pursue happiness; (e) interference with their

4  Federal Due Process rights; and (f) interference with their Federal Equal

5  Protection rights.

6      59.    Defendant is legally obligated to act quickly to protect Plaintiffs'

7  legal rights (as articulated in their claims set forth below) as well as their heath

8  and lives.  The Tenderloin's long role as the City's containment zone must

9  cease.

10              **VI.  <u>CLAIMS FOR RELIEF</u>**

11              **FIRST CLAIM FOR RELIEF**

12              **Violation of Due Process**

13       **42 U.S.C. § 1983; U.S. Const. Amend. V/XIV**

14              **(All Plaintiffs against Defendant)**

15      60.    Plaintiffs re-allege and incorporate herein by this reference each

16  and every allegation set forth in Paragraphs 1 through 59 of this Complaint as

17  though set forth fully herein.

18      61.    Defendant, by abdicating its duties under the law to ensure safe and

19  secure living conditions in the Tenderloin, has denied residents due process of

20  law as guaranteed by the Fifth and Fourteenth Amendments of the United States

21  Constitution.  The squalid sidewalk conditions, exacerbated profoundly by the

22  threat of infection, have denied residents their unimpeded liberty and use of

23  their property, and have allowed conditions to fester that threaten residents'

24  health and lives.

25      62.    Upon information and belief, this was done with deliberate intent

26  and/or reckless disregard of Plaintiffs' rights.  Plaintiffs seek injunctive relief

27  and the cost of attorneys' fees in bringing this action.

28  / / /

**SECOND CLAIM FOR RELIEF**

**Violation of Equal Protection**

**42 U.S.C. § 1983; U.S. Const. Amend. V/XIV**

**(All Plaintiffs against Defendant)**

63.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 62 of this Complaint as though set forth fully herein.

64.    Defendant, by enforcing the law in some areas and declining to enforce the law in others, has arbitrarily determined where homeless encampments may or may not be located and what communities should be affected, without following its own procedures and in violation of both state and federal law.  This has placed a disproportionate burden on some persons, communities, and businesses over others.

65.    Upon information and belief, this was done with deliberate intent and/or reckless disregard of Plaintiffs' rights.  Plaintiffs seek injunctive relief and the cost of attorneys' fees in bringing this action.

**THIRD CLAIM FOR RELIEF**

**Violation of Due Process Clause, State-Created Danger Doctrine**

**42 U.S.C. § 1983; U.S. Const. Amend. XIV**

**(All Plaintiffs against Defendant)**

66.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 65 of this Complaint as though set forth fully herein.

67.    By the acts and omissions described above, Defendant has affirmatively created or increased the risk that Plaintiffs would be exposed to dangerous conditions, which placed Plaintiffs specifically at risk, and Plaintiffs were harmed as a result.

/ / /

68.     Defendant knew or should have known that its acts or omissions specifically endangered Plaintiffs, and Defendant was deliberately indifferent thereto.

**FOURTH CLAIM FOR RELIEF**

**Uncompensated Taking**

**42.U.S.C. § 1983; U.S. Const. Amend. V/XIV**

**(All Plaintiffs against Defendant)**

69.     Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 68 of this Complaint as though set forth fully herein.

70.     The Fifth Amendment mandates, in relevant part, that "private property [shall not] be taken for public use, without just compensation."  The Fifth Amendment is applied to the states through the Fourteenth Amendment.[30] The actions by the City, as described in detail *supra*, have limited, damaged, and/or burdened the property owners so substantially that they rise to the level of a regulatory taking, yet no compensation has been provided.

71.     Upon information and belief, this was done with deliberate intent and/or reckless disregard of Plaintiffs' rights.  Plaintiffs seek injunctive relief and the cost of attorneys' fees in bringing this action.

**FIFTH CLAIM FOR RELIEF**

**Municipal Liability for Unconstitutional Custom or Policy**

**42 U.S.C. § 1983**

**(All Plaintiffs against Defendant)**

72.     Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 71 of this Complaint as though set forth fully herein.

---

[30]     *Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 241, 17 S. Ct. 581, 586 (1897).

73.     Plaintiffs are informed, believe and allege that, at all times herein mentioned, Defendant and its agents, with deliberate indifference, and conscious and reckless disregard to the safety, security, and constitutional and statutory rights of Plaintiffs, engaged in the unconstitutional conduct and omissions set forth above, all pursuant to policy, procedure, or customs held by the City.

