Lauren Hansen (CA BAR NO. 268417)
Melissa A. Morris (CA BAR NO. 233393)
PUBLIC INTEREST LAW PROJECT
449 15th St., Suite 301
Oakland, CA 94612-06001
Tel: (510) 891-9794
Fax: (510) 891-9727
Email: lhansen@pilpca.org

ATTORNEYS FOR PROPOSED INTERVENORS
HOSPITALITY HOUSE; COALITION ON
HOMELESSNESS; AND FAITHFUL FOOLS

Lili V. Graham (CA BAR NO. 284264)
Tiffany L. Nocon (CA BAR NO. 301547)
DISABILITY RIGHTS CALIFORNIA
350 S Bixel Street, Ste 290
Los Angeles, CA 90017-1418
Tel: (213) 213-8000
Fax: (213) 213-8001
Email: Lili.Graham@disabilityrightsca.org

ATTORNEYS FOR PROPOSED INTERVENORS
HOSPITALITY HOUSE; COALITION ON
HOMELESSNESS; AND FAITHFUL FOOLS

Michael David Keys
(CA BAR NO. 133815)
Jessica Berger (CA BAR NO. 319114)
BAY AREA LEGAL AID
1454 43rd Avenue
San Francisco, CA 94122
Tel: (415) 982-1300
Fax: (415) 982-4243
Email:   mkeys@baylegal.org

ATTORNEYS FOR PROPOSED
INTERVENORS COALITION ON
HOMELESSNESS

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

HASTINGS COLLEGE OF THE LAW, a public trust and institution of higher education duly organized under the laws and the Constitution of the State of California; FALLON VICTORIA, an individual; RENE DENIS, an individual; TENDERLOIN MERCHANTS AND PROPERTY ASSOCIATION, a business association; RANDY HUGHES, an individual; and KRISTEN VILLALOBOS, an individual,

        Plaintiffs,

        v.

CITY AND COUNTY OF SAN FRANCISCO, a municipal entity,

        Defendant.

Case No. 4:20-cv-3033-JST

**[PROPOSED] COMPLAINT IN INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF**

Date: July 22, 2020
Time: 2:00 P.M.
Place: Courtroom 6, Second Floor
Judge: Hon. Jon S. Tigar

Complaint Filed: May 4, 2020
Trial Date: None Set

# I.    INTRODUCTION

1.      Intervenors HOSPITALITY HOUSE, COALITION ON HOMELESSNESS, and FAITHFUL FOOLS intervene in this action to compel the City and County of San Francisco to comply with federal disability law and to protect the statutory and constitutional rights of unhoused residents of San Francisco's Tenderloin neighborhood.

2.      Homelessness is a long-standing problem in the Tenderloin District and other parts of San Francisco.  In recent years, the crisis has worsened. The City has failed to implement its homeless programs to meet the severe and growing need for safe, adequate housing and shelter for its residents.

3.      The COVID-19 pandemic has only exacerbated the problem—shelters, which were overcapacity pre-pandemic, are not admitting any new persons to their waitlists.  The City purports to have a program to temporarily move unhoused individuals who have tested positive for or are at high risk for COVID-19 into hotels, but the City has moved very few homeless residents into hotels.  Unsheltered residents have only one option—to do their best to shelter in place and practice social distancing on the streets, often in tents on public property.

4.      The Tenderloin neighborhood, already home to a significant number of the City's unsheltered residents, has been especially impacted by the City's failures to effectively implement its programs. The City has failed to ensure that unhoused residents, particularly those with disabilities, can equally access programs and services.

5.      The Plaintiffs, HASTINGS COLLEGE OF THE LAW, FALLON VICTORIA, RENE DENIS, TENDERLOIN MERCHANTS AND PROPERTY ASSOCIATION, RANDY HUGHES, and KRISTEN VILLALOBOS, brought this action alleging that they have been harmed by the presence of unsheltered individuals in the Tenderloin. Their lawsuit implicates the rights and interests of unhoused residents but does not represent or advance those interests.

6.      Intervenors seek to compel the City to comply with the law and seek a remedy that ensures that unhoused persons in the Tenderloin do not face disability discrimination.

7.     Intervenors further seek declaratory relief to ensure that any remedy obtained in this litigation honors and safeguards the constitutional and statutory rights of unsheltered individuals living in the Tenderloin.

## II.     JURISDICTION AND VENUE

8.     Intervenors assert their claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12131 *et seq*. (the "ADA"); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§794 *et seq*.; 42 U.S.C. §§ 1983, 1988; and the Fourteenth Amendment, U.S. Constitution; and Art. 1 § 7, California Constitution.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1367.  Intervenors' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 1343, 2201, and 2202 and by Fed. R. Civ. P. 57 and 65.

9.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this District, and because the Defendant is a municipal entity located within the District.

10.     This action has been assigned to the Honorable Jon S. Tigar of Northern District of California.

## III.     PARTIES

### A.  Plaintiffs

11.     The underlying action was brought by HASTINGS COLLEGE OF THE LAW, a law school located in San Francisco's Tenderloin neighborhood, the TENDERLOIN MERCHANTS AND PROPERTY ASSOCIATION, which is described in the Complaint as "an association of owners of businesses in the Tenderloin", and four individuals: FALLON VICTORIA, RENE DENIS, RANDY HUGHES, and KRISTEN VILLALOBOS.

### B.  Defendant

12.     Defendant CITY AND COUNTY OF SAN FRANCISCO ("Defendant" or the "City") is a municipal entity existing under the laws of the State of California, with the capacity to sue and be sued.

### C.  Intervenors

**Hospitality House**

13.     Intervenor HOSPITALITY HOUSE is a non-profit shelter and service organization located in the Tenderloin District in the City of San Francisco.  Hospitality House brings this action as an organizational intervenor.

14.     Hospitality House serves thousands of low-income residents, both housed and unhoused, in the Tenderloin, Mid-Market, and Sixth Street Corridor neighborhoods.  It was founded in the Tenderloin in 1967, a time when the neighborhood was seen as a safe haven for thousands of LGBT youth fleeing oppressive communities.  Hospitality House's emerged from Central City Hospitality House, a simple drop-in space run by community volunteers and offering homeless youth refuge, safety, and community.

15.     Hospitality House draws on the experiences of its staff and board members who are formerly homeless. Joe Wilson, the Executive Director of Hospitality House, came to the organization nearly 38 years ago, when he was homeless in the Tenderloin.  Before entering the shelter program at Hospitality House, Mr. Wilson slept on the streets and experienced the devastating effects of living without shelter first-hand.

16.     Hospitality House is committed to employing individuals who have lived experiences of homelessness and it currently employs unhoused persons.

17.     Hospitality House owns its building in the Tenderloin neighborhood. Every year it serves thousands of San Franciscans struggling with poverty, homelessness, and other barriers.

18.     Hospitality House serves low-income in the Tenderloin, Mid-Market, and Sixth Street Corridor through six programs: the Tenderloin Self-Help Center, Sixth Street Self-Help Center, Shelter Program, Community Arts Program, Community Building Program, and Employment Program.  The agency is recognized as an instiution of the Tenderloin for over 50 years.

19.     Its Self-Help Centers in the Tenderloin and Sixth Street Corridor reach more than 15,000 low-income residents each year.  They are behavioral health-based community drop-in centers that use a low-threshold, peer-based, self-help model for a range of emergency and supportive services.  The self-help centers also offer on-site, harm reduction-based, individual and group therapy to low-income residents.

