Lauren Hansen (CA BAR NO. 268417)
Melissa A. Morris (CA BAR NO. 233393)
PUBLIC INTEREST LAW PROJECT
449 15th St., Suite 301
Oakland, CA 94612-06001
Tel: (510) 891-9794
Fax: (510) 891-9727
Email: lhansen@pilpca.org

ATTORNEYS FOR PROPOSED INTERVENORS
HOSPITALITY HOUSE; COALITION ON
HOMELESSNESS; AND FAITHFUL FOOLS

Lili V. Graham (CA BAR NO. 284264)
Tiffany L. Nocon (CA BAR NO. 301547)
DISABILITY RIGHTS CALIFORNIA
350 S Bixel Street, Ste 290
Los Angeles, CA 90017-1418
Tel: (213) 213-8000
Fax: (213) 213-8001
Email: Lili.Graham@disabilityrightsca.org

ATTORNEYS FOR PROPOSED INTERVENORS
HOSPITALITY HOUSE; COALITION ON
HOMELESSNESS; AND FAITHFUL FOOLS

Michael David Keys
(CA BAR NO. 133815)
Jessica Berger (CA BAR NO. 319114)
BAY AREA LEGAL AID
1454 43rd Avenue
San Francisco, CA 94122
Tel: (415) 982-1300
Fax: (415) 982-4243
Email:   mkeys@baylegal.org

ATTORNEYS FOR PROPOSED
INTERVENORS COALITION ON
HOMELESSNESS

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HASTINGS COLLEGE OF THE LAW, a public trust and institution of higher education duly organized under the laws and the Constitution of the State of California; FALLON VICTORIA, an individual; RENE DENIS, an individual; TENDERLOIN MERCHANTS AND PROPERTY ASSOCIATION, a business association; RANDY HUGHES, an individual; and KRISTEN VILLALOBOS, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, a municipal entity,<br><br>Defendant. | Case No. 4:20-cv-3033-JST<br><br>**DECLARATION OF JOE WILSON IN SUPPORT OF PROPOSED INTERVENORS' MOTION FOR INTERVENTION**<br><br>Date: July 22, 2020<br>Time: 2:00 P.M.<br>Place: Courtroom 6, Second Floor<br>Judge: Hon. Jon S. Tigar<br><br>Complaint Filed: May 4, 2020<br>Trial Date: None Set<br><br>Action Filed: May 4, 2020 |

1   I, JOE WILSON, declare:

2       1.      I am Executive Director of Hospitality House, a Proposed Intervenor in *Hastings*

3   *College of the Law, et al. v. City & County of San Francisco*: Case No.: 4:20-cv-03033-JST. I

4   submit this Declaration in support of Proposed Intervenors' Motion for Intervention.

5       2.      The facts set forth below are known to me personally and are also based upon my

6   review of the files of the proposed Intervenors in this case. I have first-hand knowledge of these

7   facts. If called as a witness, I could and would testify competently, under oath, to such facts.

8       3.      Hospitality House is a non-profit organization and service provider in San

9   Francisco, California. We provide a variety of programs to low-income community residents in

10  the Tenderloin, Mid-Market, and Sixth Street Corridor neighborhoods.

11      4.      I am the Executive Director of Hospitality House, but my experience with the

12  organization actually began almost 38 years ago, when I was homeless and living in the

13  Tenderloin District. I came to San Francisco to attend college at Stanford University. I

14  eventually had to drop out to take care of my mother who was ill. I wound up exhausting

15  savings, and had no family support, no siblings, and no friends. I found myself homeless on the

16  streets of San Francisco. Eventually in late 1982, I heard about Hospitality House's shelter

17  program and that was the beginning of a 38 year relationship that significantly changed the

18  course of my life.

19      5.      I have literally slept in gutters at night. I have gone to sleep at night on the street

20  in some cases hoping that morning would not come. The coldness, the starkness, the inhumanity

21  of being on the street with nothing, without the security that four walls can bring, is a very

22  debilitating experience. These personal experiences are at the forefront of my mind when I do

23  the work at Hospitality House.

