Lauren Hansen (CA BAR NO. 268417)
Melissa A. Morris (CA BAR NO. 233393)
PUBLIC INTEREST LAW PROJECT
449 15th St., Suite 301
Oakland, CA 94612-06001
Tel: (510) 891-9794
Fax: (510) 891-9727
Email: lhansen@pilpca.org

ATTORNEYS FOR PROPOSED INTERVENORS
HOSPITALITY HOUSE; COALITION ON
HOMELESSNESS; AND FAITHFUL FOOLS

Lili V. Graham (CA BAR NO. 284264)
Tiffany L. Nocon (CA BAR NO. 301547)
DISABILITY RIGHTS CALIFORNIA
350 S Bixel Street, Ste 290
Los Angeles, CA 90017-1418
Tel: (213) 213-8000
Fax: (213) 213-8001
Email: Lili.Graham@disabilityrightsca.org

ATTORNEYS FOR PROPOSED INTERVENORS
HOSPITALITY HOUSE; COALITION ON
HOMELESSNESS; AND FAITHFUL FOOLS

Michael David Keys
(CA BAR NO. 133815)
Jessica Berger (CA BAR NO. 319114)
BAY AREA LEGAL AID
1454 43rd Avenue
San Francisco, CA 94122
Tel: (415) 982-1300
Fax: (415) 982-4243
Email:   mkeys@baylegal.org

ATTORNEYS FOR PROPOSED
INTERVENORS COALITION ON
HOMELESSNESS

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HASTINGS COLLEGE OF THE LAW, a public trust and institution of higher education duly organized under the laws and the Constitution of the State of California; FALLON VICTORIA, an individual; RENE DENIS, an individual; TENDERLOIN MERCHANTS AND PROPERTY ASSOCIATION, a business association; RANDY HUGHES, an individual; and KRISTEN VILLALOBOS, an individual,<br><br>             Plaintiffs,<br><br>       v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, a municipal entity,<br><br>             Defendant. | Case No. 4:20-cv-3033-JST<br><br>**DECLARATION OF JENNIFER FRIEDENBACH IN SUPPORT OF PROPOSED INTERVENORS' MOTION FOR INTERVENTION**<br><br>Date: July 22, 2020<br>Time: 2:00 P.M.<br>Place: Courtroom 6, Second Floor<br>Judge: Hon. Jon S. Tigar<br><br>Complaint Filed: May 4, 2020<br>Trial Date: None Set<br><br>Action Filed: May 4, 2020 |

*Hastings College of the Law v. City and County of San Francisco;* **Case No. 4:20-cv-3033-JST**
**DECLARATION OF FRIEDENBACH ISO PROPOSED INTERVENORS' MOTION FOR INTERVENTION**

I, JENNIFER FRIEDENBACH, declare:

1. I am the Executive Director of the Coalition on Homelessness ("Coalition"). The Coalition is a Proposed Intervenor in *Hastings College of the Law, et al. v. City & County of San Francisco*: Case No.: 4:20-cv-03033-JST. I make this Declaration in support of Proposed Intervenors' Motion for Intervention.

2. The facts set forth below are known to me personally, and I have first-hand knowledge of these facts. If called as a witness, I could and would testify competently, under oath, to such facts.

3. The Coalition on Homelessness is a Tenderloin-based organization that organizes unhoused people and front-line service providers to create permanent solutions to homelessness while working to protect the human rights of those forced to remain on the streets of San Francisco. The Coalition was founded over thirty years ago when people experiencing homelessness joined with frontline service providers in response to the lack of systemic solutions to homeless and the exclusion of homeless people in crafting city policy that affects unhoused persons.

4. Over 50 percent of the Coalition's staff and board members are either currently homeless or formerly homeless.

5. The Coalition's funding is based primarily on donations from individuals and private foundations. In order to remain independent, we do not accept donations from government entities involved in running the homeless system, such as Department of Public Health or Department of Homelessness Services and Housing (DHSH).

6. The Coalition has hundreds of members who are unhoused and living in San Francisco. Unhoused members actively participate in our open workgroup meetings, call upon us for support when needed, and write for and distribute our biweekly newspaper.

