Lauren Hansen (CA BAR NO. 268417)
Melissa A. Morris (CA BAR NO. 233393)
PUBLIC INTEREST LAW PROJECT
449 15th St., Suite 301
Oakland, CA 94612-06001
Tel: (510) 891-9794
Fax: (510) 891-9727
Email: lhansen@pilpca.org

ATTORNEYS FOR PROPOSED INTERVENORS
HOSPITALITY HOUSE; COALITION ON
HOMELESSNESS; AND FAITHFUL FOOLS

Lili V. Graham (CA BAR NO. 284264)
Tiffany L. Nocon (CA BAR NO. 301547)
DISABILITY RIGHTS CALIFORNIA
350 S Bixel Street, Ste 290
Los Angeles, CA 90017-1418
Tel: (213) 213-8000
Fax: (213) 213-8001
Email: Lili.Graham@disabilityrightsca.org

ATTORNEYS FOR PROPOSED INTERVENORS
HOSPITALITY HOUSE; COALITION ON
HOMELESSNESS; AND FAITHFUL FOOLS

Michael David Keys
(CA BAR NO. 133815)
Jessica Berger (CA BAR NO. 319114)
BAY AREA LEGAL AID
1454 43rd Avenue
San Francisco, CA 94122
Tel: (415) 982-1300
Fax: (415) 982-4243
Email: mkeys@baylegal.org

ATTORNEYS FOR PROPOSED
INTERVENORS COALITION ON
HOMELESSNESS

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HASTINGS COLLEGE OF THE LAW, a public trust and institution of higher education duly organized under the laws and the Constitution of the State of California; FALLON VICTORIA, an individual; RENE DENIS, an individual; TENDERLOIN MERCHANTS AND PROPERTY ASSOCIATION, a business association; RANDY HUGHES, an individual; and KRISTEN VILLALOBOS, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, a municipal entity,<br><br>Defendant. | Case No. 4:20-cv-3033-JST<br><br>**DECLARATION OF CHRISTIN EVANS IN SUPPORT OF PROPOSED INTERVENORS' SUPPLEMENTAL BRIEF IN SUPPORT OF THE MOTION FOR INTERVENTION**<br><br>Date:<br>Time:<br>Place: Courtroom 6, Second Floor<br>Judge: Hon. Jon S. Tigar<br><br>Complaint Filed: May 4, 2020<br>Trial Date: None Set |

*Hastings College of the Law v. City and County of San Francisco;* **Case No. 4:20-cv-3033-JST**
**DECLARATION OF CHRISTIN EVANS ISO PROPOSED INTERVENORS' SUPPLEMENTAL BRIEF ISO THE MOTION FOR INTERVENTION**

I, CHRISTIN EVANS, declare:

1. I am a resident of San Francisco, and a homelessness activist. I make this Declaration in support of Proposed Intervenors' supplemental brief in support of the Motion for Intervention.

2. The facts set forth below are known to me personally, and I have first-hand knowledge of these facts. If called as a witness, I could and would testify competently, under oath, to such facts.

3. I am a small business owner. I own a couple of businesses in the Haight Ashbury ("the Haight") neighborhood—a bookstore and a bar and restaurant. The Haight has long had a challenge with large numbers of youth who are homeless and living in the neighborhood. When I first bought the bookstore, I quickly became acquainted with how divisive homelessness in San Francisco can be. I found that many conversations ended up with a lot of screaming and not a lot of understanding.

4. As a bookstore owner, I want to provide a place where people can engage, be thoughtful, and come together as a community. I started forums to educate myself and others on the topic of homelessness. I work closely with the Coalition on Homelessness, and have volunteered during the pandemic to purchase and distribute tents to people experiencing homelessness. I estimate that we have delivered around 1,000 tents to people so they can shelter in place, protected from the elements and COVID-19.

5. I first heard about the UC Hastings lawsuit against the City of San Francisco shortly after it was filed. The number of tents have increased in the Tenderloin, but the timing of the lawsuit was really disappointing because people don't have anywhere to go. Homeless people also need to be able to shelter in place, which is consistent with the CDC guidance I have read.

6. On Thursday, June 12, I heard media reports that the City had reversed course on not providing hotel rooms to unhoused persons, and that it was now moving people from the Tenderloin into hotels. Previously, the City had not prioritized the unhoused population for hotel rooms.

7.     That same day, I learned about the Stipulated Injunction filed with the Court and I understood that the agreement contained a lot of language about police enforcement.  I became concerned that the City would immediately resume its enforcement against homeless people, especially given the City's history with sweeps, issuing citations, and threatening people with arrest if they do not move along.  I saw this happen when the City cleared the Tenderloin of homeless individuals right before the 2016 Super Bowl. They used a lot of police presence and threats of citations in order to get unhoused people to leave the area.

