# EXHIBIT A

# EXHIBIT A

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into by and between, on the one hand, County of Orange ("County") and, on the other hand, the following plaintiffs:

(1) Orange County Catholic Worker ("OCCW") (an unincorporated association, acting by and through its designated representatives), and the following individuals, who enter into this agreement on their individual behalf, as defined herein: Lisa Bell, Melissa Fields, Gloria Shoemake, Richie Thomas, Shawn Carroll, Larry Ford, Cameron Ralston, and Kathy Schuler (collectively, "Individual OCCW Plaintiffs") (together with OCCW, "OCCW Plaintiffs");

(2) People's Homeless Task Force, an unincorporated association (the "Ramirez Plaintiff"); and,

The OCCW Plaintiffs and the Ramirez Plaintiff are collectively referred to herein as "Plaintiffs." The parties to this Agreement are referred to herein individually as a "Party" and collectively as the "Parties."

## Class Certification and Notice

The parties stipulate to the conditional certification for settlement purposes of a Class of Plaintiffs defined as: all current and future homeless individuals located in the Northern and Central SPA of the County. Upon final approval of the Agreement, the Class shall be certified as described above.

Promptly upon execution of this Agreement by all parties, Plaintiffs shall apply to the Court by application and/or motion for approval of the Settlement. Plaintiffs shall

apply to the Court for entry certifying a class pursuant to Federal Rules of Civil Procedure 23(b)(2).

The Parties agree that the damages in this action to the individual Plaintiffs are incidental to the benefits of the structural relief provided by the Settlement. Accordingly, the Parties agree to seek an Order by the District Court that the class may be certified pursuant to F.R.Civ.P. 23(b)(2) without notice to putative class members.

Individual plaintiffs – David Ramirez, Sharon Sweat, Stephenie Saint Vincent, Raya Ives, Derek MacArthur, Kim Gray and Erik Teasley – ("Individual Ramirez Plaintiffs") are not considered part of this class certification and settlement agreement. The parties acknowledge that Individual Ramirez Plaintiffs' damages are not included in this injunctive settlement agreement. The parties agree to negotiate Individual Ramirez Plaintiffs' damages separate and apart from this settlement agreement.

## RECITALS

**A.** WHEREAS, on January 29, 2018, OCCW Plaintiffs filed an action, entitled *Orange County Catholic Worker vs. Orange County,* United States District Court, Central District of California Case No. 8:18-cv-00155-DOC-KES (the "OC Catholic Worker Action"), against the County, the City of Anaheim, the City of Costa Mesa, and the City of Orange.

**B.** WHEREAS, on March 13, 2018, the City of Santa Ana intervened in the OC Catholic Worker Action.

**C.** WHEREAS, on April 26, 2018, the City of Santa Ana filed a cross-

2

complaint in the OC Catholic Worker Action against the County and all other cities in the County alleging: (1) violation of the Eighth Amendment (cruel and unusual punishment), (2) violation of the Fourteenth Amendment (equal protection), and (3) violation of the Fourteenth Amendment (due process).

**D.** WHEREAS, on July 26, 2018, the OCCW Plaintiffs filed a First Amended Complaint ("OCCW FAC"), against all Defendants, which included, among other changes, added Richie Thomas as a named Plaintiff and pleaded a potential class action against the County.

**E.** WHEREAS, on November 13, 2018, the OCCW Plaintiffs filed a Supplemental Complaint adding the City of Tustin as a Defendant.

**F.** WHEREAS, on June 28, 2019, the OCCW Plaintiffs filed a Supplemental Complaint adding the cities of Brea, Buena Park, Cypress, Fullerton, La Habra, La Palma, Placentia, Stanton, Villa Park and Yorba Linda as defendants.

**G.** WHEREAS, the OCCW FAC as well as the Supplemental Complaint alleges that OCCW is an unincorporated association dedicated to the service and care of the poor in Orange County, and that the Individual OCCW Plaintiffs are homeless individuals residing in Orange County.  The OCCW FAC alleges, inter alia, that Defendants, and each of them, have violated the Individual OCCW Plaintiffs' rights by enforcing various laws against them, including trespass, loitering, and/or anti-camping ordinances, at times when, according to OCCW Plaintiffs, there were no immediately accessible and appropriate beds available to them in Orange County.  The County

3

disputes the factual allegations and legal contentions made by OCCW Plaintiffs in the OCCW FAC and the Supplemental Complaint.

     **H.**    WHEREAS, the OCCW FAC alleges the following claims for relief against the County: (1) violation of the Eighth and Fourteenth Amendments to the U.S. Constitution, and Article VII, sec. 17, of the California Constitution for alleged "cruel and unusual punishment"; (2) violation of the First and Fourth Amendments to the U.S. Constitution; (3) violation of the right to due process of law under the Fourteenth Amendment to the U.S. Constitution; (4) violation of Fair Housing Act, 42 U.S.C. § 3604 and California Government Code §12955 et seq.; (5) violation of the 14th Amendment; Art. 1 §13; (6) violation of the Americans with Disabilities Act; (7) violation of California Civil Code § 52.1; (8) violation of California Government Code § 815.6; (9) violation of California Government Code § 11135; and (10) taxpayers' and class members suit for declaratory and injunctive relief, California Code of Civil Procedure § 526a.  The County disputes each of these claims for relief in their entirety, and disputes OCCW Plaintiff's underlying legal contentions and theories.

     **I.**    WHEREAS, on February 7, 2018, the Ramirez Plaintiffs filed an action against the County of Orange in the United State District Court, Central District of California under Case No. 2:18-cv-01027 entitled David Ramirez, Sharon Sweat, Stephenie Saint Vincent, Raya Ives, Derek Macarthur, Kim Gray, and Erik Teasley as individuals; People's Homeless Task Force, an unincorporated association vs. the County of Orange (the "Ramirez Action").

**J.** WHEREAS, the Ramirez Action alleges, inter alia, that the Ramirez Individual Plaintiffs are homeless individuals with various disabilities who lived on the Riverbed, since their disabilities made it nearly impossible for them to live in any emergency shelter, and that the County has violated their rights by failing to provide housing, homelessness services, or programs that accommodate their disabilities. The County disputes the factual allegations and legal contentions made by the Ramirez Plaintiffs.

**K.** WHEREAS, on March 23, 2018, the Ramirez Plaintiffs filed a FAC ("Ramirez FAC") alleging: (1) Violations of the Americans with Disabilities Act; (2) Violations of the Americans with Disabilities Act – Intentional Discrimination; (3) Violation of Section 504 of the Rehabilitation Act of 1973; (4) Violation of Substantive Due Process; State Created Danger/Reckless Endangerment; (5) Violation of Equal Protection; (6) Violation of the Bane Act (California Civil Code § 52.1); (7) Violation of Procedural Due Process; (8) Interference with Right to Petition the Government; (9) Interference with Right to Seek and Associate With Counsel; (10) Right to Be Secure From Unreasonable Seizures; (11) Right to Due Process of Law-Seizure of Property; (12) Violation of the Fair Housing Act; (13) Violation of the Duty to Affirmatively Further Fair Housing; Violation of FEHA-Disability and Source of Income Discrimination; and, (14) Breach of Fiduciary Duty of Care. The County disputes each of these claims for relief in their entirety, and disputes Plaintiff's underlying legal contentions and theories. The County disputes the factual allegations and legal

5

contentions made by Plaintiffs in the Ramirez FAC.

