UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HASTINGS COLLEGE OF THE LAW, a public trust and institution of higher education duly organized under the laws and the Constitution of the State of California; FALLON VICTORIA, an individual; RENE DENIS, an individual; TENDERLOIN MERCHANTS AND PROPERTY ASSOCIATION, a business association; RANDY HUGHES, an individual; and KRISTEN VILLALOBOS, an individual, <br><br>                      Plaintiffs, <br><br>    v. <br><br>CITY AND COUNTY OF SAN FRANCISCO, a municipal entity, <br><br>                      Defendant. | Case No. 4:20-cv-03033-JST <br><br>**STIPULATED INJUNCTION** |

SECTION I.  The parties share the goal of improving living conditions in the Tenderloin neighborhood, and of making the streets and sidewalks clear and safe for the use of persons in the Tenderloin, including residents, the unhoused, visitors, employees, employers, shoppers, and persons with disabilities.  The parties wish to help businesses and all persons in the Tenderloin thrive and enjoy the safety and opportunity that are expected in any San Francisco Neighborhood. The problems

facing the Tenderloin are substantial and are not easily solved and have been exacerbated by the COVID-19 crisis.  As the parties recognize that the COVID-19 crisis creates additional challenges to improving the Tenderloin neighborhood, this injunction is intended to address the current situation.  Ultimately the City's goal is to be able to provide sufficient access to shelters and navigation centers so that no resident of San Francisco must resort to sleeping in a tent on the street or sidewalk.  The City is committed to making all reasonable efforts to achieve this goal.

SECTION II.   During the COVID-19 emergency[1], the City will reduce the number of tents and other encamping materials and related personal property on sidewalks and streets in the Tenderloin by offering alternatives to people living in those tents including the following:

> First, the City will offer shelter-in-place hotel rooms to people facing heightened health risks from COVID-19.  The City estimates that approximately thirty-percent of people currently living in tents in the Tenderloin will be eligible for an SIP hotel room.  To ensure that rooms are available for all eligible people currently in the Tenderloin, the City will prioritize access to hotel rooms for unsheltered persons currently living in the Tenderloin.

> Second, the City will establish safe sleeping villages outside the Tenderloin to which people can relocate.  Safe sleeping villages are staffed areas that offer access to social services, restrooms, garbage service, power, water, and hand sanitizer.  The City will ensure that safe sleeping villages comply with and are maintained consistent with guidelines from the San Francisco Department of Public Health.

> Third, the City will make available some off-street sites in the

---

[1] The end of the COVID-19 emergency is defined for purposes of this injunction as the date the Mayor lifts the San Francisco emergency order.

    Tenderloin (such as parking lots) to which tents can be moved so they are no longer on sidewalks or streets or blocking sidewalks or entrances to businesses and homes.  The City agrees that this option will only be available for a maximum of 50-70 tents because of existing structures in the Tenderloin.  These off-street sites will be permanently removed within three months after the end of the COVID-19 emergency, defined as the time the Mayor lifts the emergency declaration.

  Because the implementation of this stipulated injunction may have the effect of encouraging additional people to come to the Tenderloin in the hope of securing a hotel room or placement at a safe sleeping site, during this process the City will discourage additional people from erecting tents in the neighborhood.  The City intends to continue to assist unsheltered persons in other areas of the City.

  The parties recognize that it will take time to make additional sites available in and out of the Tenderloin.  The City is hopeful that most people offered an alternative location will be willing to accept it, but if necessary to comply with this stipulated injunction the City will employ enforcement measures for those who do not accept an offer of shelter or safe sleeping sites to prevent re-encampment.

  The City agrees that it shall cause seventy percent (70%) of the number of tents as counted on June 5, 2020 to be removed along with all other encamping materials and related personal property, and their occupants relocated to a hotel room, safe sleeping site, off-street sites, or other placement by July 20, 2020.  The City will take action to prevent re-encampment.  After July 20, 2020, the City will make all reasonable efforts to achieve the shared goal of permanently reducing the number of tents, along with all other encamping materials and related personal property, to zero.

  All parties shall respect the legal rights of the unhoused of the Tenderloin in all manners, including in relation to relocating and removing the unhoused, the tents, the other encamping materials and other personal property.

SECTION III.  The City will continue to offer COVID-19 testing in the Tenderloin.  The facility will offer free testing to all persons in the Tenderloin.  The City shall reach out to unhoused people to offer such testing. A mobile testing facility may eventually have to be relocated to other areas of the City, but the City will also work to establish a long-term testing site in the Tenderloin for the duration of the COVID-19 emergency.

SECTION IV.  During the time when the City is working toward removing at least 70% of the tents from the Tenderloin as described above, it will advise unsheltered persons in the Tenderloin of the following requirements:

- Tents and structures cannot block a doorway, exit, fire escape or come within 5 feet of a fire hydrant.
- Tents and structures cannot make sidewalks impassable or impede traffic.

While the City does not believe it can feasibly enforce these requirements immediately and universally throughout the Tenderloin, it will increase its enforcement efforts as the total number of tents is reduced and tents can more readily be relocated.  In addition, the City will discourage persons from erecting tents within 6 feet of a doorway to a business, residence or transit stop.

SECTION V. Narcotic sales and trafficking law violations shall be enforced by the SFPD consistently across the City.

SECTION VI. The parties recognize that the current crisis is unprecedented. The Parties agree that if either party believes the other party to be in breach of the stipulated injunction, the parties will meet and confer within one business day of a dispute being raised.  If the parties are unable to reach a resolution, the dispute will be submitted to Magistrate Judge Corley who will hold a settlement conference within 2 business days of receiving notice of a dispute.  If Magistrate Judge Corley is unable to negotiate a resolution, the dispute will be submitted to Judge Tigar. Judge Tigar will remain able to consult with Judge Corley under the parameters agreed to by the parties at the first Case Management Conference.

SECTION VII. After the COVID-19 emergency, the City will have options to help improve living conditions in the Tenderloin neighborhood that currently are not available due to constraints caused by the pandemic. The parties agree to work together to improve living conditions in the Tenderloin neighborhood for the long term.

SECTION VIII: Plaintiffs agree to seek no attorneys' fees for work done up to date of this order. Other than as stated herein, no party is waiving any rights, claims or defenses by entering this stipulated injunction. The litigation is stayed pending approval of this stipulated injunction by the Board of Supervisors. If the Board does not approve this stipulated injunction, then the litigation will be resumed. After approval by the Board this action will be dismissed, but the court will retain continuing jurisdiction to enforce this injunction.

SECTION IX: The City will immediately begin fulfilling the terms of this stipulated injunction. This stipulated injunction, however, is ultimately subject to approval by the Board of Supervisors. If the Board does not approve the stipulated injunction within three months of the date of this stipulated injunction, Plaintiffs reserve the right to ask the Court to lift the stay of the litigation.

**IT IS SO ORDERED,**

Dated: June 30, 2020

_____
JON S. TIGAR
United States District Judge