Lauren Hansen (CA BAR NO. 268417)
Melissa A. Morris (CA BAR NO. 233393)
PUBLIC INTEREST LAW PROJECT
449 15th St., Suite 301
Oakland, CA 94612-06001
Tel: (510) 891-9794
Fax: (510) 891-9727
Email: lhansen@pilpca.org

ATTORNEYS FOR PLAINTIFFS/INTERVENORS
HOSPITALITY HOUSE; COALITION ON
HOMELESSNESS; AND FAITHFUL FOOLS

Lili V. Graham (CA BAR NO. 284264)
Tiffany L. Nocon (CA BAR NO. 301547)
DISABILITY RIGHTS CALIFORNIA
350 S Bixel Street, Ste 290
Los Angeles, CA 90017-1418
Tel: (213) 213-8000
Fax: (213) 213-8001
Email: Lili.Graham@disabilityrightsca.org

ATTORNEYS FOR PLAINTIFFS/INTERVENORS
HOSPITALITY HOUSE; COALITION ON
HOMELESSNESS; AND FAITHFUL FOOLS

Michael David Keys
(CA BAR NO. 133815)
Jessica Berger (CA BAR NO. 319114)
BAY AREA LEGAL AID
1800 Market Street, 3rd Floor
San Francisco, CA 94102
Tel: (415) 982-1300
Fax: (415) 982-4243
Email: mkeys@baylegal.org

ATTORNEYS FOR
PLAINTIFFS/INTERVENORS
COALITION ON HOMELESSNESS

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HASTINGS COLLEGE OF THE LAW, a public trust and institution of higher education duly organized under the laws and the Constitution of the State of California; FALLON VICTORIA, an individual; RENE DENIS, an individual; TENDERLOIN MERCHANTS AND PROPERTY ASSOCIATION, a business association; RANDY HUGHES, an individual; and KRISTEN VILLALOBOS, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, a municipal entity, <br><br> Defendant. | **Case No. 4:20-cv-3033-JST** <br><br> **AMENDED AND SUPPLEMENTAL COMPLAINT IN INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> Place: Courtroom 6, Second Floor <br> Judge: Hon. Jon S. Tigar <br><br> Complaint Filed: May 4, 2020 <br> Trial Date: None Set |

# I.    INTRODUCTION

1.     Homelessness is a long-standing problem in the Tenderloin District and other parts of San Francisco. In recent years, the crisis has worsened. The City has failed to implement its homeless programs to meet the severe and growing need for safe, adequate housing and shelter for its residents. The City has also failed to appropriately assess and place individuals with disabilities through its Coordinated Entry system.

2.     The COVID-19 pandemic has exacerbated these problems. Shelters, which were over capacity pre-pandemic, are not admitting any new persons to their waitlists. The City purports to have a program to move unhoused individuals who have tested positive for or are at higher risk for COVID-19 into hotels temporarily, but the City has moved only a small percentage of unhoused residents into hotels without following its own Project Roomkey placement policy. People experiencing homelessness during the coronavirus pandemic have only one option—to do their best to shelter in place and practice social distancing on the streets, often in tents on public property. The increase of tents in the Tenderloin, and in other neighborhoods throughout the City of San Francisco, has led to a wave of lawsuits alleging that the presence of unhoused persons and their property in public spaces constitutes a nuisance and harms housed residents and businesses.

3.     This lawsuit was initiated on May 4, 2020 by Plaintiffs Hastings College of the Law, Fallon Victoria, Rene Denis, Tenderloin Merchants Association, Randy Hughes, and Kristen Villalobos ("Plaintiffs"). Although the lawsuit directly implicates the rights and interests of unhoused Tenderloin residents, those rights and interests were not represented by any of the initial parties.

4.     Plaintiffs/Intervenors Hospitality House, Coalition on Homelessness, and Faithful Fools moved to intervene in this action "to ensure that unsheltered Tenderloin residents have a voice in [the] lawsuit and that their legal interests are fully protected." ECF No. 43 at 7. They filed a complaint in intervention to compel the City and County of San Francisco to comply with federal disability law and to protect the statutory and constitutional rights of unhoused residents of San Francisco's Tenderloin neighborhood.

5.      On June 12, 2020, Plaintiffs and Defendant City and County of San Francisco ("City") filed a Joint Request for Entry of Stipulated Injunction "in which the City agreed to provide hotel rooms or safe sleeping locations for the occupants of 70% of the tents currently on the sidewalks of the Tenderloin" by July 20,2020. After July 20, 2020, the City agreed to "make all reasonable efforts to achieve the [parties'] shared goal of permanently reducing the number of tents, along with all other encamping materials and related personal property, to zero."  ECF No. 51 at 7:22-25.

6.      The Injunction, and the City's process of placing unhoused individuals from the Tenderloin during the Injunction's implementation, is inconsistent with the "COVID-19 Alternative Housing Program," the City's program for implementing Project Roomkey, a state program that provided state and federal funds for the City to house vulnerable unhoused individuals into hotel rooms during COVID-19. The City's clearing of unhoused individuals street by street in the Tenderloin demonstrates a pattern and practice of prioritizing removing unhoused people from the Tenderloin over placing them by need or vulnerability. The City therefore has not appropriately placed unhoused individuals with disabilities, and it has disregarded its own COVID-19 Alternative Housing Program for vulnerable unhoused individuals.

7.      Neither Plaintiffs/Intervenors nor any other group or organization representing unhoused Tenderloin residents participated in the settlement negotiations that resulted in the Stipulated Injunction. The Court approved the Stipulated Injunction by an order dated June 30, 2020. ECF No. 71.

8.      On June 30, 2020, the Court granted Plaintiffs/Intervenors motion to intervene into this lawsuit, finding that they "'demonstrated a substantial interest in this litigation that is not adequately represented by the existing parties, and that is threatened by' any decision or settlement that fails to take account of the rights and interests of unsheltered Tenderloin residents." ECF No. 69 at 5:17-19.

9.      Plaintiffs/Intervenors have ongoing claims against the City that were not resolved by the Stipulated Injunction entered on June 30, 2020. Plaintiffs/Intervenors seek compliance

with the law and a remedy that ensures unhoused persons in San Francisco, including those impacted by the City's implementation of the Stipulated Injunction, do not face disability discrimination.

10.     Plaintiffs/Intervenors amend their Complaint in Intervention for Declaratory and Injunctive Relief to provide updated facts that have occurred since the entry of the Stipulated Injunction, including information about the City's violations of unhoused Tenderloin residents' legal rights during its implementation of the Stipulated Injunction.

11.     Plaintiffs/Intervenors request that this Court issue an order finding that the City's implementation of the Stipulated Injunction has resulted in a violation of unhoused people's rights and requiring Defendant City and County of San Francisco ("City") to take necessary steps to adequately protect the unhoused residents who are being moved away from public property in the Tenderloin pursuant to the Stipulated Injunction.

12.     Plaintiffs/Intervenors further seek declaratory relief to ensure that any remedy obtained in this litigation honors and safeguards the constitutional and statutory rights of unhoused individuals living in the Tenderloin.

## II.     JURISDICTION AND VENUE

13.     Plaintiffs/Intervenors assert their claims under the Americans with Disabilities Act, 42 U.S.C. §§12131 *et seq.* (the "ADA"); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§794 *et seq.*; 42 U.S.C. §§1983, 1988; and the Fourteenth Amendment, U.S. Constitution; and Art. 1 § 7, California Constitution.

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1367.  Plaintiffs/Intervenors' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§1343, 2201, and 2202 and by Fed. R. Civ. P. 57 and 65.

15.     Venue is proper under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this District, and because the Defendant is a municipal entity located within the District.

16.     This action has been assigned to the Honorable Jon S. Tigar of Northern District of California.

### III.  PARTIES

**A. PLAINTIFFS**

17.  The underlying action was brought by HASTINGS COLLEGE OF THE LAW, a law school located in San Francisco's Tenderloin neighborhood, the TENDERLOIN MERCHANTS AND PROPERTY ASSOCIATION, which is described in the Complaint as "an association of owners of businesses in the Tenderloin", and four individuals: FALLON VICTORIA, RENE DENIS, RANDY HUGHES, and KRISTEN VILLALOBOS.

**B. DEFENDANT**

18.  Defendant CITY AND COUNTY OF SAN FRANCISCO ("Defendant" or the "City") is a municipal entity existing under the laws of the State of California, with the capacity to sue and be sued.

**C. PLAINTIFFS/INTERVENORS**

**Hospitality House**

19.  Plaintiff/Intervenor HOSPITALITY HOUSE is a non-profit shelter and service organization located in the Tenderloin District in the City of San Francisco.  Hospitality House brings this action as an organizational Plaintiff/Intervenor.

20.  Hospitality House serves thousands of low-income residents, both housed and unhoused, in the Tenderloin, Mid-Market, and Sixth Street Corridor neighborhoods.  It was founded in the Tenderloin in 1967, a time when the neighborhood was seen as a safe haven for thousands of LGBT youth fleeing oppressive communities.

21.  Hospitality House draws on the experiences of its staff and board members who are formerly homeless.  Joe Wilson, the Executive Director of Hospitality House, came to the organization nearly 38 years ago, when he was homeless in the Tenderloin.  Before entering the shelter program at Hospitality House, Mr. Wilson slept on the streets and experienced the devastating effects of living without shelter first-hand.

