# EXHIBIT A

AO 440 (Rev. 06/12)  Summons in a Civil Action

FILED

Jun 26 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

# UNITED STATES DISTRICT COURT

### for the

### Northern District of California

DANIEL GIOSSO, JAMES GIOSSO, AND
RICHARD GIOSSO, TRUSTEES OF THE GIOSSO
CHILDREN'S TRUST; MIKE O'NEILL AND
SONS, A CALIFORNIA GENERAL
PARTNERSHIP

_Plaintiff(s)_

v.

CITY & COUNTY OF SAN FRANCISCO, a
municipal entity, and DOES 1 through 100, inclusive.

_Defendant(s)_

Civil Action No.  3:20-cv-04255-TSH

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_
CITY & COUNTY OF SAN FRANCISCO, a municipal entity
City Hall
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:
CURTIS F. DOWLING (California SBN 188091)
JAK S. MARQUEZ (California SBN 183892)
DOWLING & MARQUEZ, LLP
625 Market Street, 4th Floor
San Francisco, California 94105

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT
Susan Y. Soong

Date:        6/26/2020                                      _____
                                                            A. Kokich
                                                            _f Clerk or Deputy Clerk_

CITY ATTY'S OFFICE
1390 MARKET ST.
2020 JUL 10  AM 9: 29

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*

_____

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

1  CURTIS F. DOWLING (California SBN 188091)
2  JAK S. MARQUEZ (California SBN 183892)
   **DOWLING & MARQUEZ, LLP**
3  625 Market Street, 4th Floor
4  San Francisco, California 94105
   Tel: (415) 977-0444
5  Fax: (415) 977-0156
6  E-mail: curtis@dowlingmarquez.com
7  Attorneys for Plaintiffs
   DANIEL GIOSSO, JAMES GIOSSO, AND
8  RICHARD GIOSSO, TRUSTEES OF THE
   GIOSSO CHILDREN'S TRUST; MIKE
   O'NEILL AND SONS, A CALIFORNIA
9  GENERAL PARTNERSHIP

10
11
12                 UNITED STATES DISTRICT COURT
13                 NORTHRN DISTRICT OF CALIFORNIA
14

| | |
|---|---|
| DANIEL GIOSSO, JAMES GIOSSO, AND RICHARD GIOSSO, TRUSTEES OF THE GIOSSO CHILDREN'S TRUST; MIKE O'NEILL AND SONS, A CALIFORNIA GENERAL PARTNERSHIP | Case No.: **COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF** |
| Plaintiffs, | |
| v. | |
| CITY & COUNTY OF SAN FRANCISCO, a municipal entity, and DOES 1 through 100, inclusive. | |
| Defendants. | |

24
25    COME NOW plaintiffs  DANIEL GIOSSO, JAMES GIOSSO, and
26
27  RICHARD GIOSSO, TRUSTEES OF THE GIOSSO CHILDREN'S TRUST, and
28

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

1

MIKE O'NEILL AND SONS, A CALIFORNIA GENERAL PARTNERSHIP

(hereafter "Plaintiffs"), who allege as and for a cause of action, as follows:

## **INTRODUCTION**

1.      San Francisco's Tenderloin neighborhood faces a desperate crisis.

2.      The Tenderloin is a culturally diverse community comprised of seniors, persons with disabilities, people of color, immigrants (documented and undocumented), individuals with low incomes, LGBTQ people, and families with children.  All of its residents—housed and unhoused—are being put at risk by the policies, actions, and inaction of the City and County of San Francisco.

3.      Even before the onset of the COVID-19 pandemic, the de facto policy of the City and County of San Francisco to use the Tenderloin community as a containment zone had resulted in a dramatic decline in the livability and safety of the neighborhood.  The deplorable conditions tolerated by the City in the Tenderloin are not permitted in other neighborhoods in San Francisco.  This is a matter of fundamental fairness; what is a city-wide problem should not be allowed to weigh disproportionately on a low-income working-class neighborhood.  San Francisco should be prohibited from abandoning a single neighborhood, in an apparent effort to spare other neighborhoods the burdens that confront the city at-large.

4.      The Tenderloin, always a community of tolerance and compassion, is now blighted; its sidewalks are unsanitary, unsafe, and often impassable.  Open-air

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

drug sales and other criminal activity, plus crowds of drug users and sidewalk-blocking tents, pervade and threaten the health and lives of all of the Tenderloin's residents. What has long been suffered in the Tenderloin has become insufferable. The conditions now prevailing in the Tenderloin constitute a violation of the fundamental civil rights of those residing and working there.

5.     Small business owners, who reflect the cultural diversity of the neighborhood, face multiple challenges. Their economic viability is threatened by generic COVID-19 business disruption, but they must also cope with an existential risk to their future, as customers elect to patronize establishments where sidewalk conditions do not impose physical barriers to safe access. The same is true of providers of rental housing in the neighborhood.

6.     The pandemic has ominously exacerbated dangers and harms to those who live, work, and go to school in the Tenderloin, and it threatens to do so for years to come as successive waves of infection bring further death and despair.

7.     Plaintiffs make the factual allegations and assert the legal claims herein in an effort to compel the City and County of San Francisco to comply with the law. Plaintiffs seek ultimately not to assign blame, but to obtain legally obligatory solutions.

## II. JURISDICTION AND VENUE

8.     Plaintiffs assert the claims herein pursuant to 42 U.S.C. § 1983, and the Fifth and Fourteenth Amendments of the United States Constitution. This

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

3

Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1367, 2201 & 2202.

9.     This Court has supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as they arise from the same case or controversy as plaintiffs' federal claims.

10.    Plaintiffs seek only equitable and injunctive relief for their state law claims. Accordingly, plaintiffs need not submit a compensation claim with any local public entity pursuant to the California Tort Claims Act set forth at California Government Code §§ 810 et seq.[1]

11.    The acts and omissions complained of herein occurred in the Northern District of California. Accordingly, pursuant to 28 U.S.C. § 1391, venue is proper in this Judicial District.

## III. INTRADISTRICT ASSIGNMENT

12.    A substantial part of the events or omissions that give rise to the claims asserted herein occurred in the City and County of San Francisco, and a substantial part of the property that is the subject of this action is situated in the City and County of San Francisco.

## IV. PARTIES

### A.    Plaintiffs

13.    Plaintiffs DANIEL GIOSSO, JAMES GIOSSO, AND RICHARD

---

[1] *See Qwest Commc'ns Corp. v. City of Berkeley*, 146 F. Supp. 2d 1081, 1090-91 (N.D. Cal. 2001).

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

4

GIOSSO are the trustees of the GIOSSO CHILDREN'S TRUST and are the legal owners of the mixed-use building located at 725-727 Van Ness Avenue, San Francisco, California (hereafter "Giosso Building"). The Giosso Building has ground-floor commercial space and 31 residential rental units. The Giosso Building is located on the western edge of the Tenderloin on the 700 block of Van Ness Avenue (hereafter "The Block"), which is the block bounded on the west and east by Van Ness and Franklin Streets, and on the north and south by Turk and Eddy Streets. The Block is further divided approximately in half from the west and east by a one-block long street called Larch Street (hereafter "The Alley"). The Alley is about 2 ½ blocks away from City Hall in San Francisco.

