Exhibit A

1 LAWYERS' COMMITTEE FOR CIVIL
  RIGHTS OF THE SAN FRANCISCO BAY AREA
2 Zal K. Shroff, MJP 804620, *pro hac vice*
  131 Steuart Street, Ste. 400
3 San Francisco, CA 94105
  Telephone: (415) 543-9444
4 zshroff@lccrsf.org

5

6 *Attorneys for Plaintiffs Coalition on Homelessness,*
  *Toro Castaño, Sarah Cronk, Joshua Donohoe,*
  *Molique Frank, David Martinez, Teresa Sandoval,*
7 *Nathaniel Vaughn*

8 *Additional Counsel Appear on Signature Page*

9

10                    **UNITED STATES DISTRICT COURT**

11                  **NORTHERN DISTRICT OF CALIFORNIA**

12                          **OAKLAND DIVISION**

13

14 COALITION ON HOMELESSNESS; TORO          CASE NO. 4:22-cv-05502-DMR
   CASTAÑO; SARAH CRONK; JOSHUA
15 DONOHOE; MOLIQUE FRANK; DAVID            **SECOND AMENDED COMPLAINT**
   MARTINEZ; TERESA SANDOVAL;              **FOR DECLARATORY AND**
16 NATHANIEL VAUGHN,                        **INJUNCTIVE RELIEF**

17                     Plaintiffs.

18            v.

19 CITY AND COUNTY OF SAN FRANCISCO;
   SAN FRANCISCO POLICE DEPARTMENT;
20 SAN FRANCISCO DEPARTMENT OF
   PUBLIC WORKS; SAN FRANCISCO
21 DEPARTMENT OF HOMELESSNESS AND
   SUPPORTIVE HOUSING; SAN FRANCISCO
22 FIRE DEPARTMENT; SAN FRANCISCO
   DEPARTMENT OF EMERGENCY
23 MANAGEMENT,

24                     Defendants.

25

26

27

28

1343(a)(3) and (4), 42 U.S.C. § 12132, and 42 U.S.C. § 1983 because Plaintiffs' claims arise under the laws and Constitution of the United States.

15. The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Federal Rules of Civil Procedure 57 and 65 authorize this Court to grant Plaintiffs the declaratory and injunctive relief prayed for herein. An award of attorneys' fees is authorized pursuant to 42 U.S.C. § 1988(b).

16. This Court has supplemental jurisdiction over Plaintiffs' related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. Plaintiffs' state law claims share all common operative facts with their federal law claims, and the parties are identical. Resolving Plaintiffs' federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

17. Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because at least one of the Defendants resides in this district and a substantial part of the events and/or omissions were committed in this district.

18. Because the events and omissions giving rise to Plaintiffs' claims occurred in San Francisco County, this case should be assigned to the Northern District's San Francisco Division or its Oakland Division. N.D. Cal. L.R. 3-2(d).

## **PARTIES**

### A. **PLAINTIFFS**

#### 1. **Coalition on Homelessness**

19. The Coalition on Homelessness (the "Coalition") is a 501(c)(3) non-profit with the mission to find permanent solutions to homelessness while recognizing the dignity and human rights of unhoused people. Through community organizing and advocacy, the Coalition fights to prevent people from becoming homeless, presses for affordable housing in San Francisco, and advocates to expand resources available to unhoused people including mental health treatment, emergency shelter, and basic necessities.

20.  The Coalition envisions a San Francisco in which every human being can have and maintain decent, habitable, safe, and secure housing. This means that economic justice, housing advocacy, and supports to exit homelessness are the main focus of the Coalition's work. The Coalition's housing-related work has included getting the City to fund an emergency hotel voucher program for families and securing housing subsidies for unhoused individuals. In 2018, for example, the Coalition was the author of Proposition C, which was a ballot measure calling for a gross receipts tax on all businesses receiving more than $50 million in revenues annually. The tax was to help fund the City's affordable housing projects. With the Coalition's sustained advocacy, Proposition C passed. It has already brought more than $492 million to fund affordable housing programs that will help end homelessness in San Francisco—if used correctly. Mayor London Breed actively opposed the measure.[16]

21.  The Coalition also seeks to build networks of support for unhoused people through organizer and peer-led outreach campaigns and to connect unhoused people to social services and resources. This proactive work requires daily engagement with unhoused communities across San Francisco. It also engages volunteers and donors to provide unhoused people with the basic necessities they need to survive while living unsheltered.

22.  Over the past several years, the Coalition made the difficult choice to depart from its mission-related activities—proactive housing and homelessness prevention and support work— to focus on the dire need to protect unhoused people from the City's ongoing criminalization and property destruction practices. The Coalition has also spent some of its limited donor dollars to replace survival gear for unhoused people that the City of San Francisco has destroyed.

The Coalition is an advocacy organization of, by, and for unhoused people in San Francisco. Its members are comprised almost entirely of unhoused people or people with lived experience of homelessness who supervise, direct, and lead the Coalition's work. The Coalition has dozens of

---

[16] *See* Dominic Fracassa, *Three SF elected leaders announce opposition to Prop. C—raising business taxes for homeless services*, S. F. CHRONICLE (Oct. 5, 2018), https://www.sfchronicle.com/bayarea/article/Three-SF-elected-leaders-announce-opposition-to-13285614.php.

SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

active members at any given time and has had thousands of active members over the years. Many of the Coalition's active members have been personally impacted by citations, arrests, law enforcement threats, and property destruction while living unsheltered in San Francisco. The displacement of unhoused people and the City's constant sweeps[17] make it much more difficult for the Coalition to stay in contact with or to maintain and secure new active members.

