1  Lauren Hansen (CA BAR NO. 268417)
   Melissa A. Morris (CA BAR NO. 233393)
2  PUBLIC INTEREST LAW PROJECT
   449 15th St., Suite 301
3  Oakland, CA 94612-06001
   Tel: (510) 891-9794
4  Fax: (510) 891-9727
   Email: lhansen@pilpca.org
5

6  Lili V. Graham (CA BAR NO. 284264)
   DISABILITY RIGHTS CALIFORNIA
7  350 S Bixel Street, Ste 290
   Los Angeles, CA 90017-1418
8  Tel: (213) 213-8000
   Fax: (213) 213-8001
9  Email: lili.graham@disabilityrightsca.org

10
   (Additional counsel on following page)
11
   Attorneys for INTERVENORS
12 HOSPITALITY HOUSE, COALITION ON
   HOMELESSNESS, and FAITHFUL FOOLS
13

14

## UNITED STATES DISTRICT COURT

15

## NORTHERN DISTRICT OF CALIFORNIA

16

| | |
|---|---|
| COLLEGE OF THE LAW, SAN FRANCISCO, a public trust and institution of higher education duly organized under the laws and the Constitution of the State of California; FALLON VICTORIA, an individual; RENE DENIS, an individual; TENDERLOIN MERCHANTS AND PROPERTY ASSOCIATION, a business association; RANDY HUGHES, an individual; and KRISTEN VILLALOBOS, an individual, | Case No. 4:20-cv-3033-JST  **DECLARATION OF SAM DENNISON IN SUPPORT OF INTERVENORS' RESPONSE TO PLAINTIFFS' MOTION TO ENFORCE STIPULATED INJUNCTION**  **ASSIGNED FOR ALL PURPOSES TO THE HONORABLE JON S. TIGAR, COURTROOM 6**  Date: 05/23/2024  Time: 2:00 p.m.  Action Filed: 05/04/2020  TRIAL DATE: (TBD) |
| Plaintiffs, | |
| v. | |
| CITY AND COUNTY OF SAN FRANCISCO, a municipal entity, | |
| Defendant. | |

Case No. 4:20-cv-3033-JST
DECL OF S. DENNISON ISO INTVS' RESP TO PLTFS' MTN TO ENFORCE STIP INJUNCTION  1

DocuSign Envelope ID: 38D950E4-5BCF-4969-8E3B-CCC5A52DA4D2

Michael David Keys (CA BAR NO. 133815)
BAY AREA LEGAL AID
1800 Market Street, 3rd Floor
San Francisco, CA 94102
Tel: (415) 982-1300
Fax: (415) 982-4243
Email: mkeys@baylegal.org

**(Counsel for Intervenors continued from previous page)**

---

Case No. 4:20-cv-3033-JST
DECL OF S. DENNISON ISO INTVS' RESP TO PLTFS' MTN TO ENFORCE STIP INJUNCTION    2

DocuSign Envelope ID: 38D950E4-5BCF-4969-8E3B-CCC5A52DA4D2

I, Sam Dennison, declare:

1. I am the Co-Director of Faithful Fools, a non-profit organization, and an Intervenor in *Hastings College of the Law, et al. v. City & County of San Francisco*: Case No.: 4:20-cv-03033-JST. I make this Declaration in support of Intervenors' Opposition to Plaintiffs' Motion to Enforce Stipulated Injunction.

2. The facts set forth below are known to me personally. I have first-hand knowledge of these facts. If called as a witness, I could and would testify competently, under oath, to such facts.

3. Faithful Fools is rooted in relationship building and participating in shattering myths about those living in poverty. Our work is dynamic and changes according to the needs of the community. Faithful Fools believes in meeting people where they are through the arts, education, advocacy, and accompaniment.

4. We have collaborated with Tenderloin residents and artists to stage plays, publish poetry, make films, and create art for activism, expression, and survival. Art speaks to the human condition and sheds light on injustice.

5. Our education work is grounded in community-based learning, trauma informed theory, and other practices that emphasize equity. We host learning experiences and community workshops to gain a deeper understanding of poverty and injustice.

6. Our primary resource as advocates is building community. Accompaniment is the foundation of community and our form of direct service. We provide support for accessing medical care, housing, and other services for the purpose of stabilizing people on the streets and moving into supportive housing. Over the last 26 years, we have supported dozens of individuals (some with the most difficult mental, physical, and substance use issues) enter housing and remain housed. We have also supported individuals who have been evicted from supportive housing for missed rent payments and other technical infractions regain housing. Our work in this area is often to provide stability for individuals who are destabilized by sweeps, arrests, and eviction from permanent supportive housing.