74.     The actions and inactions of the City were known or should have been known to the policy makers responsible for that agency and occurred with deliberate indifference to the constitutional violations set forth above, and/or to the strong likelihood that constitutional rights would be violated as a result of its customs and/or policies.

75.     Plaintiffs seek injunctive relief, and the cost of attorneys' fees in bringing this action.

### SIXTH CLAIM FOR RELIEF

### Violation of Title II of the Americans with Disabilities Act

### 42 U.S.C. §§ 12131 *et seq.*

### (Plaintiff RANDY HUGHES against Defendant)

76.     Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 75 of this Complaint as though set forth fully herein.

77.     The ADA provides that people with disabilities be afforded "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ."[31] Further, the ADA ensures that transportation facilities are constructed to a set of standards that ensures accessibility for the disabled.  Sidewalks are the most common element of transportation infrastructure, yet if they are not accessible,

/ / /

---

[31]     42 U.S.C. § 12182(a).

they pose great challenges and dangers to anyone in a wheelchair or who has other mobility restrictions.

78.     Sidewalks are subject to the access requirements of Title II of the ADA and § 504 of the Rehabilitation Act.[32]  Accordingly, sidewalk width requirements ensure that sidewalks are accessible for use by wheelchair-bound individuals.

79.     The minimum width for an ADA-compliant sidewalk is 36 inches.[33]  "A public entity shall maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part."[34]

80.     Throughout the Tenderloin, the City is failing to uphold its obligations to maintain clear and accessible sidewalks and public rights-of-way for its disabled residents and visitors, resulting in regular violations of the Americans with Disabilities Act.  These ADA violations are obvious and known to the City both through its own inspections and various reports of blocked sidewalks due to encampments through its own reporting mechanisms, such as 311.  Defendant and its agents and employees have failed and continue to fail to provide reasonable accommodations for disabled persons using public sidewalks.

81.     Defendant is obligated to operate the "service, program, or activity" "so that . . ., when viewed in its entirety, it is readily accessible to and

---

[32]     *Willits v. City of Los Angeles*, 925 F. Supp. 2d 1089, 1093 (C.D. Cal. 2013) ("Any public sidewalk over which the City of Los Angeles has responsibility to inspect and notify property owners of repair needs is a 'program, service, or activity' within the meaning of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973.").

[33]     36 C.F.R. § 1191, app. D, § 403.5.1 ("the clear width of walking surfaces shall be 36 inches (915 mm) minimum").

[34]     28 C.F.R. § 35.133(a).

useable by individuals with disabilities."[35]  Yet when "viewed in its entirety" public rights-of-way are not provided by Defendant to be "readily accessible to and useable" by individuals bound to wheelchairs.

82.    The discrimination and denial of access to the City's rights-of-way for persons with disabilities is the direct result of Defendant's policies and practices of deliberately permitting tents and encampments to proliferate, and the failure to adopt or implement any adequate procedure for regularly inspecting and maintaining the pedestrian rights-of-way clear of obstructions.

83.    As a direct and proximate result of the aforementioned acts, including but not limited to Defendant's deliberate indifference to the violation of Plaintiff HUGHES' federally protected rights, Plaintiff HUGHES has suffered pain, humiliation, hardship, anxiety, indignity, and severe mental and emotional anguish.  This deprives Plaintiff HUGHES of his independence and prevents him from accessing the services and benefits of public establishments.

84.    Pursuant to 42 U.S.C. § 12133 and 29 U.S.C. § 794a(b), Plaintiff HUGHES is entitled to recover reasonable attorneys' fees and costs incurred in bringing this action.

**SEVENTH CLAIM FOR RELIEF**

**Violation of Section 504 of the Rehabilitation Act**

**29 U.S.C. §§ 794 *et seq.***

**(Plaintiffs RANDY HUGHES against Defendant)**

85.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 84 of this Complaint as though set forth fully herein.

86.    Section 504 of the Rehabilitation Act of 1973 provides in relevant part:

---

[35]    28 C.F.R. § 35.150(a).

> [N]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .[36]

87.    Plaintiff HUGHES is otherwise qualified to participate in the services, programs, or activities that are provided to individuals in the City.  The City is a recipient of federal financial assistance and therefore subject to Section 504.  Upon information and belief, Defendant and its agents and employees have violated and continue to violate Section 504 of the Rehabilitation Act by excluding Plaintiff HUGHES from participation in, denying him the benefits of, and subjecting him to discrimination regarding the benefits and services involved in utilizing public rights-of-way based solely on their disability.