20.     The Tenderloin Self-Help Center offers therapy and counseling for people with mental health and substance abuse disorders.  More than 10,000 people –housed and unhoused– utilize the self-help's services each year.  Hospitality House's Sixth Street Self-Help Center assists individuals with disabilities in accessing State Disability and Veterans Benefits.  Each year, the Sixth Street Self-Help Center helps over 6,000 people in accessing its peer-based support groups, which provides stability and connects individuals with disabilities to the community.

21.     Hospitality House's Shelter Program is located in the Tenderloin District and it has been housed in the same location for nearly 40 years, making it one of the City's oldest shelters in San Francisco.  The Shelter Program is a small men's dormitory that provides basic emergency shelter, engagement opportunities and one-on-one case management for up to thirty men, 365 nights a year.

22.     The organization's Community Arts Program provides neighborhood artists with opportunities to participate in skills workshops, create and sell artwork, and display their work to a broader audience through frequent local exhibitions.  Artists also keep 100% of the proceeds from art sales, making the Community Arts Program a unique social enterprise and economic and cultural asset for the City.  For more than 50 years, Hospitality House's Community Arts Program has been the City's only free fine arts studio and gallery space for low-income and homeless artists, celebrating art as a vehicle for social change.

23.     Hospitality House's Community Building Program is a hub for civic engagement and community-building, volunteerism, and trauma-informed leadership development.  Training in community organizing enables San Francisco residents to participate in social change. Each year nearly 400 residents take part in at least one civic event.  Three members of Hospitality House's Board of Directors are graduates of the leadership program.

24.     The Employment Program offers job readiness services, employment and training resources, and job search support through two neighborhood-based employment resources centers.  In 2019, Hospitality House sponsored hiring events with more than 60 employers and more than 200 low-income residents obtained gainful employment.

25.     As COVID-19 spread to San Francisco, Hospitality House became concerned about its shelter residents. It understood from CDC guidance and news outlets that there was a concern that individuals living in congregate settings, such as homeless shelters, were at a particular risk of spread of the coronavirus and needed to social distance to decrease that risk. It was concerned about the inability to social distance within the shelter.   It asked the City for assistance in moving the program's residents into hotels or motels temporarily during the pandemic.  The City declined to do so. As a result, the organization spent thousands of dollars booking hotel rooms to ensure the safety of its shelter residents.

26.     During the COVID-19 pandemic, Hospitality House staff have spent numerous hours advocating for the City to move unsheltered residents into empty hotel rooms, even if only temporarily.

27.     Hospitality House has also expended funds to purchase tents and Personal Protective Equipment, like masks and hand sanitizer for people who are living on the street.

28.     Today, Hospitality House continues to spend money paying for private hotel and motel rooms for its shelter participants to protect their health and safety during COVID-19, because the City has not done so. These expenditures take away resources that the organization would have normally spent on its programs and services.

29.     The City's failure to adequately implement its homelessness programs and the disparate exclusion of people with disabilities from those programs frustrates Hospitality House's mission to foster the self-sufficiency and cultural enrichment of the unhoused individuals and communities it serves. Any effort by the City to remove unhoused persons or their property from public property in the absence of adequate available shelter likewise frustrates that mission.

**Coalition on Homelessness**

30.     Intervenor COALITION ON HOMELESSNESS ("Coalition") is a non-profit organization located in the Tenderloin District in the City of San Francisco.  The Coalition brings this action as an organizational intervenor.

31.     The Coalition organizes unhoused people and front-line service providers to create permanent solutions to homelessness while working to protect the human rights of those forced to remain on the streets.

32.     The Coalition has been deeply rooted in the Tenderloin since its founding over 30 years ago. It was formed by persons experiencing homelessness and front-line service providers, who were frustrated by the lack of systemic solutions to homelessness and the exclusion of homeless people in crafting solutions at the city level.

33.     Since its inception, the organization's work has been led by and centered on the experiences of the unhoused community.  The Coalition conducts outreach to approximately 100 unhoused persons a week.  Their experiences serves as the basis of their advocacy agenda.  Much of Coalition's outreach is to persons with physical and/or mental impairments.

34.     The Coalition's work is directly informed by the experiences of unhoused persons.  Coalition's also employs staff, interns, and volunteers who were formerly homeless. Over 50 percent of the staff and board of the Coalition are currently or formerly homeless.

35.     The Coalition hosts open workgroup meetings focused on human rights and housing which are attended by allies in the community, service providers, and unhoused community members.  The Coalition develops advocacy strategies and priorities to implement their agenda throughout the City. Examples of priorities include advocating for additional housing subsidies, legislation that ensures rights to services such as mental health care, and funding for a new program that fills a gap in services such as a shelter for homeless women.

36.     The Coalition uses media, public hearings, rallies, legal action, letter-writing campaigns, and other tactics to elevate the opportunities to exit homelessness for destitute San Franciscans.

37.     In addition, the Coalition operates a street newspaper, *Street Sheet*, the longest continuing running street newspaper in the country. The content is primarily written and produced by unhoused persons and contains articles, poetry, and artwork.  Unhoused vendors sell the paper for $2.00 and keep the proceeds to help meet their basic needs.

38.     The Coalition has successfully secured thousands of housing subsidies and housing through its campaign work. It has played a key role in the passage of important legislation, including the creation of standards of care in San Francisco's shelter system, written with substantial input from shelter residents, and the passage of a single standard of care for the mental health system.

39.     The Coalition's 2018 advocacy resulted in obtaining over 360 housing subsidies for homeless youth, families, seniors, and people with disabilities.  In the same year, the Coalition also secured 75 long term subsidies for seniors and people with disabilities.  In 2019, Coalition on Homelessness partnered with Senior and Disability Action to mobilize people with disabilities.

40.     The Coalition receives funding primarily from individual donors, and private foundations, and, to remain independent, does not accept donations from government entities involved in running the homeless system of care, such as Department of Public Health or Department of Homelessness Services and Housing (DHSH).

41.     When the COVID-19 pandemic hit San Francisco, the Coalition swiftly reformulated its structure to ensure the safety of people living in shelters, on the streets, in parks, and in vehicles.

42.     Coalition staff set up daily COVID-19 policy calls and the Coalition brought on additional staff to respond to the COVID-19 crisis's impact on San Francisco's unhoused residents, including a volunteer researcher from UC Berkeley, a team of interns, and 10 unhoused individuals who conduct outreach on the street and serve as expert informants on conditions.  The Coalition also hired an outreach coordinator and a COVID-19 policy director.

43.     The Coalition created three working groups focused on (1) testing and congregate settings, (2) hotel rooms and housing, and (3) safety on the streets.  Each workgroup is staffed by Coalition employees and has a significant number of housed and unhoused community participants who give input, conduct outreach, and design campaigns to apply pressure on policy makers. Workgroups focus on ensuring that the City remembers and serves the unhoused community during the COVID-19 pandemic.  Some examples of Coalition's work during

COVID-19 include bringing together medical experts to formulate a panel and release a report on the importance of using hotel rooms to provide individual housing during the COVID-19 crisis; assisting the City with coordinating, troubleshooting, and conducting outreach for a COVID-19 testing effort in the Tenderloin neighborhood; monitoring violations of the rights of unhoused community members; and assisting the City with setting up an organized encampment in the Tenderloin.

44.     The Coalition is deeply concerned by the increasingly crowded nature of the streets in the City during the COVID-19 pandemic and the risk of ongoing community spread of the virus among unhoused San Franciscans who do not have access to safe, indoor, individual housing units where they can shelter in place.