24      6.      Every year Hospitality House serves thousands of San Franciscans struggling with

25  poverty, homelessness, and other barriers through our six programs: the Tenderloin Self-Help

26  Center, Sixth Street Self-Help Center, Community Arts Program, Community Building Program,

27  Employment Program, and Shelter Program. As described in more detail below, our programs

28

1  serve many unhoused Tenderloin residents, many of whom have disabilities, as well as other

2  low-income San Franciscans.

3      7.      Hospitality House funds its programs through a variety of sources, including

4  funds received from the City and County of San Francisco.  To access Hospitality House's

5  Shelter Program, unhoused San Franciscans can either call 311 or go through San Francisco's

6  Department of Homelessness and Supportive Housing's Homelessness Response System.  Prior

7  to the pandemic, the citywide shelter waitlist exceed 1,000 people on any given night.  Currently,

8  the wait list is closed.  The Department of Homelessness and Supportive Housing ended new

9  postings, referrals, and reservations into temporary shelter programs.

10     8.      Our self-help centers in the Tenderloin and Sixth Street Corridor reach more than

11 15,000 low-income residents each year.  They are behavioral health-based community drop-in

12 centers that use a low-threshold, peer-based, self-help model for a range of emergency and

13 supportive services.  The self-help centers also offer on-site, harm reduction-based, individual

14 and group therapy to low-income residents.

15     9.      Hospitality House's Tenderloin Self-Help Center offers therapy and counseling

16 for people with mental health and substance abuse disorders.  More than 10,000 people—housed

17 and unhoused—use the services of the Tenderloin Self Help Center each year.

18     10.     Our Sixth Street Self-Help Center assists people with disabilities with State

19 Disability and Veterans Benefits. Each year, the Sixth Street Self-Help Center helps over 6,000

20 people in accessing our peer-based support groups, which provide stability and connect

21 individuals with disabilities to the community.

22     11.     Our Community Arts Program provides neighborhood artists with opportunities to

23 participate in skills workshops, create and sell artwork, and display their work to a broader

24 audience through frequent local exhibitions.  Artists also keep 100% of the proceeds from art

25 sales, making the Community Arts Program a unique social enterprise and economic and cultural

26 asset for the City.  For more than 50 years, Hospitality House's Community Arts Program has

27 been the City's only free fine arts studio and gallery space for low-income and homeless artists,

28 celebrating art as a vehicle for social change.

1      12.    Hospitality House's Community Building Program is a hub for civic engagement

2  and community-building, volunteerism and a trauma-informed leadership development.

3  Training in community organizing enables San Francisco residents to participate in social change

4  – each year nearly 400 residents take part in at least one civic event.  Three members of

5  Hospitality House's Board of Directors are graduates of this leadership program.

6      13.    Our Employment Program offers job readiness services, employment and training

7  resources, and job search support through two neighborhood-based employment resources

8  centers.  Last year, Hospitality House sponsored hiring events with more than 60 employers and

9  more than 200 low-income residents obtained gainful employment.

10      14.    Hospitality House's Shelter Program is located in the Tenderloin District and it

11  has been housed in the same location for nearly 40 years, making it one of the City's oldest

12  shelters in San Francisco.  The Shelter Program is a small men's dormitory that provides basic

13  emergency shelter, engagement opportunities and one-on-one case management for up to thirty

14  men, 365 nights a year.

15      15.    Our Shelter Program, as well as many of its other programs, offers people

16  experiencing homelessness with the opportunity to take the first and important step towards

17  stabilization and gaining community.

18      16.    Due to the COVID-19 pandemic, staff at the Hospitality House have had to spend

19  numerous hours advocating for the City to move unsheltered residents into empty hotel rooms,

20  even if temporarily during the pandemic.  These resources were diverted from Hospitality

21  House's mission of serving unhoused residents directly, and the organization has had to

22  temporarily suspend some of its programing and make adjustments to our programs to ensure the

23  health and safety of the vulnerable communities we serve.

24      17.    Lately, we have had to use resources to focus on advocacy for hotel rooms and to

25  make sure that people who are living on the street have tents and Personal Protective Equipment,

26  like masks and hand sanitizer, which takes away from resources that we would have spent on our

27  important programs.