7. Our organization holds regular workgroup meetings focused on human rights and housing which are attended by community allies, service providers and unhoused community members.

8. We also own and operate a street newspaper entitled "Street Sheet", the longest continuously running street newspaper in the country. Street Sheet's content is primarily written and produced by unhoused persons and includes articles, poetry and artwork. Unhoused vendors sell the newspaper for $2.00 and keep the profits.

9. We also conduct outreach to approximately 100 unhoused persons a week. Through our outreach, we are able to gather input directly from people experiencing homelessness to better advocate for their interests.

10. Our advocacy agenda is shaped, framed, and prioritized based on the needs of people experiencing homelessness. We regularly utilize media, public hearings, rallies, legal action, letter writing campaigns, and other tactics to elevate the interests of unhoused San Franciscans.

11. Some of our accomplishments include advocating for and securing thousands of housing subsidies and units, passage of legislation that creates standards of care in San Francisco's shelter system written with deep input from shelter residents, and the passage of a single standard of care for the mental health system. In 2018, through our advocacy we successfully obtained over 360 housing subsidies for homeless youth, families, seniors, and people with disabilities. That same year, the Coalition also secured 75 long-term subsidies for seniors and people with disabilities.

12. In 2019, we partnered with Senior and Disability Action, a local grassroots organization that mobilizes and educates seniors and people with disabilities to fight for individual rights and social justice, to mobilize people with disabilities, because so many of our members and unhoused San Franciscans are individuals living with disabilities. Some of the particular issues faced by unhoused people with disabilities in San Francisco are seizure of wheelchairs, walkers, and other mobility devices used by people with mobility disabilities by the City's police department and/or Department of Public Works; inaccessibility of navigation centers and other congregate shelter settings to people with certain mental health symptoms; and failure to provide reasonable accommodations to unsheltered persons with disabilities when

1  requiring them to move their tents and other personal property from public sidewalks for
2  cleaning or other purposes.

3      13.     Coalition on Homelessness has a long history of advocating on behalf of
4  unhoused persons in regards to the City's past practice of property confiscation and destruction
5  of homeless people's property.  We document these City practices through our Stolen
6  Belongings project.  The City's past practice of confiscating unhoused persons property can have
7  devastating effects on their day-to-day life and their personhood, people can be deprived of their
8  identification cards, medication, public benefits cards, NARCAN, survival gear, and
9  irreplaceable family memorabilia.  During COVID-19, we advocated to the City to not seize
10 unhoused persons tents and property.  The City agreed to not confiscate tents during the health
11 crisis, and that the Department of Public Works would continue to street clean but would
12 generally not confiscate property.  My understanding is that this is a temporary City policy
13 because of COVID-19.  I believe that this temporary change in policy is one reason that
14 homelessness began to appear more visible Tenderloin.  I expect that the City will return to its
15 prior policy and practice of confiscating and disposing of unhoused persons' belongings.

16     14.    The Coalition is extremely apprehensive about the UC Hastings litigation,
17 because the results of the lawsuit, whether by a court decision or a judicial settlement will have a
18 significant and substantial impact on the lives of people experiencing homelessness in the
19 Tenderloin District.

20     15.    I first learned about the lawsuit on May 4, 2020.  I understand that, in addition to
21 UC Hastings, the lawsuit is brought by an organization dedicated to advancing the interests of
22 merchants and property owners' rights, as well as four individuals.  I read the Complaint in the
23 case, and immediately became concerned that the Plaintiffs' lawsuit would lead to the
24 displacement of unhoused residents with no other place to reside, result in property seizure and
25 destruction, and otherwise increase citations issued to unsheltered persons.

26     16.    As I explained above, during the pandemic, we worked with the City to advocate
27 for the temporary moratorium on property seizure and destruction.  The lawsuit seems to ask for
28

1  the City to restart those practices, which would have a devastating impact on unsheltered
2  Tenderloin residents.

3   17. Our staff is also concerned about the impact of the lawsuit on unhoused persons
4  with disabilities, which make up a disproportionate number of the persons who live on the streets
5  in the Tenderloin.