8.     I visited the Tenderloin on June 13, 15, 16, and 17, to monitor the City's actions, and to offer assistance to people.

9.     Each day there a whole bunch of City people on the scene, which is different than in the past, where encampment resolutions mostly involve Homeless Outreach Team (HOT), Department of Public Works (DPW), and a small police presence.  Here, they had:  the police, DPW, paramedics from the Fire Department, street medicine, and traffic control people blocking off the streets they were clearing.  I saw between three and six officers on the scene at all times.  The atmosphere has been pretty chaotic. There are police car lights flashing and a very visible show of force.

10.    The City begins early in the morning, waking people up in their tents, and presenting them with a really extreme life choice—give up your things and you get a hotel room/sleeping site or you can keep your belongings, but they won't give you alternative shelter and you have to move along.  It is unclear how much notice the City is providing to people.  The HOT team is saying that they are coming through and taking names of people in advance, but there's no notice posted anywhere.

11.    In the past few days, I have been told by City personnel that you have to give up your tent to go to a hotel.  I have watched people ask how long they will be able to stay at a hotel, and the response is "I don't know".

12.    To me there are so many different people on the scene, HOT, paramedics, Para-transit, I think there is a lot of confusion about which tent belongs to whom. If City workers don't find someone literally sleeping in the tent, whether there are people's belongings in it or

1  not, there is no real conversation or documentation about what happens to that person in terms of

2  a hotel room. Maybe that person gets passed up and doesn't get offered one.  It's unclear whether

3  someone can temporarily leave their belongings, go to the hotel, and then come back and retrieve

4  their things.

5      13.    City staff told me that they are only moving up to 20 people into hotels each day.

6      14.    We had previously helped a guy named Cuba to get into a hotel—but, it took five

7  days, and significant media attention. Cuba needed a wheelchair accessible rooms, and the hotels

8  the City offered did not have doorways that are wide enough to accommodate his chair.  Some

9  rooms are only accessible by stairs, which makes it hard for anyone with problems with mobility.

10  We have been trying to find placements for people throughout the pandemic, and there are just

11  too few ADA accessible rooms.

12      15.    On Saturday, June 13, I went to the Tenderloin with a photographer to talk to

13  people and collect their stories in the hopes that the media attention would get people into hotel

14  rooms at a faster pace.  We started at Olive Street and Polk Street, then moved to Willow Street,

15  and then over to Hyde Street.  In three hours, we captured the stories of 24 people.  We were

16  hopeful if we told these stories in the media, the City would provide hotel rooms or other shelter

17  more quickly than how long it took for Cuba to get into a hotel room.

18      16.    The first few people I spoke to were in their fifties and African-American.

19      17.    I talked to one gentleman named Michael who I really wanted to get into a hotel,

20  because he had serious health ailments—his arm was swollen—so swollen that he couldn't open

21  a water bottle.  We opened one for him and he gulped it down.  He drank another one right away

22  because he was so thirsty.  He was very emotional about needing to get inside.  Michael was

23  born and raised in San Francisco.  He is 56.  He said being homeless, he struggles to stay on his

24  insulin. Sometimes he feels like there is no hope and nobody cares.  When I asked him what a

25  hotel would mean for him, he said it would be a place he could keep his insulin and recuperate

26  after the surgery he'd recently had on his arm.

27      18.    In my outreach, I met Y.L.  She is 60 years old and sharing a tent with her

28  brother.  The City moved her brother to a hotel on Friday, and staff told her that they would

1   come back for her, and they never came back.  She needed a first floor room because she has a

2   disability, and I believe that the hotels they were offering did not have elevator access.  It turns

3   out that they put her on a waitlist but did not communicate that to her.  She was ultimately able

4   to get a hotel room.  I think the process could be improved so that there is less confusion.

5         19.    I also talked to two transitional aged youth.  One of them, Byron, wanted to know

6   how to increase his chances for a hotel since he'd been a waitlist of housing for several years

7   already.  He asked me to "circle" his name because he wanted to "feel important."  When he

8   asked me to circle his name it hurt.  He has been asking for help for years, and the City has so

9   very little to offer him.  He won't qualify for a hotel room because of his age.  Housing for

10  transitional aged youth is one of the least funded.  Many came from foster care.  Byron will

11  probably have no choice but to go to a campsite or risk citation if he doesn't leave the

12  neighborhood.

13        20.    On Monday, June 15, I showed up around 11:00 a.m.  There were several people

14  who had been promised hotels earlier that morning, and had been waiting for hours to find out

15  what hotel they would be taken to.