L. **WHEREAS**, without admitting any wrongdoing, liability, or legal violations on the part of the County, without conceding the validity of any of Plaintiffs' legal theories or claims, and for the sole purpose of resolving the OCCW Action and the Ramirez Action and any claims relating thereto in an economic and efficient manner, the Parties now desire to enter into this Agreement on the terms set forth herein.

## TERMS

**NOW, THEREFORE**, for full and valuable consideration, the sufficiency of which is hereby acknowledged, and based upon the foregoing Recitals, and the terms, conditions, covenants, and agreements herein, the Parties agree as follows:

1. **Order Regarding Continuing Jurisdiction and Effective Date**

Following the full execution of this Agreement by all Parties, the Parties shall file with the Court in the OC Catholic Worker Action and in the Ramirez Action proposed order(s) regarding settlement and continuing jurisdiction and incorporating the terms of this Agreement ("Order(s)"). The obligations of the Parties in the remaining sections of this Agreement, and the releases contained herein, shall become effective and operative on the date(s) on which the respective Order is fully executed in each of the cases and entered by the Court, and shall be contingent upon the Court's signing and entry of the respective Order(s) (hereinafter, the "Effective Date").

2. **Incorporation of Recitals**

The representations in the above-section of this Agreement, entitled "RECITALS,"

are hereby incorporated into and made a material part of the terms and representations of this Agreement.

**3.** **Definitions**

The following definitions of key terms used in this Agreement, are hereby incorporated into and made a material part of the terms and representation of this Agreement:

a. "Clinical Assessment" is an evaluative process conducted by Specially Trained clinical personnel to evaluate and diagnose an individual's mental health condition for the purpose of developing an appropriate treatment plan and determine appropriate level of care.

b. "County-Controlled Properties" shall include (1) all County unincorporated areas; (2) all County-owned property; (3), County properties that the County is leasing or occupying from a third party (e.g. branch library); and (3) the channels and other facilities of the Orange County Flood Control District.

c. "Field Screening" is the initial contact between the client and the County or County contracted provider for the purpose of conducting a preliminary evaluation of an individual's treatment, mental health, and shelter needs.

d. "Homeless Services" refers to the County's emergency shelter system.

e. "Restricted Areas" shall include (1) Orange County Flood Control District Property; (2) John Wayne Airport Property; (3) the interior spaces of County libraries outside of the posted hours of operation; (4) custody facilities or other

areas where in-custody subjects are taken; (5) contracted right-of-way railroad areas; (6) special use properties as approved by the Court; and (7) any County property or facilities not open to the general public.

f. "Specially Trained" means training (in areas referenced in the ADA Compliance in Shelters section of the "Standards of Care for County Contracted Shelter Providers," attached to this agreement as Attachment "A,"), provided to personnel working in programs or services benefitting or supporting homeless individuals enabling these personnel to recognize when a homeless person may be struggling with a mental health issues or conditions; and to sensitively communicate with homeless individuals who have mental health issues/conditions.

g. "Standards of Care" are formal guidelines for operation and service provision by County-contracted shelter operators, and are attached to this Agreement as Attachment "A".

h. "System of Care personnel" shall include representatives from the County's Health Care Agency, Orange County Community Resources or its contracted provider, Social Services Agency, County-contracted providers, or any other organization the County contracts with for outreach and engagement services. The term "System of Care Personnel" also includes OCSD staff who have been Specially Trained for interactions with the homeless population including, but not limited to, the Homeless Outreach Team, or the "HOT" team.

8

i. Service Planning Area ("SPA"):  Refers to the designated North, Central and South geographical areas of the County as set forth in the attached SPA map, Attachment "B" to this Agreement.

**4.     Enforcement of Anti-Camping and Anti-Loitering Provisions**

The Orange County Sheriff's Department ("OCSD") shall establish the following policies and procedures relating to the enforcement of the Anti-Camping and Anti-Loitering provisions of the Orange County Codified Ordinances ("OCCO") on County-Controlled Properties, with the exception of those County-Controlled Areas that are also "Restricted Areas," as defined in Section 3 of this Agreement.  The OCSD shall also use the following policies and procedures relating to the enforcement of the anti-camping and anti-loitering provisions of the municipal ordinances where OCSD provides contract law enforcement services and the city has met the requirements of *Martin v. Boise*.

4.1     Absent exigent circumstances, any enforcement of the Anti-Camping or Anti-Loitering ordinances against a homeless person (including any of the named individual Plaintiffs) will first be preceded by contacts with System of Care personnel for a Field Screening to determine appropriate placement for the individual in question, per the procedures outlined herein.

4.2     In implementation of the above-section 4.1, prior to enforcement of Anti-Camping or Anti-Loitering ordinances against any homeless person in the County Controlled Properties, OCSD will work with Specially Trained System of Care personnel to locate and offer an appropriate shelter placement for the individual within his or her

9

respective Service Planning Area ("SPA"). OCSD will not transport homeless individuals across SPAs for the purposes of shelter placement.

      4.3    To any individual who declines the offered placement, OCSD will, where feasible, give the person a warning and an opportunity to immediately relocate to a location where the person may lawfully be present before issuing a citation and/or effecting an arrest. If the individual declines the offered placement, OCSD may proceed with enforcement of the applicable Anti-Camping, Anti-Loitering or comparable ordinance in its discretion.

      4.4    <u>Restricted Areas and County Parks:</u> If the alleged violation arises from an individual's presence in a Restricted Area, at any time, or on park property outside of the established operational hours, and if there is no appropriate and immediately available placement for the person, OCSD will advise the individual that they may move to any public area outside the Restricted Area or park property as allowed by *Martin v. City of Boise*. If the individual does not then leave the Restricted Area or park property after receiving both a warning and a reasonable opportunity to gather his or her belongings, OCSD, or other applicable law enforcement agency may issue a citation or arrest the individual, as appropriate.

      4.5    Nothing in this Agreement constitutes an admission by the County that its current policies and procedures for enforcement of Anti-Camping or Anti-loitering ordinances and/or other laws based on an individual's status as homeless are either (a) different than those set forth above, or (b) in any way legally inadequate, or a concession

by Plaintiffs that it is legally adequate.

4.6    Except as explicitly provided in this Agreement, nothing in this agreement shall impact the authority of the OCSD to enforce any law not based on the individual's unsheltered status against a person believed to be homeless, including issuing citations and arresting the person for an alleged violation of the law.

## 5.    Referrals to Collaborative Courts

The Parties acknowledge that the issuance of citations and arrests may create impediments to unsheltered individuals qualifying for certain public benefits and services and may also create barriers to housing and employment.  OCSD agrees that when issuing a citation or making an arrest for a violation of an Anti-Camping or Anti-Loitering ordinance, OCSD shall inform the homeless person that they can request acceptance into the Collaborative Court.