22.  Hospitality House is committed to employing individuals who have lived experiences of homelessness, and it currently employs unhoused persons.

23.     Hospitality House owns its building in the Tenderloin neighborhood.  Every year it serves thousands of San Franciscans struggling with poverty, homelessness, and other barriers.

24.     Hospitality House serves low-income individuals in the Tenderloin, Mid-Market, and Sixth Street Corridor through six programs: the Tenderloin Self-Help Center, Sixth Street Self-Help Center, Shelter Program, Community Arts Program, Community Building Program, and Employment Program.  The agency is recognized as an institution of the Tenderloin for over 50 years.

25.     Its Self-Help Centers in the Tenderloin and Sixth Street Corridor reach more than 15,000 low-income residents each year.  They are behavioral health-based community drop-in centers that use a low-threshold, peer-based, self-help model for a range of emergency and supportive services.  The self-help centers also offer on-site, harm reduction-based, individual, and group therapy to low-income residents.

26.     The Tenderloin Self-Help Center offers therapy and counseling for people with mental health and substance abuse disorders.  More than 10,000 people –housed and unhoused– utilize the self-help services each year.  Hospitality House's Sixth Street Self-Help Center assists individuals with disabilities in accessing State Disability and Veterans Benefits.  Each year, the Sixth Street Self-Help Center helps over 6,000 people in accessing its peer-based support groups, which provides stability and connects individuals with disabilities to the community.

27.     Hospitality House's Shelter Program is located in the Tenderloin District and it has been housed in the same location for nearly 40 years, making it one of the City's oldest shelters in San Francisco.  The Shelter Program is a small men's dormitory that provides basic emergency shelter, engagement opportunities, and one-on-one case management for up to thirty men, 365 nights a year.

28.     The organization's Community Arts Program provides neighborhood artists with opportunities to participate in skills workshops, create and sell artwork, and display their work to a broader audience through frequent local exhibitions.  Artists also keep 100% of the proceeds from art sales, making the Community Arts Program a unique social enterprise and economic and cultural asset for the City.  For more than 50 years, Hospitality House's Community Arts

Program has been the City's only free fine arts studio and gallery space for low-income and homeless artists, celebrating art as a vehicle for social change.

29.     Hospitality House's Community Building Program is a hub for civic engagement and community-building, volunteerism, and trauma-informed leadership development.  Training in community organizing enables San Francisco residents to participate in social change.  Each year nearly 400 residents take part in at least one civic event.  Three members of Hospitality House's Board of Directors are graduates of the leadership program.

30.     The Employment Program offers job readiness services, employment and training resources, and job search support through two neighborhood-based employment resources centers.  In 2019, Hospitality House sponsored hiring events with more than 60 employers and more than 200 low-income residents obtained gainful employment.

31.     As COVID-19 spread to San Francisco, Hospitality House became concerned about its shelter residents.  It understood from CDC guidance and news outlets that there was a concern that individuals living in congregate settings, such as homeless shelters, were at particular risk of spread of the coronavirus and needed to social distance to decrease that risk.  It was concerned about the inability to social distance within the shelter.  It asked the City for assistance in moving the program's residents into hotels or motels temporarily during the pandemic.  The City declined to do so.  As a result, the organization spent thousands of dollars booking hotel rooms to ensure the safety of its shelter residents.

32.     During the COVID-19 pandemic, Hospitality House staff have spent numerous hours advocating for the City to move unsheltered residents, including chronically homeless individuals, into empty hotel rooms, even if only temporarily.

33.     Hospitality House has also expended funds to purchase tents and Personal Protective Equipment, like masks and hand sanitizer for people who are living on the street.

34.     During the City's implementation of the Stipulated Injunction, Hospitality House has witnessed the most vulnerable unhoused Tenderloin residents left on the streets as the City decided to clear tents block by block without consideration for residents' health condition or disabilities. Today, Hospitality House continues to spend money paying for private hotel and

motel rooms for its shelter participants, many with disabilities, to protect their health and safety during COVID-19 because the City has not done so.  These expenditures take away resources that the organization would have normally spent on its programs and services.

35.     The City's failure to adequately implement its homelessness programs and the disparate exclusion of people with disabilities from those programs frustrates Hospitality House's mission to foster the self-sufficiency and cultural enrichment of the unhoused individuals and communities it serves. Any effort by the City to remove unhoused persons or their property from public property in the absence of adequate available shelter likewise frustrates that mission.

**Coalition on Homelessness**

36.     Plaintiff/Intervenor COALITION ON HOMELESSNESS ("Coalition") is a non-profit organization located in the Tenderloin District in the City of San Francisco.  The Coalition brings this action as an organizational Plaintiff/Intervenor.

37.     The Coalition organizes unhoused people and front-line service providers to create permanent solutions to homelessness while working to protect the human rights of those forced to remain on the streets.

38.     The Coalition has been deeply rooted in the Tenderloin since its founding over 30 years ago.  It was formed by persons experiencing homelessness and front-line service providers, who were frustrated by the lack of systemic solutions to homelessness and the exclusion of homeless people in crafting solutions at the city level.

39.     Since its inception, the organization's work has been led by and centered on the experiences of the unhoused community.  The Coalition conducts outreach to approximately 100 unhoused persons a week.  Their experiences serve as the basis of their advocacy agenda.  Much of the Coalition's outreach is to persons with physical and/or mental impairments.

40.     The Coalition's work is directly informed by the experiences of unhoused persons.  The Coalition also employs staff, interns, and volunteers who were formerly homeless. Over 50 percent of the staff and board of the Coalition are currently or formerly homeless.

41.     The Coalition hosts open workgroup meetings focused on human rights and housing which are attended by allies in the community, service providers, and unhoused community members.  The Coalition develops advocacy strategies and priorities to implement their agenda throughout the City.  Examples of priorities include advocating for additional housing subsidies, legislation that ensures rights to services such as mental health care, and funding for a new program that fills a gap in services such as a shelter for homeless women.

42.     The Coalition uses media, public hearings, rallies, legal action, letter-writing campaigns, and other tactics to elevate the opportunities to exit homelessness for destitute San Franciscans.

43.     In addition, the Coalition operates a street newspaper, *Street Sheet*, the longest continually running street newspaper in the country.  The content is primarily written and produced by unhoused persons and contains articles, poetry, and artwork.  Unhoused vendors sell the paper for $2.00 and keep the proceeds to help meet their basic needs.

44.     The Coalition has successfully secured thousands of housing subsidies and housing through its campaign work.  It has played a key role in the passage of important legislation, including the creation of standards of care in San Francisco's shelter system, written with substantial input from shelter residents, and the passage of a single standard of care for the mental health system.

45.     The Coalition's 2018 advocacy resulted in obtaining over 360 housing subsidies for homeless youth, families, seniors, and people with disabilities.  In the same year, the Coalition also secured 75 long term subsidies for seniors and people with disabilities.  In 2019, Coalition on Homelessness partnered with Senior and Disability Action to mobilize people with disabilities.

46.     The Coalition receives funding primarily from individual donors, and private foundations, and, to remain independent, does not accept donations from government entities involved in running the homeless system of care, such as Department of Public Health (DPH) or Department of Homelessness Services and Housing (DHSH).

47.     When the COVID-19 pandemic hit San Francisco, the Coalition swiftly reformulated its structure to ensure the safety of people living in shelters, on the streets, in parks, and in vehicles.

48.     Coalition staff set up daily COVID-19 policy calls and the Coalition brought on additional staff to respond to the COVID-19 crisis's impact on San Francisco's unhoused residents, including a volunteer researcher from UC Berkeley, a team of interns, and 10 unhoused individuals who conduct outreach on the street and serve as expert informants on conditions.  The Coalition also hired an outreach coordinator and a COVID-19 policy director.

49.     The Coalition created three working groups focused on (1) testing and congregate settings, (2) hotel rooms and housing, and (3) safety on the streets.  Each workgroup is staffed by Coalition employees and has a significant number of housed and unhoused community participants who give input, conduct outreach, and design campaigns to apply pressure on policymakers. Workgroups focus on ensuring that the City remembers and serves the unhoused community, including chronically homeless individuals, during the COVID-19 pandemic.  Some examples of Coalition's work during COVID-19 include bringing together medical experts to formulate a panel and release a report on the importance of using hotel rooms to provide individual housing during the COVID-19 crisis; assisting the City with coordinating, troubleshooting, and conducting outreach for a COVID-19 testing effort in the Tenderloin neighborhood; monitoring violations of the rights of unhoused community members; and assisting the City with setting up an organized encampment in the Tenderloin.

50.     The Coalition is deeply concerned by the increasingly crowded nature of the streets in the City during the COVID-19 pandemic and the risk of ongoing community spread of the virus among unhoused San Franciscans who do not have access to safe, indoor, individual housing units where they can shelter in place.

51.     The Coalition has diverted its resources to provide services to unhoused persons because the City failed to act.  Much of the Coalition's work budget, except office administrative functions of accounting, payroll, development, fundraising, shifted to respond to and mitigate the City's failure to provide housing and other basic protections for unhoused people during the

1    COVID pandemic.  The Tenderloin is the geographic center of the Coalition's work and

2    COVID-19's impact on San Francisco's homeless population.

3            52.     Previously, the Coalition's work centered on human rights generally of the

4    unhoused community and housing justice for unhoused San Franciscans. In the last few months,

5    the Coalition has had to pivot to COVID-19-related work.  For example, the Coalition's human

6    rights staff split their efforts into two areas of work: (1) testing and how to stay safe in

7    congregate living, and (2) safety on the streets during the pandemic.