14. Plaintiff MIKE O'NEILL AND SONS is a California general partnership and is the owner of two different apartment buildings located on The Block. One is 828 Franklin Street, and the other is 880 Franklin Street. These two apartment buildings (hereafter "O'Neill Buildings") are collectively comprised of 174 residential rental units.

**B. Defendant**

15. Defendant CITY AND COUNTY OF SAN FRANCISCO ("Defendant" or the "City") is a municipal entity existing under the laws of the State of California, with the capacity to sue and be sued.

///

///

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

5

# V. FACTUAL ALLEGATIONS

## A.  History of the Tenderloin Neighborhood

16.   The "Tenderloin" is an approximately 50-city block neighborhood in downtown San Francisco that has been known by that name for more than a century.  Although not all authorities agree on the Tenderloin's precise metes and bounds, many consider it to be a trapezoid-shaped region which is roughly bordered on the west by Van Ness Avenue, on the north by Post Street, on the east by Mason Street, and on the south by Market Street.

17.   For most of its existence, the Tenderloin has attracted residents from the working-class and lower income segments of San Francisco society.  The socioeconomic fortunes of the Tenderloin have waxed and waned significantly over the past 60 years.

18.   Specifically, the distinctive character of the Tenderloin experienced a sharp decline in the 1960s.  By 1971, the neighborhood was described by The New York Times as the "porn capital of the USA."[2]  Prostitution and illegal drug trafficking were open and notorious, and housing conditions deteriorated.[3]

19.   A decade later, in the early to mid-1980s, the Tenderloin enjoyed a

---

[2]  Randy Shaw, After 40 Years, the Tenderloin at Another Crossroads, San Francisco Chronicle (Feb. 23, 2020), https://www.sfchronicle.com/opinion/article/After-40-years-the-Tenderloin-at-another-15066015.php (referring to William Murray, Porn Capital of America: San Francisco, New York Times Magazine (Jan. 3, 1971), at 8-9).
[3]  *See generally* Randy Shaw, *The Tenderloin: Sex, Crime, and Resistance in the Heart of San Francisco* 135-56 (2015) (Chapter 6: 1967-1977, The Tenderloin Hits Bottom).

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

6

brief revival.  Through the hard work, dedication, and inspiration provided by politicians and community leaders including then-Mayor Dianne Feinstein; the Reverend Cecil Williams of Glide Memorial United Methodist Church; and the late owner of the Cadillac Hotel, Leroy Looper, the Tenderloin attracted substantial fresh investment, particularly in its restaurants and other small businesses.[4]  New zoning regulations were enacted that protected the low-income character of the neighborhood.[5]

20.     Unfortunately, the Tenderloin's economic resurgence did not last.  By the late-1980s, several factors, including a cut in federal funding, an economic slump, and a lack of police department support, triggered another two-decade decline.[6]

21.     For a few years beginning in 2011, under the leadership of the late Mayor Ed Lee, the Tenderloin again experienced a revitalization.  New housing and restaurants opened, neighborhood parks were renovated, and the Tenderloin Museum was commissioned.[7]  But, again, the Tenderloin's prosperity did not last.

**B.     Current State of the Tenderloin**

22.     At present, more than 20,000 people are permanent residents of the Tenderloin, including 3,000 children.[8]  Indeed, the Tenderloin has the highest per

---

[4]   Shaw, *S.F. Chronicle, supra* n.2.
[5]   *Id.*
[6]   *Id.*
[7]   *Id.*
[8]   Randy Shaw, *SF Turning Tenderloin into a Ghetto, BeyondChron*

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

7

capita concentration of children of any neighborhood in San Francisco.[9]  The

Tenderloin's residents consist primarily of low-income and working class

individuals, senior citizens, disabled people, and families with children.[10]

23.    By 2019, the condition of the Tenderloin sank to a new low.  The

homeless population, which has long been present in the Tenderloin, swelled.

According to a 2019 study conducted by Applied Survey Research, the homeless

count in San Francisco increased by almost 20% over the four years from 2015 to

2019, with most of that growth occurring over the last two years.[11]

24.    The recent influx of homeless people into the Tenderloin has created a

variety of problems for all stakeholders—permanent residents, providers of rental

housing, businesses, schools, the police, and the homeless population itself (an

estimated 39% of whom suffer from mental illness[12]).

25.    Open-air drug transactions are routinely tolerated in the Tenderloin.

The easy availability of illegal drugs attracts users and intensifies the homelessness

problem.  Some 42% of the homeless population are estimated to suffer from

---

(Apr. 7, 2020), http://beyondchron.org/sf-turning-tenderloin-into-a-ghetto/.
[9]  Carrie Sisto, *Tenderloin Merchants Form New Association to Address Issues with Neighborhood's Alleys*, Hoodline (Nov. 13, 2019), https://hoodline.com/2019/11/tenderloin-merchants-form-new-association-to-address-issues-with-neighborhood-s-alleys.
[10]  Shaw, *BeyondChron, supra* n.8.
[11]  Applied Survey Research, San Francisco Homeless Count & Survey 2019 Executive Summary, San Francisco Department of Homelessness & Supportive Housing (2019), http://hsh.sfgov.org/wpcontent/uploads/ExecutiveSummary_SanFrancisco2019.pdf.
[12]  *Id.*

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

alcohol or drug addiction.[13]

26.    Sidewalks in the Tenderloin are now packed with tents, some of which contain as many as six individuals.  Since the latter part of 2019, a sizeable number of homeless persons have created an unwanted tent encampment in The Alley.  It has grown over time and gotten particularly bad in the last few months.  The people in the encampment have taken over both sides of the street, erecting and placing tents and other obstructions on the entire length of The Alley.  Recent photographs depicting various portions of the encampment are attached hereto as Exhibit "A."  There are also tents on portions of the sidewalks surrounding The Block.

27.    According to a count conducted by Urban Alchemy (a non-profit organization that provides litter reduction services in the Tenderloin and adjacent neighborhoods of San Francisco to ensure safe, clean, and accessible sidewalks and rights-of-way), the number of tents and makeshift shelters on Tenderloin sidewalks grew from 158 on March 3, 2020, to 391 on May 1, 2020.  A chart illustrating the increase in the number of those tents and shelters on Tenderloin sidewalks from December 10, 2019, to May 1, 2020, is attached hereto as Exhibit "B."