### 2. Nathaniel Vaughn

23.    Nathaniel Vaughn is a Black man who was born and raised in San Francisco. Unfortunately, Mr. Vaughn's family lost the home they were renting in 2019 due to financial constraints and unaffordable rents in San Francisco. Although Mr. Vaughn's mother successfully secured a Single Room Occupancy unit (SRO) due to her medical conditions, Mr. Vaughn was left with nowhere to go. From 2019 to 2020, Mr. Vaughn experienced regular harassment by San Francisco Police Department ("SFPD") and Department of Public Works ("DPW"). This included being forced to move under threat of citation and arrest at least once a month. Mr. Vaughn recently settled a claim against the City and County of San Francisco for $7,000 after a judge found that the City had destroyed his personal property while he was homeless, including his tent, survival gear, a suitcase full of sports collector cards, and his godmother's ashes—among other items.

24.    Mr. Vaughn was finally able to secure placement in an affordable SRO after these harrowing experiences. But Mr. Vaughn now faces the potential threat of eviction at a time when the City is carrying out massive SRO evictions.[18] Mr. Vaughn would have no way of finding

---

[17] A "sweep"—which the City calls an "encampment resolution"—is a City-led operation to clear homeless people and their property off of public property. Such sweeps usually start around 7 a.m. and include representatives from DPW and the SFPD, among others.  *See* Michelle Robertson, *An interview with the controversial San Francisco agency responsible for conducting homeless sweeps*, SF GATE (Aug. 25, 2021), https://www.sfgate.com/bay-area-politics/article/sf-homeless-sweeps-encampment-resolution-hsoc-16400951.php.

[18] *See* Joaquin Palomino & Trisha Thadani, *The Breed administration offered them homes. Then it spent millions to kick them out*, S. F. CHRONICLE (Aug. 25, 2022), https://www.sfchronicle.com/projects/2022/sf-sro-evictions/; Joaquin Palomino & Trisha Thadani, *S.F. is evicting its most vulnerable tenants closer to pre-pandemic levels. But official numbers don't show scope of the crisis*, S. F. CHRONICLE (Sept. 6, 2022), https://www.sfchronicle.com/sf/article/S-F-is-evicting-its-most-vulnerable-tenants-17423437.php.

SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

and without a place he could afford—he became homeless by the age of 20. Mr. Frank became a recreational drug user once we has forced onto the streets. Thus began a cycle of incarceration for various offenses spurred by the conditions of his poverty. Mr. Frank finally broke that vicious cycle and his addiction in 2018. But he has never been able to find affordable housing in the City where he grew up.

28.     Over the past several years, Mr. Frank was repeatedly harassed by the City— including SFPD and DPW—just for being homeless and sleeping outside. Mr. Frank was physically assaulted by both an SFPD officer and a DPW worker while pleading with them not to destroy his belongings. Mr. Frank recently settled a claim against the City and County of San Francisco for $5,000 after the City destroyed his personal property while he was homeless, including backpacks containing essential survival gear, his X-Box One, and sentimental photos— among other items.

29.     After years of struggling to make ends meet, being forced out onto the street due to unaffordable rents as a youth, experiencing incarceration, and battling ongoing homelessness, Mr. Frank had finally been able to secure safe and stable temporary housing through the City's Shelter-in-Place ("SIP") program that began during COVID-19. This was a victory after a lifetime of housing instability in San Francisco. As of August 2022, however, Mr. Frank was informed that every unhoused person living in his building is to be evicted by the end of September 2022.

30.     Mr. Frank was subsequently approved to transfer to another shelter after being notified that his current SIP hotel would be closing down. However, this is still a temporary placement. Mr. Frank meets the U.S. Department of Housing and Urban Development ("HUD") definition of homelessness, as he is currently residing in temporary shelter. *See* 24 CFR 91.5. Mr. Frank fears that if he loses this temporary placement, he will become unsheltered again and be subject to the City's regular criminalization threats and property destruction.

### 5.     Teresa Sandoval

31.     Teresa Sandoval is a Hispanic and Native woman living in San Francisco. She is a double amputee who uses either a wheelchair or prosthetics for mobility. Over the past several years, Ms. Sandoval has been repeatedly harassed by the City—including by SFPD and DPW. Ms.

1   has taken, and has sought additional funding for its unlawful sweep operations.[20]

2   44.     Mayor Breed's office has had knowledge of and has participated in planning at

3   least two large-scale sweep operations that unlawfully displaced unhoused individuals.[21]

4   45.     Sam Dodge, in his role as HSOC director, is responsible for leading the City's

5   homelessness sweeps, including directing City agencies to seize the property of unhoused people

6   and threaten them with citation and arrest despite not having sufficient shelter to offer these

7   individuals. Mr. Dodge has also failed to train staff regarding the constitutional and legal

8   requirements prior to conducting sweep operations against unhoused people.

9                    **2.     San Francisco Police Department**

10  46.     The San Francisco Police Department ("SFPD") is an agency of the City and

11  County of San Francisco. SFPD and its officers have a custom and practice of citing, fining, and

12  arresting—as well as threatening to cite, fine, and arrest—unhoused people who have no choice

13  but to shelter in public because San Francisco has not provided sufficient or adequate shelter to

14  accommodate them. SFPD also coordinates with other agencies on a daily basis to respond to

---

[20] *See, e.g.*, Press Release, Off. of the Mayor, *supra* note 7 (noting that the Mayor has "Mayor London N. Breed announced a 34% reduction in tents on the streets of San Francisco since she took office in July, a reduction of approximately 193 tents in less than four months [...] she has expanded the resources for Healthy Streets Operations Center (HSOC)"); Mallory Moench, *supra* note 7 ("With the city getting people off the streets, the city's emergency response team [the Healthy Streets Operation Center] put pressure on Public Works to remove toilets, as revealed by emails first released by an anonymous account on Twitter and available via public records request"); Mayor's Proposed Budget FY 2019-20 and 2020-21, *supra* note 7, at 19, ("To continue the positive work of HSOC and to ensure that HSOC continues to be a service-first approach to addressing unsheltered homelessness and unhealthy street behavior, the two-year budget includes over $4.0 million to sustain existing services in participating departments").