7. The current motion to enforce the stipulated injunction incorrectly equates tent

removal with solving the problems associated with poverty and homelessness. The goal of the University through this injunction is to remove tents, without consideration of the rights and lives of unhoused people. The injunction would just move people to other parts of the city, only causing further harm. Our experience, based on 26 years doing this work, is that removing tents is not an effective way to help people exit homelessness and it exacerbates poor mental and physical health conditions of unhoused individuals. This case seems to confuse tents, as a metric of community wellbeing (both housed and unhoused), with rates of poverty and homelessness.

8. The focus on reasonable efforts to get to zero tents sidesteps the need for coordinating the services that we know work and which demonstrably improve community wellbeing by decreasing rates of homelessness through reducing the number of people who cycle in and out of housing. Clearing tents without a plan to permanently house chronically unhoused individuals or coordinated services does not work and only causes further harm. The consequence of sweeps have been and will continue to push people into the cycles of poverty that frustrate the residents of the Tenderloin. Sweeps provide an illusion of action while making matters worse for everyone: wasting precious human and fiscal resources, perpetuating chaotic conditions on the streets, and condemning those who want to get off the streets into long term homelessness.

9. Based on our experience working with the community, the collaboration that occurred during the COVID-19 pandemic meaningfully reduced the number of tents in the Tenderloin from approximately 450 to less than 60. During this time, work with the City and other programs ensured unhoused people were placed in shelters with appropriate services for their needs, including reasonable accommodations for people with disabilities. The program worked because 1) it was coordinated, 2) it provided meaningful placement, and 3) it approached conditions on the streets strategically. As a result, the vast majority of people who were offered placement in the Shelter in Place hotels accepted placement. First and foremost, people needed places to go that had coordinated services including access to medical care, food, mental health services, and a path to permanent housing. My understanding is that there is no additional federal or state funding for these hotels anymore.

10. Once people are adequately placed, they need to transition from temporary placement to permanent housing, health care, and community. They also need access to services that help rebuild skills for employment, developing healthy lifestyles, and sustainable relationships. Without these resources, people exiting homelessness often face problems that they are unable to solve and they return to the streets, either through eviction or because they become isolated.

11. Harm occurs when the number of tents is the metric by which we measure improved living conditions in the Tenderloin. Meaningful metrics would include data on violence and chaotic street behaviors, health outcome measures (for housed and unhoused individuals alike), access to and completion of education goals (high school and beyond), reduction of intimate partner violence and sexual assault (on the streets and within low income housing). These metrics should be combined with data on the number of people served by the Department of Homelessness and Supportive Housing, the number of people successful housed in permanent housing <u>from the Tenderloin</u>, and reduction in rates of low-income housing evictions within the Tenderloin. If the court and this injunction remain focused solely on tents, people living in tents will continue to lose access to medical care, stable support services, and the personal belongings that inevitably get thrown away with their tents (including medication for chronic health issues like diabetes and heart disease, photos of loved ones, etc.) while the housed community continues to live with chaotic and unhealthy conditions. With a focus on appropriate metrics, we can make meaningful progress towards improving living conditions in the Tenderloin.

12. In our experience the impact of sweeps versus coordinated service outreach points to significant value in the latter approach. University of California at San Francisco research indicates that unhoused people in San Francisco who were moved into Shelter in Place hotels during the pandemic dramatically reduced use of acute health care services; other research further indicates that sweeps decrease the effectiveness of outreach and other services designed to exit people from unsheltered homelessness while failing to reduce crime, public drug use or other detrimental behaviors.

13. The work of direct service providers tasked with exiting people from unsheltered homelessness is needlessly hindered and undermined by the narrow focus on tent counts. We often have to start over, rebuild broken trust, or address new levels of trauma. This sets us back months and sometimes years in getting a person to accept services. Instead, we should be looking at effective systems that ensure people can be placed in housing with appropriate services that are measured by meaningful and useful metrics.

14. Instead of continuing litigation, we need both the University of California College of Law and the City to work with service providers, public health officials, and community members to devise effective short-term strategies for calming the streets like providing low barrier trauma informed coordinated services; coordinate the efforts of all outreach teams to more effectively stabilize the street community as well as develop long-term, cost effective strategies for housing unhoused residents including a targeted housing program, on-going support, employment programs, and other services.

15. As a service provider, we are in a constant state of remediating the harm done by sweeps. Despite the City's enforcement efforts, there are still many unhoused people in San Francisco. We have repeatedly experienced near success with an individual only to have the trust, stability, and willingness to move inside be destroyed by sweeps and arrests. Resolutions to this case must include trauma informed approaches and harm reduction services that deliver meaningful improvements to living conditions in the Tenderloin.

16. I oppose the Plaintiffs' Motion to Enforce the Injunction because I am concerned that enforcement will harm unhoused people in the Tenderloin.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed on April 15, 2024, San Francisco, California.

*Sam Dennison*
Sam Dennison
*Co-Director, Faithful Fools*