88.    Upon information and belief, said discrimination occurred with deliberate intent and/or reckless disregard of Plaintiff HUGHES' rights.  Plaintiff HUGHES seeks injunctive relief and the cost of attorneys' fees in bringing this action.

### EIGHTH CLAIM FOR RELIEF

### Negligence

### (All Plaintiffs against Defendant)

89.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 88 of this Complaint as though set forth fully herein.

90.    Defendant, by and through its agents and employees, has the sole right and responsibility to control, maintain, and keep safe and clean the public

---

[36]    29 U.S.C. § 794(a).

and public-right-of-way areas in San Francisco, including parks, sidewalks, streets, and public buildings, and to make and enforce laws assuring the public health and safety thereof for its citizens and their guests. Among other things, Defendant has the duty to maintain these areas in a manner that does not unreasonably interfere with the free passage or use by Plaintiffs and that addresses and alleviates conditions that are harmful to health or indecent or offensive to the senses, that create a fire hazard, or that permit crime to occur unabated including the illegal sale of controlled substances.

91.     As controlling law makes clear, "The public is entitled to the free and unobstructed use of the entire streets and sidewalks. . . ."[37] Indeed, municipalities "have the duty to keep their communities' streets open and available for movement of people and property, the primary purpose to which the streets are dedicated."[38]

92.     Defendant and its agents have breached their duty to San Francisco's citizens, including and specifically to Plaintiffs, and each Plaintiff has suffered as a result, as described more fully below. The bases of this claim for relief include the conduct, acts, and omissions of individual responsible City officials, based on the theory of *respondeat superior*.

93.     Plaintiffs seek no monetary damages hereunder and submit this claim for only equitable and injunctive relief. Accordingly, the City is not entitled to any claim of immunity, pursuant to Cal. Gov't Code § 814.

/ / /

/ / /

/ / /

/ / /

---

[37]     *Vanderhurst v. Tholcke*, 113 Cal. 147, 152 (1896).

[38]     *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 160, 60 S. Ct. 146, 150 (1939).

**NINTH CLAIM FOR RELIEF**

**Public Nuisance**

**Cal. Civ. Code §§ 3490 *et seq.***

**(All Plaintiffs against Defendant)**

94.     Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 93 of this Complaint as though set forth fully herein.

95.     California has defined nuisance as:

> [a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance.[39]

96.     That statute "is an expression of the Legislature's public policy against public nuisances, and it is plainly aimed at protecting the public from the hazards created by public nuisances."[40]  In addition to health and safety hazards, "[a] reduction in property values caused by activities on a neighboring piece of land, and an assault on the senses by noise, dust, and odors, are just the kinds of harm that common law suits to abate a nuisance are designed to redress."[41]  A

/ / /

/ / /

---

[39]     Cal. Civ. Code § 3479.

[40]     *People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51, 136 (2017).

[41]     *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 101 F.3d 503, 505 (7th Cir. 1996).

public nuisance is the substantial and unreasonable interference with a public right.[42]

97.     As described above, the City, by its failure to maintain the public property under its control and to enforce the laws requiring the same, is perpetuating and facilitating a public nuisance.

98.     All Plaintiffs have experienced a substantial and unreasonable interference with the enjoyment of their property, whether that be a building owned or a room rented, and with their right of free passage and use; each has suffered and continues to be threatened with respect to his, her, or its health and welfare, by reason of the constant threat of disease and the experience of human waste, trash, tents, and encampments outside his, her, or its property and along and on the sidewalks and streets.

99.     Each Plaintiff has been damaged in his, her, or its own right, in a manner specially injurious to himself, herself, or itself.  No Plaintiff consented to Defendant's conduct.

**TENTH CLAIM FOR RELIEF**

**Private Nuisance**

**Cal. Civ. Code §§ 3501 *et seq.***

**(All Plaintiffs against Defendant)**

100.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 99 of this Complaint as though set forth fully herein.

101.   Each Plaintiff owns, leases, occupies, or otherwise controls all of a portion of the home or business identified.  By Defendant's actions and inactions, each has created a condition or permitted a condition to exist that is harmful to the health, is indecent and offensive to the senses, obstructs the free

---

[42]     *San Diego Gas & Elec. Co. v. Superior Court*, 13 Cal. 4th 893, 938 (1996).

passage and use of public parks, squares, streets, highway, and sidewalks, permits unlawful sales of illicit narcotics, and constitutes a fire hazard, as described *supra*.