45.     The Coalition has diverted its resources to provide services to unhoused persons because the City failed to act.  Much of the Coalition's work budget, with the exception of office administrative functions of accounting, payroll, development, fundraising, shifted to respond to and mitigate the City's failure to provide housing and other basic protections for unhoused people during the COVID pandemic.  The Tenderloin is the geographic center of the Coalition's work and of COVID-19's impact on San Francisco's homeless population.

46.     Previously, the Coalition's work centered on human rights generally of the unhoused community and housing justice for unhoused San Franciscans. In the last few months, the Coalition has had to pivot to COVID-19-related work.  For example, the Coalition's human rights staff split their efforts into two areas of work: (1) testing and how to stay safe in congregate living, and (2) safety on the streets during the pandemic.

47.     The Coalition also previously focused on decreasing criminalization, and staff are now focused on outreach to Tenderloin residents.  Staff spend hours each day coordinating COVID-19 testing for the Tenderloin neighborhood. They distribute tents, masks, and hand sanitizer to street-based residents.

48.     Staff is also monitoring and helping with de-escalation efforts in the organized sleeping camp in the Tenderloin.

49.     The Coalition has opposed the removal of tents from public property without adequate relocation plans.

50.     The Coalition's Housing Justice staff usually focuses on conducting outreach to families in shelters and residential hotels and fighting for housing. Because of the City's failure to adequately address the needs of homeless residents during the pandemic, the Housing Justice staff is now focused on trying to get as many people as possible into hotel rooms, monitoring the conditions in hotels, and mobilizing the community to apply for newly created jobs in COVID-19 hotels.

51.     The Coalition halted its Street Sheet production and is also now focused on online production of materials related to COVID-19.  Staff used printing funds to offer grants to unhoused newspaper vendors who are now out of work. They raise additional funds to distribute grants to vendors in the Tenderloin and other areas of the City so that vendors can survive.

52.     Due to the City's inaction, the Coalition has spent hundreds of hours that it could have devoted to its traditional work and programs.

53.     The City's failure to adequately implement its homelessness programs, and the disparate exclusion of people with disabilities from those programs, frustrates the Coalition's mission to organize homeless people and front line service providers to create permanent solutions to homelessness, while working to protect the human rights of those forced to remain on the streets. Any effort by the City to remove unhoused persons or their property from public property in the absence of adequate available shelter likewise frustrates that mission.

**Faithful Fools**

54.     Intervenor FAITHFUL FOOLS is a non-profit organization located in the Tenderloin District in the City of San Francisco.  Faithful Fools brings this action as an organizational intervenor.

55.     Faithful Fools is a nonprofit organization that fosters awareness and analysis of deteriorating social conditions in the United States and the world at large, seen from the level of the streets, and facilitates individual and collective responses thereto.

56.     Faithful Fools owns its building in the Tenderloin District.

57.     In her youth, Faithful Fools' Co-director Sarah Matthias Dennison (aka Sam Dennison) was homeless, living in her car in the Tenderloin District.  Relying on the kindness and generosity of organizations like the Intervenors herein, she eventually was able to return to college and obtain housing.  She brings her experiences with poverty and homelessness to her work at Faithful Fools, in turn shaping the work that the organization does in the community.

58.     Faithful Fools is dedicated to addressing the needs of the visibly growing numbers of people living on the streets.

59.     Faithful Fools runs programs for Tenderloin residents, including a weekly interfaith Bible study session, movie nights, working groups, street retreats, and writing workshop. Faithful Fools also provides direct services to homeless individuals by working, side by side, with them to navigate the complex housing system as they seek to exit homelessness. Faithful Fools also provides direct services to individuals living in low-income housing, providing grocery shopping, accompaniment to medical appointments, and other services.

60.     Faithful Fools serves and represents unhoused people in San Francisco, many of whom are disproportionately living with disabilities.

61.     There is a community of unhoused persons who reside on the sidewalk outside of Faithful Fools.  Staff regularly provide support to these individuals by helping them access food and water, enroll in the Coordinated Entry System (CES), and attend court dates, as well as medical, legal, and housing appointments. One member of Faithful Fools staff provides one-on-one trauma resolution therapy to individuals living on the sidewalk and in tents.

62.     In the last nine years, all of the people who have lived on sidewalk in front of Faithful Fools have been African American, and many have had disabilities.  Many have experienced intergenerational poverty and the effects of systemic racism, including frequent incarceration.

63.     Faithful Fools is committed to addressing racism and the fundamental human rights of the people in the Tenderloin neighborhood.

64.     Faithful Fools is also committed to the well-being of their housed neighbors. They are committed to the principle that no one's human rights can be intentionally abridged for the sake of another person's human rights.

65.     Faithful Fools has spent thousands of dollars providing additional services to unhoused individuals due to the City's inaction during the current pandemic.  Faithful Fools estimates that it has spent approximately $2,000 on tents for persons trying to shelter in place on the streets.  It has also spent additional funds on providing hotel rooms to homeless persons who are at risk of getting COVID-19.

66.     Faithful Fools' costs have also increased.  After the City's shelter in place order went into effect, the co-directors of Faithful Fools asked the City for additional toilets, hand washing stations, and water to provide to unhoused persons.  The City failed to adequately respond. So, Faithful Fools has had to seek donations of water, hand sanitizer, and masks to distribute these essential items to people living in the streets.  Faithful Fools would have ordinarily used donations to operate its programs and services for unhoused persons.

67.     The City's failure to adequately implement its homelessness programs and the disparate exclusion of people with disabilities from those programs frustrates Faithful Fools' mission to support unhoused members of the community. Any effort by the City to remove unhoused persons or their property from public property in the absence of adequate available shelter likewise frustrates that mission.

## IV.    LEGAL BACKGROUND

68.     The Americans with Disabilities Act ("ADA") was enacted "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2). The ADA recognizes individuals with disabilities will experience discrimination in critical areas such as housing, public accommodations, health services and access to public services and will "continually encounter various forms of discrimination, including outright intentional exclusion."  *Id* § 12101(a)(3),(5).

69.     Title II of the ADA mandates that "[n]o qualified individual with a disability shall, by reasons of such disability, be excluded from participation in, or be denied the benefits

1   of, the services, programs, or activities of a public entity, or be subjected to discrimination by

2   any such entity." *Id.* § 12132.

3          70.    The ADA's non-discrimination mandate includes an affirmative duty on the part

4   of public entities like the City to "make reasonable modifications in policies, practices, or

5   procedures when the modifications are necessary to avoid discrimination on the basis of

6   disability, unless the public entity can demonstrate that making the modifications would

7   fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

8          71.    Section 504 of the Rehabilitation Act of 1973 provides, "No otherwise qualified

9   individual with a disability in the United States . . . shall, solely by reason of her or his disability,

10  be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

11  under any program or activity receiving Federal financial assistance". 29 U.S.C. § 794(a).

12         72.    The Eighth Amendment to the United States Constitution and Article I, Section

13  17, of the California Constitution prohibit the infliction of cruel and unusual punishment. The

14  Eighth Amendment "preclude[s] the enforcement of a statute prohibiting sleeping outside against

15  homeless individuals with no access to alternative shelter". *Martin v. City of Boise,* 920 F. 3d

16  584, 617 (9th Cir. 2019). "[J]ust as the state may not criminalize the state of being 'homeless in

17  public places,' the state may not 'criminalize conduct that is an unavoidable consequence of

18  being homeless — namely sitting, lying, or sleeping on the streets.'" *Id.* at 1048 (quoting *Jones*

19  *v. City of Los Angeles,* 444 F. 3d 1118, 1127 (9th Cir. 2006)).