28

18.    In the early days of the virus, we waited for the City and County of San Francisco to provide guidance on how to adjust our Shelter Program, especially because we receive funding from the City and County of San Francisco. We understood from CDC guidance and news outlets that there was a concern that individuals living in congregate settings, such as homeless shelters, were at a particular risk of spread of the coronavirus and needed to social distance to decrease that risk.

19.    With the introduction of Project Roomkey and other initiatives to protect unhoused individuals, we believed the City and County of San Francisco would take action to ensure the safety of our shelter participants, specifically by providing hotel rooms and removing unhoused San Franciscans from congregate shelters.

20.    We were concerned about the inability of our Shelter Program residents to social distance within the shelter and we asked the City for help moving our residents into hotels, which it declined to do. Hospitality House spent thousands of dollars booking and paying for private hotel and motel rooms for all of our shelter participants to protect their health and safety in light of COVID-19. These resources would have otherwise gone to other Hospitality House programs.

21.    I first learned about the current litigation, *UC Hastings College of the Law, et al. v. City & County of San Francisco*, from news reports on May 4, 2020. I read the Complaint and, because of the allegations about homeless people, became worried that the lawsuit would lead to the displacement of unhoused residents in the Tenderloin, many of whom are people living with disabilities.

22.    On May 27, 2020, Hospitality House and 27 other homeless advocates and service providers sent a letter to David L. Faigman, the Chancellor and Dean of the University of California Hastings College of Law highlighting our concerns and asking him to sign a pledge on behalf of UC Hastings that would promise to protect the human rights of homeless individuals in this lawsuit.

23.    The pledge asked that UC Hastings not sign a settlement agreement or advocate for a legal outcome that negatively impacts or criminalizes unhoused Tenderloin residents. The

1  pledge also asked that UC Hastings respect current CDC guidance regarding tent encampments,

2  in that if individual housing options are not available or offered to unhoused residents, the City

3  should allow people to remain where they are to prevent the spread of COVID-19.  The pledge

4  included a request that UC Hastings work hard to ensure that illegal property confiscation does

5  not become a result of the litigation.

6          24.     I was disappointed, although not surprised, when I learned that Mr. Faigman

7  refused to sign our pledge to protect the human rights of homeless individuals.  I fear that

8  without the intervention of organizations who are committed to protecting the rights and interests

9  of unsheltered Tenderloin residents, a decision or settlement agreement could violate their rights

10  or go against their interests.

11          25.     I am also personally disappointed, because, as a former unsheltered San Francisco

12  resident, I know that so many of our participants and future participants will be affected by this

13  lawsuit.

14          26.     During COVID-19, we have also seen the increase in tents and overcrowding of

15  unsheltered residents in the Tenderloin neighborhood.  Unsheltered Tenderloin residents are

16  potential participants in Hospitality House's programs and many of them likely have participated

17  in our programs in the past or may do so in the future.  A major concern I have is a that potential

18  settlement or ruling that could have the effect of dispersing unhoused persons into areas with

19  which they are not familiar, and where they will not be able to access services and support.

20          27.     San Francisco has the incredible dichotomy of having some of the most expensive

21  real estate in the world and yet so many people living on the street.  The current health crisis has

22  only highlighted this dichotomy.  I believe that the current litigation also exemplifies division,

23  where UC Hastings, business owners, and housed Tenderloin residents want the City to take

24  action to clear the streets of its unsheltered and most vulnerable residents and their property,

25  even though those unsheltered people have nowhere to go, and are also members of the

26  community.

27          28.     Hospitality House and the people we serve also want the City to take action to

28  protect the health and safety of the Tenderloin District, but not at the expense of harming,

1  displacing, or violating the rights of unhoused people who live there. Without the promise of a

2  party involved in the litigation to look out for the interests of those most affected, those living on

3  the streets, the rights and safety of unsheltered Tenderloin residents will be at risk.

4        29.    For these reasons, I support the efforts of Hospitality House moving for

5  intervention in this matter.

6

7        I declare under penalty of perjury under the laws of the United States of America that the

8  foregoing is true and correct to the best of my knowledge.  Executed on June 8, 2020 in San

9  Francisco, California.

10

11  JOE WILSON

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28