6   18. On May 27, 2020, I wrote a letter to David L. Faigman, the Chancellor and Dean
7  of the University of California Hastings College of Law outlining our concerns, and asking him
8  to sign a pledge protecting the human rights of homeless individuals in this lawsuit. The request
9  was also signed by Hospitality House, Faithful Fools, and 25 other homeless advocates and
10 service providers. A true and correct copy is attached as Exhibit A.

11  19. The pledge is noncontroversial; it merely asks that UC Hastings not sign a
12 settlement agreement or advocate for a legal outcome that negatively impacts or criminalizes
13 unhoused Tenderloin residents. The pledge also asks that UC Hastings respect current CDC
14 guidance regarding unsheltered homelessness, in that, if individual housing options are not
15 available or offered to unhoused residents, the City should allow people to remain where they are
16 to prevent the spread of COVID-19. The pledge included a request that UC Hastings work hard
17 to ensure that the City does not unlawfully confiscate unhoused persons' property as a result of
18 the litigation. See Exhibit A.

19  20. A day later, on May 28, 2020, I saw a news article that reported that over 100 UC
20 Hastings students and alumni also wrote a letter to Mr. Faigman, criticizing the law school's role
21 in the Tenderloin lawsuit. A true and correct copy is attached as Exhibit B.

22  21. On June 1, 2020, I received a disappointing response from Mr. Faigman.
23 Although Mr. Faigman's letter paid lip service to protecting the rights of the unhoused, it seemed
24 to indicate that the rights of housed persons are superior (see "the housed residents…have long
25 been disregarded). A true and correct copy of this letter is attached as Exhibit C.

26  22. On the same day, I wrote Mr. Faigman back, renewing our request for UC
27 Hastings to sign the pledge. He wrote back the same day, saying "I'm sorry, I thought my letter
28

made it clear that I would not be signing the proposed Pledge." A true and correct copy of this email correspondence is attached as Exhibit D.

23. I emailed him back asking for further clarification as to why he would not sign the pledge. He wrote back refusing to provide clarification, as well as indicating he was not going to have any further discussions with me (or anyone else connected with unhoused persons) about the issues or interests important to unhoused residents, and he would defer only to the federal courts. See Exhibit D.

24. When viewed in the context of the Complaint and Dean Faigman's June 1 statement that the "[Tenderloin] sidewalks and doorways must be cleared," his refusal to commit Hastings to observing the most basic rights of homeless people as part of any resolution of the lawsuit raises serious questions for the Coalition. I do not believe UC Hastings and the other Plaintiffs will adequately represent the voice of the unhoused in this litigation.

25. I also worry that the City and County of San Francisco will not adequately represent the interests of unsheltered Tenderloin residents. San Francisco is responsible for protecting the interests of both housed and unhoused residents. Often the City chooses the interests of housed residents over those of unhoused residents. For example, San Francisco uses a complaint-based encampment resolution policy, whereby residents can report encampments through a phone app and City workers will remove the encampment. San Francisco also issues citations of unhoused individuals for life-sustaining activities, such as sitting or lying on the sidewalk, even in the absence of adequate alternative shelter for the City's unhoused residents.

26. When homelessness is approached with enforcement, it makes it more difficult for individuals to exit homelessness. For example, they receive tickets they are unable to pay and get warrants that prevent them from accessing publicly funded housing. Frequently an enforcement approach further destabilizes the individuals, they lose contact with health and social workers who are trying to connect them with services and housing. We have seen this practice decrease safety for unhoused residents, who are forced to sleep in new places away from community members that help keep them safe.

27. The City's actions during the COVID-19 crisis also makes me wary of its ability to represent the interests of persons experiencing homelessness because of its history of property confiscation, prior to the COVID-19 pandemic. We have been monitoring San Francisco's confiscation of unhoused people's property for several years through our Stolen Belongings project.

28. With the exception of back office administrative functions of accounting, payroll, development, and fundraising, the Coalition's staff and programming has shifted its focus to address the City's actions, or lack of actions, towards unhoused persons during this pandemic.