16        21.    I helped one gentleman who didn't want to go to a hotel because he didn't want to

17  leave his support system of friends, and his friends didn't qualify for a room because they are too

18  "young."  I guess it's the City's policy to only provide shelter to persons over a certain age

19  and/or who have an underlying health condition.  City staff still wanted to move his tent, and so

20  they provided an alternative campsite spot.  He finally took the City up on its offer for a campsite

21  spot. It was a very stressful and intense situation.  This person had probably been up most of the

22  night and probably was sleep deprived and hungry.  The police showed up and basically told him

23  get rid of all of your stuff, and get it down to two bags, and then you can leave with two bags and

24  either go to a hotel or to a campsite.  He had a lot of stuff and had difficulty figuring out what to

25  keep and what to leave behind.  He was very agitated—he was upset and yelling.  It was very

26  distressing to watch.  There were a lot of City staff surrounding him, which increased the

27  tension.  Before he was done packing up, the Department of Public Works (DPW) started

28  cleaning and opening the water hoses.  So there was a three foot river of water coming down the

1 street and sidewalk between where he was packing up his things, and the place he had to get to in
2 order to get transported to the campsite.

3     22.    Ultimately, we were able to help the gentleman take six bags of things with him to
4 the campsite, but only because his friends agreed to carry some bags and pretend they were their
5 own possessions. We encountered another hurdle—in order to get into the outdoor camping site,
6 his friends had to have tents, and they didn't have any. So I gave them tents so they could all go
7 together. The City should be the ones providing tents so that people can get into the campsite.

8     23.    There are a lot of walkers and wheelchairs all over the Tenderloin. Many of the
9 homeless individuals I observed have disabilities. It always shocks me how many there
10 are. There was a woman sitting in a wheelchair, who got up and walked away. Staff took the
11 wheelchair and put it in back of DPW truck, without checking whether she needed it
12 again. They said because the wheelchair is in good condition, they will hold it for 30 days, and if
13 no one picks it up, they will probably donate it. I thought they were supposed to hold property
14 for 90 days. It seems like it's a free for all out there right now—there are no clear rules.

15     24.    I also saw them take a walker and other tents, and throw them into a trash crusher
16 truck. They did not bag and tag these items.

17     25.    On Tuesday, June 16, I witnessed City staff cut the locks off tents that were
18 clearly not abandoned. I think this is a violation of the City's property confiscation policies, at
19 least as they were before the pandemic. Sometimes people temporarily leave their tents to go to
20 the bathroom, or to a medical appointment, or to get food. For all we know, that person locked
21 up their tent and was off trying to do one of these things. City staff seemed ready to throw the
22 tent and everything inside of it away, but I insisted that staff bag and tag those tents. They
23 did. They didn't leave notice behind on how the person could pick up their stuff, which is also
24 what they are supposed to do under their own policies.

25     26.    Later on Tuesday, I went back to the same intersection I was at on Monday. Sure,
26 there weren't tents there, but there were people there—and a lot of them. The parties seem to
27 have created a framework that removes tents, but there are still people who are homeless who
28 remain. There are a lot of people living outside.

*Hastings College of the Law v. City and County of San Francisco;* **Case No. 4:20-cv-3033-JST**
**DECLARATION OF EVANS ISO PROPOSED INTERVENORS' SUPPLEMENTAL BRIEF ISO THE MOTION FOR INTERVENTION**    **5**

27. On Wednesday, June 17, I arrived in the Tenderloin at about 7:15 am, and DPW already was on site, had woken everyone up. DPW told the unhoused residents that a cleanup was happening (I'm told at least one couple took off). No HOT team was on site until after 7:30 am. I stopped DPW from taking one woman's belongings. Five of them surrounded her and gave her trash bags and then just started grabbing stuff before she could make choices about what to keep. I intervened and DPW backed off after a heated discussion.

28. When I help move homeless people into their new surroundings, I find moving stressful, even when all I have to do is help. It is hard for homeless people to decide quickly what belongings they want to keep and where they want to go. They have so little belongings to begin with. At this point, most things they have in their possession has some significance or use for them.

29. The CDC said that nonprofits should work together to find solutions during the pandemic, so it would make sense that an organization like the Coalition on Homelessness would be buying tents, distributing them, and be part of the solution. We are trying to make it safer for people on the street. But no organization, or unhoused person, has been involved in the creation or implementation of the Stipulated Injunction. People are going to suffer—in fact, the entire community will suffer—as a result if the suit goes forward without the perspectives of homeless advocates.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed on June 18, 2020 in San Francisco, California.

_____
CHRISTIN EVANS

*Hastings College of the Law v. City and County of San Francisco;* **Case No. 4:20-cv-3033-JST**
**DECLARATION OF EVANS ISO PROPOSED INTERVENORS' SUPPLEMENTAL BRIEF ISO THE MOTION FOR INTERVENTION**                                                                                                              6