## 6.    County Maintenance, Remediation and/or Cleaning Projects

Nothing herein shall be construed to prevent the County from performing routine maintenance, remediation, or cleaning projects, as determined to be necessary by the County ("County Project").  However, the County will advise Plaintiffs' counsel when a County Project is expected to be submitted to the Board of Supervisors (or appropriate County department) for approval if said County Project is expected to result in the displacement of an unsheltered community and, if necessary, submit the proposal for the County Project to the Court's dispute resolution process pursuant to this agreement. Nothing in this section shall preclude the County from implementing an emergency

11

project that does not allow sufficient time for the notice outlined herein. Absent exigent circumstances or an emergency, the County shall provide at least 24-hours' notice to affected homeless persons and shall provide storage, at no charge, for their personal property in an area that is accessible for individuals to reclaim their property and that is reasonably accessible for individuals with disabilities. The parties agree to meet and confer regarding the extent of the County's obligation to store essential personal property seized during such projects.

### 7. Development of Standards of Care for Homeless Shelters

7.1.    The County will adopt "Standards of Care" for its Homeless Services to ensure that program eligibility, rights and responsibilities, grievance process, ADA accommodations, and services are clearly communicated to County-contracted service providers/shelter operators and program participants. Any disputes will be submitted to the Court for resolution. All City-only and private facilities, programs or services for people experiencing homelessness that receive funding distributed through the County will be provided with the "Standards of Care" and all related notices and forms and will be required to implement the "Standards of Care," to the extent applicable, as a condition of receiving public monies.

7.2.    The County and Plaintiffs' counsel will develop a set of rights and responsibilities in line with best practices concerning appropriate behavior for participants in the program to be incorporated into the Standards of Care. Any disputes that arise during the Parties' meet-and-confer efforts will be submitted to the Court for

12

resolution. The proposed "Standards of Care for County Contracted Shelter Providers" is attached to this Agreement as Attachment "A".

**8.** **Clinical Assessments**

The County will post a notice in each facility subject to this Agreement, advising of the availability of clinical assessments, and will provide such an assessment to those who request it. These clinical assessments will be made available to all homeless persons within the County of Orange who may be eligible for County-funded treatment programs and resources. When appropriate, the County will provide linkage to appropriate services and programs, through Specially Trained case managers, for those requiring higher levels of care for mental health conditions.

For participants in County programs assisting homeless individuals, each participant will be reassessed by an appropriate clinical professional, as selected by the County, prior to moving that participant to a different level of care, program, or facility.

When conducting clinical assessments of homeless persons, the County agrees to consider and, where feasible, utilize evidence-based and trauma-informed practices, including but not limited to, the following:

    a.    Participants reporting a history of trauma during screening should, with their consent, undergo a comprehensive mental health assessment.

    b.    The participant will be provided information about the process, the treatment plan and timeline for services, as appropriate.

    c.    As part of the treatment plan development, the County will endeavor to

13

include participant choice, control, and collaboration in service and

treatment options, recognizing the participant's strengths and skills.

The County will negotiate in good faith with Plaintiffs' counsel regarding how to

implement the assessment principles described above.  Any disputes will be submitted to

the Court for resolution.

**9.     ADA/Reasonable Accommodation Procedure at All Stages**

The County will establish a formal, uniform process whereby individuals with

disabilities can request reasonable accommodations or modifications to gain equal access

to facilities, programs, services, and activities.  Notice of the availability of the process

shall be posted in each facility and at the office of any County program, services or

activities relating to individuals experiencing homelessness and resources for Homeless

Services. The Parties agree to negotiate in good faith regarding the content of the

County's formal, uniform processes to be established, and the Parties shall submit any

disputes that arise during these meet-and-confer efforts to the Court for resolution.  The

Parties agree to abide by the Court's determination with respect to such submitted

disputes.

The County will identify an ADA Coordinator responsible for ensuring that the

County's programs, services, and activities relating to individuals experiencing

homelessness are ADA-compliant, including requests for reasonable accommodations

and appeals of reasonable accommodation denials.  The County shall provide

individuals with disabilities with reasonable written notice of changes affecting their

14

shelter or access to services. Such changes shall include any modifications to services or the termination of services. Individuals will have a right to an appeal process if they disagree with the County's terms in the written notice subject to the Dispute Resolution Procedure to be agreed to by the parties.

The County will designate and train an ADA Coordinator to be available for every County-run site to ensure the County's compliance with the ADA through all of the County's programs, services, and activities relating to individuals experiencing homelessness. Additionally, all staff at facilities will be trained to recognize when they need to call upon the ADA Coordinator to consider accommodations or modifications that are either requested, or that the staff reasonably understand to be needed because of a disability.

### 10. Due Process Protections

The County will ensure appropriate due process protocols, including a timely and effective administrative appeals process, for homeless individuals being denied access to, or being terminated from, County-administered shelters. This procedure shall be included in the Standards of Care. Due process procedures may vary by the provider, program and shelter, but all such due process procedures shall comply and be otherwise consistent with local, state, and federal laws. The County, however, is not prohibited from exiting an individual immediately from a placement if a concern arises regarding the safety and/or security of the program operations.

15

The County will post notice at each facility of the legal counsel monitoring this Settlement Agreement and contact information for assistance. The parties will meet and confer on procedures for Plaintiffs' counsel to access their clients who reside in County-operated facilities subject to this Agreement. The procedures will provide that counsel shall not impact program operations.

## 11. **Dispute-Resolution Process**

The Parties hereby agree that any and all disputes concerning the adequacy of any placement offered to a homeless individual pursuant to any portion of this Agreement including, but not limited to, whether the offered placement sufficiently accommodates the individual's disabilities, will be resolved via the "Dispute-Resolution Process," as defined below.

The Court shall retain jurisdiction over the OCCW and Ramirez Actions for a period of three (3) years from the Effective Date of this Agreement (hereinafter, the "Termination Date"), for the purposes of (a) overseeing the implementation of this Agreement, and (b) implementing and presiding over the dispute-resolution process (the "Dispute-Resolution Process") to be established by the Court and to which the Parties hereby consent and agree:

11.1. Except as expressly identified in this Agreement, or as may be modified by the Court or the Parties, with the Court's consent, during the three-year period of the Court's continued jurisdiction, this Dispute Resolution Process shall apply to adjudicate any and all disputes between, on the one hand, the County and, on the other hand, any

16

homeless individual or individuals who consent, at the time of requesting the Dispute

Resolution Process, to be bound by said process and the provisions of this Agreement

applicable to the Plaintiffs including, but not limited to, any individual Plaintiff for (a) the

implementation of this Agreement, and/or (b) disputes regarding the availability or

adequacy of any shelter or shelter services offered to the individual pursuant to this

Agreement (collectively, the "Disputes," and individually, a "Dispute"). Any and all

Court hearings and/or mediated disputes shall be conducted in a closed setting to preserve

privacy and HIPAA protections.