8            53.     The Coalition also previously focused on decreasing criminalization, and staff is

9    now focused on outreach to Tenderloin residents.  Staff spends hours each day coordinating

10   COVID-19 testing for the Tenderloin neighborhood. They distribute tents, masks, and hand

11   sanitizer to street-based residents.

12           54.     Staff is also monitoring and helping with de-escalation efforts in the organized

13   sleeping camp in the Tenderloin.

14           55.     The Coalition has opposed the removal of tents from public property without

15   adequate relocation plans and protection of the legal rights of those being relocated.

16           56.     The Coalition's Housing Justice staff usually focuses on conducting outreach to

17   families in shelters and residential hotels and fighting for housing.  Because of the City's failure

18   to adequately address the needs of homeless residents during the pandemic, the Housing Justice

19   staff is now focused on trying to get as many people as possible into hotel rooms, monitoring the

20   conditions in hotels, and mobilizing the community to apply for newly created jobs in COVID-

21   19 hotels.

22           57.     Coalition staff has also diverted resources to monitor a settlement agreement

23   reached between the City and Plaintiffs in the *UC Hastings v. City and County of San Francisco*

24   case. This includes having staff and volunteers on site at specific city blocks as the City moved

25   people into alternative shelter, advocating on behalf of each individual in order to retain personal

26   belongings, and making sure that the placements offered are appropriate for persons with

27   disabilities. Since the implementation of the Stipulated Injunction, Coalition staff work from

28   morning to evening to advocate for appropriate placements for unhoused individuals in the

1  Tenderloin. Therefore, Coalition are diverted from working with other unhoused individuals who

2  are not at city designated blocks even if they are higher risk for severe illness if the individual

3  were to contract coronavirus.

4      58.     The Coalition halted its *Street Sheet* production for several months, and is also

5  now instead focused on online production of materials related to COVID-19.  Staff used printing

6  funds to offer grants to unhoused newspaper vendors who are now out of work.  They raised

7  additional funds to distribute grants to vendors in the Tenderloin and other areas of the City so

8  that vendors can survive.  *Street Sheet* resumed its normal operations on or around July 3, 2020.

9      59.     Due to the City's inaction, the Coalition has spent hundreds of hours that it could

10  have devoted to its traditional work and programs.

11      60.     The City's failure to adequately implement its homelessness programs, and the

12  disparate exclusion of people with disabilities from those programs, frustrates the Coalition's

13  mission to organize homeless people and front line service providers to create permanent

14  solutions to homelessness, while working to protect the human rights of those forced to remain

15  on the streets.  Any effort by the City to remove unhoused persons or their property from public

16  property without adequate and necessary protection of those people's legal rights frustrates that

17  mission.

18      **Faithful Fools**

19      61.     Plaintiff/Intervenor FAITHFUL FOOLS is a non-profit organization located in

20  the Tenderloin District in the City of San Francisco.  Faithful Fools brings this action as an

21  organizational Plaintiff/Intervenor.

22      62.     Faithful Fools is a nonprofit organization that fosters awareness and analysis of

23  deteriorating social conditions in the United States and the world at large, seen from the level of

24  the streets, and facilitates individual and collective responses thereto.

25      63.     Faithful Fools owns its building in the Tenderloin District.

26      64.     In her youth, Faithful Fools' Co-director Sarah Matthias Dennison (aka Sam

27  Dennison) was homeless, living in her car in the Tenderloin District.  Relying on the kindness

28  and generosity of organizations like the Plaintiffs/Intervenors herein, she eventually was able to

return to college and obtain housing.  She brings her experiences with poverty and homelessness to her work at Faithful Fools, in turn shaping the work that the organization does in the community.

65. Faithful Fools is dedicated to addressing the needs of the visibly growing numbers of people living on the streets.

66. Faithful Fools runs programs for Tenderloin residents, including a weekly interfaith Bible study session, movie nights, working groups, street retreats, and writing workshops. Faithful Fools also provides direct services to homeless individuals by working, side by side, with them to navigate the complex housing system as they seek to exit homelessness. Faithful Fools also provides direct services to individuals living in low-income housing, providing grocery shopping, accompaniment to medical appointments, and other services.

67. Faithful Fools serves and represents unhoused people in San Francisco, many of whom are disproportionately living with disabilities.

68. There is a community of unhoused persons who reside on the sidewalk outside of Faithful Fools.  Staff regularly provide support to these individuals by helping them access food and water, enroll in the Coordinated Entry System (CES), and attend court dates, as well as medical, legal, and housing appointments. One member of Faithful Fools staff provides one-on-one trauma resolution therapy to individuals living on the sidewalk and in tents.

69. In the last nine years, all of the people who have lived on the sidewalk in front of Faithful Fools have been African American, and many have had disabilities.  Many have experienced intergenerational poverty and the effects of systemic racism, including frequent incarceration.

70. Faithful Fools is committed to addressing racism and the fundamental human rights of the people in the Tenderloin neighborhood.

71. Faithful Fools is also committed to the well-being of their housed neighbors. They are committed to the principle that no one's human rights can be intentionally abridged for the sake of another person's human rights.

72.     Faithful Fools has spent thousands of dollars providing additional services to unhoused individuals, including chronically homeless individuals, due to the City's inaction during the current pandemic.  Faithful Fools estimates that it has spent approximately $2,000 on tents for persons trying to shelter in place on the streets.  It has also spent additional funds on providing hotel rooms to homeless persons who are at risk of getting COVID-19.

73.     Faithful Fools' costs have also increased.  After the City's shelter in place order went into effect, the co-directors of Faithful Fools asked the City for additional toilets, hand washing stations, and water to provide to unhoused persons.  The City failed to adequately respond.  So, Faithful Fools has had to seek donations of water, hand sanitizer, and masks to distribute these essential items to people living in the streets.  Faithful Fools would have ordinarily used donations to operate its programs and services for unhoused persons.

74.     The City's failure to adequately implement its homelessness programs and the disparate exclusion of people with disabilities from those programs frustrates Faithful Fools' mission to support unhoused members of the community.  Faithful Fools has had to advocate on behalf of unhoused individuals with physical disabilities from being placed in hotels rooms that were inaccessible for individuals with limited mobility and utilized a wheelchair. The lack of accessible hotel rooms has diverted many hours of Faithful Fools' resources to ensure that individuals are provided accessible units and placements.  Any effort by the City to remove unhoused persons or their property from public property in the absence of adequate available shelter likewise frustrates that mission.

## IV.    LEGAL BACKGROUND

75.     The Americans with Disabilities Act ("ADA") was enacted "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities."  42 U.S.C. §12101(b)(2).  The ADA recognizes individuals with disabilities will experience discrimination in critical areas such as housing, public accommodations, health services, and access to public services and will "continually encounter various forms of discrimination, including outright intentional exclusion."  *Id.* §12101(a)(3), (5)*.*

76.     Title II of the ADA mandates that "[n]o qualified individual with a disability shall, by reasons of such disability, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* §12132.

77.     The ADA's non-discrimination mandate includes an affirmative duty on the part of public entities like the City to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination based on disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. §35.130(b)(7)(i).

78.     Section 504 of the Rehabilitation Act of 1973 provides, "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance".  29 U.S.C. §794(a).

79.     The Eighth Amendment to the United States Constitution and Article I, Section 17, of the California Constitution prohibits the infliction of cruel and unusual punishment. The Eighth Amendment "preclude[s] the enforcement of a statute prohibiting sleeping outside against homeless individuals with no access to alternative shelter". *Martin v. City of Boise*, 920 F. 3d 584, 617 (9th Cir. 2019). "[J]ust as the state may not criminalize the state of being 'homeless in public places,' the state may not 'criminalize conduct that is an unavoidable consequence of being homeless — namely sitting, lying, or sleeping on the streets.'" *Id.* at 1048 (quoting *Jones v. City of Los Angeles,* 444 F. 3d 1118, 1127 (9th Cir. 2006)).

80.     Furthermore, "the Fourth and Fourteenth Amendments protect homeless persons from government seizure and summary destruction of their unabandoned, but momentarily unattended, personal property." *Lavan v. City of Los Angeles,* 693 F.3d 1022, 1024 (9th Cir. 2002).

81.     California Welfare and Institutions Code section 17000 mandates that each county in California shall relieve and support its indigent and disabled residents who cannot support themselves. San Francisco City and County administer a program under section 17000, *et seq.*

82. Section 17000 provides:

Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions.

83. Welfare and Institutions Code section 10000 defines the purpose of these obligations as follows:

The purpose of this division is to provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed. It is the legislative intent that aid shall be administered and services provided promptly and humanely, with due regard for the preservation of family life, and without discrimination on account of ancestry, marital status, political affiliation, or any characteristic listed or defined in Section 11135 of the Government Code. That aid shall be so administered and services so provided, to the extent not in conflict with federal law, as to encourage self-respect, self-reliance, and the desire to be a good citizen, useful to society.