28.    Those tents, such as those presently in The Alley, block the sidewalks in the Tenderloin, impeding pedestrians' travel.  They also serve as cover for drug dealers and others conducting nefarious activities.[14]  However, on plaintiffs'

---

[13]  *Id.*
[14]  Phil Matier, *SF Homeless Tents, Once Seen as Problem, Now Seen as Path to Coronavirus Social Distancing*, San Francisco Chronicle (Apr. 12, 2020),

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

9

information and belief, the San Francisco Police Department has been directed not

to remove or disturb those tents, despite the fact that they block the sidewalks and

shield criminals and despite the health risks that they pose to permanent residents,

business owners, pedestrians, and homeless people themselves.[15]

29.     According to Randy Shaw, executive director of the Tenderloin

Housing Clinic,[16] "The Tenderloin has become a horror show. Feces, drug dealers

and users, graffiti, tents and crowds on sidewalks dominate the landscape."[17]

30.     The crisis in the Tenderloin presents an immediate and dire public

health problem.

31.     The Tenderloin's crisis also presents an environmental problem, as the

U.S. Environmental Protection Agency has recognized. In a letter to Governor

Gavin Newsom dated September 26, 2019, EPA Administrator Andrew R. Wheeler

wrote:

> The EPA is aware of the growing homelessness crisis
> developing in major California cities, including Los Angeles
> and San Francisco, and the impact of this crisis on the environ-
> ment. Indeed, press reports indicate that "piles of human
> feces" on sidewalks and streets in these cities are becoming all
> too common. The EPA is concerned about the potential water

---

https://www.sfchronicle.com/bayarea/philmatier/article/SF-homeless-tents-once-
seen-as-problem-now-seen-15193812.php.
[15] Shaw, *BeyondChron*, *supra* n.8.
[16] Mr. Shaw also co-founded and serves on the Board of Directors of Uptown
Tenderloin, Inc., a nonprofit organization that in 2009 spearheaded the creation of
the national Uptown Tenderloin Historic District. Uptown Tenderloin, Inc. was the
driving force behind the Tenderloin Museum, which opened in 2015. Mr. Shaw is
the editor of BeyondChron.org.
[17] Shaw, *BeyondChron*, *supra* n.8.

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

10

quality impacts from pathogens and other contaminants from untreated human waste entering nearby waters.  San Francisco, Los Angeles and the state do not appear to be acting with urgency to mitigate the risks to human health and the environment that may result from the homelessness crisis.[18]

32.    The plight of the Tenderloin is aggravated by the NIMBY[19] attitude and behavior exhibited by many in San Francisco.  That is, as the streets of other San Francisco neighborhoods improve, the condition of the Tenderloin deteriorates. As San Francisco Chronicle columnist Heather Knight recently observed, "[t]hough city officials would never admit it, they've long treated the low-income neighborhood [of the Tenderloin] as a containment zone, tolerating everything from blatant drug dealing to open-air injection drug use to filthy sidewalks that wouldn't stand in wealthier parts of town."[20]  Randy Shaw similarly asserted, "in 2020, our 'progressive' city still maintains a double standard that bars activities in gentrified neighborhoods that it allows in the Tenderloin."[21]

## C.    Impact on Plaintiffs

33.    Plaintiffs are providers of rental housing, and the occupants in the Giosso Building and the O'Neill Buildings are residential tenants who live in the

---

[18]   Letter from Andrew R. Wheeler, Administrator, U.S. Environmental Protection Agency, to Gavin C. Newsom, Governor, State of California (Sep. 26, 2019), https://www.epa.gov/sites/production/files/2019-09/documents/9.26.19_letter-epa.pdf (footnotes omitted).
[19]   "Not In My Back Yard"
[20]   Heather Knight, *"The Problem Is Getting Worse": SF's Troubled Tenderloin Buckles under Weight of Coronavirus*, San Francisco Chronicle (Apr. 17, 2020), https://www.sfchronicle.com/bayarea/heatherknight/article/The-problem-is-getting-worse-SF-s-15206953.php.
[21]   Shaw, *S.F. Chronicle*, *supra* n.2.

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

11

neighborhood. Plaintiffs and their managers and tenants, along with other persons who reside on and/or work on The Block, have suffered from the deterioration of their community. Tent-blocked sidewalks in The Alley and around The Block, groups of addicts injecting themselves, the odors of smoked crystal methamphetamine and human waste, open-air drug dealing, a makeshift bicycle "chop shop," assaults, and noise at all hours of the day and night immediately outside the Giosso Building and the O'Neill Buildings cause residents to fear for their safety; many are afraid to venture outside their building, particularly at night.

34.     The tent encampment in The Alley, and the criminal, anti-social, and/or disruptive activities which take place therein on a regular, if not daily, basis are a nuisance by any conceivable understanding of that term. Fights have erupted between members of the encampment wielding steel poles. A woman was dragged around by her neck. Members of the encampment have assaulted and harassed tenants who live on The Block. They urinate and defecate in The Alley.[22] They make unbearable noise at all hours of the day and evening. They do drugs out in the open. They have tried to break into plaintiffs' buildings and rental units. They steal packages/deliveries left for the residents. There is a makeshift bicycle "chop shop" present as well.   A contractor recently noted that one member of the encampment had a firearm. On plaintiff's information and belief, there was a drug

---

[22]  On plaintiffs' information and belief, the City only encouraged the encampment to grow by installing a portable toilet in The Alley earlier this year.

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

overdose on January 25, 2020; on plaintiffs' further information and belief, a stabbing death occurred in The Alley in February, 2020. The tenants in the Giosso Building and the O'Neill Buildings feel like prisoners in their own homes. They do not feel safe living on the block, and do not feel safe exiting/entering their buildings for any reason (e.g., grocery shopping). Numerous vacancies now exist in plaintiffs' three buildings because of the nuisance. Things have gotten so bad that tenants are now vacating these buildings and are specifically citing the encampment in The Alley as the reason. For example, one tenant vacated earlier this year and informed the manager of the Giosso Building that his reason for moving was:

> . . . . ultimately that I felt unsafe at the property due to the people that started to congregate around the building and on Larch St during my tenancy. Over my time at the building (August 2018-January 2020) the number of what I would consider to be violent homeless people living in that area grew exponentially. Barely a week went by where I didn't call either the non-emergency police line or 911 because people were fighting on Larch St at all hours of the day and night . . . .

And, because the nuisance in The Alley is unavoidable and so obvious to anyone who would enter any of plaintiffs' three buildings to view vacant units, plaintiffs cannot re-rent these vacant units.

35.     Nearby businesses in the Tenderloin have likewise suffered as a result of the neighborhood's decline, including crime and vandalism such as broken shop windows.

36.     Since the start of the COVID-19 pandemic, many, if not most or all, of

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

the people in the encampment in The Alley do not adhere to social distancing rules for the pandemic; they congregate in large groups in close proximity, without masks; they do not make way for other people who live and work on The Block who are trying to use the sidewalks; they sometimes display hostile and threatening behavior. Numerous residents in plaintiffs' three buildings have windows which are directly above, and not far from, the tents and people who form the encampment in The Alley.