[21] Amy Sawyer of the Mayor's Office was copied on and referenced in an email from June 4, 2021 discussing a sweep on Willow Street prior to a large event Mayor Breed would be attending, in which Jeff Kositsky requested 18 shelter beds for 41 tents; *see also See* David Sjostedt, *Police Clear Homeless Encampment Days After Mayor's Tweet, Prompting Questions About Legality of Such Sweeps*, THE S. F. STANDARD (Jun. 6, 2022), https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/ (noting June 2022 sweep of visibly homeless people near the Ferry Building).

SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

one of the wealthiest places in the world, it has stood by and allowed its low-income residents to be displaced and thrust into homelessness.[55]

    C.    <u>The City Blames Unhoused People for the Crisis it Caused, Subjecting Residents to a Renewed Era of Failed Mass Incarceration Policies, Criminalization, and Racist Policing as a Punishment for Being Poor.</u>

    67.    Instead of taking responsibility for its role in creating the homelessness crisis, San Francisco cracks down with criminal penalties on the low-income residents it has driven into homelessness.[56] The City "has more anti-homeless ordinances on its book than any other California and possibly U.S. city."[57] It seeks to erase any trace of unhoused people from public space, reflecting a deep "disdain for visible poverty."[58] In her remarks and actions, Mayor London Breed has also raised the specter that unhoused people are a blight to be removed from sight.[59]

---

*metropolitan income inequality data reveal ups and downs through 2016*, BROOKINGS INSTITUTION (Feb. 5, 2018)  https://www.brookings.edu/research/city-and-metropolitan-income-inequality-data-reveal-ups-and-downs-through-2016/ (identifying San Francisco as one of the cities with the highest income inequality in the United States).

[55] Georgina McNee & Dorina Pojani, *NIMBYism as a barrier to housing and social mix in San Francisco,* J. HOUS. & THE BUILT ENVIRON. 37, 553–573 (2022). https://doi.org/10.1007/s10901-021-09857-6 ("Planning meetings appear to be dominated by older, white, and financially stable residents, and this is a major (though not sole) barrier to the city's social mix").

[56] *See* Mallory Moench, *Mayor Breed Promised to Bring Tough Love to the Troubled Tenderloin. Did She Deliver?*, SF Chronicle (Apr. 15, 2022), https://www.sfchronicle.com/sf/article/san-francisco-mayor-tenderloin-17082180.php (quoting Mayor Breed's pledge to be "more aggressive with law enforcement" in the Tenderloin).

[57] Chris Herring, *Complaint-Oriented Policing: Regulating Homelessness in Public Space*, 84 Am. Soc. Rev., No. 5, Oct. 2019, at 769, 790, 794.

[58] *See* Sara K. Rankin, *supra* note 15 at 102-104 (2019).

[59] *See* David Marks, *SF Mayor Breed Declares State of Emergency in Tenderloin*, KQED (Dec. 17, 2021),      https://www.kqed.org/news/11899726/sf-mayor-breed-declares-state-of-emergency-in-tenderloin (quoting S.F. Mayor London Breed as saying, "too many people are sprawled over our streets" . . . "There are a number of things that this city is going to do to address public safety, and part of that is a police response."); David Sjostedt, *supra* note 26 (discussing city response to presence of visibly homeless people near the Ferry Building); Press Release, Off. of the Mayor,

more efficient to expend resources on non-punitive alternatives like permanent housing.[67]

72. In 2015, for example, San Francisco spent at least $20 million to enforce quality-of-life ordinances against homeless individuals.[68] This is quite likely a massive undercount of San Francisco's direct spend on annual criminalization efforts that do not work.[69] Meanwhile, San Francisco's choice not to make affordable housing available for its unhoused residents imposes hundreds of millions of dollars in downstream costs every year by straining the City's healthcare, social service, and legal systems.[70]

73. In Santa Clara County—a county with a comparable population of unhoused people to San Francisco—a comprehensive study found that the county indirectly spent over $520 million annually on its healthcare, criminal, and social services systems as a result of leaving people unhoused and not directly addressing homelessness. Even a preliminary tally of some of San

---

[67] *See e.g.*, Rankin, *Punishing Homelessness*, *supra* note 15, at 104, 109 ([C]riminalization, along with other traditional approaches that manage homelessness, are the most expensive and least effective ways to address it"); Joshua Howard et al., *At What Cost: The Minimum Cost of Criminalizing Homelessness in Seattle and Spokane*, HOMELESS RIGHTS ADVOC. PROJECT, (May 8, 2015) https://digitalcommons.law.seattleu.edu/hrap/10 (finding that over a five year period, Seattle spent a minimum of $2.3 million enforcing just 16% of its criminalization ordinances and Spokane spent a minimum of $1.3 million enforcing 75% of its criminalization ordinances and concluding that non-punitive alternatives, such as building housing are more effective "in terms of cost and in terms of addressing the underlying problems of homelessness").

[68] Policy Analysis Report: *Homelessness and the Cost of Quality of Life Laws*, S.F. BUDGET AND LEGIS. ANALYST OFFICE (2016) http://2zwmzkbocl625qdrf2qqqfok-wpengine.netdna-ssl.com/wp-content/uploads/2016/06/Budget-and-Legislative-Analyst-Report.Quality-of-Life-Infactions-and-Homelessness.052616-1.pdf

[69] *See, e.g.*, Herring & Yarbrough, *supra* note 10, at 66-68 (discussing difficulty of determining exact costs and noting that it is a political decision to intentionally overlook and ignore reporting on the costs of enforcing these laws).

[70] *See, e.g*., Ballard & Batko, *supra* note 67 (discussing costliness of homelessness-jail, whereby unhoused people cycle in and out of jail, shelters, rehabilitation centers, and emergency care); Cunningham, *supra* note 70; Gregory A. Shinn, *Rethink Homelessness & Impact Homelessness, The Cost Of Long-Term Homelessness In Central Florida: The Current Crisis and the Economic Impact of Providing Sustainable Housing Solutions* 15-17, 20 (2014), CENT. FLA. COMM'N ON HOMELESSNESS https://shnny.org/uploads/Florida-Homelessness-Report-2014.pdf (discussing how long-term homelessness is expensive to the community and that the cost of doing nothing is substantial).