102.   Defendant's conduct has been and is intentional and unreasonable, or unintentional but negligent or reckless.  Alternatively, the condition permitted to exist was the result of abnormally dangerous activity that substantially interfered with each Plaintiff's use or enjoyment of his, her, or its land that would reasonably annoy or disturb an ordinary person.  No Plaintiff consented to Defendant's conduct; each was harmed; Defendant's conduct was a substantial factor in causing the harm; and the seriousness of the harm outweighs any public benefit of such conduct (which is none).

103.   Plaintiffs seek no monetary damages hereunder and submit this claim for only equitable and injunctive relief.  Accordingly, the City is not entitled to any claim of immunity, pursuant to Cal. Gov't Code § 814.

## ELEVENTH CLAIM FOR RELIEF
### Violation of Mandatory Duty
### Cal. Gov't Code § 815.6; Cal. Welf. & Inst. Code § 17000
### (All Plaintiffs against Defendant)

104.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 103 of this Complaint as though set forth fully herein.

105.   Defendant City is liable under Cal. Gov't Code § 815.6 and common law negligence theory for violation of a statutorily mandated duty to provide medical care for the indigent.  Cal. Welf. & Inst. Code § 17000 provides:

> Every county and every city and county shall relieve and support
> all incompetent, poor, indigent persons, and those incapacitated by
> age, disease, or accident, lawfully resident therein, when such

persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions.

106.   Cal. Welf. & Inst. Code § 10000 clarifies and defines the purpose of these obligations as follows:

The purpose of this division is to provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed.  It is the legislative intent that aid shall be administered and services provided promptly and humanely, with due regard for the preservation of family life, and without discrimination on account of ancestry, marital status, political affiliation, or any characteristic listed or defined in Section 11135 of the Government Code.  That aid shall be so administered and services so provided, to the extent not in conflict with federal law, as to encourage self-respect, self-reliance, and the desire to be a good citizen, useful to society.

107.   Sections 17000 and 10000 taken together mandate that "medical care be provided to indigents . . . promptly and humanely."[43]  This means that cities and counties must provide medical care to the poor "at a level which does not lead to unnecessary suffering or endanger life and health."[44]  The California Supreme Court has held that municipalities must provide "subsistence medical services."[45]  Cities and counties have an obligation to provide "'medically

---

[43]   *Tailfeather v. Board of Supervisors*, 48 Cal. App. 4th 1223, 1245 (1996).

[44]   *Id.* at 1240.

[45]   *Hunt v. Superior Court*, 21 Cal. 4th 984, 1014 (1999) ("Section 10000 imposes a minimum standard of care—one requiring that subsistence medical

necessary' care, not just emergency care."[46]  Importantly, a city or county's obligation to provide medically necessary care must be fulfilled "without regard to its fiscal plight."[47]  "Medically necessary" for adults is defined by statute: "[A] service is 'medically necessary' or a 'medical necessity' when it is reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain."[48]

108.   In view of the above-described facts and circumstances, and the significant studies, statistics, and reports including those set forth *supra*, and other such evidence as may be provided, a person's status as an unsheltered homeless individual both causes and exacerbates physical and mental health problems, ultimately causing much higher rates of infection, disease, decay, pain, and death.

109.   Basic shelter is "medically necessary" because it is "reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain," and the City's failure to provide the same to its homeless population constitutes a breach of its duty under Cal. Welf. & Inst. Code §§ 17000 & 10000.

110.   Plaintiffs, and each of them, have been damaged by the City's failure to provide shelter, as described in detail *supra*.

111.   Plaintiffs seek no monetary damages hereunder and submit this claim for only equitable and injunctive relief.  Accordingly, the City is not entitled to any claim of immunity, pursuant to Cal. Gov't Code § 814.

---

services be provided promptly and humanely.").

[46]  *County of Alameda v. State Bd. of Control*, 14 Cal. App. 4th 1096, 1108 (1993) (quoting *Bay Gen. Cmty. Hosp. v. County of San Diego*, 156 Cal. App. 3d 944, 957 (1984)).

[47]  *Id.*

[48]  Cal. Welf. & Inst. Code § 14059.5(a).

## TWELFTH CLAIM FOR RELIEF

### Deprivation of the Guarantee of Safety and the Pursuit of Happiness

### Cal. Const. art. I § 1

### (All Plaintiffs against Defendant)

112.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 111 of this Complaint as though set forth fully herein.

113.   California Constitution, article I § 1 provides:

All people are by nature free and independent and have inalienable rights.  Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.