20         73.    Furthermore, "the Fourth and Fourteenth Amendments protect homeless persons

21  from government seizure and summary destruction of their unabandoned, but momentarily

22  unattended, personal property." *Lavan v. City of Los Angeles,* 693 F.3d 1022, 1024 (9th Cir.

23  2002).

24         74.    California Welfare and Institutions Code section 17000 mandates that each county

25  in California shall relieve and support its indigent and disabled residents who cannot support

26  themselves.  San Francisco City and County administers a program pursuant to section 17000, *et*

27  *seq*.

28         75.    Section 17000 provides:

> Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions.

76.     Welfare and Institutions Code section 10000 defines the purpose of these obligations as follows:

> The purpose of this division is to provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed. It is the legislative intent that aid shall be administered and services provided promptly and humanely, with due regard for the preservation of family life, and without discrimination on account of ancestry, marital status, political affiliation, or any characteristic listed or defined in Section 11135 of the Government Code. That aid shall be so administered and services so provided, to the extent not in conflict with federal law, as to encourage self-respect, self-reliance, and the desire to be a good citizen, useful to society.

## V.     FACTUAL BACKGROUND

### A.     HOMELESSNESS IN THE TENDERLOIN NEIGHBORHOOD

77.     There are over 8,000 unhoused people in San Francisco, including 5,180 who are unsheltered, according to the 2019 point-in-time street and shelter count.

78.     Approximately 3,656 unhoused people live in District 6, which contains the Tenderloin Neighborhood.

79.     Over the last several years, the number of unsheltered individuals has steadily increased, due in part to the dearth of emergency shelters and permanent affordable housing available in the City's housing market.

80.     Shelters and other essential services have become even scarcer since January 2020, and, as a result, the number of tents occupied by unhoused persons has increased 285 percent since January, according to the Tenderloin Neighborhood Plan for COVID-19.[1]

81.     A disproportionate number of unhoused San Franciscans have disabilities.  The City's most recent 2019 Homeless Count and Survey found:

---

[1] Tenderloin Neighborhood Plan for COVID-19, revised May 6, 2020, available at https://sf.gov/sites/default/files/2020-05/Tenderloin_Neighborhood_Plan_May_6_2020.pdf

1     Seventy-four percent (74%) of respondents reported living with one or more health
2 conditions, compared to 68% in 2017. These conditions included chronic physical illnesses,
3 physical disabilities, chronic substance use, and severe mental health conditions. In 2019,
4 twenty-seven percent (27%) of respondents reported having physical disabilities. Sixty-nine
5 percent (69%) of respondents reported their condition limited their ability to hold a job, live in
6 stable housing, or take care of themselves, compared to 53% in 2017.[2]

7     82.     In contrast, Census data indicate that only 5.9% of San Francisco residents under
8 age 65 identify as having a disability.

9     83.     Unsheltered persons have resided in the Tenderloin Neighborhood and other
10 neighborhoods in the City for many years.

11     84.     These individuals struggle to meet the necessities of life and often combat mental
12 illness, substance abuse issues, physical disabilities, or any other combination of these
13 impairments.

14     85.     Many persons experiencing homelessness have close ties with other unsheltered
15 persons as well as a sense of community in the neighborhood in which they live. Some have
16 close family relations who live in low-income housing (SROs) to whom they have
17 responsibilities including paying rent, picking up medication and groceries, and going to medical
18 appointments. Others have close connection to service providers. These relationships form a
19 strong bond of community among housed and unhoused residents in the Tenderloin.   They
20 receive much-needed services from Faithful Fools, Hospitality House, the Coalition on
21 Homelessness, and other organizations, including food, shelter, and assistance with handling
22 citations they receive from police as a result of their being homeless.

23 **B.     THE CITY'S HOMELESS PROGRAMS AND SERVICES**

24     86.     In 2016, the City of San Francisco created the Department of Homelessness and
25 Supportive Housing (DHSH), a full system program that aims to engage homeless services and
26 programs through multiple local, state, and federal funding sources to meet the needs of its

27

28 ───────────
[2] *San Francisco Homeless Count and Survey Comprehensive Report* (2019) 28, available at
http://hsh.sfgov.org/wp-content/uploads/FINAL-PIT-Report-2019-San-Francisco.pdf

1   community. The City's homeless program and services' vision is to end homelessness for as

2   many people as possible through a framework developed in 2016 by DHSH called the

3   Homelessness Response System ("Homelessness Response System").  The Homelessness

4   Response System receives over $44 million annually from the federal Department of Housing

5   and Urban Development (HUD).

6       87.    The Homelessness Response System strives to provide housing to individuals

7   experiencing homelessness. In the absence of the ability to house, the Homelessness Response

8   System seeks to provide unhoused individuals with food, shelter, outreach, health care, and other

9   forms of assistance.  Since 2016, this Homelessness Response System has helped approximately

10  5,500 people exit homelessness through housing, rent subsidies, and reunification programs.  The

11  Homelessness Response System aims to reduce chronic homelessness by 50 percent.[3]

12      88.    The central strategy to reducing chronic homelessness in the Homelessness

13  Response System is the creation of a "Housing Ladder" to move residents living in Permanent

14  Supportive Housing to other subsidized housing, "thereby opening up Permanent Supportive

15  Housing units for chronically homeless clients."[4]  The Homelessness Response System also has a

16  strategic framework roadmap for addressing street homelessness.

17      89.    In its 2019 implementation, the Homelessness Response System reduced chronic

18  homelessness among Veterans and moved families and individuals from Permanent Supportive

19  Housing to affordable housing. This created new openings for individuals experiencing

20  homelessness. The Homelessness Response System implemented the Whole Person Care Medi-

21  Cal waiver pilot program, adding housing navigation services and greatly expanded housing

22

23

---

[3] HUD defines a chronically homeless individuals as meeting the following two criteria:1) an
individual who is homeless and resides in a place not meant for human habitation, and has been
homeless and resides in such a place for at least one year or on at least four separate occasions in
the last 3 years; and 2) the individual has a disability such as diagnosable substance use disorder,
serious mental illness, development disability, post-traumatic stress disorder, cognitive
impairments resulting from a brain injury, or chronic physical illness or disability. 42 U.S.C.
§11360 at 401(2) of the McKinney-Vento Homeless Assistance Act.
[4] Department of Homelessness and Supportive Housing, City and County of San Francisco, at 7.
Dated October 2017. Available online at: http://hsh.sfgov.org/wp-content/uploads/2017/10/HSH-
Strategic-Framework-Full.pdf.

stabilization services.  Finally, the program expanded its system to include more housing units for individuals with mental illness using California's No Place Like Home initiative and to refine and improve care coordination services to match service level with need.  The Coordinated Entry System's purpose is to ensure that housing resources would be available for chronically homeless individuals who face the highest barriers in entering and sustaining housing.

90.     Using the Coordinated Entry System (CES), a HUD-funded program, the Homelessness Response System estimates 3,600 chronically homeless adults will be placed in Permanent Supportive housing by 2022.  And to achieve its goal of 50 percent reduction of chronic homelessness, the City will need to use additional resources and interventions.

91.     The City denies access to its Homelessness Response System through its entry system, partially due to its misapplication of the Vulnerability Index-Service Prioritization Decision Assistance Tool (VI-SPDAT).  Each individual that wants access to the Homelessness Response System must be entered into the CES.  The CES then provides referrals for the individual to be assessed for vulnerability through the VI-SPDAT.  Upon information and belief, in San Francisco, the VI-SPDAT has been modified to assess the needs of individuals for the local services and programs available through the HSH or Homelessness Response System. However, the VI-SPDAT does not assess a person's medical history, severity of disability, or appropriateness of current living arrangements.  Intervenors have seen homeless individuals with severe disabilities be assessed as a low priority under the City's VI-SPDAT assessment tool, even though they are living in inappropriate living arrangements such as a shelter bed or on the streets with a chronic health disorder.  At no time has the City's implementation of its Homelessness Response System included a process to appropriately assess and accommodate the needs of homeless individuals with disabilities. Therefore, the City's Homelessness Response System has discriminated many homeless individuals with disabilities.

C.  **CRIMINALIZATION OF HOMELESSNESS AND CONFISCATION OF UNHOUSED PEOPLE'S PROPERTY**

92.     Upon information and belief, the City has tried to implement the Homelessness Response System, yet simultaneously engaged in activities that punish unhoused people for their

1   continued homelessness, including the clearance of encampments and seizure of homeless

2   individuals' personal property. These activities have a disparate impact on people with

3   disabilities.

4       93.    The City has a historical practice of engaging in "sweeps" of unsheltered

5   Tenderloin residents, often in response to complaints from housed residents through its 311

6   system.  City staff issue citations or threaten to issue citations to anyone who does not move

7   along.

8       94.    City staff also conduct routine warrant checks on unhoused people and arrest

9   anyone who has an outstanding warrant, simply to remove them from the street.

10      95.    The City unlawfully confiscates property that is not trash or abandoned, and in

11  many circumstances destroys it instead of preserving it as is required by City policy.

12      96.    In the limited circumstances that the City does bag and tag an unhoused person's

13  items, people have trouble accessing the facility in which the City keeps the belongings.

14      97.    The City refuses to store items it determines as "bulky" and disposes of such

15  items.  A common example is that, when someone stores their belongings in a cart, the City will

16  take the entire cart and throw it away.

17      98.    The City often does not give people with disabilities enough time to move their

18  personal belongings, even if they have physical or mental disabilities that are impairing their

19  ability to comply with City staff commands.

20      99.    The sweeps have resulted in the detention, citation and arrest of homeless

21  individuals based on allegations of quality of life ordinances, such as sitting, sleeping, and

22  property storage violations.

23      100.   The City has also conducted sweeps where City workers have confiscated and

24  destroyed the property of homeless individuals, including the destruction of important

25  documents, medication and essential belongings that made it harder for homeless individuals to

26  participate in the Homelessness Response System.  Without proper documentation or access to

27  medication, an individual faces barriers to being appropriately assessed and placed in the

28  homeless services or programs.

1     101.    The City conducted these enforcements even though there was a clear lack of

2  emergency shelter beds available in the City.  Before the COVID-19 public health orders and

3  guidelines, the City consistently has a 1200-person waitlist for individuals waiting for a single

4  bed in the Homelessness Response System's shelter services.  The City did not offer available

5  shelter to persons before conducting these sweeps.

6     102.    Even if there were adequate shelter or navigation center beds, not all would be

7  accessible to people with disabilities. For example, people with trauma and other mental health

8  concerns frequently are unable to sleep in congregate settings. Additionally, many mobility

9  issues are not evident if an individual does not use a wheelchair, so stairs and other barriers may

10 be an unidentified issue when the City does not comprehensively assess a person's disability.

11 The City does not adequately determine whether a shelter placement is appropriate before it

12 offers the placement to an unhoused person with disabilities.

13 **D.    COVID-19, ITS IMPACT ON THE HOMELESS COMMUNITY, AND THE**

14 **CITY'S RESPONSE**

15    103.    On March 16, 2020, the City announced an Executive Order C19-07 requiring,

16 among other things, that San Francisco residents shelter in place in their homes.  The Order

17 exempts unhoused persons, who do not have homes in which to shelter.

18    104.    The City's Homelessness Response System was drastically affected when

19 COVID-19 hit and the need for its services were made more evident.  Prior to the pandemic,

20 unhoused San Franciscans could either call 311 or go through San Francisco's Department of

21 Homelessness and Supportive Housing's Homelessness Response System to try and obtain

22 shelter.  While there was already an inadequate number of shelter beds to meet the needs of San

23 Francisco's unhoused residents before the COVID-19 pandemic, the pandemic has drastically

24 decreased the amount of available shelter; shelters are no longer accepting new residents.  Prior

25 to the pandemic, the citywide shelter waitlist exceed 1,000 people on any given night.  Currently,

26 the wait list is closed.  The Department of Homelessness and Supportive Housing ended new

27 postings, referrals, and reservations into temporary shelter programs.

28

1    105.    As of June 4, only 1,000 individuals remain in shelter, compared to 2,425

2    individuals before the pandemic.

3    106.    The U.S. Centers for Disease Control and Prevention (CDC) issued interim

4    guidance noting that people who are homeless are a particularly vulnerable group.[5]

5    107.    The CDC also issued guidance to local and state governments regarding homeless

6    encampments, recommending that "if individual housing options are not available, allow people

7    who are living unsheltered or in encampments to remain where they are.  Clearing encampments

8    can cause people to disperse throughout the community and break connections with service

9    providers.  This increases the potential for infectious disease spread."[6]

10    108.    Consistent with this guidance, and following intensive advocacy by Intervenor

11    Coalition on Homelessness, the City stopped sweeping encampments and committed to not

12    taking tents.  Intervenors understand this policy change to be a temporary response to the

13    pandemic, not a long-term reformulation of the City's approach to homelessness.

14    109.    During the COVID-19 pandemic, organizations including Intervenors Hospitality

15    House, Faithful Fools, and the Coalition on Homelessness, worked to provide tents to unhoused

16    persons to allow them to shelter in place safely.

17    110.    The Tenderloin's unhoused population is at increased risk of contracting COVID-

18    19 because they do not have safe places to self-isolate or adequate access to hygiene facilities

19    and medical care.

20    111.    In April, nearly 100 residents tested positive for COVID-19 at Multi-Service

21    Center South ("MSC South"), the City's largest homeless shelter, demonstrating the enormous

22    risk of the virus spreading quickly through shelters and other congregate settings.

23

24

25    [5] Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19):*
      *Homelessness* (Apr. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

26    precautions/homelessness.html.
      [6] Centers for Disease Control and Prevention, *Coronavirus Disease 2019: Interim Guidance on*

27    *People Experiencing Unsheltered Homelessness* (rev. May 13, 2020),
      https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-

28    homelessness.html#isolation.

112.    Recent reports and studies confirm that unhoused people are exceptionally vulnerable to infection and serious illness or death from COVID-19.  Dr. Margot Kushel, Director of the UCSF Center for Vulnerable Populations and an expert on the health effects of homelessness, notes that homeless individuals' health resembles that of people twenty to twenty-five years older.

113.    A University of Pennsylvania study found that unhoused individuals infected with COVID-19 are twice as likely to be hospitalized, two to four times more likely to require critical care, and two to three times more likely to die from the virus than the general population.

114.    These risk factors have a particularly devastating impact on people of color, who are far more likely to be homeless than white people in San Francisco.  The significant racial disparities in outcomes related to COVID-19 are amplified among the unhoused populations in San Francisco.

115.    At the same time that there are over 8,000 unhoused people in San Francisco, over 5,000 people are completely unsheltered, and there are tens of thousands of unoccupied hotel rooms in the City.

116.    On April 3, 2020, Governor Newsom announced Project Roomkey, a statewide program to prevent the spread of COVID-19 among unhoused individuals by providing temporary housing in hotels. Through Project Roomkey, FEMA reimburses 75 percent of the cost to rent hotel rooms for individuals who have tested positive for COVID-19, have been exposed to COVID-19, are over 65 years old, or have underlying medical conditions that put them at high risk.

117.    Consistent with state policy to rapidly house significant numbers of unhoused people, on April 14, 2020, the Board of Supervisors unanimously enacted Ordinance No. 69-20 as an emergency ordinance.  The Ordinance enacted additional Homelessness Response System services that required the City to procure 8,250 private hotel rooms. Ordinance at Section 3(a). The Ordinance required that the City obtain seven thousand hotel or motel rooms for people experiencing homelessness in San Francisco, including people residing in a City shelter or

1  navigation center, people who are currently unsheltered, and unhoused people being released

2  from jails.

3      118.    The Ordinance took effect upon adoption by the Board of Supervisors and was

4  returned unsigned by Mayor Breed.  It is therefore the law of the City.

5      119.    April 26, 2020, the deadline for procuring the required number of rooms, has

6  passed.

7      120.    The City has not leased the required number of rooms for unhoused people, and

8  Mayor Breed has repeatedly made public statements indicating that her administration does not

9  intend to do so.  According to one report, she was "adamant that it's not realistic to move the

10 entire homeless population inside [and stated that] '[i]f it were that easy we would have done it a

11 long time ago.'"

12     121.    The City also has legal authority to commandeer private property during a

13 declaration of local emergency.

14     122.    As of June 6, 2020, the City had leased 1,982 hotel rooms for unhoused

15 individuals, and only 1,239 of those rooms were occupied.[7]  The City, using federal and state

16 funds, are leaving leased hotel rooms empty while homeless individuals on the streets have

17 nowhere to go to mitigate the prevention of COVID-19.  In addition, upon information and

18 belief, the City was provided trailers and recreational vehicles (RVs) to help accommodate its

19 homeless population, but on or around May 28, 2020, the City sent 29 RVs back to the State.

20 Despite the Centers for Disease Control and Prevention ("CDC") guidelines and the State's

21 incorporating CDC guidelines in its guidelines and funding guidance, the City did not adequately

22 identify, conduct outreach, or assess all individuals who would fall into the higher risk categories

23 for severe illness if they contracted COVID-19.  Therefore, many homeless individuals with

24 disabilities who fall within these higher-risk categories were not given the option of placement in

25 Project Roomkey or the trailers.  Meanwhile, upon information and belief, the deaths of

26 unsheltered homeless individuals have at least doubled since the pandemic began.

27

28 [7] *See* COVID-19 Alternative Housing, https://data.sfgov.org/stories/s/4nah-suat.  (Last Visited
   May 4, 2020).

123.    On May 4, 2020, the City issued a draft Tenderloin Neighborhood Plan for COVID-19, which aimed to: address encampments by offering safe sleeping alternatives to unsheltered individuals; facilitate social distancing compliance by closing streets and parking; ensure that housed residents in the Tenderloin have safe passage and access to their homes and businesses; improve access to hygiene station, restrooms and garbage disposal for unhoused individuals; address food and water insecurity for housed and unhoused residents alike; increase police presence in the neighborhood to focus on public safety concerns; increase health services in the neighborhood; and increase education and outreach to residents and businesses through a 'care ambassador' program.

124.    Two days later, the City issued its finalized plan.  The plan recommends establishing a program for increasing the number of community outreach workers and ambassadors, improving and formalizing participation and a feedback process with community groups, and increasing outreach to residents and businesses.

125.    The City has not fully implemented its community engagement program, and its interaction with community-based organizations and unhoused residents has been disorganized and haphazard.

126.    Intervenors are informed and believe that, during the six week period from March 30 to May 10, 2020, there were 36 deaths of unhoused persons in San Francisco, double the number from this time last year.  Most of these deaths occurred in the Tenderloin District.  This information suggests that disruptions and changes due to the current emergency situation has had a severe effect on people experiencing homelessness.

**E.  THE INSTANT LAWSUIT AND INTERVENORS' RESPONSE**

127.    On May 4, 2020, at the height of the COVID-19 pandemic, Plaintiffs Hastings College of Law, the Tenderloin Merchants and Property Association, and four individuals filed the instant lawsuit, which seeks to eliminate unhoused persons from a neighborhood that Plaintiffs refer to as a "horror show."  Hastings Compl., at ¶33.

128.    On May 27, 2020, Intervenors Hospitality House, the Coalition, Faithful Fools, and 25 other organizations asked the Dean and Chancellor of Plaintiff Hastings College of Law

1  to pledge to protect the human rights of homeless individuals in the litigation.  Specifically, the

2  pledge asks that Hastings College of Law not enter into any settlement agreement or advocate for

3  any legal outcome that negatively impacts or criminalizes unhoused Tenderloin residents.  The

4  pledge also asks that Hastings respect current CDC guidance regarding tent encampments, in

5  that, if individual housing options are not available or offered to unhoused residents, the City

6  should allow people to remain where they are to prevent the spread of COVID-19.  The pledge

7  also included a request that Hastings work to ensure that illegal property confiscation does not

8  result from the litigation.

9      129.    One day later, law students and alumni of Hastings law school sent a letter to the

10  law school criticizing its role in the lawsuit.

11     130.    David Faigman, the Dean and Chancellor of UC Hastings responded by letter on

12  June 1, 2020, dismissing the concerns of the students, alumni, and organizations serving

13  unhoused residents.

14     131.    Jennifer Friedenbach, the Executive Director at the Coalition on Homelessness,

15  attempted to persuade Mr. Faigman to sign the pledge again and engage in a dialogue about the

16  interests of unhoused persons. He refused.

17          **VI.    INTERVENORS' RESPONSE TO PLAINTIFFS' CLAIMS**

18       **A.  CONSTITUTIONAL CLAIMS**

19     132.    Plaintiffs' First, Second, Third, Fourth, Twelfth, and Thirteenth Causes of Action

20  allege violations of the United States and California Constitutions by the City.  All are vague as

21  to the alleged violation and the relationship between the alleged harm and the conduct of the

22  City, failing to adequately state claims.

23     133.    Further, these claims, and the remedies that they allude to, seek to promote

24  Plaintiffs' interests over the constitutional rights of unhoused residents of the Tenderloin.

25     134.    For example, the Third Cause of Action alleges violation of Plaintiffs' Fourteenth

26  Amendment due process rights under a state-created danger theory, arguing that "Defendant has

27  affirmatively created or increased the risk that Plaintiffs would be exposed to dangerous

28  conditions, which placed Plaintiffs specifically at risk, and Plaintiffs were harmed as a result."

1   The exact nature of the danger alleged for purposes of this claim and that danger's relationship to

2   action by the City are unclear, but the harms to Plaintiffs alleged in the Complaint do not rise to

3   the level necessary to demonstrate a violation of the Fourteenth Amendment under state-created

4   danger theory.

5         135.    In contrast, the seizure and destruction of unhoused persons' tents and other

6   survival gear in the absence of adequate alternative shelter, exposing them to the elements and

7   depriving them of the means to shelter in place during a pandemic, would result in a tangible and

8   significant danger to unsheltered persons.

9         136.    Likewise, any response by the City to homelessness in the Tenderloin that forces

10  unsheltered people into congregate settings where COVID-19 can spread more easily, or that

11  scatters those people to other locations, would affirmatively increase unhoused Tenderloin

12  residents' risk of contracting and spreading the deadly virus. Such action would not only

13  contravene prevailing public health recommendations but would also result in a state-created

14  danger to unhoused people.

15        137.    Plaintiffs also assert unconstitutional takings in their Fourth and Thirteenth

16  Causes of Action. Neither of these claims is adequately stated, and neither demonstrates an

17  uncompensated taking that violates the United States or California Constitutions.

18        138.    In contrast to Plaintiff's vague and unsupported assertions that the City has

19  affected a regulatory taking, the City's historical removal of unhoused persons' tents and other

20  property from the Tenderloin's public sidewalks could have very real impacts on the property

21  rights of unhoused persons, including violation of their rights under the Fourth and Fourteenth

22  Amendments.

23  **B.  DISABILITY DISCRIMINATION CLAIMS**

24        139.    Plaintiffs' Sixth, Seventh, and Fourteenth Causes of Action—which pertain only

25  to Plaintiff Randy Hughes—allege violations of the Americans with Disabilities Act under Title

26  II, Section 504 of the Rehabilitation Act of 1973, and under the California Disabled Persons Act.

27  They allege that the City has failed to ensure accessible sidewalks. They do not allege specific

28

1 instances of violation but a more general lack of access due to the alleged presence of unhoused

2 people and their belongings on public sidewalks.

3     140. Intervenors do not dispute the City's obligation to ensure that sidewalks are

4 accessible. Intervenors' clients, staff, and volunteers, and many other unhoused residents of the

5 City, use wheelchairs or mobility devices. They are likewise harmed when public sidewalks are

6 not passable.

7     141. The City must balance the interest of its residents, including residents who have

8 disabilities. The City must maintain the accessibility of the City's public sidewalks, curb ramps,

9 crosswalks, and transit stops for people with disabilities. 28 C.F.R. § 35.150; *see also* 28 C.F.R.

10 §§ 35.149, 35.104.

11     142. Unhoused individuals are disproportionately people living with disabilities.

12 Disability laws, including the ADA, require the City to provide reasonable modifications;

13 sidewalk clearance must not be done at the expense of other people with disabilities' safety or

14 rights.

15     143. The City can take action that meets its requirements under the ADA and disability

16 laws without violating the constitutional and disability rights of unhoused residents. For

17 example, tents can be permitted off to the side with 36-inch passable walkways as opposed to

18 100-percent clear sidewalks and removal of all unsheltered persons and their tents.

19     144. Plaintiffs alone cannot define disability rights within the Tenderloin. Plaintiffs

20 recognize a disproportionate number of homeless individuals have disabilities. In their

21 Complaint, Plaintiffs state that "the homeless population itself (an estimated 39% of whom suffer

22 from mental illness)." Comp. ¶ 28 (citation omitted). However, Plaintiffs fail to assert or protect

23 the constitutional rights of unhoused Tenderloin residents.

24     145. Further, the City's implementation of its Homelessness Response System,

25 particularly during the COVID-19 pandemic, has disproportionately excluded or harmed

26 unhoused people with disabilities in the City, as alleged in greater detail below.

27     **C. NEGLIGENCE AND NUISANCE CLAIMS**

28

146.     Plaintiffs Eighth, Ninth, and Tenth Causes of Action assert allegations of negligence and public and private nuisance against the Defendant due to the presence of people who have no choice but to live on the street during a pandemic. These Causes of Action fail to state a claim for which relief can be granted.

147.     Further, the obstructions and nuisances alleged in the Complaint are human beings who have no other place to go, especially during a pandemic.  These Causes of Action seek to elevate the Plaintiffs' "annoy[ance]" and "disturb[ance]" over unhoused persons' constitutional and statutory rights. *See* Pl. Compl. at ¶102.

148.     Intervenors dispute the allegations that unhoused Tenderloin residents cause criminal activity. For example, Plaintiffs Hughes, Denis, and Villalobos cite alleged criminal behavior in the Tenderloin. But they offer no evidence that unhoused Tenderloin residents conducted criminal behavior. These criminal activity allegations unfairly paint all homeless individuals as criminals without any substantial factual allegations or evidence.

149.     Plaintiffs also complain of human waste without acknowledging lack of bathroom facilities, especially during COVID-19.

**D.  THE CITY'S DUTY TO RELIEVE AND SUPPORT INDIGENT RESIDENTS**

150.     Plaintiffs' Eleventh Cause of Action alleges broadly that the City is violating its mandatory duty under Welfare and Institutions code section 17000 to provide medical care for the indigent.  They further allege that basic shelter is medically necessary because it is reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain.

151.     Welfare and Institutions Code section 17000 mandates counties[8] to "relieve and support all incompetent, poor, and indigent persons."

152.     Welfare and Institutions Code section 10000 states the purpose of these obligation is to provide "appropriate aid and services to all of [the State's] needy and distressed…promptly and humanely…"  A legislatively declared purpose of public medical care programs is to

---

[8] Welfare and Institutions Code section 17000, which requires counties to relieve and support their indigent residents, applies to the City in its capacity as a city *and county*.

1  "promote the welfare and happiness of all of the people of the state" by providing appropriate aid

2  and services to all needy and distressed.

3      153.   Welfare and Institutions Code Section 17000 imposes an independent duty on

4  counties to provide a subsistence medical care program.  See *Hunt v. Super. Ct.* (1999) 21 Cal.

5  4th 984, 991.

6      154.   Sections 17000 and 10000 mandate that "medical care be provided to indigents . .

7  . promptly and humanely."  The California Supreme Court has interpreted this statute as

8  imposing a mandatory duty to provide a system of "last resort" subsistence medical care—a level

9  of care which does not lead to unnecessary suffering or endanger life and health—to *all*

10  medically indigent residents.  *Id.* at 1012-15.

11     155.   Counties have an obligation to provide "'medically necessary' care, not just

12  emergency care."  *County of Alameda v. State Bd. of Control*, 14 Cal. App. 4th 1096, 1108

13  (1993) (quoting *Bay Gen. Cmty. Hosp. v. County of San Diego*, 156 Cal. App. 3d 944, 957

14  (1984)).

15     156.   There is no discretion to fail to provide this medically necessary care.  *County of*

16  *San Diego v. State of Cal.*, 15 Cal.4th 68 (1997).

17     157.    "Medically necessary" is defined by statute:  "[A] service is 'medically

18  necessary' or a 'medical necessity' when it is reasonable and necessary to protect life, to prevent

19  significant illness or significant disability, or to alleviate severe pain."  Welf. & Inst. Code

20  §14059.5(a).

21     158.   Proposed Intervenors take the position that, during a public health emergency, the

22  City has a duty to provide medically necessary shelter to unsheltered individuals to protect life,

23  to prevent significant illness or significant disability, or to alleviate severe pain under Welfare

24  and Institutions Code section 14059.5(a).

25          **VII.   INTERVENORS' CLAIMS AGAINST THE CITY**

26     159.   Defendant must allow individuals to access its programs and services, including

27  access to navigation centers, placement into shelter or Permanent Supportive Housing, affordable

28  housing, and/or to place unhoused persons in hotels through Project Roomkey.  Defendants'

1   failure and refusal to comply with federal disability law has proximately resulted in harm to

2   unhoused Tenderloin District residents, and Plaintiff organizations and, unless restrained and

3   enjoined, will continue to result in imminent and irreparable harm.

4       160.    The problem of homelessness, and lack of access to programs and services has

5   grown for the last several years and threatens to continue to grow, causing harm to Intervenors

6   absent declaratory and injunctive relief.

7       161.    A judicial declaration is necessary and appropriate at this time in order that each

8   of the parties may know their respective rights and duties and act accordingly.

9       162.    Plaintiffs therefore seek declaratory and injunctive relief restraining Defendants

10  from engaging in the unlawful acts described herein.

11                          **FIRST CLAIM FOR RELIEF**
                 **Violation of Title II of the Americans with Disabilities Act**
12                          **42 U.S.C. §§12132, et seq.**

13      163.    Intervenors incorporate by reference all foregoing and subsequent paragraphs as

14  though fully set forth herein.

15      164.    Title II of the ADA says that no qualified individual with a disability shall, by

16  reason of such disability, be excluded from participation in or be denied the benefits of the

17  services, programs, or activities of a public entity, or be subjected to discrimination by any such

18  entity. 42. U.S.C. § 12132. Title II prohibits all discrimination by public entities, regardless of

19  the context, and applies to all acts by public entities. Section 12132 has been broadly construed

20  to prohibit municipalities from discriminating against disabled persons. Zoning ordinances and

21  decisions are subject to section 12132.

22      165.    All public entities, including state and local governments and their departments,

23  agencies, and instrumentalities, must comply with the ADA.

24      166.    Title II regulations interpreting the ADA prohibit a public entity from using

25  criteria and methods of administration that have the effect of subjecting qualified individuals

26  with disabilities to discrimination based on disability. 29 C.F.R. § 35.130(b)(8). Public entities

27  must instead operate programs in such a way that they are "readily accessible to and usable by

28  individuals with disabilities" – requirement of program access. 29 C.F.R. § 35.150.

167.    Title II also requires the City to make reasonable modifications in its policies and practices to afford people with disabilities access to its programs. 28 C.F.R. § 35.130(b)(7)(i).

168.    Intervenors are organizations that represent the interests of "qualified persons with disabilities" as defined under the Americans with Disabilities Act ("ADA"). 42 U.S.C. § 12102; 42 U.S.C. § 12131; 28 C.F.R. § 35.104.

169.    The City of San Francisco is a public entity within the meaning of Title II of the ADA, and under the ADA's broad language, a "program, service, or activity" includes within its scope "anything a public entity does." *Yeskey v. Pennsylvania Dep't of Corr.*, 118 F.3d 168, 171 at n.5 (3rd Cir. 1997), aff'd 524 U.S. 206 (1998) (quoting 28 C.F.R. Pt. 35, App. A, preamble to ADA regulations).  At all times relevant to this action, the City has been a public entity within the meaning of Title II of the ADA and has provided programs, services, or activities to the public. For example, the City's control and maintenance of sidewalks, are services, programs, or activities of the City.  Similarly, the City's regulations and implementations for serving unhoused individuals with disabilities are services, programs, or activities of the City.

170.    In carrying out its policies and practices as described herein, the City has used criteria and methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination based on disability.  29 C.F.R. § 35.130(b)(3).  The City's denial of access to its Homelessness Response System with an assessment tool that does not adequately assess a person's need based on disability for entry into the City's appropriate programs or services. The City has also failed to allow access to the housing options, such as hotels or motels through Project Roomkey, to homeless individuals at higher risk of severe illness for COVID-19. The most vulnerable homeless individuals are individuals with disabilities as defined by the ADA.

171.    Further, the City's actions and omissions as stated herein have denied unhoused persons with disabilities their rights to meaningful access through reasonable modifications to the Homelessness Response System, and thereby subjecting them to discrimination in violation of the ADA.

172.    In carrying out its policies and practices as described herein, the City has used federal and state funds, and has implemented federally funded programs, in a manner that discriminates against qualified individuals as basis of their disabilities.

173.    Intervenors have standing to sue because they and their constituents have been harmed by the City's conduct.

174.    Based on the foregoing, Intervenors are entitled to and demand declaratory and injunctive relief and reasonable attorneys' fees and costs.

175.    Based on the foregoing, Intervenors have suffered damages and will continue to suffer damages as a result of the City's discriminatory practices. These damages include, without limitation, the out-of-pocket costs associated with the City's denial of access to services, and the physical and emotional distress caused by the City's conduct, as alleged herein. These damages are a direct and legal result of the City's actions and omissions.

**SECOND CLAIM FOR RELIEF**
**Violation of §504 of the Rehabilitation Act of 1973**
**(29 U.S.C. §794; 29 U.S.C. §794a)**

176.    Intervenors incorporate by reference all foregoing and subsequent allegations as though fully set forth herein.

177.    Section 504 of the Rehabilitation Act of 1973 requires that qualified persons with disabilities be provided with meaningful access to federal- and state-funded programs. In order to ensure meaningful access, reasonable modifications may be required unless the recipient of the federal funding can demonstrate that such modifications would result in a fundamental alteration in the nature of the program. 29 U.S.C. § 749; 24 C.F.R. §§ 8.3 and 8.4.

178.    At all times relevant herein, the City has been the recipient of financial assistance from the federal government. Upon information and belief, the Homelessness Response System is funded in whole or in part by financial assistance from the federal government through the Department of Housing and Urban Development.

179.    The City has used its federal funds in a manner that discriminates against people with disabilities in violation of section 504 of the Rehabilitation Act. The City's actions and omissions as stated herein have denied Intervenors' their rights to meaningful access through

1    reasonable modifications to the Homelessness Response System, and thereby subjecting them to

2    discrimination on the basis of disability in violation of section 504 of the Rehabilitation Act.

3    Unhoused Tenderloin residents have not been able to access the homeless programs and services

4    that provide social services, healthcare, and placement in affordable housing.  In addition, during

5    COVID-19, individuals with disabilities have been denied access to the shelters or alternative

6    housing or services program. For individuals with disabilities, who fall within the higher risk

7    categories for severe illness of COVID-19 as defined in the CDC guidelines, they have been

8    denied access to Project Roomkey and other COVID-19 related Homelessness Response System

9    services.

10         180.    Intervenors are entitled to injunctive and declaratory relief, damages and

11   attorneys' fees and costs.

12                   **VIII.   INTERVENORS' REQUEST FOR RELIEF**

13   WHEREFORE, Intervenors respectfully request that this Court grant the following relief:

14   a.    Assert jurisdiction over Intervenors' claims;

15   b.    Reject Plaintiffs' First, Second Third, Fourth, Fifth, Eighth, Ninth, Tenth, Twelfth, and

16         Thirteenth Causes of Action, and deny relief pursuant to those claims.

17   c.    Issue injunctive relief to compel Defendant to ensure that unhoused persons with

18         disabilities are not excluded from participation in or denied the benefits of the services,

19         programs, or activities, or subjected to discrimination;

20   d.    Issue injunctive relief compelling Defendant to provide meaningful access to federal and

21         state-funded programs for unhoused persons with disabilities under Section 504 of the

22         Rehabilitation Act of 1973;

23   e.    Issue a declaratory judgment that the City must not engage in seizure of unhoused

24         persons' property that violates their Fourth or Fourteenth Amendment Rights.

25   f.    Issue a declaratory judgment that the City must not violate unhoused persons' Eighth

26         Amendment rights by taking action that criminalizes their homeless status.

27   g.    Award reasonable costs and expenses incurred in the prosecution of this action, including

28         reasonable attorneys' fees and costs under 42 U.S.C. §§ 1988 and 1920; and

h.      Grant any and such other and further relief as the Court may deem just and proper.


DATED:  June 8, 2020                    Respectfully submitted,

                                        PUBLIC INTEREST LAW PROJECT
                                        DISABILITY RIGHTS CALIFORNIA
                                        BAY AREA LEGAL AID


                            By:     _____
                                        LAUREN HANSEN
                                        Attorneys for Intervenors