29. For example, previously our work centered on human rights generally of the unhoused community, such as decriminalization and housing justice for unhoused San Franciscans more generally. Now, our staff and resources focus on the City's failure to provide housing, reasonable accommodations for persons with disabilities, and basic protections for unhoused people during the COVID-19 pandemic. Our staff now spends time conducting outreach to unsheltered Tenderloin residents, troubleshooting and coordinating testing for the Tenderloin neighborhood, assisting in distribution of tents, masks, and hand-sanitizer, and assisting with meeting the material needs. The Coalition has also had to work to stave off sweeps in the Haight and the Tenderloin, dispatching staff to location, troubleshooting and negotiating with city department representatives on site of the proposed sweep. Staff also monitor and assist with de-escalation in the organized sleeping camp in the Tenderloin.

30. One particular challenge is that staff have to spend more time than they usually would trying to reach unhoused persons, in part because it is more difficult to keep in contact with them. There are very few places for people to charge their phones, and so many residents' phones are dead or disconnected. We have noticed that even meeting their most basic needs, like finding clean water and food has become increasingly difficult for unhoused persons.

31. The Coalition has also had to devote resources to answering calls for tent and person removal without adequate relocation plans; the Complaint in this lawsuit is one such call. For example, our organization has spent resources creating a pledge and a letter to UC Hastings asking them to honor the human rights of their unhoused Tenderloin neighbors during the lawsuit

1  proceedings, which they refused to sign, and we then expended resources we would not have
2  otherwise on making the community aware of this refusal.

3      32.    The above descriptions are only some of the ways that our programs have shifted
4  during the City's response to this pandemic.  Our Housing Justice staff and our street newspaper,
5  Street Sheet, has also had to shift its resources in light of the City's response to COVID-19 and
6  to movements, like this lawsuit, to forcibly remove unhoused residents with nowhere to go from
7  the Tenderloin neighborhood.

8      33.    The center of our work during the crisis has been in the Tenderloin, though I will
9  note that homelessness touches every neighborhood in San Francisco.

10     34.    I am concerned about the current living conditions in the Tenderloin district.
11 Many people living in tents are overcrowded because there is not enough space for them to social
12 distance, yet the City has not provided adequate safe places for unhoused persons to go, such as
13 hotel rooms to shelter in place during this pandemic.

14     35.    For example, there is currently an encampment in Fulton Square that the City
15 helped create, consisting of about 50 people.  The people in that encampment were screened for
16 alternative housing, but my understanding is that they have nowhere else to go.  For some reason
17 the City will not place them in hotel rooms or other housing and that is why they are there.  It is
18 my understanding that the City is planning on forcing these people to leave Fulton Square by
19 June 30, 2020.  I do not know where they will go.  I understand that the square is crowded, but
20 the City has not explained where people can safely be and they are not offering any safe or
21 adequate alternatives, even temporary ones. The City has the resources to commandeer rooms,
22 but for reasons I do not fully understand, they simply refuse.

23     36.    It's inconceivable to me that this lawsuit could proceed without the voice of any
24 unhoused person or organization representing them.  I recognize and support the need for prompt
25 and comprehensive action to address the current situation in the Tenderloin, however any
26 resolution must consider the needs and interests of unsheltered Tenderloin residents.  Many of
27 these unsheltered residents have been in the Tenderloin for a long time, they have community
28 and connections with service providers.  I feel that there is no other choice but for the Coalition

---

*Hastings College of the Law v. City and County of San Francisco;* **Case No. 4:20-cv-3033-JST**
**DECLARATION OF FRIEDENBACH ISO PROPOSED INTERVENORS' MOTION FOR INTERVENTION**     **7**

1 to try to intervene in this lawsuit so that people experiencing homelessness can have a voice
2 during these proceedings, the outcome of which will substantially affect their lives.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed on June 8, 2020 in San Francisco, California.

                                                                                                          JENNIFER FRIEDENBACH

---

*Hastings College of the Law v. City and County of San Francisco;* **Case No. 4:20-cv-3033-JST**
**DECLARATION OF FRIEDENBACH ISO PROPOSED INTERVENORS' MOTION FOR INTERVENTION**     **8**