  11.2. In the event of any Dispute arising during the pendency of the Court's

retained jurisdictions, the parties to that Dispute will first attempt to meet and confer

informally with the other side in an effort to resolve it. In the case of a Dispute raised by

one or more homeless individuals (including, but not limited to, any individual Plaintiffs)

against the County or a Dispute raised by the County against one or more homeless

individuals who are known to be represented by counsel of record in the Action, this

attempt will at least involve (a) a communication from the party initiating the Dispute to

the other side's counsel describing in detail the Dispute and the requested remedy, and

providing any evidence in their possession in relation thereto, and (b) a discussion, either

in person or via telephone, seeking to resolve the Dispute. County employees, as well as

the employees of the Shelter(s), shall give any affected individual notice of the Court's

Dispute-Resolution Process and the contact information for Plaintiffs' counsel, together

with a statement that Plaintiffs' counsel may be available to assist them.

11.3.  If the parties to a Dispute are unable to resolve it within two (2) court days after it is first raised informally by one of the parties to the Dispute, any party to the Dispute may request a hearing with the Court under the standards and processes to be set by the Court, and the Court will have jurisdiction to resolve that Dispute.  If the Dispute involves an emergency situation that presents a threat to the immediate health and safety of an individual, the parties may seek expedited review by the Court immediately.

11.4.  Except as provided for in Section 4 hereinabove, nothing in this agreement shall impact the OCSD's right to enforce any law not based on the individual's unsheltered status against a person believed to be homeless, including issuing citations and arresting the person for an alleged violation of the law.

## 12.    Release and Covenant Not to Sue

In consideration for the terms of this Agreement, Plaintiffs, and each of them, on their own behalf, and any other individual claiming rights under this Agreement including, but not limited to, those employing the dispute resolution procedures set forth herein (the "Releasing Parties"), and except as set forth above in this Agreement, hereby release and forever discharge the County, as well as its present and former employees, agents, managers, officers, directors, Board members, attorneys, departments including the OCSD, the County's Health Care Agency and Social Services Agency and divisions or affiliated entities, whether previously or hereafter affiliated in any manner (the "Released Parties"), from and against any and all claims, demands, causes of action, obligations, damages, attorneys' fees, costs, and liabilities, arising from or relating to the

18

events detailed in the lawsuit of any nature whatsoever, whether or not now known,

suspected, or claimed, which the Releasing Parties, and/or any of them, have at the time

of signing this agreement, as against the Released Parties, or any of them, whether

directly or indirectly, relating to or arising out of (a) the OC Catholic Worker and

Ramirez Actions, (b) any claims raised in, or that could have been raised in, the OC

Catholic Worker or Ramirez Actions, (c) the availability of homeless shelters, shelter

beds, and/or other homeless accommodations in Orange County, (d) the County's alleged

obligation to provide and/or fund such accommodations, and/or (e) OCSD's alleged

inability to enforce any of the County's Ordinances and any law that the Releasing

Parties claim criminalizes a person's homeless status, against any person because of his or

her homeless status (hereinafter, the "Release Claims"), conditional upon the provisions

herein.

### 13.   Waiver of California Civil Code Section 1542

The Parties acknowledge that they are familiar with the provisions of California

Civil Code section 1542 and, except as otherwise provided herein, expressly waive and

relinquish any and all rights or benefits that they may have under said section to the

fullest extent permitted by law concerning any matters relating to the Parties' Actions.

California Civil Code section 1542 states:

**A general release does not extend to claims that the creditor or releasing party**

**does not know or suspect to exist in his or her favor at the time of executing the**

**release and that, if known by him or her, would have materially affected his or her**

**settlement with the debtor or released party.**

The Parties declare that they understand the full nature, extent and import of section 1542 of the California Civil Code and have been so advised by their attorneys.

The Releasing Parties, and each of them, warrant that they have made no assignment, and will make no assignment, of any claim, chose in action, right of action, or any right, of any kind whatsoever, within the scope of the Released Claims, and that no other person or entity of any kind had or has any interest in any of the demands, obligations, actions, causes of action, debts, liabilities, rights, contracts, damages, attorneys' fees, costs, expenses, losses, or claims within the scope of the Released Claims.

## 14.   Dismissal of the Action

At the conclusion of the Court's retained jurisdiction, Plaintiffs will take all necessary actions and file all necessary documents to effectuate dismissal of the OC Catholic Worker Action with prejudice and the Ramirez Action with prejudice.

## 15.   Settlement Payments and Attorneys' Fees

The parties understand that the individual Plaintiffs claim damages and as a result will meet and confer in an attempt to resolve those claims.  The County agrees to pay Plaintiffs' reasonable attorneys' fees.  Should an agreement as to the amount of attorneys' fees not be reached by the Parties, Plaintiffs have the right to file a Motion for Attorneys' Fees in this Court in each of the actions included in this settlement.  County shall not object to the motion(s) on the basis that Plaintiffs are not entitled to attorneys' fees but may object to the amount of fees claimed.

20

Plaintiffs' counsel will be entitled to monitoring fees, upon proof of time spent, not to exceed $ 100,000 a year during the time that the Court retains jurisdiction to review and enforce the terms of the Agreement.

### 16. <u>Non-Admission of Liability</u>

By entering into this Agreement, neither the County nor the OCSD admits any liability, and explicitly denies any liability or wrongdoing of any kind arising out of or relating to any of the claims alleged in the Action. Nothing herein constitutes an admission by the County or the OCSD as to any interpretation of laws, or as to the merits, validity, or accuracy of any of the claims or legal contentions made against it in the Action. The County and the OCSD have entered into this Agreement solely to avoid the time, expense, and risk of continued litigation. The Parties agree that an express condition of this settlement is that there has been no finding of liability on the merits, and that this settlement and any document related to this settlement, including this Agreement and the Order, and the confidential negotiations leading up to this settlement, shall be inadmissible in evidence and shall not be used for any purpose in this or any other proceeding except in an action or proceeding to approve, interpret, or enforce the Agreement.

### 17. <u>Knowing and Voluntary</u>

This Agreement is an important legal document that has been voluntarily and knowingly executed by the Parties. The Parties, and each of them, specifically represent that, prior to signing this Agreement, (a) they have each been provided a reasonable

21

period of time within which to consider whether to accept this Agreement, (b) they have each carefully read and fully understand all of the provisions of this Agreement, and (c) they are voluntarily, knowingly, and without coercion entering into this Agreement based upon their own judgment. Plaintiffs, and each of them, further specifically represent that, prior to signing this Agreement, they have conferred with counsel of their choice to the extent desired concerning the legal effect of this Agreement, and that the legal effect of this Agreement has been adequately explained to them.

## 18. Entire Agreement

This Agreement constitutes the entire agreement between the Releasing Parties, the County and the OCSD regarding the matters discussed herein and supersedes any and all other agreements, understandings, negotiations, or discussions, either oral or in writing, express or implied, between the Releasing Parties, the County, and the OCSD relating to the subject matter hereof. The Releasing Parties, the County and the OCSD each acknowledge that no representations, inducements, promises, agreements, or warranties, oral or otherwise, have been made by them, or anyone acting on their behalf, which are not embodied in the Agreement, that they have not executed this Agreement in reliance on any such representation, inducement, promise, agreement, or warranty, and that no representation, inducement, promise, agreement, or warranty not contained in this Agreement including, but not limited to, any purported supplements, modifications, waivers, or terminations of this Agreement, shall be valid or binding, unless executed in writing by all of the Parties to this Agreement. Any alteration, change, or modification of

22

or to this Agreement shall be made by written instrument executed by each party hereto in order to become effective.

### 19.   Warranty of Authority

Each individual or entity that executes this Agreement represents and warrants, in his, her, or its personal capacity, that he, she, or it is duly authorized and empowered to enter into this Agreement on behalf of the party it purports to represent.

### 20.   Counterparts

This Agreement may be executed in multiple counterparts, each of which shall be considered an original but all of which shall constitute one agreement.

### 21.   Representation by Counsel and Understanding

The Parties acknowledge that each of them has been represented in the settlement of the matter by its own counsel and represent that each of them has been fully advised of the nature of the Agreement and the possible rights and obligations released herein. The rule of construction that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of the Agreement.  The Parties further acknowledge that each of them has carefully read and fully understands all of the provisions of the Agreement, and that each of them is voluntarily entering into the Agreement.

### 22.   No Waiver of Terms of Agreement

The failure to insist upon compliance with any term, covenant or condition contained in the Agreement shall not be deemed a waiver of that term, covenant or

23

condition, nor shall any waiver or relinquishment of any right or power contained in the Agreement at any one time or more times be deemed a waiver or relinquishment of any right or power at any other time or times.

## 23. **Independent Legal Advice**

The Parties each represent, warrant, and agree that each has received independent legal advice from their respective attorneys with respect to the terms of the settlement provided for in this Agreement and with respect to the advisability of entering into this Agreement.

## 24. **No Other Representation**

The Parties each represent, warrant, and agree that, except for the statements expressly set forth in this Agreement, each has not relied upon any statement, representation, or promise of any other party hereto in entering into this Agreement, or in making the agreements provided for in this Agreement.

## 25. **Modification of Agreement**

The enforcement terms of this Agreement may be vacated or modified, at the request of any party hereto, before the Termination Date (defined below) if: (a) the holding of *Martin v. City of Boise*, 920 F.3d 584, Case no. 15-35845 (9th Cir. April 1, 2019) ("*Martin v. Boise*") is reversed or modified, or is otherwise no longer good law; or, (b) the Court determines that the number of available and appropriate shelter placements in the County of Orange warrant termination or modification of the Agreement, or (c) upon petition by the County, the Court determines that other terms of the Agreement

24

have been met.

The parties shall meet and confer with each other concerning any modification of this Agreement or the dispute resolution process, and any continuing disagreements will ultimately be resolved by the Court.

**26.** **Signatures**

On behalf of the County of Orange:

DATED: July 23, 2019

For the County of Orange:

Frank Kim
County Executive Officer
County of Orange

DATED: July 23, 2019

For the County of Orange:

Leon Page
County Counsel
County of Orange

Approved as to Form:

DATED: July 23, 2019

Carol Sobel
Attorney for *OCCW et al.*, Plaintiffs

DATED: July 23, 2019

Lili Graham
Attorney for *People's Homeless Task Force,* Plaintiff

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14                          **[BLANK PAGE]**
15
16
17
18
19
20
21         .
22
23
24
25
26
27
28

26

*OCCW* Plaintiffs:

_____
Orange County Catholic Workers
Plaintiff

_____
Lisa Bell
Plaintiff

_____
Melissa Fields
Plaintiff

_____
Gloria Shoemake
Plaintiff

_____
Richie Thomas
Plaintiff

_____
Shawn Carroll
Plaintiff

_____
Larry Ford
Plaintiff

_____
Cameron Ralston
Plaintiff

_____
Kathy Schuler
Plaintiff

*People's Homeless Task Force* Plaintiff:

_____
Dave Duran
People's Homeless Task Force
Plaintiff

_____
Jeanine Robbins
People's Homeless Task Force
Plaintiff

*OCCW* Plaintiffs:

_____
Orange County Catholic Workers
Plaintiff

_____
Lisa Bell
Plaintiff

_____
Melissa Fields
Plaintiff

_____
Gloria Shoemake
Plaintiff

_____
Richie Thomas
Plaintiff

_____
Shawn Carroll
Plaintiff

_____
Larry Ford
Plaintiff

_____
Cameron Ralston
Plaintiff

_____
Kathy Schuler
Plaintiff

*People's Homeless Task Force* Plaintiff:

_____
Dave Duran
People's Homeless Task Force
Plaintiff

_____
Jeanine Robbins
People's Homeless Task Force
Plaintiff

*OCCW* Plaintiffs:

_____
Orange County Catholic Workers
Plaintiff

_____
Larry Ford
Plaintiff

_____
Lisa Bell
Plaintiff

_____
Cameron Ralston
Plaintiff

_____
Melissa Fields
Plaintiff

_____
Kathy Schuler
Plaintiff

*People's Homeless Task Force* Plaintiff:

_____
Gloria Shoemake
Plaintiff

_____
Dave Duran
People's Homeless Task Force
Plaintiff

_____
Richie Thomas
Plaintiff

_____
Jeanine Robbins
People's Homeless Task Force
Plaintiff

_____
Shawn Carroll
Plaintiff

# ATTACHMENT

# A

**ATTACHMENT A**

# ATTACHMENT "A"

## STANDARDS OF CARE FOR COUNTY CONTRACTED SHELTER PROVIDERS

The County of Orange, in its endeavor to provide care and coordination for the System of Care, agrees to adopt the following Standards of Care for its County funded or contracted shelters serving homeless participants. The Parties agree that the County is not responsible for the implementation of the Standards of Care within contracted shelter programs not funded by the County. While the County acknowledges that flexibility is an important component for this work, it also recognizes that the System of Care remains incomplete in meeting every need that presents amidst the crisis of homelessness, not just in OC but across the State, and it must rely on the broader jurisdictional partner entities to support solutions to homelessness in all three Service Planning Areas designated within the County. This regional approach requires the participation of Cities that control land use, constituents, advocates, service providers, private and public sector affiliates, state and federal contributors to also invest in solutions that expand the supportive services, sheltering and permanent housing necessary to complete a fully responsive system of care in the County of Orange.

That said, the County is committed to provide the necessary oversight of its contracted facilities, its selected providers, promoting quality assurance practices for the programs operations and remediation protocols for clients to exercise their right to due process to redress concerns that may arise in the conduct of this work.

The Standards of Care document, which is under development and open for feedback from key informant stakeholders, is designed to promote an environment that is conducive under the following governing principals:

- The Service Providers are trained, competent and equipped to effectively address the complex needs presented by those experiencing homelessness in Orange County.

- The Clients are empowered to freely enter into a voluntary service partnership whereby their right to be treated with dignity and respect is mutually shared with support services staff, assisting clients to reach their fullest potential.
- The Facilities are maintained as accessible, clean, safe, secure and vector free.
- Flaws in the relational ability to achieve our mutual objectives are inherent in this work and that processes are in place to both identify and resolve issues collectively.
- The policies and processes outlined within the Standards of Care are designed to ensure the sustainability of these governing principals.

## **SHELTER STAFF TRAINING**

Mandatory staff training will be implemented regarding safety, compliance and quality services provisions to best address the complex needs of the clients served. Programs shall establish and document a regular process for onboarding new staff and regularly update the training completed by current staff.

All shelter staff shall receive training upon hire or upon request by the County to ensure competency within the following core areas:

a.  Program Operations;

b.  Effective interactions with participants;

c.  Housing First & Low Barrier Practices;

d.  Harm Reduction;

e.  Trauma Informed Care, including Secondary Trauma;

f.  Mental Health First Aid;

g.  Non-Violent Crisis Intervention;

h.  Stages of Change/Motivational Interviewing;

i.  Equal Access Gender Identity Policy;

j.  Emergency evacuation procedures;

k.     Domestic Violence & Safety Planning;

l.     CPR, First Aid/Medical Emergency, & Communicable Disease procedures; and,

m.    Cultural Responsiveness and Sensitivity

Certificates and other documentation that verify training attendance shall be maintained for each employee and documented in the employee's file.

Program staff is considered Mandated Reporters of suspected child and senior abuse and must report suspicions of child or senior abuse as required by California Law.

## FACILITIES: HEALTH, SAFETY AND SECURITY

Existing County facilities that are designed for shelter use must meet standards outlined in HUD ESG Habitability Standards for Emergency Shelters within 18 months. A site checklist will be adopted and utilized by both providers and the County to ensure ongoing standards are met for permanent shelter facilities. Additional facility and programmatic conditions are specified below, as pertaining to Security, Health and Safety for shelter program participants:

1.    Programs shall develop written policies and procedures that address universal precautions, tuberculosis control, and disease prevention, and are in compliance with Health Care Agency guidelines, which shall be available to any client.

2.    Programs shall ensure that at least one staff per shift has been trained in and has an up-to-date certification for CPR and emergency first aid procedures.

3.    Programs shall establish a policy and procedure for all entry and exits that includes sign in/out procedure for all participants.

4.    Programs shall develop a policy and procedure for emergencies, disasters, and security, including the stockpiling of appropriate quantities of water and food rations. The plan shall include policies and procedures for:

a.    Reporting a fire or other emergency;

b. Emergency evacuations, including the differences in evacuation procedures depending on the type of evacuation and exit route assignments;

c. Assisting participants in their evacuation;

d. Accounting for all participants and staff after evacuation;

e. Staff performing rescue or medical duties;

f. Deterring theft and protect participant and staff from harm; and

g. Crisis interventions when staff are required or permitted to call 911, make a police report, or perform other non-violent interventions.

h. Critical incident documentation and reporting standards

## SHELTER PROGRAM ORIENTATION / INTAKE CHECKLIST

It is important that shelter providers communicate clear expectations regarding program rules and expectations with clients during the intake process. This should be done both verbally and in writing with each client, in a manner which is preferred by the client, topics will include:

Program operational hours – curfew, meals, services available etc.

Transportation / shuttle schedules

Lead staff and case management staffing structure

Shelter Policies regarding rule violations that may cause warnings vs immediate exits:

Warnings: missed curfew, smoking in non-designated area, being in non-designated area, disrespectful language/behaviors towards staff or other residents, harassment of staff or other residents, or other behaviors that create an unsafe environment for staff or other clients in the program. Repeated warnings for same issue could lead to exit.

Immediate exits may be for violations which cause an immediate safety issue related to:

Contraband: no drugs, no weapons in the shelter program;

Conduct: under the influence drugs/alcohol, physical fighting, possession of stolen property; physical assault and/or battery.

Client Rights and Responsibilities will be provided upon intake to highlight that the program success depends on both the client and the staff working together on progress towards goals to self-sufficiency. The Client plays a key role in maintaining open and transparent communication about needs and barriers, progress and outcomes. The staff is available to facilitate the necessary resource linkages to facilitate that progress.

Each client intake process will be completed within 72 hours and will include the development of an Individualized Service Plan (ISP) to outline the client's goals to reach self-sufficiency.

**CLIENT FEEDBACK OPPORTUNITIES:**

Shelter Providers will create opportunities for client feedback

Regular resident meetings will be conducted to discuss facility needs, program structure or suggestions about new services recommended by clients, etc.

Placement of Suggestion Boxes in visible places for anonymous or signed feedback to providers

Client feedback surveys upon exit (facilities, staffing, services ratings and open feedback)

Grievance forms readily available for clients to fill out and submit

**INTEGRATION OF COUNTY DEPARTMENTAL AND CONTRACTED SERVICES FOR SHELTER PROGRAMS:**

SSA: public benefits applications and renewals

HCA: Public Health Nursing assistance, Behavioral Health supports and services

A screening by the Behavioral Health team, or by the CHAT –

H Public Health Nurse teams may also be requested or needed

to identify a more appropriate level of care (medical and/or

behavioral health placement). This screening is available

during the intake process or while the person is staying in the shelter program, in response to need which may arise at any time.

If the screening reveals that a clinical assessment is appropriate, HCA shall make the arrangements to have such assessment completed at the current placement facility when practicable or transport individuals as needed to a County clinic.

Mobile or Co-located Health services

Access to Collaborative Courts

Employment programs

Veteran Services

## CREATION OF STANDARDIZED GRIEVANCE POLICIES AND PROCEDURES

The County will standardize Grievance Forms to be used by all contracted shelter providers, with corresponding protocols to resolve issues before they become grievances. The grievance protocols will begin at the program manager level, with escalation to the Agency Executive Director/CEO level, with notification to the County at that level. There will also be a method for program clients to submit a grievance to the County directly, as desired.

Behavioral Health treatment programs have formalized grievance / due process procedures which are prescribed by funding sources and are considered independent of these Shelter Program Standards of Care.

Shelter Programs will adhere to the development of standardized grievance procedures, which include elevation to higher authority, with timeframes for resolutions and appeals.

The Shelter Programs will have Agency specific protocols for Grievance Policies and Procedures, which will incorporate the standardized grievance procedures developed by the County and for which the County will require the selected providers to:

a.   Submit a copy of the Agency Grievance Policies and Procedures to the County OCCR for review and approval.

b.   The approved Grievance Policies and Procedures shall be discussed with participants during intake and copies offered to the participant.

c.   Programs shall maintain documentation of the participant's signature acknowledging that the Grievance Policies and Procedures were discussed and offered to them or documentation that the client was unable/unwilling to sign the acknowledgement.

d.   Grievance Policies and Procedures shall be prominently displayed in common area(s) in the facility.

**Grievance Policies and Procedures shall include, but are not limited to, the following:**

e.   The identification of at least one staff and an alternate (by staff title, not name) who are responsible for addressing all grievances.  The designated alternate shall be responsible for addressing grievances in which the designated staff is the subject of the grievance;

f.   Information about how the participant can file a grievance, including information about how they can contact assigned staff(s) and alternate(s) to file a grievance;

g.   A timeline not to exceed 72 hours, during which the participant will acknowledgement of the grievance being received and a timeline not to exceed 10 business days during which the participant will receive a written decision about the grievance that includes the factors that led to the final determination;

h.   Information about how the grievance will be reviewed, including a discussion of what facts will be used in the review;

i.  Information about the appeal process to be entered into if the participant is not in agreement with the grievance decision including the identification of at least one staff and an alternate (by staff title, not name) who are responsible for a second level review of the grievance and a <u>timeline not to exceed 72 hours</u>, during which the participant will receive acknowledgement of the request for a second level review of the  grievance being received and a timeline not to exceed 10 business days during which the participant will receive a second level written grievance decision that includes a statement of the factors that led to the final determination;

j.  Information about the appeal process to be entered into if the participant is not in agreement with the second level grievance decision that includes discussion of the client's right to contact the OCCR Director of Housing and Homeless Services for review of the programs decision, and the contact information for these entities;

Request for Dispute Resolution Services may be referred to:

Elder Law and Disability Rights Center
1535 E. 17th Street
Santa Ana, CA  92705
Ph: (714) 617-5353
Email: info@eldrcenter.org

If either party wishes to seek review by the Court they shall notify the chambers of Judge David O. Carter via email at: <u>DOC_Chambers@cacd.uscourts.gov</u>.

Any hearings by the Court shall be conducted during regular business hours whenever feasible.

k.  Discussion of how the confidentiality of the participant who filed a grievance and the written grievance will be ensured; and

l.  Discussion of the receipt and outcome of all grievances will be documented and maintained including the date the grievance was submitted, the date the submission was acknowledged, the staff that addressed the grievance and the date the participant received the written grievance disposition.

8

## ADA COMPLIANCE IN SHELTER PROGRAMS

County agrees to designate an ADA Coordinator position that will ensure annual training for County and County Contracted shelter staff, in addition to providing regular site visits to ensure facility ADA compliance requirements under both federal and state applicable standards are addressed. The ADA Coordinator will implement the following:

Annual checklist of ADA compliance submitted by providers to the County

Mandatory training of shelter staff in ADA Compliance and Disability Accommodations protocol

Provide consultation to shelter providers regarding specific disability accommodation requests

The following section outlines requirements related to ADA compliance. If a site is unable to comply with any of the following standards, programs shall document that reasonable accommodations to meet the accessibility needs of participants was addressed, and program must ensure that documentation of reasonable accommodations is filed for future monitoring by the ADA Coordinator.  The parties recognize that not every facility can reasonably accommodate every disability.  The County shall make every effort to accommodate disabilities where feasible and reasonable in accordance with state, and federal laws; and if a reasonable accommodation would not fundamentally change the nature of the program.

1. Facilities shall be accessible to participants with disabilities.
2. Facilities shall not have areas, in or out of the property, with broken, raised, or un-level sidewalks or walkways, or stairs or steps with no identified accessible pathway to the entrance and/or curb cuts.
3. Entry into the facility shall be accessible to participants with limited mobility, including participants who use wheelchairs or scooters, manually-powered mobility aids such as walkers, crutches, or canes.

4.  The exterior of the facility shall be accessible for participants with disabilities when approaching, entering or inside the location.

5.  Programs shall provide at least one restroom with at least one stall with a five-foot turning radius.

6.  All restrooms established under this section shall have handles for an individual using a mobility device to move themselves without assistance.

7.  If parking is available at the facility, programs shall provide at least one ADA accessible van parking space for every 25 non-accessible parking spaces. The accessible space shall provide enough room for a van with a hydraulic side lift to go up and down without any issue.

8.  All fire alarm systems and fire extinguishers shall be no more than 48 inches from the ground for easy access in case of an emergency.

9.  All programmatic areas shall be accessible for an individual with a mobility device.

10. Programs shall provide at least one shower accessible for those with a mobility device, regardless of gender.

11. Program sites shall provide at least one accessible roll-in shower or at least two transfer ADA shower seats.

12. Programs shall provide accessible beds for persons with mobility disabilities designed for easy transfer from a mobility device.

13. If there are common/communal areas located at the facility, they shall be accessible for all participants, including those with mobility devices.

14. If there is a dining area located in the facility, it shall be accessible for all participants, including those with mobility devices.

15. Doors within the facility shall be equipped with a handle which can be opened with a closed fist rather than a knob.

16. Accessibility postings shall be posted in plain sight in a common area of the facility.

17.     Language Accessibility- Shelter operators must ensure clients have access to interpreter services if requested.

18.     The County shall provide a means for a shelter resident to submit a request for an ADA accommodation for a disability and a timeline for review and response to the request, consistent with the Dispute Resolution Process..

Appendix:

A:  Standardized County Grievance Form (under development)

B: ESG Habitability Checklist for Emergency Shelters

# APPENDIX A
## to
## Attachment A

**Appendix A to Attachment A**

# Appendix A

## Grievance Form Under Development

# APPENDIX B
## to
## Attachment A

**Appendix B to Attachment A**

# ESG Minimum Habitability Standards for Emergency Shelters and Permanent Housing: Checklists

## About this Tool

The Emergency Solutions Grants (ESG) Program Interim Rule establishes different habitability standards for emergency shelters and for permanent housing (the Rapid Re-housing and Homelessness Prevention components).

- **Emergency Shelter Standards**.

  ➢ Emergency shelters that receive ESG funds for renovation or shelter operations must meet the minimum standards for safety, sanitation, and privacy provided in §576.403(b).

  ➢ In addition, emergency shelters that receive ESG funds for renovation (conversion, major rehabilitation, or other renovation) also must meet state or local government safety and sanitation standards, as applicable.

- **Permanent Housing Standards.** The recipient or subrecipient cannot use ESG funds to help a program participant remain in or move into housing that does not meet the minimum habitability standards under §576.403(c). This restriction applies to all activities under the Homelessness Prevention and Rapid Re-housing components.

Recipients and subrecipients must document compliance with the applicable standards. Note that these checklists do not cover the requirements to comply with the Lead-Based Paint requirements at §576.403(a). For more discussion about how and when the standards apply, see *ESG Minimum Standards for Emergency Shelters and Permanent Housing,* located at http://OneCPD.info/esg.

The checklists below offer an optional format for documenting compliance with the appropriate standards. These are intended to:

1. Provide a clear summary of the requirements and an adaptable tool so recipients and subrecipients can formally assess their compliance with HUD requirements, identify and carry out corrective actions, and better prepare for monitoring visits by HUD staff.

2. Provide a tool for a recipient to monitor that its subrecipient is in compliance with HUD requirements. Where non-compliance is identified, the ESG recipient can use this information to require or assist the subrecipient to make necessary changes.

Prior to beginning the review, the subrecipient should organize relevant files and documents to help facilitate their review. For instance, this may include local or state inspection reports (fire-safety, food preparation, building/occupancy, etc.), or policy and procedure documents related to emergency shelter facility maintenance or renovations.

Carefully read each statement and indicate the shelter's or unit's status for each requirement (Approved or Deficient). Add any comments and corrective actions needed in the appropriate box. The reviewer should complete the information about the project, and sign and date the form. This template includes space for an "approving official," if the recipient or subrecipient has designated another authority to approve the review. When the assessment is complete, review it with program staff and develop an action plan for addressing any areas requiring corrective action.

## Minimum Standards for Emergency Shelters

**Instructions**: Place a check mark in the correct column to indicate whether the property is approved or deficient with respect to each standard. A copy of this checklist should be placed in the shelter's files.

| Approved | Deficient | Standard<br>(24 CFR part 576.403(b)) |
|---|---|---|
| | | 1. *Structure and materials*:<br>   a. The shelter building is structurally sound to protect the residents from the elements and not pose any threat to the health and safety of the residents.<br>   b. Any renovation (including major rehabilitation and conversion) carried out with ESG assistance uses Energy Star and WaterSense products and appliances. |
| | | 2. *Access*. Where applicable, the shelter is accessible in accordance with:<br>   a. Section 504 of the Rehabilitation Act (29 U.S.C. 794) and implementing regulations at 24 CFR part 8;<br>   b. The Fair Housing Act (42 U.S.C. 3601 et seq.) and implementing regulations at 24 CFR part 100; and<br>   c. Title II of the Americans with Disabilities Act (42 U.S.C. 12131 et seq.) and 28 CFR part 35. |
| | | 3. *Space and security*: Except where the shelter is intended for day use only, the shelter provides each program participant in the shelter with an acceptable place to sleep and adequate space and security for themselves and their belongings. |
| | | 4. *Interior air quality*: Each room or space within the shelter has a natural or mechanical means of ventilation. The interior air is free of pollutants at a level that might threaten or harm the health of residents. |
| | | 5. *Water Supply*: The shelter's water supply is free of contamination. |
| | | 6. *Sanitary Facilities*: Each program participant in the shelter has access to sanitary facilities that are in proper operating condition, are private, and are adequate for personal cleanliness and the disposal of human waste. |
| | | 7. *Thermal environment*: The shelter has any necessary heating/cooling facilities in proper operating condition. |
| | | 8. *Illumination and electricity*:<br>   a. The shelter has adequate natural or artificial illumination to permit normal indoor activities and support health and safety.<br>   b. There are sufficient electrical sources to permit the safe use of electrical appliances in the shelter. |
| | | 9. *Food preparation*: Food preparation areas, if any, contain suitable space and equipment to store, prepare, and serve food in a safe and sanitary manner. |
| | | 10. *Sanitary conditions*: The shelter is maintained in a sanitary condition. |
| | | 11. *Fire safety*:<br>   a. There is at least one working smoke detector in each occupied unit of the shelter. Where possible, smoke detectors are located near sleeping areas.<br>   b. All public areas of the shelter have at least one working smoke detector.<br>   c. The fire alarm system is designed for hearing-impaired residents.<br>   d. There is a second means of exiting the building in the event of fire or other emergency. |
| | | 12. If ESG funds were used for renovation or conversion, the shelter meets state or local government safety and sanitation standards, as applicable. |
| | | 13. Meets additional recipient/subrecipient standards (if any). |

## CERTIFICATION STATEMENT

I certify that I have evaluated the property located at the address below to the best of my ability and find the following:

☐ Property meets all of the above standards.

☐ Property does not meet all of the above standards.

| **COMMENTS:** |
| --- |
|  |

---

ESG Recipient Name: _____

ESG Subrecipient Name (if applicable): _____

Emergency Shelter Name: _____

Street Address: _____

City: _____   State: _____   Zip: _____

Evaluator Signature: _____   Date of review: _____

Evaluator Name: _____

Approving Official  Signature (if applicable): _____   Date: _____

Approving Official Name (if applicable): _____

# Minimum Standards for Permanent Housing

**Instructions:** Place a check mark in the correct column to indicate whether the property is approved or deficient with respect to each standard. The property must meet all standards in order to be approved. A copy of this checklist should be placed in the client file.

| Approved | Deficient | Standard<br>(24 CFR part 576.403(c)) |
|---|---|---|
| | | 1. *Structure and materials*: The structure is structurally sound to protect the residents from the elements and not pose any threat to the health and safety of the residents. |
| | | 2. *Space and security*: Each resident is provided adequate space and security for themselves and their belongings. Each resident is provided an acceptable place to sleep. |
| | | 3. *Interior air quality*: Each room or space has a natural or mechanical means of ventilation. The interior air is free of pollutants at a level that might threaten or harm the health of residents. |
| | | 4. *Water Supply*: The water supply is free from contamination. |
| | | 5. *Sanitary Facilities*: Residents have access to sufficient sanitary facilities that are in proper operating condition, are private, and are adequate for personal cleanliness and the disposal of human waste. |
| | | 6. *Thermal environment*: The housing has any necessary heating/cooling facilities in proper operating condition. |
| | | 7. *Illumination and electricity*: The structure has adequate natural or artificial illumination to permit normal indoor activities and support health and safety. There are sufficient electrical sources to permit the safe use of electrical appliances in the structure. |
| | | 8. *Food preparation*: All food preparation areas contain suitable space and equipment to store, prepare, and serve food in a safe and sanitary manner. |
| | | 9. *Sanitary condition*: The housing is maintained in sanitary condition. |
| | | 10. *Fire safety*:<br>   a. There is a second means of exiting the building in the event of fire or other emergency.<br>   b. The unit includes at least one battery-operated or hard-wired smoke detector, in proper working condition, on each occupied level of the unit. Smoke detectors are located, to the extent practicable, in a hallway adjacent to a bedroom.<br>   c. If the unit is occupied by hearing-impaired persons, smoke detectors have an alarm system designed for hearing-impaired persons in each bedroom occupied by a hearing-impaired person.<br>   d. The public areas are equipped with a sufficient number, but not less than one for each area, of battery-operated or hard-wired smoke detectors. Public areas include, but are not limited to, laundry rooms, day care centers, hallways, stairwells, and other common areas. |
| | | 11. Meets additional recipient/subrecipient standards (if any). |

## CERTIFICATION STATEMENT

I certify that I have evaluated the property located at the address below to the best of my ability and find the following:

☐ Property meets all of the above standards.

☐ Property does not meet all of the above standards.

| **COMMENTS:** |
| --- |
| |

ESG Recipient Name: _____

ESG Subrecipient Name: _____

Program Participant Name: _____

Street Address: _____

Apartment: _____

City: _____ State: _____ Zip: _____

Evaluator Signature: _____        Date of review: _____

Evaluator Name: _____

Approving Official  Signature (if applicable): _____        Date: _____

Approving Official Name (if applicable): _____

Case 4:20-cv-03033-JST Document 66-3 Filed 06/24/20 Page 51 of 52

# ATTACHMENT

# B

**ATTACHMENT B**



**Service Planning Areas**

- North Region
- Central Region
- South Region

# SERVICE PLANNING AREAS

Health Policy Research and Communication, May 2017