## V.     FACTUAL BACKGROUND

### A. HOMELESSNESS IN THE TENDERLOIN NEIGHBORHOOD

84. There are over 8,000 unhoused people in San Francisco, including 5,180 who are unsheltered, according to the 2019 point-in-time street and shelter count.

85. Approximately 3,656 unhoused people live in District 6, which contains the Tenderloin Neighborhood.

86. Over the last several years, the number of unsheltered individuals has steadily increased, due in part to the dearth of emergency shelters and permanent affordable housing available in the City's housing market.

87. Shelters and other essential services have become even scarcer since January 2020, and, as a result, the number of tents occupied by unhoused persons has increased 285 percent since January, according to the Tenderloin Neighborhood Plan for COVID-19.[1]

88. Since June 12, 2020, the City has provided hotel rooms for approximately 600 people experiencing homelessness in San Francisco.

---

[1] Tenderloin Neighborhood Plan for COVID-19, revised May 6, 2020, available at https://sf.gov/sites/default/files/2020-05/Tenderloin_Neighborhood_Plan_May_6_2020.pdf

89.     A disproportionate number of unhoused San Franciscans have disabilities. The City's most recent 2019 Homeless Count and Survey found: Seventy-four percent (74%) of respondents reported living with one or more health conditions, compared to 68% in 2017. These conditions included chronic physical illnesses, physical disabilities, chronic substance use, and severe mental health conditions. In 2019, twenty-seven percent (27%) of respondents reported having physical disabilities. Sixty-nine percent (69%) of respondents reported their condition limited their ability to hold a job, live in stable housing, or take care of themselves, compared to 53% in 2017.[2] In contrast, Census data indicate that only 5.9% of San Francisco residents under age 65 identify as having a disability.

90.     These individuals struggle to meet the necessities of life and often combat mental illness, substance abuse issues, physical disabilities, or any other combination of these impairments.

91.     Unhoused persons have resided in the Tenderloin Neighborhood and other neighborhoods in the City for many years. Many have close ties with other unhoused persons as well as a sense of community in the neighborhood in which they live. Some have close family relations who live in low-income housing (SROs) to whom they have responsibilities including paying rent, picking up medication and groceries, and going to medical appointments. Others have a close connection to service providers. These relationships form a strong bond of community among housed and unhoused residents in the Tenderloin. They receive much-needed services from Faithful Fools, Hospitality House, the Coalition on Homelessness, and other organizations, including food, shelter, and assistance with handling citations they receive from police as a result of their being homeless.

**B.  THE CITY'S HOMELESS PROGRAMS AND SERVICES**

92.     In 2016, the City of San Francisco created the Department of Homelessness and Supportive Housing (DHSH), a full system program that aims to engage homeless services and programs through multiple local, state, and federal funding sources to meet the needs of its

---

[2] *San Francisco Homeless Count and Survey Comprehensive Report* (2019) 28, available at http://hsh.sfgov.org/wp-content/uploads/FINAL-PIT-Report-2019-San-Francisco.pdf

community. The City's homeless program and services' vision is to end homelessness for as many people as possible through a framework developed in 2016 by DHSH called the Homelessness Response System ("Homelessness Response System").  The Homelessness Response System receives over $44 million annually from the federal Department of Housing and Urban Development (HUD).

93.     The Homelessness Response System strives to provide housing to individuals experiencing homelessness. In the absence of the ability to house, the Homelessness Response System seeks to provide unhoused individuals with food, shelter, outreach, health care, and other forms of assistance. Since 2016, this Homelessness Response System has helped approximately 5,500 people exit homelessness through housing, rent subsidies, and reunification programs. The Homelessness Response System aims to reduce chronic homelessness by 50 percent.[3]

94.     The central strategy to reducing chronic homelessness in the Homelessness Response System is the creation of a "Housing Ladder" to move residents living in Permanent Supportive Housing to other subsidized housing, "thereby opening up Permanent Supportive Housing units for chronically homeless clients."[4] The Homelessness Response System also has a strategic framework roadmap for addressing street homelessness.

95.     In its 2019 implementation, the Homelessness Response System reduced chronic homelessness among Veterans and moved families and individuals from Permanent Supportive Housing to affordable housing. This created new openings for individuals experiencing homelessness. The Homelessness Response System implemented the Whole Person Care Medi-Cal waiver pilot program, adding housing navigation services and greatly expanded housing

---

[3] HUD defines a chronically homeless individuals as meeting the following two criteria:1) an individual who is homeless and resides in a place not meant for human habitation, and has been homeless and resides in such a place for at least one year or on at least four separate occasions in the last 3 years; and 2) the individual has a disability such as diagnosable substance use disorder, serious mental illness, development disability, post-traumatic stress disorder, cognitive impairments resulting from a brain injury, or chronic physical illness or disability. 42 U.S.C. § 11360 at 401(2) of the McKinney-Vento Homeless Assistance Act.
[4] Department of Homelessness and Supportive Housing, City and County of San Francisco, at 7. Dated October 2017. Available online at: http://hsh.sfgov.org/wp-content/uploads/2017/10/HSH-Strategic-Framework-Full.pdf.

1   stabilization services. Finally, the program expanded its system to include more housing units for

2   individuals with mental illness using California's No Place Like Home initiative and to refine

3   and improve care coordination services to match service level with need. The Coordinated Entry

4   System's purpose is to ensure that housing resources would be available for chronically

5   homeless individuals who face the highest barriers in entering and sustaining housing.

6       96.    Using the Coordinated Entry System (CES), a HUD-funded program, the

7   Homelessness Response System estimates 3,600 chronically homeless adults will be placed in

8   Permanent Supportive housing by 2022. And to achieve its goal of a 50 percent reduction of

9   chronic homelessness, the City will need to use additional resources and interventions.

10      97.    The City denies access to its Homelessness Response System through its entry

11  system, partially due to its misapplication of the Vulnerability Index-Service Prioritization

12  Decision Assistance Tool (VI-SPDAT). Each individual that wants access to the Homelessness

13  Response System must be entered into the CES. The CES then provides referrals for the

14  individual to be assessed for vulnerability through the VI-SPDAT. Upon information and belief,

15  in San Francisco, the VI-SPDAT has been modified to assess the needs of individuals for the

16  local services and programs available through the DHSH or Homelessness Response System.

17  However, the VI-SPDAT does not assess a person's medical history, the severity of disability, or

18  appropriateness of current living arrangements. Plaintiffs/Intervenors have seen homeless

19  individuals with severe disabilities be assessed as a low priority under the City's VI-SPDAT

20  assessment tool, even though they are living in inappropriate living arrangements such as a

21  shelter bed or on the streets with a chronic health disorder.

22      98.    At no time has the City's implementation of its Homelessness Response System

23  included a process to appropriately assess and accommodate the needs of homeless individuals

24  with disabilities. Therefore, the City's Homelessness Response System has discriminated against

25  homeless individuals with disabilities.

26  **C. CRIMINALIZATION OF HOMELESSNESS AND CONFISCATION OF**

27  **UNHOUSED PEOPLE'S PROPERTY**

28

99. Upon information and belief, the City has tried to implement the Homelessness Response System, yet simultaneously engaged in activities that punish unhoused people for their continued homelessness, including the clearance of encampments and seizure of homeless individuals' personal property. These activities have a disparate impact on people with disabilities.

100. The City has a historical practice of engaging in "sweeps" of unsheltered Tenderloin residents, often in response to complaints from housed residents through its 311 complaint system. City staff issue citations or threatens to issue citations to anyone who does not move along.

101. City staff also conduct routine warrant checks on unhoused people and arrest anyone who has an outstanding warrant, simply to remove them from the street.

102. The City unlawfully confiscates property that is not trash or abandoned, and in many circumstances destroys it instead of preserving it as is required by City policy.

103. In the limited circumstances that the City does bag and tag an unhoused person's items, people have trouble accessing the facility in which the City keeps the belongings.

104. The City refuses to store items it determines as "bulky" and disposes of such items. A common example is that, when someone stores their belongings in a cart, the City will take the entire cart and throw it away.

105. The City often does not give people with disabilities enough time to move their personal belongings, even if they have physical or mental disabilities that are impairing their ability to comply with City staff commands.

106. The sweeps have resulted in the detention, citation, and arrest of homeless individuals based on allegations of quality of life ordinances, such as sitting, sleeping, and property storage violations.

107. The City has also conducted sweeps where City workers have confiscated and destroyed the property of homeless individuals, including the destruction of important documents, medication, and essential belongings that made it harder for homeless individuals to participate in the Homelessness Response System. Without proper documentation or access to

medication, an individual faces barriers to being appropriately assessed and placed in homeless services or programs.

108.    The City conducted these enforcements even though there was a clear lack of emergency shelter beds available in the City. Before the COVID-19 public health orders and guidelines, the City consistently had a 1200-person waitlist for individuals waiting for a single bed in the Homelessness Response System's shelter services. The City did not offer available shelter to persons before conducting these sweeps.

109.    Even if there were adequate shelter or navigation center beds, not all would be accessible to people with disabilities. For example, people with trauma and other mental health concerns frequently are unable to sleep in congregate settings. Additionally, many mobility issues are not evident if an individual does not use a wheelchair, so stairs and other barriers may be an unidentified issue when the City does not comprehensively assess a person's disability. The City does not adequately determine whether a shelter placement is appropriate before it offers the placement to an unhoused person with disabilities.

**D.  UNHOUSED PERSONS' VULNERABILITY TO COVID-19**

110.    The U.S. Centers for Disease Control and Prevention (CDC) issued interim guidance noting that people who are homeless are a particularly vulnerable group.[5]

111.    The CDC also issued guidance to local and state governments regarding homeless encampments, recommending that "if individual housing options are not available, allow people who are living unsheltered or in encampments to remain where they are. Clearing encampments can cause people to disperse throughout the community and break connections with service providers. This increases the potential for infectious disease spread."[6]

---

[5] Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): Homelessness* (Apr. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/homelessness.html.
[6] Centers for Disease Control and Prevention, *Coronavirus Disease 2019: Interim Guidance on People Experiencing Unsheltered Homelessness* (rev. May 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html#isolation.

112.    The California Department of Public Health along with several other state agencies issued guidance issued guidance reaffirming "the need for communities to provide non congregate sheltering (NCS) for people experiencing homelessness to protect human life, and minimize strain on health care system capacity during the pandemic..."[7]

113.    The Tenderloin's unhoused population is at increased risk of contracting COVID-19 because they do not have safe places to self-isolate or adequate access to hygiene facilities and medical care.

114.    In April, nearly 100 residents tested positive for COVID-19 at Multi-Service Center South ("MSC South"), the City's largest homeless shelter, demonstrating the enormous risk of the virus spreading quickly through shelters and other congregate settings.

115.    Recent reports and studies confirm that unhoused people are exceptionally vulnerable to infection and serious illness or death from COVID-19. Dr. Margot Kushel, Director of the University of California San Francisco (UCSF) Center for Vulnerable Populations and an expert on the health effects of homelessness, notes that homeless individuals' health resembles that of people twenty to twenty-five years older.

116.    A University of Pennsylvania study found that unhoused individuals infected with COVID-19 are twice as likely to be hospitalized, two to four times more likely to require critical care, and two to three times more likely to die from the virus than the general population.

117.    These risk factors have a particularly devastating impact on people of color, who are far more likely to be homeless than white people in San Francisco. The significant racial disparities in outcomes related to COVID-19 are amplified among the unhoused populations in San Francisco.

118.    Upon information and belief, the deaths of unsheltered homeless individuals have at almost tripled since the pandemic began. Plaintiffs/Intervenors are informed and believe that, during the four months from March 1 to June 30, 2020, there were 97 deaths of unhoused persons in San Francisco, compared to 34 deaths from this time last year. Most of these deaths

---

[7] https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Individuals_Experiencing_Homelessness.pdf

1  occurred in the Tenderloin District. This information suggests that disruptions and changes due

2  to the current emergency has had a severe effect on people experiencing homelessness.

3  **E. THE CITY'S POLICIES AND PRACTICES REGARDING UNHOUSED**

4  **PERSONS DURING COVID-19**

5  **Shelter in Place Orders and Sweeps of Unhoused Persons**

6  119.  On March 16, 2020, the City announced an Executive Order C19-07 requiring,

7  among other things, that San Francisco residents shelter in place in their homes. The Order

8  exempts unhoused persons, who do not have homes in which to shelter.

9  120.  Consistent with the CDC and California Department of Public Health's guidance,

10  and following intensive advocacy by Plaintiff/Intervenor Coalition on Homelessness, during the

11  months of April and May the City stopped sweeping encampments and committed to not taking

12  tents. Plaintiffs/Intervenors understand this policy change was a temporary response to the

13  pandemic, not a long-term reformulation of the City's approach to homelessness.

14  121.  The City has since resumed sweeps of unhoused persons. Data shows that from

15  March 9, 2020 to July 9, 2020, the City cited or arrested people for unlawful lodging outside

16  and/or violating the shelter in place order a total of 553 times.

17  **Changes to San Francisco's Homeless Response System**

18  122.  The City's Homelessness Response System was drastically affected when

19  COVID-19 hit and the need for its services was made more evident. Before the pandemic,

20  unhoused San Franciscans could either call 311 or go through San Francisco's Department of

21  Homelessness and Supportive Housing's Homelessness Response System to try and obtain

22  shelter. While there was already an inadequate number of shelter beds to meet the needs of San

23  Francisco's unhoused residents before the COVID-19 pandemic, the pandemic has drastically

24  decreased the amount of available shelter; shelters are no longer accepting new residents.

25  Currently, the shelter waitlist is closed. The Department of Homelessness and Supportive

26  Housing ended new postings, referrals, and reservations into temporary shelter programs.

27  123.  As of July 28, 2020 shelters have not returned to full capacity.

28

**State and City Initiatives for Providing Non-Congregate Housing to Unhoused Persons**

124.    On April 3, 2020, Governor Newsom announced Project Roomkey, a statewide program to prevent the spread of COVID-19 among unhoused individuals by providing temporary housing in hotels. Through Project Roomkey, FEMA reimburses 75 percent of the cost to rent hotel rooms for individuals who have tested positive for COVID-19, have been exposed to COVID-19, are over 65 years old, or have underlying medical conditions that put them at high risk.

125.    Consistent with state policy to rapidly house significant numbers of unhoused people, on April 14, 2020, the Board of Supervisors unanimously enacted Ordinance No. 69-20 as an emergency ordinance. The Ordinance enacted additional Homelessness Response System services that required the City to procure 8,250 private hotel rooms. Ordinance at Section 3(a). The Ordinance required that the City obtain seven thousand hotel or motel rooms for people experiencing homelessness in San Francisco, including people residing in a City shelter or navigation center, people who are currently unsheltered, and unhoused people being released from jails.

126.    The Ordinance took effect upon adoption by the Board of Supervisors and was returned unsigned by Mayor Breed. It is therefore the law of the City.

127.    The City has legal authority to commandeer private property during a declaration of local emergency.

128.    To date, the City still has not leased the required number of rooms for unhoused people, and Mayor Breed had repeatedly made public statements indicating that her administration does not intend to do so. According to one report, she was "adamant that it's not realistic to move the entire homeless population inside [and stated that] '[i]f it were that easy we would have done it a long time ago.'"

129.    The City established the COVID-19 Alternative Housing Program "to provide emergency, temporary housing and shelter options for individuals who are directly affected by

1    coronavirus, or are at high risk of adverse impacts if they contract the virus."[8] The Alternative

2    Housing Programs include placements in hotel and RV units for vulnerable populations,

3    congregate beds for vulnerable populations, and hotel units for essential workers. The City also

4    identified has several priority populations for COVID-19 Alternative Housing, which are:

5    individuals diagnosed with COVID-19 or people "under investigation" without a space to safely

6    isolate, COVID-negative individuals experiencing homelessness, many of whom are classified as

7    "vulnerable", individuals who have recovered from COVID-19 and require a safe space to

8    shelter in place, and front-line City workers and City-contract workers. Individuals over the age

9    of 60 and/or those with certain health conditions are required to be prioritized for non-congregate

10   settings according to the City's policies.

11        130.    Upon information and belief, the City was also provided trailers and recreational

12   vehicles (RVs) to help accommodate its homeless population, but on or around May 28, 2020,

13   the City sent 29 RVs back to the State.

14        131.    Despite the Centers for Disease Control and Prevention ("CDC") guidelines and

15   the State's incorporation of those guidelines in its funding priorities, upon information and

16   belief, the City did not adequately identify, conduct outreach, or assess all individuals who

17   would fall into the higher risk categories for severe illness if they contracted COVID-19.

18        132.    Many homeless individuals with disabilities who fall within these higher-risk

19   categories were not given the option of placement in Project Roomkey or RV trailers through the

20   City's Alternative Housing Program.

21        133.    As of July 27, 2020, the City had leased 2,407 hotel rooms for unhoused

22   individuals, and only 1,901 of those rooms were occupied.[9] The City, using federal and state

23   funds, is leaving leased hotel rooms empty while homeless individuals on the streets have

24   nowhere to go to mitigate exposure to COVID-19.

25        **Tenderloin Neighborhood Plan**

26   _____
     [8] COVID-19 Alternative Housing, The City of San Francisco.  Available at:

27   https://data.sfgov.org/stories/s/4nah-suat (last visited on July 28, 2020).

28   [9] *See* COVID-19 Alternative Housing, https://data.sfgov.org/COVID-19/COVID-19-Alternative-Housing-Sites/qu2c-7bqh (Last Visited July 28, 2020).

134.     On May 4, 2020, the City issued a draft Tenderloin Neighborhood Plan for COVID-19, which aimed to: address encampments by offering safe sleeping alternatives to unsheltered individuals; facilitate social distancing compliance by closing streets and parking; ensure that housed residents in the Tenderloin have safe passage and access to their homes and businesses; improve access to hygiene stations, restrooms and garbage disposal for unhoused individuals; address food and water insecurity for housed and unhoused residents alike; increase police presence in the neighborhood to focus on public safety concerns; increase health services in the neighborhood; and increase education and outreach to residents and businesses through a 'care ambassador' program.

135.     Two days later, the City issued its finalized plan. The plan recommends establishing a program for increasing the number of community outreach workers and ambassadors, improving and formalizing participation and a feedback process with community groups, and increasing outreach to residents and businesses.

136.     The City has not fully implemented its community engagement program, and its interaction with community-based organizations and unhoused residents has been disorganized and haphazard.

**F.  *UC HASTINGS, et al. v. CITY AND COUNTY OF SAN FRANCISCO***

137.     On May 4, 2020, Plaintiffs Hastings College of Law, the Tenderloin Merchants and Property Association, and four individuals filed the instant lawsuit, which seeks to eliminate unhoused persons from a neighborhood that Plaintiffs refer to as a "horror show."  Pl. Compl., at ¶ 33.

138.     On May 27, 2020, Plaintiffs/Intervenors Hospitality House, the Coalition, Faithful Fools, and 25 other organizations asked the Dean and Chancellor of Plaintiff Hastings College of Law to pledge to protect the human rights of homeless individuals in the litigation. Specifically, the pledge asks that Hastings College of Law not enter into any settlement agreement or advocate for any legal outcome that negatively impacts or criminalizes unhoused Tenderloin residents. The pledge also asks that Hastings respect current CDC guidance regarding tent encampments, in that, if individual housing options are not available or offered to unhoused

residents, the City should allow people to remain where they are to prevent the spread of COVID-19. The pledge also included a request that Hastings works to ensure that illegal property confiscation does not result from the litigation.

139.    David Faigman, the Dean and Chancellor of UC Hastings refused to sign the pledge.

140.    On June 9, 2020, Plaintiffs/Intervenors filed their Motion for Intervention. Four days later, on June 12, the City and Plaintiffs submitted a proposed Stipulated Injunction to the Court for approval.

141.    Plaintiffs/Intervenors advocated that the Court should grant intervention and allow Plaintiffs/Intervenors to improve the Stipulated Injunction to protect the interests of unhoused persons. The agreement contained no policies or procedures for determining appropriate placements. Appropriate placement needs to include assessment for medical needs, social needs, and access to continuation of services to consider the individuals' needs. The agreement failed to incorporate the City's policies and procedures for the prioritization and placement of vulnerable unhoused individuals into the City's COVID-19 Alternative Housing program; and it did not contain any policies or procedures ensuring that unhoused persons' personal property would not unlawfully confiscated and if taken, would be property stored.

142.    On June 30, 2020, the Court granted Plaintiffs/Intervenors' Motion for Intervention, and also approved the Stipulated Injunction.

**G.  THE STIPULATED INJUNCTION IN *UC HASTINGS COLLEGE OF LAW, et al., v. CITY AND COUNTY OF SAN FRANCISCO***

143.    The Stipulated Injunction provides a series of actions to be taken by the City "that will reduce the number of tents and other encamping materials and related personal property on sidewalks and streets in the Tenderloin…" ECF No. 71 at 2:8-10.

144.    Pursuant to the Stipulated Injunction, the City agreed:

    a.    to offer shelter-in-place hotels to people facing heightened health risks from COVID-19;

b.  to establish safe sleeping villages outside of the Tenderloin to which people can relocate;

c.  to make available off-street sites in the Tenderloin where people can be moved. *Id.* at 2-3;

d.  to cause 70% of the number of tents as counted on June 5, 2020 to be removed along with all personal property and their occupants to hotels, safe-sleeping sites, off-street sites, or other placements by July 20, 2020. After July 20, 2020, the City agreed to use all reasonable efforts to achieve a "shared goal of permanently reducing the number of tents, along with all other encamping materials and related personal property, to zero." *Id.* at 3:22-25.

e.  to continue to offer COVID-19 testing in the Tenderloin, offer free testing to all persons in the Tenderloin, and work to establish a long-term testing site in the Tenderloin for the duration of COVID-19. *Id.* at 4:1-6.

f.  that during the time it is working to remove at least 70% of the tents from the Tenderloin it will advise unsheltered persons that tents and other structures cannot block a doorway, exit, fire escape or be located within five feet of a fire hydrant. Further, that tents and other structures not make sidewalks impassible or impede traffic. As the total number of tents is reduced, the City will increase its enforcement efforts and discourage persons from erecting tents within six feet of a doorway to a business, residence or transit stop. *Id.* at 4:7-17.

g.  that narcotic sales and trafficking laws shall be enforced consistently across the City. *Id.* at 4:18-19.

145.   The parties agreed to stay the litigation pending approval of the Stipulated Injunction by the San Francisco Board of Supervisors. The Stipulated Injunction will be submitted to the San Francisco Board of Supervisors for approval. If it fails to approve the Stipulated Injunction, Plaintiffs may resume the litigation. *Id.* at 5:8-17.

**H.  CITY'S IMPLEMENTATION OF STIPULATED INJUNCTION**

1    146.    Beginning on or around June 12, 2020, the City began implementing the

2    Stipulated Injunction before Court approval and without approval from the Board of Supervisors.

3    147.    Since implementation of the Stipulated Injunction began, Plaintiffs/Intervenors

4    have received reports that the City has not been able to provide hotels or other accommodations

5    with legally adequate accessibility and supportive services.

6    148.    People in wheelchairs were have been passed over due to a lack of hotels with

7    necessary elevators.

8    149.    People in wheelchairs have been passed over for placement in a hotel because

9    they were unable to make transfer from wheelchair to bed or find independent transportation.

10   150.    In at least one case, an individual who uses a wheelchair and has multiple

11   sclerosis was told by a City worker that she would not get a hotel room on a particular day

12   because the City did not have any accessible rooms available. The City worker said they had to

13   time the placement right, meaning on a day that accessible rooms were available. Upon a room

14   becoming available, the individual then had to prove to the City she was able to independently

15   transfer from her wheelchair to the van before the placement was approved. Upon information

16   and belief, the individual was told that this was necessary because the room was not accessible

17   and the individual would be required to transfer from the chair to her bed without support or

18   assistance.

19   151.    People with disabilities who asked for further details about a hotel before

20   placement in order to determine if it would be appropriate have been denied that opportunity and

21   told they had to accept the placement unseen or receive no placement at all.

22   152.    Upon information and belief, unhoused persons only had a few minutes to decide

23   whether to accept the placement.

24   153.    Upon accepting a placement, the City gave unhoused persons very little time to

25   collect their belongings, and would not allow people to take more than two trash bags of

26   belongings.

27

28

154.     In the City's implementation, the City shifted its focus from prioritizing individuals based on health factors to placing unhoused individuals in shelter based on their geographic location and possession of a tent.

155.     Prior to the lawsuit Plaintiffs filed, the Department of Public Health was responsible for placing unhoused persons in hotels.

156.     Upon information and belief, the City did not assess or create a list of priority vulnerability groups for the Tenderloin as articulated in its COVID-19 Alternative Housing Program.

157.     Instead, upon information and belief, the City brought law enforcement officers, staff from the Department of Public Works, and staff from its Healthy Streets Operation Center to move unhoused people out of the Tenderloin, block by block. When the City cleared the block, it put metal barricades up to prevent anyone else from staying at the location cleared.

158.     Upon information and belief, once the City identifies a person is eligible for placement on their geographic location, the City does not screen for an unhoused persons' disability needs prior to placing them in a hotel room, safe sleeping site, or congregated shelter such as the Moscone Shelter. Upon information and belief, unhoused persons placed in hotels are screened by a nurse or health professional after the individual has already been placed by the City. Thus, the screening is not for the purposes of determining what placement is appropriate for the person based on their needs because they have already been placed.

159.     Upon information and belief, unhoused individuals who fall within the vulnerable priority groups, as defined in the COVID-19 Alternate Housing Program, were not identified as priority groups for placement during the City's Stipulated Injunction implementation process. The City did not determine which unhoused individuals were part of the vulnerable priority groups and therefore did not provide appropriate non-congregate setting as the Program's policies and procedures require. On blocks the City did not clear per its actions under the Stipulated Injunction, Plaintiffs/Intervenors have identified numerous unhoused individuals, who are disabled that should have been placed in non-congregate settings. However, the City's

1   implementation resulted in a shortage of hotel rooms for vulnerable unhoused individuals, many

2   with disabilities.

3       160.    Upon information and belief, those who did not receive a placement were forced

4   to move to other City blocks so that the City could claim compliance with the Stipulated

5   Injunction.

6       161.    The City's action leaves vulnerable unhoused individuals, many with disabilities,

7   on blocks that were not the subject of the lawsuit.

8       162.    One hotel used by the City during implementation had backed up sewage so that

9   at least one person placed at the hotel experienced rashes, headaches, cold sweats, and felt

10  sick. Despite requesting a reasonable accommodation in writing, the City did not offer to provide

11  a medical assessment. When this person complained about the conditions, she was told the only

12  other option was a congregate setting. This option was not appropriate for her because she is

13  immunocompromised and experienced trauma from repeated sexual assaults at one of the City's

14  congregate shelters.

15      163.    The City's implementation of the Stipulated Injunction does not address whether

16  a person may decline an offer of shelter for reasons related to having a disability. For example, a

17  person with a disability might not be able to lie down at a safe sleeping site placement if the beds

18  or cots are not made physically accessible or does not accommodate a person's mental health

19  disabilities if the person gets triggered for being too close to the next person. A person with

20  complicated health needs might not be able to move to a hotel room or safe sleeping site outside

21  the Tenderloin immediately without a health-conscious process that ensures undisrupted care

22  from health providers, located in the neighborhood. A crowded congregate setting may not be

23  accessible to a person who has mental health symptoms that are triggered by being in a large,

24  crowded space, nor to someone who is at high-risk for contracting COVID-19 due to underlying

25  health conditions.

26      164.    The Stipulated Injunction also does not contain any policies or procedures for

27  ensuring that unhoused persons' personal property is not unlawfully confiscated and if taken,

28  property stored.

165.     Forcing individuals with disabilities to accept shelter placements that are not accessible, or taking enforcement action against someone who rejects a shelter placement because it does not meet their disability-related needs, violates those individuals' rights.

166.     On or around July 3, 2020, the City began offering placements in congregate shelter settings, contrary to public health guidance for COVID-19.

## VI.     PLAINTIFFS/INTERVENORS' RESPONSE TO PLAINTIFFS' CLAIMS

### A.  CONSTITUTIONAL CLAIMS

167.     Plaintiffs' First, Second, Third, Fourth, Twelfth, and Thirteenth Causes of Action allege violations of the United States and California Constitutions by the City.  All are vague as to the alleged violation and the relationship between the alleged harm and the conduct of the City, failing to adequately state claims.

168.     Further, these claims, and the remedies that they allude to, seek to promote Plaintiffs' interests over the constitutional rights of unhoused residents of the Tenderloin.

169.     For example, the Third Cause of Action alleges violation of Plaintiffs' Fourteenth Amendment due process rights under a state-created danger theory, arguing that "Defendant has affirmatively created or increased the risk that Plaintiffs would be exposed to dangerous conditions, which placed Plaintiffs specifically at risk, and Plaintiffs were harmed as a result." The exact nature of the danger alleged for purposes of this claim and that danger's relationship to action by the City is unclear, but the harms to Plaintiffs alleged in the Complaint do not rise to the level necessary to demonstrate a violation of the Fourteenth Amendment under state-created danger theory.

170.     In contrast, the seizure and destruction of unhoused persons' tents and other survival gear in the absence of adequate alternative shelter, exposing them to the elements and depriving them of the means to shelter in place during a pandemic, would result in a tangible and significant danger to unsheltered persons.

171.     Likewise, any response by the City to homelessness in the Tenderloin that forces unsheltered people into congregate settings where COVID-19 can spread more easily, or that scatters those people to other locations, would affirmatively increase unhoused Tenderloin

1   residents' risk of contracting and spreading the deadly virus.  Such action would not only

2   contravene prevailing public health recommendations but would also result in a state-created

3   danger to unhoused people.

4          172.    Plaintiffs also assert unconstitutional takings in their Fourth and Thirteenth

5   Causes of Action.  Neither of these claims is adequately stated, and neither demonstrates an

6   uncompensated taking that violates the United States or California Constitutions.

7          173.    In contrast to Plaintiff's vague and unsupported assertions that the City has

8   affected a regulatory taking, the City's historical removal of unhoused persons' tents and other

9   property from the Tenderloin's public sidewalks could have very real impacts on the property

10  rights of unhoused persons, including violation of their rights under the Fourth and Fourteenth

11  Amendments.

12     **B.  DISABILITY DISCRIMINATION CLAIMS**

13         174.    Plaintiffs' Sixth, Seventh, and Fourteenth Causes of Action—which pertain only

14  to Plaintiff Randy Hughes—allege violations of the Americans with Disabilities Act under Title

15  II, Section 504 of the Rehabilitation Act of 1973, and under the California Disabled Persons Act.

16  They allege that the City has failed to ensure accessible sidewalks.  They do not allege specific

17  instances of violation but a more general lack of access due to the alleged presence of unhoused

18  people and their belongings on public sidewalks.

19         175.    Plaintiffs/Intervenors do not dispute the City's obligation to ensure that sidewalks

20  are accessible.  Plaintiffs/Intervenors' clients, staff, and volunteers, and many other unhoused

21  residents of the City, use wheelchairs or mobility devices.  They are likewise harmed when

22  public sidewalks are not passable.

23         176.    The City must balance the interest of its residents, including residents who have

24  disabilities.  The City must maintain the accessibility of the City's public sidewalks, curb ramps,

25  crosswalks, and transit stops for people with disabilities.  28 C.F.R. §35.150; *see also* 28 C.F.R.

26  §§35.149, 35.104.

27         177.    Unhoused individuals are disproportionately people living with disabilities.

28  Disability laws, including the ADA, require the City to provide reasonable modifications;

1   sidewalk clearance must not be done at the expense of other people with disabilities' safety or

2   rights.

3        178.    The City can take action that meets its requirements under the ADA and disability

4   laws without violating the constitutional and disability rights of unhoused residents.  For

5   example, tents can be permitted off to the side with 36-inch passable walkways as opposed to

6   100-percent clear sidewalks and removal of all unsheltered persons and their tents.

7        179.    Plaintiffs alone cannot define disability rights within the Tenderloin.  Plaintiffs

8   recognize a disproportionate number of homeless individuals have disabilities.  In their

9   Complaint, Plaintiffs state that "the homeless population itself (an estimated 39% of whom suffer

10  from mental illness)."  Pl. Compl. ¶ 28 (citation omitted).  However, Plaintiffs fail to assert or

11  protect the constitutional rights of unhoused Tenderloin residents.

12       180.    Further, the City's implementation of its Homelessness Response System,

13  particularly during the COVID-19 pandemic, has disproportionately excluded or harmed

14  unhoused people with disabilities in the City, as alleged in greater detail below.

15  **C. NEGLIGENCE AND NUISANCE CLAIMS**

16       181.    Plaintiffs Eighth, Ninth, and Tenth Causes of Action assert allegations of

17  negligence and public and private nuisance against the Defendant due to the presence of people

18  who have no choice but to live on the street during a pandemic.  These Causes of Action fail to

19  state a claim for which relief can be granted.

20       182.    Further, the obstructions and nuisances alleged in the Complaint are human

21  beings who have no other place to go, especially during a pandemic.  These Causes of Action

22  seek to elevate the Plaintiffs' "annoy[ance]" and "disturb[ance]" over unhoused persons'

23  constitutional and statutory rights.  *See* Pl. Compl. at ¶ 102.

24       183.    Plaintiffs/Intervenors dispute the allegations that unhoused Tenderloin residents

25  cause criminal activity.  For example, Plaintiffs Hughes, Denis, and Villalobos cite alleged

26  criminal behavior in the Tenderloin.  But they offer no evidence that unhoused Tenderloin

27  residents conducted criminal behavior.  These criminal activity allegations unfairly paint all

28  homeless individuals as criminals without any substantial factual allegations or evidence.

1    184.    Plaintiffs also complain of human waste without acknowledging the lack of

2  bathroom facilities, especially during COVID-19.

3    **D. THE CITY'S DUTY TO RELIEVE AND SUPPORT INDIGENT RESIDENTS**

4    185.    Plaintiffs' Eleventh Cause of Action alleges broadly that the City is violating its

5  mandatory duty under Welfare and Institutions Code Section 17000 to provide medical care for

6  the indigent.  They further allege that basic shelter is medically necessary because it is

7  reasonable and necessary to protect life, to prevent significant illness or significant disability, or

8  to alleviate severe pain.

9    186.    Welfare and Institutions Code section 17000 mandates counties[10] to "relieve and

10  support all incompetent, poor, and indigent persons."

11    187.    Welfare and Institutions Code section 10000 states the purpose of these

12  obligations is to provide "appropriate aid and services to all of [the State's] needy and

13  distressed…promptly and humanely…"  A legislatively declared purpose of public medical care

14  programs is to "promote the welfare and happiness of all of the people of the state" by providing

15  appropriate aid and services to all needy and distressed.

16    188.    Welfare and Institutions Code Section 17000 imposes an independent duty on

17  counties to provide a subsistence medical care program.  See *Hunt v. Super. Ct.,* 21 Cal. 4th 984,

18  991 (1999).

19    189.    Sections 17000 and 10000 mandate that "medical care be provided to indigents . .

20  . promptly and humanely."  The California Supreme Court has interpreted this statute as

21  imposing a mandatory duty to provide a system of "last resort" subsistence medical care—a level

22  of care which does not lead to unnecessary suffering or endanger life and health—to *all*

23  medically indigent residents.  *Id.* at 1012-15.

24    190.    Counties must provide "'medically necessary' care, not just emergency care."

25  *County of Alameda v. State Bd. of Control*, 14 Cal. App. 4th 1096, 1108 (1993) (quoting *Bay*

26  *Gen. Cmty. Hosp. v. County of San Diego*, 156 Cal. App. 3d 944, 957 (1984)).

27

28  ---
[10] Welfare and Institutions Code section 17000, which requires counties to relieve and support their indigent residents, applies to the City in its capacity as a city *and county*.

191.    There is no discretion to fail to provide this medically necessary care. *County of San Diego v. State of Cal.*, 15 Cal.4th 68 (1997).

192.    "Medically necessary" is defined by statute: "[A] service is 'medically necessary' or a 'medical necessity' when it is reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain." Welf. & Inst. Code § 14059.5(a).

193.    Plaintiffs/Intervenors take the position that, during a public health emergency, the City must provide medically necessary shelter to unsheltered individuals to protect life, to prevent significant illness or significant disability, or to alleviate severe pain under Welfare and Institutions Code Section 14059.5(a).

## VII.    PLAINTIFFS/INTERVENORS' CLAIMS AGAINST THE CITY

194.    The City fails appropriately provide access to unhoused individuals to its COVID-19 Alternative Housing program.

195.    Furthermore, the City's failure and refusal to ensure that implementation of the Stipulated Injunction fully complies with federal disability law has proximately resulted in harm to unhoused Tenderloin District residents, including denials of placement in hotels due to persons' disabilities, placement in hotels that cannot and do not appropriately accommodate the resident's disability, refusal to allow residents with disabilities to see a potential hotel site before accepting placement, and failing to ensure that hotel placement sites meet required sanitation standards and have prompt access to necessary medical care.

196.    The problem of homelessness and lack of access to programs and services has grown for the last several years and threatens to continue to grow, causing harm to Plaintiffs/Intervenors absent declaratory and injunctive relief.

197.    A judicial declaration is necessary and appropriate at this time to protect the legal rights and interests of those unhoused Tenderloin residents who are subject to implementation of the Stipulated Injunction.

198.    Plaintiffs/Intervenors therefore seek declaratory and injunctive relief restraining Defendants from failing to take all steps that are necessary to ensure that unhoused Tenderloin

residents with disabilities are provided with all accommodation to which they are entitled by law.

## FIRST CLAIM FOR RELIEF

### Violation of Title II of the Americans with Disabilities Act

### 42 U.S.C. §§12132, *et seq*.

199.    Plaintiffs/Intervenors incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

200.    Title II of the ADA says that no qualified individual with a disability shall, because of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42. U.S.C. §12132.  Title II prohibits all discrimination by public entities, regardless of the context, and applies to all acts by public entities.  Section 12132 has been broadly construed to prohibit municipalities from discriminating against disabled persons.  Zoning ordinances and decisions are subject to section 12132.

201.    All public entities, including state and local governments and their departments, agencies, and instrumentalities, must comply with the ADA.

202.    Title II regulations interpreting the ADA prohibit a public entity from using criteria and methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination based on disability.  29 C.F.R. §35.130(b)(8).  Public entities must instead operate programs in such a way that they are "readily accessible to and usable by individuals with disabilities" – requirement of program access.  29 C.F.R. §35.150.

203.    Title II also requires the City to make reasonable modifications in its policies and practices to afford people with disabilities access to its programs.  28 C.F.R. §35.130(b)(7)(i).

204.    Plaintiffs/Intervenors are organizations that represent the interests of "qualified persons with disabilities" as defined under the Americans with Disabilities Act ("ADA").  42 U.S.C. §12102; 42 U.S.C. §12131; 28 C.F.R. §35.104.

205.    The City of San Francisco is a public entity within the meaning of Title II of the ADA, and under the ADA's broad language, a "program, service, or activity" includes within its scope "anything a public entity does." *Yeskey v. Pennsylvania Dep't of Corr.*, 118 F.3d 168, 171

at n.5 (3rd Cir. 1997), aff'd 524 U.S. 206 (1998) (quoting 28 C.F.R. Pt. 35, App. A, preamble to ADA regulations). At all times relevant to this action, the City has been a public entity within the meaning of Title II of the ADA and has provided programs, services, or activities to the public. For example, the City's control and maintenance of sidewalks, are services, programs, or activities of the City. Similarly, the City's regulations and implementations for serving unhoused individuals with disabilities are services, programs, or activities of the City.

206.     The City discriminates against unhoused individuals with disabilities from accessing its COVID-19 Alternative Housing program and instead implements a haphazard process that provides access to the City's limitedly resourced hotel and motels by only using geographic assessment. This process of placement into a hotel only through a geographic criteria leaves disproportionately denies unhoused individuals with disabilities from accessing the program and violates the City's COVID-19 Alternative Housing program policies and procedures for priority assessment and housing placement.

207.     Further, in implementing the Stipulated Injunction and carrying out its policies and practices as described herein, the City has used criteria and methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination based on disability. 29 C.F.R. §35.130(b)(3). The City's does not in practice use an assessment tool that adequately assess a person's need based on disability for entry into the City's appropriate programs or services, including temporary shelter. The City has also failed to allow access to the housing options, such as hotels or motels through Project Roomkey, to homeless individuals at higher risk of severe illness for COVID-19. The most vulnerable homeless individuals are individuals with disabilities as defined by the ADA.

208.     The City's actions and omissions in failing to follow its COVID-19 Alternative Housing program and failing to implement the Stipulated Injunction as stated herein have denied unhoused persons with disabilities their rights to meaningful access through reasonable modifications to the Homelessness Response System, and thereby subjecting them to discrimination in violation of the ADA.

209.     In carrying out its policies and practices as described herein, the City has used federal and state funds and has implemented federally funded programs, in a manner that discriminates against qualified individuals as basis of their disabilities.

210.     Plaintiffs/Intervenors have standing to sue because they and their constituents have been harmed by the City's conduct.

211.     Based on the foregoing, Plaintiffs/Intervenors are entitled to and demand declaratory and injunctive relief and reasonable attorneys' fees and costs.

212.     Based on the foregoing, Plaintiffs/Intervenors have suffered damages and will continue to suffer damages as a result of the City's discriminatory practices. These damages include, without limitation, the out-of-pocket costs associated with the City's denial of access to services, and the physical and emotional distress caused by the City's conduct, as alleged herein. These damages are a direct and legal result of the City's actions and omissions.

## SECOND CLAIM FOR RELIEF

### Violation of § 504 of the Rehabilitation Act of 1973

### (29 U.S.C. §794; 29 U.S.C. §794a)

213.     Plaintiffs/Intervenors incorporate by reference all foregoing and subsequent allegations as though fully set forth herein.

214.     Section 504 of the Rehabilitation Act of 1973 requires that qualified persons with disabilities be provided with meaningful access to federal- and state-funded programs. To ensure meaningful access, reasonable modifications may be required unless the recipient of the federal funding can demonstrate that such modifications would result in a fundamental alteration in the nature of the program.  29 U.S.C. §749; 24 C.F.R. §§8.3 and 8.4.

215.     At all times relevant herein, the City has been the recipient of financial assistance from the federal government. Upon information and belief, the Homelessness Response System is funded in whole or in part by financial assistance from the federal government through the Department of Housing and Urban Development. The COVID-19 Alternative Housing program is funded by federal, including funds from the Federal Emergency Management Agency (FEMA), and state funds.

1      216.    The City's implementation of the Stipulated Injunction has used its federal funds

2 in a manner that discriminates against people with disabilities in violation of section 504 of the

3 Rehabilitation Act. The City's actions and omissions as stated herein have denied

4 Plaintiffs/Intervenors' their rights to meaningful access through reasonable modifications to the

5 Homelessness Response System, and thereby subjecting them to discrimination based on

6 disability in violation of section 504 of the Rehabilitation Act. Unhoused Tenderloin residents

7 have not been able to access the homeless programs and services that provide social services,

8 healthcare, and placement in affordable housing. In addition, during COVID-19, individuals with

9 disabilities have been denied access to the shelters or alternative housing or services program.

10 For individuals with disabilities, who fall within the higher risk categories for severe illness of

11 COVID-19 as defined in the CDC guidelines, they have been denied access to Project Roomkey

12 and other COVID-19 related Homelessness Response System services.

13      217.    Plaintiffs/Intervenors are entitled to injunctive and declaratory relief, damages and

14 attorneys' fees and costs.

15         **VIII.   PLAINTIFFS/INTERVENORS' REQUEST FOR RELIEF**

16 WHEREFORE, Plaintiffs/Intervenors respectfully request that this Court grant the following

17      relief:

18 a.    Assert jurisdiction over Plaintiffs/Intervenors' claims;

19 b.    Reject Plaintiffs' First, Second Third, Fourth, Fifth, Eighth, Ninth, Tenth, Twelfth, and

20      Thirteenth Causes of Action, and deny relief under those claims;

21 c.    Issue injunctive relief to compel Defendant to ensure that unhoused persons with

22      disabilities are not excluded from participation in or denied the benefits of the services,

23      programs, or activities, or subjected to discrimination;

24 d.    Issue injunctive relief compelling Defendant to provide meaningful access to federal and

25      state-funded programs for unhoused persons with disabilities under Section 504 of the

26      Rehabilitation Act of 1973;

27 e.    Issue a declaratory judgment that the City must not engage in seizure of unhoused

28      persons' property that violates their Fourth or Fourteenth Amendment Rights;

*Hastings College of the Law v. City and County of San Francisco;* **Case No. 4:20-cv-3033-JST**
**AMENDED AND SUPPLEMENTAL COMPLAINT IN INTERVENTION FOR DECLARATORY AND**
**INJUNCTIVE RELIEF**                   **39**

1   f.      Issue a declaratory judgment that the City must not violate unhoused persons' Eighth

2           Amendment rights by taking action that criminalizes their homeless status;

3   g.      Award reasonable costs and expenses incurred in the prosecution of this action, including

4           reasonable attorneys' fees and costs under 42 U.S.C. §§1988 and 1920; and

5   h.      Grant any and such other and further relief as the Court may deem just and

6   proper.

7

8   DATED:  July 28, 2020                    Respectfully submitted,

9                                            PUBLIC INTEREST LAW PROJECT
                                             DISABILITY RIGHTS CALIFORNIA
10                                           BAY AREA LEGAL AID

11

12                              By:          _____

13                                           LAUREN HANSEN
                                             Attorneys for Plaintiffs/Intervenors

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28