37.     Plaintiffs' managers have called and/or written the City and the San Francisco Police Department, demanding the removal of the encampment, but the City and its police department have turned a blind eye to the problem, done nothing in response to it, and have allowed the continuation of a nuisance which threatens the health and safety of others.

**D.     Effect of the COVID-19 Pandemic**

38.     On March 16, 2020, in response to the COVID-19 pandemic, Mayor London Breed directed San Francisco businesses to close and issued a citywide shelter-in-place order.[23] The homeless population in the Tenderloin, however, has no place in which to shelter. Homeless people are exempted from social distancing conventions. Plaintiffs are deeply concerned that the homeless population in The

---

[23]  Russell Berman, *The City That Has Flattened the Coronavirus Curve*, The Atlantic (Apr. 12, 2020), https://www.theatlantic.com/politics/archive/2020/04/coronavirus-san-francisco-london-breed/609808/; *see also* City & County of San Francisco, Dept. of Public Health, Order of the Health Officer No. C19-07 (Mar. 16, 2020), https://www.sfdph.org/dph/alerts/files/HealthOrderC19-07-%20Shelter-in-Place.pdf.

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

14

Alley and around The Block—who have likely never been tested and who lack the resources to comply with the public health guidance of sheltering in place, practicing social distancing, washing hands, and wearing face coverings—may have COVID-19, posing a greater risk to the residents in their buildings and to their managers and inviting a general spread of the virus.

39.     Despite the high risk of infection and other dangers posed to residents in the Tenderloin and beyond, the City has yet to implement wide-scale testing for people living on the streets.

40.     Studies show that a primary cause of homelessness is loss of employment.[24]  The pandemic has caused a devastating increase in unemployment, in San Francisco and throughout the state and country.[25]  The homeless population in the Tenderloin has grown since the onset of the pandemic, and it will likely continue to grow.  On plaintiff's information and belief, the City reduced the number of persons allowed to sleep in City shelters out of concern for the coronavirus, but afforded the persons it displaced no other shelter opportunity, thereby forcing them to turn to living on the streets and in tents, and adding to the homeless population which was already existent in the Tenderloin when the pandemic started.

---

[24]  Applied Survey Research, *supra* n.11.
[25]  Adam Beam, *California's Unemployment Rate Soars, But Worst Yet to Come*, NBC Bay Area (Apr. 17, 2020), https://www.nbcbayarea.com/news/california/california-unemployment-rate-jumped-to-5-3-in-march/2274716/.

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

15

41.     The explosive growth in the size of the Tenderloin's homeless

population has likewise harmed its permanent residents.  Individuals and families

living in SROs are terrified to go outside.  As Heather Knight explained, "[m]any

families live in tiny single room occupancy hotels, sharing communal kitchens and

bathrooms.  But to get outside for fresh air or to run essential errands, they're faced

with an impossible choice: push through crowded sidewalks, social distancing be

damned, or walk into traffic to get around the throngs."[26]

42.     On April 20, 2020, District 6 Supervisor Matt Haney transmitted a

letter to Mayor Breed and other City officials regarding the Tenderloin's crisis.[27]  In

his detailed letter, Supervisor Haney explained (among many other things) how

Tenderloin residents are "uniquely vulnerable to the spread of COVID-19" and how

the proliferation of tents on the sidewalks of the Tenderloin creates "extreme health

hazards for everyone."[28]  Supervisor Haney closed his letter with a demand for "a

specific, targeted intervention strategy from the City" to "slow the spread of the

virus, save lives, and protect everyone in our city."[29]

43.     The City's acts and omissions, whether intentional or negligent, that

allow the Tenderloin to serve as the City's repository for its homeless population

(as Supervisor Haney outlines in his letter and as plaintiffs have detailed above)

---

[26]  Knight, *supra* n.20.
[27]  Letter from Matt Haney, Supervisor, San Francisco District 6, to London
Breed, Mayor, City of San Francisco, *et al.* (Apr. 20, 2020).
[28]  *Id.* at 1.
[29]  *Id.* at 4.

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

have created dire consequences for the Tenderloin's residents and businesses, including plaintiffs'. The City's acts and omissions threaten plaintiffs with the following specific consequences: (a) an increased risk of infection of COVID-19; (b) interference with their property rights; (c) loss of business and other opportunities; (d) interference with their California constitutional right to pursue happiness; (e) interference with their federal due process rights; and (f) interference with their federal equal protection rights.

44.    Defendant is legally obligated to act quickly to protect plaintiffs' legal rights (as articulated in their claims set forth below) as well as the health and lives of plaintiffs, their managers, and their tenants. The Tenderloin's long role as the City's containment zone must cease.

## VI. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of Due Process

### 42 U.S.C. § 1983; U.S. Const. Amend. V/XIV

### (All Plaintiffs against Defendant)

45.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 44 of this Complaint as though set forth fully herein.

46.    Defendant, by abdicating its duties under the law to ensure safe and secure living conditions in the Tenderloin, has denied residents on The Block and in

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

17

plaintiffs' buildings due process of law as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution. The squalid sidewalk conditions, exacerbated profoundly by the threat of infection, have denied these residents their unimpeded liberty and use of their property, and have allowed conditions to fester that threaten residents' health and lives.

47.     Upon plaintiffs' information and belief, this was done with deliberate intent and/or reckless disregard of plaintiffs' rights. Plaintiffs seek injunctive relief and the cost of attorneys' fees in bringing this action.

## SECOND CLAIM FOR RELIEF

### Violation of Equal Protection

### 42 U.S.C. § 1983; U.S. Const. Amend. V/XIV

### (All Plaintiffs against Defendant)

48.     Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 47 of this Complaint as though set forth fully herein.

49.     Defendant, by enforcing the law in some areas and declining to enforce the law in others, has arbitrarily determined where homeless encampments may or may not be located and what communities should be affected, without following its own procedures and in violation of both state and federal law. This has placed a disproportionate burden on some persons, communities, and businesses over others.

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

18

50.    Upon plaintiffs' information and belief, this was done with deliberate intent and/or reckless disregard of plaintiffs' rights.  Plaintiffs seek injunctive relief and the cost of attorneys' fees in bringing this action.

**THIRD CLAIM FOR RELIEF**

**Violation of Due Process Clause, State-Created Danger Doctrine**

**42 U.S.C. § 1983; U.S. Const. Amend. XIV**

**(All Plaintiffs against Defendant)**

51.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 50 of this Complaint as though set forth fully herein.

52.    By the acts and omissions described above, defendant has affirmatively created or increased the risk that plaintiffs, their managers, and their tenants would be exposed to dangerous conditions, which placed plaintiffs, their managers, and their tenants specifically at risk, and these persons were and have been harmed as a result.

53.    Defendant knew or should have known that its acts or omissions specifically endangered plaintiffs, their managers, and their tenants, and defendant was deliberately indifferent thereto.

///

///

///

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

19

## FOURTH CLAIM FOR RELIEF

### Uncompensated Taking

### 42.U.S.C. § 1983; U.S. Const. Amend. V/XIV

### (All Plaintiffs against Defendant)

54.     Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 53 of this Complaint as though set forth fully herein.

55.     The Fifth Amendment mandates, in relevant part, that "private property [shall not] be taken for public use, without just compensation."  The Fifth Amendment is applied to the states through the Fourteenth Amendment.[30]  The actions by the City, as described in detail herein, have limited, damaged, and/or burdened the property owners (including, but not limited to, plaintiffs) so substantially that they rise to the level of a regulatory taking, yet no compensation has been provided.

56.     Upon information and belief, this was done with deliberate intent and/or reckless disregard of plaintiffs' rights.  Plaintiffs seek injunctive relief and the cost of attorneys' fees in bringing this action.

///

///

---

[30]     *Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 241, 17 S. Ct. 581, 586 (1897).

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

20

## FIFTH CLAIM FOR RELIEF

## Municipal Liability for Unconstitutional Custom or Policy

## 42 U.S.C. § 1983

## (All Plaintiffs against Defendant)

57.     Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 56 of this Complaint as though set forth fully herein.

58.     Plaintiffs are informed, believe and allege that, at all times herein mentioned, defendant and its agents, with deliberate indifference, and conscious and reckless disregard to the safety, security, and constitutional and statutory rights of plaintiffs, engaged in the unconstitutional conduct and omissions set forth above, all pursuant to policy, procedure, or customs held by the City.

59.     The actions and inactions of the City were known or should have been known to the policy makers responsible for that agency and occurred with deliberate indifference to the constitutional violations set forth above, and/or to the strong likelihood that constitutional rights would be violated as a result of its customs and/or policies.

60.     Plaintiffs seek injunctive relief, and the cost of attorneys' fees in bringing this action.

///

///

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

21

# SIXTH CLAIM FOR RELIEF

## Negligence

## (All Plaintiffs against Defendant)

61.     Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 60 of this Complaint as though set forth fully herein.

62.     Defendant, by and through its agents and employees, has the sole right and responsibility to control, maintain, and keep safe and clean the public and public-right-of-way areas in San Francisco, including parks, sidewalks, streets, and public buildings, and to make and enforce laws assuring the public health and safety thereof for its citizens and their guests.  Among other things, defendant has the duty to maintain these areas in a manner that does not unreasonably interfere with the free passage or use by plaintiffs, their managers, and their tenants and that addresses and alleviates conditions that are harmful to health or indecent or offensive to the senses, that create a fire hazard, or that permit crime to occur unabated including the illegal sale and/or use of controlled substances.

63.     As controlling law makes clear, "[t]he public is entitled to the free and unobstructed use of the entire streets and sidewalks. . . ."[31]  Indeed, municipalities "have the duty to keep their communities' streets open and available for movement

---

[31]  *Vanderhurst v. Tholcke*, 113 Cal. 147, 152 (1896).

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

of people and property, the primary purpose to which the streets are dedicated."[32]

64.    Defendant and its agents have breached their duty to San Francisco's citizens, including and specifically to plaintiffs, their managers, and their tenants and each plaintiff has suffered as a result.  The bases of this claim for relief include the conduct, acts, and omissions of individual responsible City officials, based on the theory of respondeat superior.

65.    Plaintiffs seek no monetary damages hereunder and submit this claim for only equitable and injunctive relief.  Accordingly, the City is not entitled to any claim of immunity, pursuant to California Government Code § 814.

### SEVENTH CLAIM FOR RELIEF

### Public Nuisance

### Cal. Civ. Code §§ 3490 et seq.

### (All Plaintiffs against Defendant)

66.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 65 of this Complaint as though set forth fully herein.

67.    California has defined nuisance as:

> [a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life

---

[32]  *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 160, 60 S. Ct. 146, 150 (1939).

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

23

or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance.[33]

68.     That statute "is an expression of the Legislature's public policy against public nuisances, and it is plainly aimed at protecting the public from the hazards created by public nuisances."[34] In addition to health and safety hazards, "[a] reduction in property values caused by activities on a neighboring piece of land, and an assault on the senses by noise, dust, and odors, are just the kinds of harm that common law suits to abate a nuisance are designed to redress."[35] A public nuisance is the substantial and unreasonable interference with a public right.[36]

69.     As described above, the City, by its failure to maintain the public property under its control and to enforce the laws requiring the same, is perpetuating and facilitating a public nuisance.

70.     All plaintiffs, and their managers and tenants, have experienced a substantial and unreasonable interference with the enjoyment of their property, whether that be a building owned or a room rented, and with their right of free passage and use; each has suffered and continues to be threatened with respect to

---

[33]   California Civil Code § 3479.
[34]   *People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51, 136 (2017).
[35]   *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 101 F.3d 503, 505 (7th Cir. 1996).
[36]   *San Diego Gas & Elec. Co. v. Superior Court*, 13 Cal. 4th 893, 938 (1996).

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

his or her health and welfare, by reason of the constant threat of disease and the experience of human waste, trash, tents, and an encampment outside their properties and along and on the sidewalks and streets of The Alley and The Block.

71.  Each plaintiff has been damaged in his or her own right, in a manner specially injurious to himself or herself.  No plaintiff consented to defendant's conduct.

### EIGHTH CLAIM FOR RELIEF

### Private Nuisance

### Cal. Civ. Code §§ 3501 et seq.

### (All Plaintiffs against Defendant)

72.  Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 71 of this Complaint as though set forth fully herein.

73.  Each plaintiff co-owns the Giosso Building or the O'Neill Buildings. By defendant's actions and inactions, each has created a condition or permitted a condition to exist that is harmful to the health, is indecent and offensive to the senses, obstructs the free passage and use of public parks, squares, streets, highway, and sidewalks, permits unlawful sales of illicit narcotics, and constitutes a fire hazard, as described herein.

74.  Defendant's conduct has been and is intentional and unreasonable, or unintentional but negligent or reckless.  Alternatively, the condition permitted to

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

25

exist was the result of abnormally dangerous activity that substantially interfered

with each plaintiff's use or enjoyment of his or her land (as well as the enjoyment

of the same land by his or her manager(s) and tenants), that would reasonably

annoy or disturb an ordinary person.  No plaintiff consented to defendant's conduct;

each was harmed; defendant's conduct was a substantial factor in causing the harm;

and the seriousness of the harm outweighs any public benefit of such conduct

(which is none).

75.    Plaintiffs seek no monetary damages hereunder and submit this claim

for only equitable and injunctive relief.  Accordingly, the City is not entitled to any

claim of immunity, pursuant to California Government Code § 814.

### NINTH CLAIM FOR RELIEF

### Violation of Mandatory Duty

### Cal. Gov't Code § 815.6; Cal. Welf. & Inst. Code § 17000

### (All Plaintiffs against Defendant)

76.    Plaintiffs re-allege and incorporate herein by this reference each and

every allegation set forth in Paragraphs 1 through 75 of this Complaint as

though set forth fully herein.

77.    Defendant City is liable under California Government Code § 815.6

and common law negligence theory for violation of a statutorily mandated duty to

provide medical care for the indigent. California Welfare & Institutions Code §

17000 provides:

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions.

78. California Welfare & Institutions Code § 10000 clarifies and defines the purpose of these obligations as follows:

The purpose of this division is to provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed. It is the legislative intent that aid shall be administered and services provided promptly and humanely, with due regard for the preservation of family life, and without discrimination on account of ancestry, marital status, political affiliation, or any characteristic listed or defined in Section 11135 of the Government Code. That aid shall be so administered and services so provided, to the extent not in conflict with federal law, as to encourage self-respect, self-reliance, and the desire to be a good citizen, useful to society.

79. Sections 17000 and 10000 taken together mandate that "medical care be provided to indigents . . . promptly and humanely."[37] This means that cities and counties must provide medical care to the poor "at a level which does not lead to unnecessary suffering or endanger life and health."[38] The California Supreme Court has held that municipalities must provide "subsistence medical services."[39] Cities and counties have an obligation to provide "'medically

---

[37] *Tailfeather v. Board of Supervisors*, 48 Cal. App. 4th 1223, 1245 (1996).
[38] *Id.* at 1240.
[39] *Hunt v. Superior Court*, 21 Cal. 4th 984, 1014 (1999) ("Section 10000 imposes a minimum standard of care—one requiring that subsistence medical services be

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

27

necessary' care, not just emergency care."[40]  Importantly, a city or county's

obligation to provide medically necessary care must be fulfilled "without regard to

its fiscal plight."[41]  "Medically necessary" for adults is defined by statute:

> "[A] service is 'medically necessary' or a 'medical necessity'
> when it is reasonable and necessary to protect life, to prevent
> significant illness or significant disability, or to alleviate
> severe pain."[42]

80.    In view of the above-described facts and circumstances, and the

significant studies, statistics, and reports including those set forth herein, and other

such evidence as may be provided, a person's status as an unsheltered homeless

individual both causes and exacerbates physical and mental health problems,

ultimately causing much higher rates of infection, disease, decay, pain, and death.

81.    Basic shelter is "medically necessary" because it is "reasonable and

necessary to protect life, to prevent significant illness or significant disability, or to

alleviate severe pain," and the City's failure to provide the same to its homeless

population constitutes a breach of its duty under California Welfare & Institutions

Code §§ 17000 & 10000.

82.    Plaintiffs, and each of them, have been damaged by the City's failure

to provide shelter, as described in detail herein.

---

provided promptly and humanely.").
[40]  *County of Alameda v. State Bd. of Control*, 14 Cal. App. 4th 1096, 1108 (1993)
(quoting *Bay Gen. Cmty. Hosp. v. County of San Diego*, 156 Cal. App. 3d 944, 957
(1984)).
[41]  *Id.*
[42]  California Welfare & Institutions Code § 14059.5(a).

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

28

83.     Plaintiffs seek no monetary damages hereunder and submit this claim for only equitable and injunctive relief.  Accordingly, the City is not entitled to any claim of immunity, pursuant to California Government Code § 814.

## TENTH CLAIM FOR RELIEF

### Deprivation of the Guarantee of Safety and the Pursuit of Happiness

### Cal. Const. art. I § 1

### (All Plaintiffs against Defendant)

84.     Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 83 of this Complaint as though set forth fully herein.

85.     California Constitution, article I § 1 provides:

> All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.

86.     The actions by the City have limited, damaged, and/or burdened plaintiffs' constitutionally guaranteed inalienable rights, including plaintiffs' rights to enjoy and defend their life and liberty; to acquire, possess, and protect their property; and to pursue and obtain safety, happiness, and privacy.[43]  The same is

---

[43] *See generally* Joseph R. Grodin, *Rediscovering the State Constitutional Right to Happiness and Safety*, 25 Hastings Const. L.Q. 1, 29 (1997) ("Either as an alternative or as an additional meaning, the happiness and safety clauses could be viewed as a declaration, and even a judicially enforceable one, that government has an affirmative obligation to provide at least the minimum conditions necessary for human happiness and safety. This would entail, arguably, the assurance of such things as minimal requirements for food, shelter, and medical care, and so far as

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

29

true of the tandem rights of their managers and tenants.

87.  Plaintiffs seek no monetary damages hereunder and submit this claim for only equitable and injunctive relief.  Accordingly, the City is not entitled to any claim of immunity, pursuant to California Government Code § 814.

## ELEVENTH CLAIM FOR RELIEF

### Inverse Condemnation

### Cal. Const. art. I § 19

### (All Plaintiffs against Defendant)

88.  Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in Paragraphs 1 through 87 of this Complaint as though set forth fully herein.

89.  California Constitution, article I § 19(a) provides in relevant part:

> Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner.

90.  The actions by the City have limited, damaged, and/or burdened the owners' property and/or business so substantially that they rise to the level of a regulatory taking, yet no compensation has been provided.

91.  Plaintiffs seek no monetary damages hereunder and submit this claim for only equitable and injunctive relief.  Accordingly, the City is not entitled to any claim of immunity, pursuant to California Government Code § 814.

possible, a nondangerous environment.").

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

30

## VII. DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs pray for judgment against Defendant, as follows:

1.     Injunctive/equitable relief in a manner to be determined by law (e.g., an injunction commanding defendant to remove the tent encampment and ensure that The Alley and The Block are and remain free of any public and/or private nuisance on the streets and sidewalks);

2.     An award of costs of suit, including attorneys' fees, as permitted by law and

3.     Such other and further relief as this Court deems just and proper.

Dated: June 25, 2020          **DOWLING & MARQUEZ, LLP**

By: Curtis F. Dowling
Attorneys for Plaintiffs
DANIEL GIOSSO, JAMES
GIOSSO, AND RICHARD
GIOSSO, TRUSTEES OF THE
GIOSSO CHILDREN'S TRUST &
MIKE O'NEILL AND SONS, A
CALIFORNIA GENERAL
PARTNERSHIP

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF**

EXHIBIT "A"

















EXHIBIT "B"



Tent and Makeshift Count

1

2

3 UNITED STATES DISTRICT COURT

4 NORTHERN DISTRICT OF CALIFORNIA

5

6 DANIEL GIOSSO,

          Plaintiff,

7

8     v.

CITY OF SAN FRANCISCO,

9

          Defendant.

10

Case No.  20-cv-04255-TSH

**ORDER SETTING INITIAL CASE MANAGEMENT CONFERENCE AND ADR DEADLINES**

11

12     IT IS HEREBY ORDERED that this action is assigned to the Honorable Thomas S.

13 Hixson . When serving the complaint or notice of removal, the plaintiff or removing defendant

14 must serve on all other parties a copy of this order, the Notice of Assignment of Case to a United

15 States Magistrate Judge for Trial, and all other documents specified in Civil Local Rule 4-2.

16 Plaintiffs or removing parties must file a consent or declination to proceed before a magistrate

17 judge within 14 days of the filing of the complaint or the removal.  All other parties must file a

18 consent or declination within 14 days of appearing in the case.  All parties who have made an

19 appearance must file a consent or declination within 7 days of the filing of a dispositive motion or

20 the case will be reassigned to a district court judge.  Counsel must comply with the case schedule

21 listed below unless the Court otherwise orders.

22     IT IS FURTHER ORDERED that this action is assigned to the Alternative Dispute

23 Resolution (ADR) Multi-Option Program governed by ADR Local Rule 3.  Counsel and clients

24 shall familiarize themselves with that rule and with the material entitled "Dispute Resolution

25 Procedures in the Northern District of California" on the Court ADR Internet site at

26 http://www.cand.uscourts.gov/adr.  A limited number of printed copies are available from the

27 Clerk's Office for parties in cases not subject to the court's Electronic Case Filing program (ECF).

28     IT IS FURTHER ORDERED that plaintiff or removing defendant serve upon all parties

United States District Court
Northern District of California

the brochure entitled "Consenting To A Magistrate Judge's Jurisdiction In The Northern District

Of California", additional copies of which can be downloaded from the court's Internet website:

http://www.cand.uscourts.gov.

| CASE SCHEDULE – ADR MULTI-OPTION PROGRAM | | |
|---|---|---|
| **Date** | **Event** | **Governing Rule** |
| 6/26/2020 | Complaint Filed | |
| 9/3/2020 | *Last day to:<br>• meet and confer re: initial disclosures, early settlement, ADR process selection, and discovery plan | FRCivP 26(f) & ADR L.R.3-5 |
| | • file ADR Certification signed by Parties and Counsel (form available at http://www.cand.uscourts.gov) | Civil L.R . 16-8(b) & ADR L.R. 3-5(b) |
| 9/17/2020 | **Last day to file Rule 26(f) Report, complete initial disclosures or state objection in Rule 26(f) Report and file Case Management Statement per Standing Order re Contents of Joint Case Management Statement<br>(also available at http://www.cand.uscourts.gov) | FRCivP 26(a) (1) Civil  L.R . 16-9 |
| 9/24/2020 | INITIAL CASE MANAGEMENT CONFERENCE (CMC) at 10:00 AM in:<br>Courtroom G, 15th Floor<br>Phillip Burton Federal Building<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 | Civil L.R . 16-10 |

* If the Initial Case Management Conference is continued, unless otherwise ordered this deadline is continued to 21 days in advance of the Initial Case Management Conference.

** If the Initial Case Management Conference is continued, unless otherwise ordered this deadline is continued to 7 days in advance of the Initial Case Management Conference.

United States District Court
Northern District of California

2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

## CIVIL STANDING ORDER FOR
## MAGISTRATE JUDGE THOMAS S. HIXSON

Parties shall comply with the procedures in the Federal Rules of Civil or Criminal Procedure, the
Northern District of California's Local Rules and General Orders, and this Standing Order, all of which
are available at http://www.cand.uscourts.gov.  Failure to comply with any of the rules or orders may be
grounds for monetary sanctions, dismissal, entry of judgment, or other appropriate sanctions.

### UNREPRESENTED (PRO SE) PARTIES

Parties representing themselves should visit the link titled "Representing Yourself" on the
Court's homepage, www.cand.uscourts.gov. The link discusses the Court's "Legal Help
Center" which provides free assistance at the San Francisco, Oakland, and San Jose
courthouses for unrepresented parties.  Parties may visit the Legal Help Centers at the
San Francisco and Oakland courthouses or call (415)-782-8982 to make an appointment.
Parties can make an appointment to visit the San Jose Legal Help Center by calling 408-
297-1480.

### SCHEDULING

Civil law and motion is heard on Thursdays at 10:00 a.m.  All motions (except criminal duty
matters) shall be noticed for any available Thursday.  The parties may confirm availability at
http://www.cand.uscourts.gov/tsh.  Any scheduling questions should be directed to Judge
Hixson's Courtroom Deputy, Rose Maher, at tshcrd@cand.uscourts.gov or (415) 522-4708.

### DISCOVERY

Discovery disputes are governed by Judge Hixson's Discovery Standing Order, available at
http://www.cand.uscourts.gov/tshorders.

### CONSENT TO PROCEED BEFORE MAGISTRATE JUDGE

In civil cases that are randomly assigned to Judge Hixson for all purposes, the parties should file
their written consent to the assignment of a United States Magistrate Judge for all purposes, or
their request for reassignment to a district judge, as soon as possible, but no later than the
deadlines specified in Civil Local Rule 73-1.  If a party files a dispositive motion (such as a
motion to dismiss or a motion for remand), the moving party must file the consent/declination
simultaneously with the motion.  The consent/declination form is available at
http://www.cand.uscourts.gov/civilforms.

### CIVIL CASE MANAGEMENT

Counsel shall meet and confer prior to the Case Management Conference and file a joint
statement no later than seven days prior to the conference.  The statement shall address the

*Revised September 5, 2018*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

## DISCOVERY STANDING ORDER FOR
## MAGISTRATE JUDGE THOMAS S. HIXSON

This Standing Order informs all parties of the discovery procedures for cases assigned to Magistrate Judge Thomas S. Hixson or referred for purposes of discovery. It addresses all case-related discovery, including that which involves non-parties, and therefore applies whether or not an individual or entity is named in the complaint. Failure to abide by this Standing Order may result in the imposition of sanctions pursuant to Federal Rule of Civil Procedure 16(f) and Civil Local Rule 37-4.

All questions should be directed to Judge Hixson's Courtroom Deputy, Rose Maher, at tshcrd@cand.uscourts.gov or (415) 522-4708.

Upon referral from a District Judge or upon the development of an impasse with respect to discovery in a pending case assigned to Judge Hixson, <u>no motions to compel or other motions shall be considered</u>. Instead, the parties must first meet and confer. That is, counsel for each party shall meet and confer in person or, if counsel are located outside the Bay Area, by telephone, to attempt to resolve their dispute informally. A mere exchange of letters, e-mails, telephone calls or facsimile transmissions does not satisfy the meet and confer requirement.

## MEET AND CONFER REQUIREMENTS

If the parties are unable to resolve their dispute informally after a good faith effort, including meet and confer efforts conducted by lead counsel, the parties have two options:

1) If the dispute is straightforward or the parties believe some initial informal guidance from the Court may help them resolve their dispute without the need for briefing, the parties may contact Judge Hixson's Courtroom Deputy, Rose Maher, to arrange a telephonic conference.

2) For more complex disputes, the parties shall prepare a joint statement of not more than five pages (12-point or greater font) that contains the following:

    a)    A cover page (excluded from the five-page limit) with the case caption, an attestation that the parties met and conferred in person (or by telephone if outside the Bay Area) in good faith to resolve their dispute(s) prior to filing the letter, and the signature of both parties or counsel;

    b)    Each party's position, including pertinent factual background, requested relief, and citations to relevant legal authority; and

    c)    Each party's final proposed compromise

The joint letter shall not be accompanied by exhibits or affidavits other than relevant excerpts of discovery requests and responses, privilege logs, deposition testimony, and meet and confer correspondence.

The joint statement shall be e-filed (unless the case is exempt from e-filing requirements)

*Revised September 25, 2019*

under the Civil Events category of "Motions and Related Filings > Motions – General > Discovery Letter Brief."

Upon review of the parties' submission[s], the Court will advise the parties of how it intends to proceed. The Court may issue a ruling or schedule a telephone or in-person conference with the parties, and at such conference may issue rulings, order more formal briefing, or set further hearing dates. The Court may also order the parties to come to the courthouse to meet and confer in good faith.

## CHAMBERS COPIES

The parties do not need to submit chambers copies for cases subject to electronic filing, except for documents that exceed 10 pages when combined. For these documents only, the submitting party shall comply with Civil Local Rule 5-1(e)(7). All chambers copies should be double-sided (when possible) and include: (1) the ECF running header (case number, docket number, date, and ECF page number) at the top of each page; and (2) if the filing includes exhibits, they must be clearly delineated with tabbed dividers. These printed copies shall be marked "Chambers Copy" and submitted to the Clerk's Office (not chambers), in an envelope marked with "Magistrate Judge Hixson," the case number, and "Chambers Copy."

## PROTECTIVE ORDERS

If parties believe a protective order is necessary, they shall, where practicable, use one of the model stipulated protective orders (available at http://cand.uscourts.gov/stipprotectorder). If the parties' proposed protective offer differs materially from the model protective order, the parties shall file a statement explaining each modification to the model order, along with a redline version comparing the proposed protective order with the model order.

## SANCTIONS

No motion for sanctions may be filed until after the moving party has complied with the requirements above. Motions for sanctions shall be filed separately, pursuant to Federal Rule 37 and Civil Local Rules 7 and 37-4.


**IT IS SO ORDERED.**


THOMAS S. HIXSON
United States Magistrate Judge

*Revised September 25, 2019*

# STANDING ORDER FOR ALL JUDGES
## OF THE NORTHERN DISTRICT OF CALIFORNIA
### CONTENTS OF JOINT CASE MANAGEMENT STATEMENT

All judges of the Northern District of California require identical information in Joint Case Management Statements filed pursuant to Civil Local Rule 16-9. The parties must include the following information in their statement which, except in unusually complex cases, should not exceed ten pages:

1.  Jurisdiction and Service: The basis for the court's subject matter jurisdiction over plaintiff's claims and defendant's counterclaims, whether any issues exist regarding personal jurisdiction or venue, whether any parties remain to be served, and, if any parties remain to be served, a proposed deadline for service.

2.  Facts: A brief chronology of the facts and a statement of the principal factual issues in dispute.

3.  Legal Issues: A brief statement, without extended legal argument, of the disputed points of law, including reference to specific statutes and decisions.

4.  Motions: All prior and pending motions, their current status, and any anticipated motions.

5.  Amendment of Pleadings: The extent to which parties, claims, or defenses are expected to be added or dismissed and a proposed deadline for amending the pleadings.

6.  Evidence Preservation: A brief report certifying that the parties have reviewed the Guidelines Relating to the Discovery of Electronically Stored Information ("ESI Guidelines"), and confirming that the parties have met and conferred pursuant to Fed. R. Civ. P. 26(f) regarding reasonable and proportionate steps taken to preserve evidence relevant to the issues reasonably evident in this action. *See ESI Guidelines 2.01 and 2.02, and Checklist for ESI Meet and Confer.*

7.  Disclosures: Whether there has been full and timely compliance with the initial disclosure requirements of Fed. R. Civ. P. 26, and a description of the disclosures made.

8.  Discovery: Discovery taken to date, if any, the scope of anticipated discovery, any proposed limitations or modifications of the discovery rules, a brief report on whether the parties have considered entering into a stipulated e-discovery order, a proposed discovery plan pursuant to Fed. R. Civ. P. 26(f), and any identified discovery disputes.

9.  Class Actions: If a class action, a proposal for how and when the class will be certified, and whether all attorneys of record for the parties have reviewed the Procedural Guidance for Class Action Settlements.

10. Related Cases: Any related cases or proceedings pending before another judge of this court, or before another court or administrative body.

11. Relief: All relief sought through complaint or counterclaim, including the amount of any damages sought and a description of the bases on which damages are calculated. In addition, any party from whom damages are sought must describe the bases on which it contends damages should be calculated if liability is established.

12. <u>Settlement and ADR</u>: Prospects for settlement, ADR efforts to date, and a specific ADR plan for the case, including compliance with ADR L.R. 3-5 and a description of key discovery or motions necessary to position the parties to negotiate a resolution.

13. <u>Consent to Magistrate Judge For All Purposes</u>: Whether **all** parties will consent to have a magistrate judge conduct all further proceedings including trial and entry of judgment. ___ Yes ___ No

14. <u>Other References</u>: Whether the case is suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

15. <u>Narrowing of Issues</u>: Issues that can be narrowed by agreement or by motion, suggestions to expedite the presentation of evidence at trial (e.g., through summaries or stipulated facts), and any request to bifurcate issues, claims, or defenses.

16. <u>Expedited Trial Procedure</u>: Whether this is the type of case that can be handled under the Expedited Trial Procedure of General Order No. 64 Attachment A. If all parties agree, they shall instead of this Statement, file an executed Agreement for Expedited Trial and a Joint Expedited Case Management Statement, in accordance with General Order No. 64 Attachments B and D.

17. <u>Scheduling</u>: Proposed dates for designation of experts, discovery cutoff, hearing of dispositive motions, pretrial conference and trial.

18. <u>Trial</u>: Whether the case will be tried to a jury or to the court and the expected length of the trial.

19. <u>Disclosure of Non-party Interested Entities or Persons</u>: Whether each party has filed the "Certification of Interested Entities or Persons" required by Civil Local Rule 3-15. In addition, each party must restate in the case management statement the contents of its certification by identifying any persons, firms, partnerships, corporations (including parent corporations) or other entities known by the party to have either: (i) a financial interest in the subject matter in controversy or in a party to the proceeding; or (ii) any other kind of interest that could be substantially affected by the outcome of the proceeding. In any proposed class, collective, or representative action, the required disclosure includes any person or entity that is funding the prosecution of any claim or counterclaim.

20. <u>Professional Conduct</u>: Whether all attorneys of record for the parties have reviewed the Guidelines for Professional Conduct for the Northern District of California.

21. Such other matters as may facilitate the just, speedy and inexpensive disposition of this matter.