Francisco's direct expenditures on homelessness-related services indicates the annual cost of homelessness—a cost ultimately borne by taxpayers—is at least similar to that of Santa Clara[71], if not significantly higher.[72]

74.    In this context, making affordable housing available would be a far more prudent investment than the City's destructive and costly practice of forcing unhoused people to cycle through different streets, jails, hospitals, and temporary shelters. To meet its housing goals for low-income and very low-income units, San Francisco would need to build 6,624 new affordable units, which would cost about $4.8 billion.[73] That would be enough to house every currently unsheltered San Franciscan. Assuming San Francisco indirectly spends about the same annually on

---

[71] *See* SANTA CLARA CNTY. OFF. OF SUPPORTIVE HOUS., *Santa Clara County Homeless Census and Survey Reports*, https://osh.sccgov.org/continuum-care/reports-and-publications/santa-clara-county-homeless-census-and-survey-reports (documenting trends in Santa Clara's unhoused population); Santa Clara County Continuum of Care, *How does Santa Clara County compare to other jurisdictions?*, https://osh.sccgov.org/sites/g/files/exjcpb671/files/2017%20PIT%20CoC_Comparisons.pdf (comparing Santa Clara to San Francisco); Molly Turner, *Homelessness in the Bay Area*, SPUR (Oct. 23, 2017), https://www.spur.org/publications/urbanist-article/2017-10-23/homelessness-bay-area ("San Francisco and Santa Clara counties have some of the nation's highest percentages of homelessness.").

[72] *See e.g.*, DEP'T OF HOMELESSNESS & STRATEGIC HOUS., Five Year Strategic Framework, (Oct. 2017), https://hsh.sfgov.org/wp-content/uploads/2017/10/HSH-Strategic-Framework-Full.pdf (noting the city spent $256.7 million on homelessness services through HSH in 2017); S.F. DEP'T OF PUB. HEALTH,, Annual Report FY 2020-2021, https://www.sfdph.org/dph/files/reports/PolicyProcOfc/FINAL-Annual_Report_FY2021.pdf (noting city spent $28 million on a mental health initiative for unhoused people in 2020); S.F. DEP'T OF PUB. HEALTH, Mental Health San Francisco Implementation Plan, https://www.sfdph.org/dph/files/IWG/MHSF_Implementation_Report_Feb.2022.pdf (noting city is poised to spend another $60 million for mental health services serving unhoused people); BAY AREA COUNCIL ECON. INST., Bay Area Homelessness: A Regional View of a Regional Crisis17 (noting city spent $54 million on street cleaning in 2018). None of these sources include the cost of physical health services—health services were the largest source of spending in the Santa Clara study.

[73] *See* 2020 Housing Inventory, *supra* note 55 at 15 (noting deficit of 6,624 units); BAY AREA COUNCIL ECON. INST., *How Much Does it Cost to Construct One Unit of Below Market Housing in the Bay Area?*, http://www.bayareaeconomy.org/how-much-does-it-cost-to-produce-one-unit-of-below-market-housing-in-the-bay-area/#:~:text=In%202019%2C%20the%20average%20construction,of%20below%20market%20rate%20housing (identifying that producing a single unit of affordable housing costs around $700,000 in San Francisco).

SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

homelessness as Santa Clara does—$520 million—and it instead chose to invest that sum in affordable housing, the City would be able to build 742 of those new units per year and could actually stem, and even end, the homelessness crisis.[74]

75.    This necessary investment in affordable housing pales in comparison to the hundreds of millions of taxpayer dollars San Francisco hemorrhages each year as a consequence of keeping its residents unhoused and forced to sleep on the City's streets or in temporary shelter.

76.    In addition to being unjustifiably costly, criminalization harms unhoused people and puts our communities at further safety risk.[75] Criminalization does not reduce the presence of unhoused people in public space, it only makes unhoused people less likely to seek or to receive social services and supports (of which there is already an unmet need). The criminal eviction of unhoused people from public areas also has no discernible impact on economic activity at storefront businesses.[76]

77.    Solving homelessness is possible.[77] Studies have consistently shown that housing is the answer.[78] Affordable housing is cost-effective and makes communities safer by investing in long-term stability and community growth. The City need not continue expending vast resources criminalizing its unhoused population when it could invest in the only permanent, cost-effective

---

[74] *See id.*

[75] *See* Rankin, *supra* note 15, at 108, 113-14 (discussing consequences of ordinances and concluding that they emotional and psychological tolls on encampment residents, exacerbate existing physical and mental health problems, and "render chronically homeless people more resistant to recovery and more likely to remain homeless, to become sick, to self-medicate, to be incarcerated, and even to die.").

[76] Herring & Yarbrough *supra* note 10, at 61, 67; Berkeley Law Policy Advocacy Clinic, Does Sit-Lie Work: Will Berkeley's "Measure S" Increase Economic Activity And Improve Services To Homeless People, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2165490 (finding no meaningful evidence to support claims that sit-lie ordinances increase economic activity).

[77] Rankin, *supra* note 15, at 130-34. ("Studies consistently show that solving chronic homelessness is achievable through the evidence-based solutions of Housing First and permanent supportive housing").

[78] *Id.*

SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1    solution to its homelessness crisis—affordable housing.[79]

2    　　　78.　　Nonetheless, San Francisco has repeatedly failed to approve measures that would

3    rapidly expand the building of affordable housing.[80] The City has also failed to appropriately and

4    promptly spend hundreds of millions of annual Proposition C tax dollars that are specifically

5    allocated to address permanent solutions to the City's homelessness crisis.[81]

6    **FACTUAL ALLEGATIONS**

7    　　A.　　<u>San Francisco Does Not Have Enough Shelter Beds to House Thousands of its</u>

8    　　　　　<u>Unhoused Residents, Forcing Unhoused People to Sleep on the Streets.</u>

9    　　　79.　　San Francisco does not have sufficient and adequate shelter to accommodate those

10   currently experiencing homelessness in the City. This is true on any given day, yet the City

11   nonetheless conducts regular sweeps across the City.

12   　　　80.　　According to San Francisco's 2019 Homeless Count and Survey, there were 8,035

13   homeless individuals residing in the City.[82] On the night the City conducted a count of its homeless

14   population, the City counted 5,180 individuals—or 64% percent of the City's homeless

---

[79] *See e.g.*, *id.* at 104 ("[N]on-punitive alternatives, such as permanent supportive housing, are the most cost-effective ways to solve chronic homelessness."); Samantha Batko, *We Can End Homelessness through Housing First Interventions*, URBAN INST. (Feb. 12, 2020) https://www.urban.org/urban-wire/we-can-end-homelessness-through-housing-first-interventions.

[80] For example, the City has chosen not to use federal and state funds to immediately create affordable housing options for the unhoused. *See, e.g.,* STREETSHEET, *An Unprecedented Golden Opportunity* (May 20, 2021), https://streetsheet.medium.com/an-unprecedented-golden-opportunity-a28150b601b9 (noting that the City could, but has not, invest in a series of building purchase programs that would immediately create affordable housing options for the unhoused).

[81] *See* J.D. Morris, *Here's how much San Francisco has spent of $600 million in Prop. C money slated for homeless services*, S. F. CHRONICLE (May 27, 2022), https://www.sfchronicle.com/sf/article/Here-s-how-much-San-Francisco-spent-prop-C-tax-17202036.php ("San Francisco has only spent about a quarter of the funds it has available from a 2018 business tax that voters approved to make massive investments in homeless services").

[82] San Francisco Homeless County & Survey Comprehensive Report 2019, *supra* note 11, at 10.

1  population—as unsheltered.[83] The City counted 2,855 individuals in the shelter count.[84] Although

2  San Francisco had 3,493 shelter beds available in 2019, the number of beds was far insufficient to

3  shelter San Francisco's entire population.[85] In 2021, because of a *temporary* COVID-19 program,

4  the City modestly increased its shelter capacity to provide 5,080 shelter beds.[86] This was still

5  approximately 3,000 beds short of what would have been necessary to shelter every unhoused San

6  Franciscan.

7        81.    According to San Francisco's 2022 Homeless Count and Survey, there were 7,754

8  unhoused people in San Francisco on a given day and as many as 20,000 individuals may

9  experience homelessness in San Francisco over the course of a full year.[87] The City's total shelter

10  bed availability during the same time period remained at only 5,080 beds.[88] The City is thus, by

11  its own count, thousands of shelter beds short.

12        82.    The shortage is getting worse. The present shelter inventory includes 2,263

13  temporary Shelter-in-Place hotel rooms for COVID-19 that will be phased out entirely by the end

14  of FY21-22.[89] San Francisco is already keeping the majority of these temporary COVID beds

15  vacant in anticipation of an end to supplemental federal funding for the temporary Shelter-in-Place

16  program. Without the COVID beds, the 2019 count is most accurate: only 3,493 beds are actually

17  available, meaning a shortage of at least 4,400 beds.[90]

---

18  [83] *Id.*

19  [84] *Id.*

20  [85] San Francisco 2021 Sheltered Point-in-Time Count 4, S.F. DEP'T OF HOMELESSNESS &
21  SUPPORTIVE HOUSING (2021), https://hsh.sfgov.org/wp-content/uploads/2021/09/2021-Sheltered-PIT-Count.pdf.

22  [86] *Id.* at 4 (identifying that 2,263 temporary shelter beds added due to COVID-19 "will be phased
23  out in FY21-22").

24  [87] San Francisco Homeless County & Survey Comprehensive Report 2022, at 2, S.F. DEP'T OF
25  HOMELESSNESS & SUPPORTIVE HOUSING (2022), https://hsh.sfgov.org/wp-content/uploads/2022/08/2022-PIT-Count-Report-San-Francisco-Updated-8.19.22.pdf.

26  [88] San Francisco 2021 Sheltered Point-in-Time Count, *supra* note 90, at 4.

27  [89] *Id.* at 4 (identifying that 2,263 temporary shelter beds added due to COVID-19 "will be phased
out in FY21-22").

28  [90] *Id.* at 3 (noting 3,493 available shelter beds as of January 2019).

1   policies were not only ineffective, but also confusing for the City employees seeking to enforce

2   them.[97] In 2020, the City announced a shift in strategy to respond to street encampments in the

3   face of criticism that HSOC was operating without community engagement and was responding

4   to unhoused people with policing rather than needed services.[98]

5        102. HSOC now characterizes itself as "a collaborative effort of multiple City

6   departments" that aims "to coordinate the City's response both to homeless encampments and to

7   behaviors that impact quality of life in San Francisco's public spaces."[99]

8        103. As an interdepartmental taskforce, HSOC consists of the following five primary

9   agencies: the San Francisco Police Department ("SFPD"), the Department of Public Works

10  ("DPW"), the Department of Homelessness and Supportive Housing ("HSH"), the Department

11  of Public Health ("DPH"), and the Department of Emergency Management ("DEM").[100]

12       104. HSOC is governed by the directors of each of these five departments as well as

13  representatives from the Mayor's office.[101] But HSOC's daily operations and practices are

14  spearheaded by HSOC's Director—who is a City employee based in the DEM.

15

---

16  [97] A memorandum from June 9, 2018, written by Jeff Kositsky, HSOC's manager, communicated
    an ongoing list of issues and concerns that the Department of Homelessness and Supportive
17  Housing had been amassing about HSOC since February of 2018. Included in this list was that
18  "[a]ll participating agencies should be communicating action through HSOC; there are
    SFPD/DPW actions taking place earlier that create a great deal of confusion with field staff."

19
    [98] *See* Joshua Sabatini, *SF to make major changes to homeless response operations*, S. F.
20  EXAMINER (Mar. 2, 2020), https://www.sfexaminer.com/archives/sf-to-make-major-changes-to-
21  homeless-response-operations/article_f9f9d928-c70a-50a0-b5a4-bae0b1784b93.html; OFF. OF
    BUDGET & LEGIS. ANALYST, Policy Analysis Report: Police Department Role in Street Teams,
22  CITY & CNTY. OF S. F. BD. OF SUPERVISORS (Apr. 19, 2022),
    https://sfbos.org/sites/default/files/BLA.SCRT_.HSOC_.041922.pdf (noting that after HSOC
23  began "efforts have been made to de-emphasize the law enforcement nature of City policy towards
    homeless encampments, and to enhance service referrals and mental health and substance abuse
24  outreach").

25  [99] Healthy Streets Data and Information, CITY & CNTY. OF SAN FRANCISCO,
26  https://sfgov.org/scorecards/hsoc (last visited July 29, 2022).

27  [100] Review of the Healthy Streets Operation Center, *supra* note 27, at 12.

28  [101] *Id.* at 13.

SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

SFPD officers often have no information about or ability to offer shelter beds without other City agencies that are not dispatched. *Cf.* SFPD Bulletin No. 19-080 (before an order to vacate can be criminally enforced for non-compliance, SFPD is required to confirm that there has been a "written offer of shelter or housing at least 24 hours before ordering removal of a tent or encampment").

149.     SFPD conducts these regular enforcement activities despite knowing that the City lacks sufficient shelter to house its unhoused population and knowing that unhoused people have no voluntary access to shelter in the City. These SFPD enforcement operations happen everywhere across the city and at all hours, including the middle of the night.

150.     SFPD has an explicit custom and practice of authorizing its officers to cite and arrest unhoused people for failing to "move along" without any attempt to offer shelter, as long as the officers are policing in area where an HSOC sweep has already taken place. SFPD's "mission descriptions" lists the "goal of re-encampment prevention is to re-secure and clean areas where there have been encampment resolutions and to ensure no tents, structures and vehicles remain. In general, sheltering options will not be offered unless there is an urgent situation[.]" (emphasis in original).[120] SFPD uses this practice to threaten individuals with citation or arrest whether or not there is present shelter availability, and regardless of whether they ever received an offer of services at a prior sweep operation. SFPD also has its own pick-up truck out of its Tenderloin station that it uses to remove property illegally as well.

151.     Similarly, DPW dispatches to perform street cleaning in different neighborhoods across San Francisco on a daily basis and conducts informal sweep operations to displace unhoused people as a part of that process. DPW interacts with hundreds of unhoused individuals each month. Yet, contrary to its stated policies, DPW consistently seizes and disposes of homeless individuals' valuable personal property and survival gear without following the City's Bag and Tag policies.

---

[120] HSOC Daily Operations Call, Mar. 30, 2021, Mission Descriptions.

had been asked to move without an accompanying offer of a place to move. Nearly 60% of survey respondents said that they had been displaced by the City at least one time in just the past four weeks, and nearly 20% of all respondents had been forced to move by the City five or more times during this same short period.[121]

157.    Far from the services first approach HSOC promises, in January and February 2021, HSOC connected only 30% of unhoused individuals it encountered with shelter and connected none to permanent housing.[122]

158.    These numbers pale in comparison to the daily SFPD and DPW sweep operations that are conducted without documentation and without even the guise of offering services to unhoused individuals.

## 2.    SFPD Continues to Cite or Arrest Thousands of Unhoused People for Sleeping in Public Despite a Lack of Shelter.

159.    Public records also make it clear that SFPD is engaging in widespread enforcement of quality-of-life offenses that criminalize homelessness despite a complete lack of daily shelter availability and the fact that unhoused individuals have had no voluntary option to seek shelter from the City since April 2020. A Policy Analysis Report from the Budget and Legislative Analyst's Office to the Board of Supervisors notes that police officers have been a highly visible and active presence when encampments are cleared by the City.[123]

160.    For example, between July and September 2021, police were dispatched in response to "homeless complaints" (also known as 915 calls) at least 3,606 times. This data indicates that a law enforcement officer was dispatched to respond to a "homeless complaint" between 744 and 965 times each month, as opposed to a HOT team worker who is theoretically trained to provide

---

[121]   2022 Street Needs Assessment 25, LATINO TASK FORCE (June 16, 2022), https://www.ltfrespuestalatina.com/_files/ugd/bbc25b_99f10a84713449bd9e24e1ec89bb1c0c.pdf.

[122] Behind the Healthy Streets Operation Curtain: The True Story of San Francisco's Abusive Encampment Response, *supra* note 6, at 6.

[123] Policy Analysis Report, *supra* note 103, at 16.

177.     Sweeps also cause unhoused people to be displaced in large numbers. This displacement—which occurs almost on a daily basis—makes it much more difficult for the Coalition to stay in contact with its members or to maintain and secure new active members. Defendants' sweeps have resulted in the Coalition losing touch with countless members over the past several years, and have presented significant obstacles that have prevented the Coalition from being able to secure new membership.

178.     The Coalition's unplanned, reactive work to monitor and protect unhoused people from Defendants' sweeps has had a measurable fiscal impact on the organization. In 2018 when HSOC's sweeps began, the Coalition had to divert one staff member to work half of their time on monitoring homeless sweeps—with the rest of the organization's staff efforts focused on its proactive work to advocate for housing and shelter. With the total compensation to one full-time employee of $58,244.69 (including benefits), the approximate cost to the Coalition of sweeps monitoring at that time was $29,122.34.

179.     In 2019, however, recognizing the need for more direct monitoring, the Coalition began dedicating one full-time and one part-time employee to sweep monitoring and response work, with each employee spending at least half of their time monitoring sweeps. With the total compensation to 1.5 full-time employees of $90,080.66, the approximate cost to the Coalition of sweeps monitoring that year increased to $45,040.33.

180.     In 2020, with the increased frequency and destructiveness of HSOC sweeps—even with HSOC halting some regular sweep activity for four months because of the COVID-19 pandemic—the Coalition was again forced to increase its sweeps monitoring work to include two full-time employees—each spending at least two-thirds of their time on this reactive monitoring work. With the total compensation to 2 full-time employees of $130,947.86 that year, the approximate cost to the Coalition of sweeps monitoring jumped to $86,425.58.

181.     In 2020, the Coalition also spent $28,000 on tents and survival belongings in the face of HSOC's sweeps to replace what the City took from unhoused people. The money the Coalition used to purchase tents was from cash donations that otherwise could have been spent on emergency support, payment to unhoused people for conducting and participating in surveys, and

SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

meeting staffing needs. The staff time conducting this fundraiser likewise could have been spent on fundraising or other projects for the Coalition's core mission activities.

182.     In 2021, the Coalition was forced to engage staff from all program areas to help monitor and stop Defendants' sweeps—including producing a report on sweeps, monitoring police activities at sweeps, setting up a volunteer network, and setting up administrative clinics to file claims related to property confiscated at sweeps. This required the Coalition to dedicate three full-time employees to this effort. The total cost to the Coalition of sweep monitoring during this year skyrocketed to $134,246.56.

183.     The Coalition is a small organization with a limited and fixed budget, and these expenditures substantially limit the amounts that the Coalition can spend on its proactive work to end homelessness or its campaigns to build affordable housing and shelter.

## 2.     The Coalition's Active Members Have Experienced Defendants' Criminalization and Property Destruction First-Hand.

184.     The Coalition is an advocacy organization of, by, and for unhoused people in San Francisco. Its members are comprised almost entirely of unhoused people or people with lived experience who supervise, direct, and lead the Coalition's work. The Coalition has dozens of active members at any given time and has had hundreds of active members over the years.

185.     Many of the Coalition's individual members have been directly impacted by the City's criminalization and sweep policies. The Coalition's staff and volunteers engage with several members each week who have been victimized by Defendants' harmful criminalization and sweep policies. The Coalition has drafted administrative claims for property destruction against the City on behalf of several of these members—and has filed at least 23 administrative claims since September of 2021.

186.     Some of the Coalition's most active members have been particularly impacted. For example, Couper Orona, Shyhyene Brown, and Toro Castaño are unhoused people who have been active members in the Coalition and help lead the Coalition's human rights working group. But each of these individuals has also lived through threats of arrest and have lost their valuable personal property in Defendants' sweeps over the last several years.

displace unhoused people from public property within the City without first offering shelter. In 2018, for example, SFPD stated its enforcement plan as follows: "PD will be citing all individuals with tents, and DPW will take control of tents /bag and tag. HSH will be staged at Olive between Vanness and Polk at 0730 for individuals who wish to explore options to HSH." In other words, SFPD has directly identified a practice of citing individuals first, before any clear shelter options exist, and contemplates DPW summarily seizing the belongings of unhoused individuals. Meanwhile in August 2021, the San Francisco Port authorized staff to "send roving patrol [to a reported encampment] to disperse as needed." There was no mention of services.

233.   Indeed, department heads sometimes specifically request enforcement instead of and without services offers. For instance, then-HSOC Director Kositsky stated clearly in an email on May 14, 2021, that "we believe enforcement is the only tool remaining" and that there was "little reason for outreach workers to return to [the area in question]." This was a blatant direction from the City for SFPD to enforce without offering services.

234.   This custom and practice is so pervasive that it is even contained in the "mission descriptions" section of HSOC's Daily Operations Agendas. In the meeting notes from one such meeting on April 14, 2021, "re-encampment prevention" includes the notice that, "[i]n general, sheltering options will not be offered unless there is an urgent situation."

235.   This is because the City is fully aware that it has no services to offer. An email from Jeff Kositsky identified the extent of the shelter shortage: "It turns out that the resource center at MSC south [the City's largest shelter] is almost always full. People line up out front all the time waiting for the next seat to open up." Meanwhile, in June 2019 HSH accurately reported that "shelters are full at all times now." The City admitted in its HSOC reports that no women at homeless sweeps were offered shelter at that time: "these mats are for men only facilities and therefore could not be offered to female contacts."

236.   In 2020, Kositsky advocated for a policy that would explicitly warn unhoused individuals that there were no services to offer. In the notes from an HSOC principals meeting on June 11, 2020, Kositsky noted that they would need "to include message about not coming to TL [the Tenderloin district] for services and that we are taking back the streets." Like much of the

SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1  communication described above, this direction from the head of HSOC places the focus on

2  enforcement rather than services.

3      237.   In emails from April and May 2021, HSOC's Director Jeff Kositsky explicitly

4  advocated for SFPD to police unhoused individuals without regard to shelter: "want to see if SFPD

5  can commit to preventing [an encampment] from reforming for a few weeks." Alaric

6  Degranfinried of DPW made a similar admission in an email on June 16, 2020, in which he

7  requested that DPW coordinate with SFPD to have an area "extra cleaned…even if they'll likely

8  move right back when we're done." Degranfinried recognized that the individuals being swept had

9  nowhere else to go.

10      238.   A former HOT worker confirmed that whenever he was deployed to a sweep in

11  2021, sweeps proceeded before any City agency knew how many and what kind of shelter beds

12  would be available on a given day—if at all. He confirmed that he raised these issues with his

13  supervisor, Mark Mazza, the director of HSH's HOT team, who refused to do anything.

14      239.   Indeed, there were sometimes planned operations even when City officials knew

15  that no shelter was available. For instance, on October 30, 2020, Kositsky sent out a schedule that

16  included "remov[ing] all unauthorized tents" in several locations, even though shelter availability

17  for the planned day of the operation was "none."

18      240.   Sam Dodge, the director of HSOC, openly admits that the City does not have

19  enough shelter to accommodate all of the unhoused individuals it enforces against on a given

20  day.[141] Nonetheless, Mr. Dodge continues to direct HSOC to conduct unconstitutional sweep

21  operations.

22      241.   This conduct extends to the very highest of City officials. For example, the Mission

23  Local reported on a sweep operation at the behest of the Mayor's Office in June 2021 because

24  Mayor Breed was to attend a fundraiser event near to where unhoused people were residing. The

25  reporting described emails from City department heads requesting "at least 18 HSH shelter beds"

---

[141] Laura Wenus, *supra* note 8. ("Workers with the city's Healthy Streets Operations Center clear
encampments when there are enough open beds in the city's shelter system to accommodate about
40% of that encampment's residents in shelters. According to the center's director, Sam Dodge,
the formula is adjusted each week.").

when officials knew that "40+ tents [would] be cleared." Mayor Breed also directly instigated a sweep operation in June 2022 that resulted in the displacement of unhoused people located near the Ferry Building and the destruction of their property.[142]

242.    Throughout 2021 and ending in February 2022, the City Attorney's Office conducted ongoing negotiations with the Coalition on Homelessness and various other advocacy groups regarding the City's repeated property destruction practices. The result was to be an update to DPW's written bag and tag policies to better safeguard the property of unhoused individuals—including additional notice prior to property seizure, explicit protections for larger bulky items such as tents and other survival belongings, and photographing of disputed property prior to destruction. But DPW's published policy on its website had remained unchanged from 2016, there are no reports that staff have been trained on the new policies, and the unlawful custom and practice of unnoticed destruction and enforcement continues.

P.    Individual Plaintiffs Have Been Subject To, And Are At Ongoing Risk of Being Subject to, the City's Unconstitutional Criminalization and Property Destruction.

243.    Individual Plaintiffs Nathaniel Vaughn, Toro Castaño, Molique Frank, Teresa Sandoval, David Martinez, Sarah Cronk, and Joshua Donohoe ("Individual Plaintiffs") have been directly impacted by Defendants' criminalization and sweep policies. Individual Plaintiffs are all people who are currently unhoused or who are at imminent risk of becoming unhoused again. Several are active members with the Coalition on Homelessness. All Individual Plaintiffs have lived through threats of arrest and have lost their valuable personal property as a result of Defendants' sweeps over the last several years. They fear the same will recur without intervention to stop the City's unconstitutional practices.

244.    **Nathaniel Vaughn.** Nathaniel Vaughn's property was destroyed by the City on January 8, 2020, while he was homeless and staying near Jerrald Avenue and Evans Avenue on Rankin Street. Though he had gone to visit his mother at her SRO and so was not present when the sweep began, he had left his tent clean and his belongings neatly packed inside. Nonetheless,

---

[142] David Sjostedt, *supra* note 26.

SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

conformance with the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution; Article I, §§ 7(a), 13, and 17 of the California Constitution;

      b.    Issue a mandatory order requiring Defendants to reasonably modify their programs to avoid any continued discrimination against unhoused people, pursuant to 42 U.S.C. § 12131 and Cal. Gov. Code § 11135;

      c.    Issue a mandatory order requiring Defendants to submit to regular monitoring and compliance checks by the Court at Defendant's expense;

**Other Relief:**

      a.    Order Defendants to pay for Plaintiffs' attorneys' fees and costs; and

      b.    Grant Plaintiffs such further relief as the Court deems just and proper.

Dated:  June 6, 2023                   Respectfully submitted,

By: */s/ Zal K. Shroff*

LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE SAN FRANCISCO BAY AREA
Zal K. Shroff, MJP 804620, *pro hac vice*
Elisa Della-Piana, SBN 226462
Hadley Rood, SBN 348168
131 Steuart Street, Ste. 400
San Francisco, CA 94105
Telephone: (415) 543-9444
zshroff@lccrsf.org
edellapiana@lccrsf.org
hrood@lccrsf.org

By: */s/ John Thomas H. Do*

AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA
John Thomas H. Do, SBN 285075
Brandon L. Greene, SBN 293783
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
jdo@aclunc.org
bgreene@aclunc.org

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

By: /s/ Alfred C. Pfeiffer, Jr.

LATHAM & WATKINS LLP
Alfred C. Pfeiffer, Jr., SBN 120965
Wesley Tiu, SBN 336580
Kevin Wu, SBN 337101
Tulin Gurer, SBN 303077
505 Montgomery Street, Ste 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
al.pfeiffer@lw.com
wesley.tiu@lw.com
kevin.wu@lw.com
tulin.gurer@lw.com

LATHAM & WATKINS LLP
Joseph H. Lee, SBN 248046
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: (714) 540-1235
joseph.lee@lw.com

LATHAM & WATKINS LLP
Rachel Mitchell, SBN 344204
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
rachel.mitchell@lw.com

*Attorneys for Plaintiffs*
*Coalition on Homelessness, Toro Castaño, Sarah*
*Cronk, Joshua Donohoe, Molique Frank, David*
*Martinez, Teresa Sandoval, Nathaniel Vaughn*

SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1

2                              **ATTESTATION**

3          I, Alfred C. Pfeiffer, Jr., am the ECF user whose user ID and password authorized the

4   filing of this document. Under Civil L.R. 5-1(h)(3), I attest that all signatories to this document

5   have concurred in this filing.

6

7   Dated:  June 6, 2023                    */s/ Alfred C. Pfeiffer*

8                                            Alfred C. Pfeiffer, Jr.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                        SECOND AMENDED COMPLAINT FOR
                                                        DECLARATORY AND INJUNCTIVE RELIEF
                                                        CASE NO. 4:22-CV-05502-DMR