114.   The actions by the City have limited, damaged, and/or burdened Plaintiffs' constitutionally guaranteed inalienable rights, including Plaintiffs' rights to enjoy and defend their life and liberty; to acquire, possess, and protect their property; and to pursue and obtain safety, happiness, and privacy.[49]

115.   Plaintiffs seek no monetary damages hereunder and submit this claim for only equitable and injunctive relief.  Accordingly, the City is not entitled to any claim of immunity, pursuant to Cal. Gov't Code § 814.

/ / /

/ / /

/ / /

---

[49]   *See generally* Joseph R. Grodin, *Rediscovering the State Constitutional Right to Happiness and Safety*, 25 Hastings Const. L.Q. 1, 29 (1997) ("Either as an alternative or as an additional meaning, the happiness and safety clauses could be viewed as a declaration, and even a judicially enforceable one, that government has an affirmative obligation to provide at least the minimum conditions necessary for human happiness and safety.  This would entail, arguably, the assurance of such things as minimal requirements for food, shelter, and medical care, and so far as possible, a nondangerous environment.").

## THIRTEENTH CLAIM FOR RELIEF

### Inverse Condemnation

### Cal. Const. art. I § 19

### (All Plaintiffs against Defendant)

116.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 115 of this Complaint as though set forth fully herein.

117.   California Constitution, article I § 19(a) provides in relevant part:

> Private property may be taken or damaged for a public use and
> only when just compensation, ascertained by a jury unless waived,
> has first been paid to, or into court for, the owner.

118.   The actions by the City have limited, damaged, and/or burdened the owners' property and/or business so substantially that they rise to the level of a regulatory taking, yet no compensation has been provided.

119.   Plaintiffs seek no monetary damages hereunder and submit this claim for only equitable and injunctive relief.  Accordingly, the City is not entitled to any claim of immunity, pursuant to Cal. Gov't Code § 814.

## FOURTEENTH CLAIM FOR RELIEF

### Violation of California Disabled Persons Act

### Cal. Civ. Code §§ 54 *et seq.*

### (Plaintiff RANDY HUGHES against Defendant)

120.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 119 of this Complaint as though set forth fully herein.

121.   California's Disabled Persons Act codifies requirements that ensure equal and full access to individuals with disabilities.  That Act provides, in part:

> Individuals with disabilities or medical conditions have the same
> right as the general public to the full and free use of the streets,

highways, sidewalks, walkways, public buildings, medical facilities, including hospitals, clinics, and physicians' offices, public facilities, and other public places.[50]

Further,

Individuals with disabilities shall be entitled to full and equal access, as other members of the general public, to accommodations, advantages, facilities, medical facilities, including hospitals, clinics, and physicians' offices . . . and other places to which the general public is invited, subject only to the conditions and limitations established by law, or state or federal regulation, and applicable alike to all persons.[51]

122.  As detailed above, Plaintiff HUGHES is an individual with disabilities as defined by the Disabled Persons Act, and he is being denied full and equal access to places to which the general public is invited, including "free and full use" of public sidewalks, by the policies and practices of the City, including its failure regularly to maintain its sidewalks in a manner that permits wheelchair-bound individuals "full and free use" thereof.

123.  Plaintiff HUGHES seeks no monetary damages hereunder and submit this claim for only equitable and injunctive relief.  Accordingly, the City is not entitled to any claim of immunity, pursuant to Cal. Gov't Code § 814.

## VII.  DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs pray for judgment against Defendant, as follows:

1.  Injunctive/equitable relief in a manner to be determined by law;

/ / /

---

[50]  Cal. Civ. Code § 54(a).

[51]  Cal. Civ. Code § 54.1(a)(1).

-35-
COMPLAINT

1       2.    An award of costs of suit, including attorneys' fees, as permitted by

2   law; and

3       3.    Such other and further relief as this Court deems just and proper.

4                     WALKUP, MELODIA, KELLY & SCHOENBERGER
                      GREENBERG GROSS LLP

5

6

7   Dated:  May 4, 2020           By:   /S/ Michael A. Kelly

8                           Michael A. Kelly
                            Richard H. Schoenberger

9                           Matthew D. Davis
                            Jade Smith-Williams

10                          Alan A. Greenberg
                            Wayne R. Gross
                            Deborah S. Mallgrave

11                   Attorneys for Plaintiffs HASTINGS
                     COLLEGE OF THE LAW; FALLON

12                   VICTORIA; RENE DENIS; TENDERLOIN
                     MERCHANTS AND BUSINESS OWNERS

13                   ASSOCIATION; RANDY HUGHES; and
                     KRISTEN VILLALOBOS

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT