Lauren Hansen (CA BAR NO. 268417)
Melissa A. Morris (CA BAR NO. 233393)
PUBLIC INTEREST LAW PROJECT
449 15th St., Suite 301
Oakland, CA 94612-06001
Tel: (510) 891-9794
Fax: (510) 891-9727
Email: lhansen@pilpca.org

Lili V. Graham (CA BAR NO. 284264)
DISABILITY RIGHTS CALIFORNIA
350 S Bixel Street, Ste 290
Los Angeles, CA 90017-1418
Tel: (213) 213-8000
Fax: (213) 213-8001
Email: lili.graham@disabilityrightsca.org

**(Additional counsel on following page)**

Attorneys for INTERVENORS
HOSPITALITY HOUSE, COALITION ON
HOMELESSNESS, and FAITHFUL FOOLS

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLLEGE OF THE LAW, SAN FRANCISCO, a public trust and institution of higher education duly organized under the laws and the Constitution of the State of California; FALLON VICTORIA, an individual; RENE DENIS, an individual; TENDERLOIN MERCHANTS AND PROPERTY ASSOCIATION, a business association; RANDY HUGHES, an individual; and KRISTEN VILLALOBOS, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, a municipal entity, <br><br> Defendant. | **Case No. 4:20-cv-3033-JST** <br><br> **DECLARATION OF LAUREN HANSEN IN SUPPORT OF INTERVENORS' RESPONSE TO PLAINTIFFS' MOTION TO ENFORCE STIPULATED INJUNCTION** <br><br> **ASSIGNED FOR ALL PURPOSES TO THE HONORABLE JON S. TIGAR, COURTROOM 6** <br><br> Date: 05/23/2024 <br> Time: 2:00 p.m. <br><br> Action Filed: 05/04/2020 <br> TRIAL DATE: (TBD) |

Michael David Keys (CA BAR NO. 133815)
BAY AREA LEGAL AID
1800 Market Street, 3rd Floor
San Francisco, CA 94102
Tel: (415) 982-1300
Fax: (415) 982-4243
Email: mkeys@baylegal.org

**(Counsel for Intervenors continued from previous page)**

I, Lauren Hansen, declare:

1.      I am an attorney with the Public Interest Law Project, admitted to practice law in California and before this court.  I represent Intervenors Hospitality House, Coalition on Homelessness, and Faithful Fools in Intervenors' Opposition to the City and County of San Francisco's Motion to Enforce the Stipulated Injunction.

2.      The facts set forth below are known to me personally, and I have first-hand knowledge of these facts.  If called as a witness, I could and would testify competently, under oath, to such facts.

3.      After agreeing to a dismissal of the action on September 29, 2020, the Court administratively closed the case on October 7, 2020.  I did not hear of any activity with this Injunction until September 8, 2023.

4.      On September 8, 2023, I received a notification from the Court, referring the parties to a pre-settlement conference.  I participated in a call with Judge Cisneros to discuss Intervenors' participation in the new round of discussions of the Stipulated Injunction on September 15, 2023. I also participated in a pre-settlement conference with all of the parties on October 2, 2023.

5.      I represented Intervenors' during a meeting on November 15, 2023, along with Intervenor Sam Dennison from Faithful Fools.  The Intervenors' explained their position on the settlement agreement, but the Parties did not reach any resolution to Plaintiffs' concerns.

6.      Nearly four months later, I received notification that Plaintiffs filed a Motion to Enforce the Stipulated Injunction. I met and conferred with counsel for Plaintiffs and the City, and we agreed on a modified briefing schedule.  I submit this Declaration in support of Intervenors' Opposition to the Plaintiffs' Motion to Enforce.

7.      Attached is a true and correct copy of a statement Mayor London Breed made on Medium.com about the City's compliance with the injunction in *Coalition on Homelessness et al. v. City and County of San Francisco et al.* (case no. 22-cv-05502-DMR, 2022).  The statement is labeled Exhibit 1.

8. Attached as Exhibit 2 is a true and correct copy of the City's Police Bulletin governing encampment cleanups. I obtained this document on April 10, 2024 from the City of San Francisco's Police Department Website at https://www.sanfranciscopolice.org/department-bulletins-notices-2023.

9. Exhibit 3 is a true and correct copy of an article from SFIST, describing the City's efforts to removed unhoused people from the area surrounding the Dreamforce Conference. I viewed and downloaded this on March 21, 2024, from this website: https://sfist.com/2023/09/15/benioff-praises-city-cleanup-for-dreamforce-asks-why-it-cant-be-like-this-every-day/. I also viewed multiple social media posts on X (formerly Twitter) that publicize the City's efforts to remove homeless encampments in the Tenderloin as well as throughout the City.

10. I am attaching a true and correct copy of a transcript from Mayor London Breed's "state of the City" speech. I obtained this document on March 21, 2024. In this speech, Mayor Breed claims success with "bringing down the tents" reducing them by 37%, in the last six months, the "lowest since before 2018." This transcript is labeled as Exhibit 4.

11. Attached as Exhibit 5 is a true and correct copy of the City's Point-in-Time Homeless Count. I downloaded this document off of this website on March 20, 2024 at https://hsh.sfgov.org/about/research-and-reports/pit/.

12. Exhibit 6 is a true and correct copy of the City's data dashboard page on daily utilization of shelter sites. I found this information here https://hsh.sfgov.org/services/the-homelessness-response-system/shelter/. The page I downloaded explains the data, including disclaimers that the data may not be completely accurate. I downloaded this from the City's website on March 20, 2024.

//

//

//

//

//

1    I declare under penalty of perjury under the laws of the United States of America that the

2  foregoing is true and correct to the best of my knowledge.  Executed on April 18, 2024 at

3  Oakland, California.

4  _____

5  Lauren Hansen
   *Attorney for Intervenors*
6  *Hospitality House; Coalition on Homelessness; and*
   *Faithful Fools*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

Open in app ↗
Sign up    Sign in

● Medium        🔍 Search                     ✎ Write   👤

# Injunction Update: Our Path Forward



London Breed · Follow
4 min read · Sep 25, 2023

👏 67    💬 1                    🔖⁺  ▶  ↗

San Francisco engages thousands of unhoused people in encampments each year by offering shelter and services. The City has made substantial investments in taking a compassionate services-first approach and providing permanent supportive housing, shelter, and services to people experiencing homelessness.

We are doing the work and continuing to house and shelter people every day.

- San Francisco has more permanent supportive housing per capita than any other city in the country besides Washington DC, and over the last 5 years, has provided more permanent supporting housing of any county in the Bay Area by far.

- We've expanded shelter by 50% since 2018 and we've helped 10,000 people exit homelessness in that time.

- San Francisco was one of the few cities in California that saw a reduction in homelessness between 2019 and 2022, with a 15% reduction in unsheltered homelessness.

But despite all of this work, **some have attacked us and sued us over our homelessness policies.**

**This obstruction has not helped get more people into housing or shelter.** It's only left more people on our streets who we want to help get indoors. And it's created the opportunity for those who want to use tents and encampments not primarily for housing but to conduct illegal behavior like drug dealing, human trafficking, and theft.

Here's the good news: our City Attorney's Office has fought for and received clarification that will allow us to resume enforcement of laws that we've been limited from enforcing for the last nine months.

Here's an update on what's happening and our next steps.

**Ninth Circuit Clarifies Disputed Term**

During encampment resolutions, the City cleans and secures streets and public spaces, while also offering services and shelter to unhoused individuals. In September 2022, the Coalition on Homelessness and other plaintiffs filed a lawsuit against the City regarding the City's practices related to homeless encampment resolutions.

As a part of that lawsuit, the plaintiffs sought a preliminary injunction, which is a type of temporary court order that courts sometimes put in place while a lawsuit is being litigated.

That injunction was granted and we've been limited throughout this entire year from enforcing a number of laws against sitting, lying, or sleeping on public streets and sidewalks for people who are "involuntarily homeless." This term and who it applies to has been the subject of debate and court appeals over the last several months, and **the Court's lack of clarity and definition has limited the City from enforcing those laws.**

Finally, in September 2023, the City received clarification on the definition of this term from the Ninth Circuit U.S. Court of Appeals. Specifically, the Court acknowledged that individuals are not involuntarily homeless if they have declined a specific offer of available shelter or otherwise have access to such shelter or the means to obtain it.

This clarification is consistent with what the City has argued in court. While the injunction remains in place, **we now have a path forward to enforce these laws** against voluntarily homeless individuals, as we previously had in the past.

The fact that it took us nearly nine months to get this clarification is frustrating. But we have to focus on moving forward.

**Next Steps**

Our City workers have been doing the best job they can in carrying out encampment resolutions under the injunction, and they are now getting prepared to enforce these laws in light of this recent clarification by the Ninth Circuit. These are people with some of the most challenging jobs in the city, and they do their work with respect, compassion, and diligence.

To make sure our workers are supported and confident in their work with this change, over the next few weeks we will be reiterating and updating their training and making sure they understand what they can and cannot do in line with the injunction and Ninth Circuit's recent clarification.

This interim step is necessary not only so they understand what has changed, but also because, unfortunately, **the plaintiffs in this case will still be out interfering with their work.** They will film our city workers. They will try to tell our workers what they can and cannot do. These activists are the same people who hand out tents to keep people on the street instead of working to bring them indoors, as we are trying to do. And they are the same people instructing and encouraging people to refuse shelter — to remain on the street instead of going indoors. Their agenda is clear.

But our commitment to addressing what's happening on our streets is equally clear.

- We will work to bring people indoors.

- We will continue to offer shelter and house people.

- We will enforce our laws when these offers are refused.

**People who have been offered available shelter should not be allowed to remain out camping on our streets.**

This lawsuit is still pending. The injunction is still in place. Our City Attorney is continuing to fight this in court. So nothing is over and things can change again. But this clarity from the Ninth Circuit is a step in the right direction. We will keep working to help get people off of our streets, into shelter, and on a path to stability, and keep our neighborhoods clean and safe for all.



# Written by London Breed



3.7K Followers

45th Mayor of the City and County of San Francisco

## More from London Breed

# **EXHIBIT 2**



# **DEPARTMENT NOTICE**

23-202
Published: 12/08/23
Expires: 12/08/26

## **Enforcement of Laws and Ordinances for Individuals Experiencing Homelessness Sitting, Lying, or Sleeping on Public Property**
(Supersedes DN 23-166)

The purpose of this notice is to inform members of the updated contact days and hours of the DEM/HSOC Dispatch Supervisor when engaging in a homeless enforcement action.

### **Background**

On December 23, 2022, the United States District Court, Northern District of California, partially granted a preliminary injunction ("injunction") regarding the City's enforcement of some City ordinances and other laws pertaining to homeless encampments, (Case No. 22-cv-05502-DMR).

The injunction remains in effect but has been further clarified through the litigation. The goal of this Department Notice is to provide guidance to members regarding the enforcement of City ordinances and other laws for homeless individuals sitting, lying, or sleeping on public property, subject to any future legal developments while this evolving issue navigates the court system.

### **Definitions**

Threat of Enforcement: any statement of intention regarding the possibility of enforcement of the laws identified in the injunction; this should not rise to the level of a criminal threat under California Penal Code section 422.

Involuntarily Homeless: an individual who (1) does not have access to shelter that is specific to them, considering any special needs; or (2) the City has not made a specific offer of shelter to them.

Voluntarily Homeless: an individual who has (1) declined a specific offer of available shelter to them, when that specific offer remains open at the time of enforcement; (2) otherwise has access to such shelter; or (3) the means to obtain it.

### **Policy**

Under the injunction, members **may not** enforce or threaten to enforce, and also may not rely on California Penal Code Section 148(a) to enforce or threaten to enforce, these five laws to prohibit **involuntarily homeless** individuals from sitting, lying, or sleeping on public property:

- Cal. Penal Code§ 647(e) (public lodging)
- Cal. Penal Code§ 370 (public nuisance)
- Cal. Penal Code§ 372 (public nuisance)
- San Francisco Police Code §168 (sit/lie)
- San Francisco Police Code § 169 (sidewalk encampments)

*Safety with Respect*

Members are reminded to activate their Body Worn Cameras (BWC) in accordance with DGO 10.11.

**What Can Members Enforce Against Homeless Individuals?**

Members may enforce all other applicable criminal laws, as appropriate, regardless of whether the individual is voluntarily or involuntarily homelessness.

Under the injunction, members may still ask involuntarily homeless individuals to relocate voluntarily, so long as the City's request is not accompanied with a threat of enforcement of any of the five laws listed above. If members order involuntarily homeless individuals to move, that request must have a legal basis besides those laws listed above.

Members are reminded that they may enforce or threaten to enforce the following laws regardless of whether the individual is involuntarily or voluntarily homeless:

- Cal. Penal Code § 647c (prohibiting "willfully and *maliciously obstruct[ing]* the free movement of any person on any street, sidewalk, or other public place or on or in any place open to the public";)
- S.F. Police Code §§ 22-24 (prohibiting "willfully and *substantially obstruct[ing]* the free passage of any person or persons on any street, sidewalk, passageway or other public place")
- S.F. Police Code §§ 25-27 (prohibiting "willfully remain[ing] upon any private property or business premises after being notified by the owner, lessee, or other person in charge thereof to leave" or entering upon private property or business premises "without permission, expressed or implied, of the owner, lessee, or other person in charge of private property or business premises ... after having been notified by the owner, lessee, or other person in charge thereof to keep off or to keep away therefrom").

The injunction does not restrict enforcement for conduct other than sitting, lying, or sleeping. For example, if an individual is obstructing access to a public facility or not allowing a 48" wide path of travel on a public sidewalk, the injunction still allows members to require the individual remove the obstruction. Members should avoid requiring the individual to relocate any farther than is necessary and appropriate to remove the obstruction.

Members can also continue to enforce nuisance laws, as long as they are separate and distinct from sitting, lying, or sleeping on public property, such as when there is a need to clean accumulated trash and debris around an encampment that creates a health hazard. If the sole basis for asking individuals to move is for temporary cleaning of the public right of way, members should make it clear ahead of time to those individuals that once the cleaning is completed they may return to the same location. Members may ensure the safety of other City agencies while they engage in their official duties, such as street cleaning and rely on Cal. Penal Code 148(a) for enforcement.

The injunction does not limit members' enforcement of laws against people blocking or trespassing onto private property. If members enforce encampments blocking private entrances

or fire routes/escapes, depending upon the situation (i.e. unoccupied building), members may consider obtaining a signed citizen's arrest form (SFPD 80).

If members take enforcement action against **involuntarily homeless** individuals for reasons other than sitting, lying, or sleeping on public property, members shall document the reasons in the incident report.

## The below only applies to HSOC or "70 Unit" Homeless Outreach Officer Assignments.

Members **may** enforce or threaten to enforce the five enjoined laws listed above against an individual who is **voluntarily homeless**, subject to the enforcement procedure below.

## Determining if an individual is voluntarily or involuntarily homeless:

Members **shall** assume all individuals are involuntarily homeless until the member has confirmation that the individual (1) declined a specific offer of available shelter and that offer remains open to the individual at the time of enforcement; (2) otherwise has access to such shelter; or (3) the means to obtain it.

- All offers of shelter shall come from Healthy Streets Operations Center Homeless Outreach workers or in coordination with them. Members shall call the DEM/HSOC Dispatch Supervisor at                    which is available from 7:00am to 7:00pm, Monday through Sunday, to obtain availability of shelter space. If during the call it is determined that the individual already has shelter, the member does not have to offer shelter and the individual can be deemed voluntarily homeless.
- If the member confirms a shelter space is available for the individual, the member should allow the individual a reasonable amount of time (at least 15 minutes) to accept or reject the offer of shelter, considering any special needs the individuals may have.
- If an individual accepts the shelter, members will refer the individual and provide the address and direction to the shelter. The shelter will allow the individual to bring the equivalent of two large trash bags and a backpack (or personal item in similar size) of belongings.
- The individual accepting shelter may ask members to request the Department of Public Works (DPW) to respond to the scene and bag and tag any remaining property. If DPW bag and tags any property, DPW will provide the individual a property receipt in duplicate.
- Members may request DPW to the scene to assist with cleanup of any remaining items.
- The member may treat that individual as voluntarily homeless if the individual fails to accept the offer in the allotted time frame.
- If the individual discloses to a member that the individual has shelter space or otherwise has access to shelter, the member may accept that assertion and deem the person as voluntarily homeless.

## Enforcement Procedure

Prior to taking any enforcement action, members shall contact the lieutenant of HSOC and obtain approval.

*Page 3 of 4*

**If the member provides an admonishment, or issues an infraction citation the member should:**

1. Document the admonishment or infraction citation in the CAD **or**
2. Prepare an incident report regarding the admonishment or citation and document how the individual was determined to be voluntarily homeless and attach photographs of the encampment.

**If the member issues a misdemeanor citation or makes a custodial arrest, the member shall:**

1. Take photographs of the encampment.
2. If the individual is cited for 647(e) (illegal lodging), members shall request DPW to respond and seize the tent as evidence. DPW will provide the individual a property receipt in duplicate.
3. If the individual is placed under custodial arrest, members shall request DPW to bag and tag the encampment. DPW will provide the individual a property receipt in duplicate. (Refer to DN 20-167 Bag and Tag and DGO 6.15 Property Processing).
4. Prepare an incident report that articulates how the individual was determined to be voluntarily homeless, the factual circumstances surrounding the enforcement action, the DEM/HSOC Dispatch Supervisor's name, and confirmation of approval from the HSOC lieutenant.
5. Document in the incident report any enforcement or threat of enforcement of the five enjoined laws.

IMPORTANT NOTES REGARDING THE ENFORCEMENT OF SECTION 647(e) -Illegal Lodging:

Officers may only enforce Section 647(e) if the individual has erected a tent, tarp, or other structure. Officers must identify and document the specific elements of "lodging" in the incident report.

For contact information and additional resources, members should refer to the Homeless Resources Guide (SFPD 507).

*William Scott*
WILLIAM SCOTT
Chief of Police

*Per DN 23-152, all sworn & non-sworn members shall electronically acknowledge this department document in PowerDMS within (30) thirty calendar days of issuance. Members whose duties are relevant to this document shall be held responsible for compliance. Any questions regarding this policy should be sent to sfpd.writtendirectives@sfgov.org who will provide additional information.*

*Safety with Respect*

# **EXHIBIT 3**



Share this ☞

15 SEPTEMBER 2023 / SF POLITICS / JAY BARMANN

# Benioff Praises City Cleanup For Dreamforce, Asks Why It Can't Be Like This Every Day

Apparently Dreamforce went well this week, and city efforts to clean up the area around the Moscone Center so that conventioneers didn't have to step over bodies or needles were a success.

Many people who go downtown on a regular basis these days will tell you that the daylight hours are pretty okay in most places besides the Tenderloin and Sixth Street. But an extra effort was put in by the city to make sure that the 42,000 people attending Dreamforce weren't confronted with too many homeless people, or any open-air drug deals on their way to and from hotels. And Mayor London Breed is saying that the city does this for every convention. What drug problem?

"This is probably the cleanest I've ever seen San Francisco... Why can't San Francisco be like this every single day? Why does it take us having to say [something]? What is that?" Salesforce CEO Marc



Share this 👉

in the days before the convention, suggesting it could leave SF altogether if the city didn't clear the homeless and drug markets out of the way.

"Yes, it can be like this," Newsom said, and despite his not being able solve homelessness while he was mayor, he said it was up to city officials to do more.

London Breed pushed back, telling ABC 7, "It's not just because of Dreamforce. There are other conventions. This is what we do for every convention that comes to San Francisco. San Francisco is changing, things are getting better." Breed also pushed back on Newsom saying, "What I am doing is not pointing the finger at anyone, but rolling up my sleeves to take full responsibility and do everything we can to address those issues [in the streets]."

Parisa Safarzadeh, a spokesperson for Breed, tells the Chronicle that the mayor's office was "a little surprised" when Benioff mouthed off two weeks ago, threatening to move the conference. "By then our work was already under way to make sure the place was welcoming and clean for the event," Safarzadeh said, suggesting the city didn't just jump into action because a billionaire CEO snapped his fingers.



@benioff **Follow**

San Francisco has been incredibly clean, beautiful, and safe for the last 3 days of Dreamforce, and it is great that the city is able to put its best foot forward for this major event that brings in 40K people from around the world, and $80M to the economy. It is important to ask... **Show more**

✏️ Last edited 10:27 AM · Sep 14, 2023                    ⓘ

❤️ **1.7K**    💬 **Reply**    ⬆️ **Share**

┌─────────────────────────────────────┐
│           **Read 252 replies**          │
└─────────────────────────────────────┘

Phoenix resident Lura Whittier tells ABC 7, "Our hotel's about a mile away, and the walk back and forth feels really safe, and I feel like we've had pretty good experiences outside of Dreamforce."

It shouldn't be some kind of mystery to Benioff or to local TV reporters how or why the city was able to sweep up a few square blocks for three days in the name of $80 million for the local economy. The undesirables, in this case, were just shooed onto other blocks, out of sight.

Case 4:20-cv-03033-JST Document 136-4 Filed 04/18/24 Page 31 of 115



some power-washing and street ambassadors and police rousing people each morning if they were sleeping or lingering in places too close to Moscone or out in the open on Market Street, and telling them to go somewhere else.

66-year-old Jan Weith, who had been sleeping in front of the Walgreens Wednesday night near 4th Street, tells the Chronicle, "The police, security guards, those street ambassadors — everyone told me 'get out of here' this morning when I woke up around 8 a.m."

Francis Zamora, spokesperson for the Department of Emergency Management, tells the Chronicle that San Francisco's Coordinated Street Response Program sprang into action similarly for Pride in June and for Fleet Week last fall. But, Zamora says, "we're glad people are taking notice of the investments the City has made over the years to assist people in crisis and address street conditions."

**Previously:** [Dreamforce Arrives Tuesday, Bringing Celebrities, Street Closures, Traffic, and Breathless AI Hype](#)

# EXHIBIT 4

English    Español    中文    Filipino

 **SF**.GOV

**Menu**

# Mayor's State of the City 2024

## Video transcript

**Transcript is from speaker's notes and may differ from what's said on the video.**

Welcome to San Francisco's James R. Herman cruise terminal at Pier 27,

the first stop for almost 300,000 people who come here every year from around the world to our beautiful city.

I want to tell you about another jewel of the San Francisco Port that just celebrated 125 years, the San Francisco Ferry Building.

In the 19th Century, commuters and visitors traveled by train or ferry, or both.

So a ferry terminal on the waterfront, right downtown, was a practical necessity.

It was the SFO of its day, the Grand Central Station.

But, as we so often do, San Francisco built a practical space of world-class beauty, with a 245 foot clocktower, a long, arched arcade, and an interior worthy of a Renaissance cathedral.

At the foot of Market Street, a beautiful bridge from water to land, the Ferry Building announced to every commuter, every traveler:

This is San Francisco.  You have arrived.

Until, that is, the late 1930s, when two new bridges–the Bay and Golden Gate–and the rise of the automobile, made the Ferry Building seem outdated and unwanted.

Soon the grand interior was converted into drab cubicles.

And then, in an act of urban planning catastrophe that only the 1950s could spawn, a double-decker freeway rose in the Ferry Building's front yard, slicing it from the city it served.

For decades, this great landmark was an isolated, nearly forgotten, crumbling shell of its former glory.

No one went there.

No one bet on its future.

Its time had passed.

But then the freeway came down.

And the city created a new, walkable, grand Embarcadero with the Giants on one end, and a restored Ferry Building at the center.

With patience, smart planning, investment, and time, San Francisco turned a discarded transit hub back into a global icon, "a famous city's most famous landmark" as Herb Caen called it.

Today, the Ferry Building hosts shops, artisans, restaurants, farmers markets, ferries, and thousands of tourists and locals.

And just a few months ago, during APEC it hosted leaders from around the world.

This one building at the heart of Downtown says a lot about our Downtown, and about our city.

First, beautiful places, world-class, desirable places never stay forgotten for long.

Second, our local government, with the right vision and right investment, can spark monumental turnarounds.

Third, and most important, never EVER bet against San Francisco.

We never stay down for long.

We have faced incredible challenges in the past five years: two unparalleled health crises —one in the form of Covid, the other Fentanyl—and a national reckoning on policing and public safety.

I know some people inside and out of San Francisco feel these challenges have overwhelmed us.

I don't begrudge people's frustration.

I don't dispute these have been a tough five years.

But rather than destroying our city, these storms have revealed our strength, our indomitable spirit, and our service to each other.

I believe the past is a precursor to our rise.

This is the Year of the Dragon.

And we will soar again.

We all know the story.

Shortly after I took office, we began to hear disquieting reports of a new and deadly virus.

Soon enough, Covid 19 would upend the world.

San Francisco declared an emergency in February of 2020, and then with our partners around the Bay, issued the first shutdown order in the country.

My Administration then:

Marshaled the Departments of Emergency Management, Public Health, and staff from throughout city government to mobilize and turn our convention center into a COVID command center.

We cut through the bureaucratic red tape to set up testing sites, community hubs, and vaccination sites around the city.

City workers fanned out to tend to our most vulnerable residents.

And as nursing homes across the country saw ballooning death rates, we protected our seniors, at Laguna Honda and elsewhere.

We were one of the first cities in the country to reach an 80% vaccination rate.

And as deaths climbed across the US and around the world,

San Francisco saw the lowest Covid death rate of any large city in the country.

People want to say our civic government is dysfunctional. We can't collaborate, can't get the hard things done.

Tell that to the thousands of San Franciscans who are alive today because of the work we did.

Our city faced a storm unlike any seen in a hundred years, and through hard work, collaboration, ingenuity, and the simple decency of our people, we orchestrated the most successful response in the country.

As Covid waned and vaccinations rose, we entered what I consider the second phase of my tenure: the recovery.

The pandemic had led to a massive shift in how our economy functions, almost overnight.

"Work from home" exposed a weakness in the economy of big cities – especially tech-forward San Francisco–

We were too dependent on fields that CAN work from home.

Our downtown had never been designed as a neighborhood with many homes and round-the-clock residents.

Downtown was office – and office was hit hard.

Simultaneously, the pandemic had constrained our efforts to house the homeless.

Then, the murder of George Floyd, and the ensuing national reckoning, devastated police recruitment and staffing here in San Francisco and around the country, even as they brought to light the systemic racism many of us have known for far too long.

The Department of Justice has called the police staffing shortage a national "crisis."

These are national challenges, exacerbated by local conditions.

So what'd we do?

We got to work.

On public safety,

We diverted non-emergency 911 calls to free up officers while providing better overall responses for those struggling on our streets.

I appointed a former hate crimes prosecutor as our new District Attorney, and Brooke Jenkins began prosecuting crimes!

We launched retail theft blitz operations.

We used bait cars and plainclothes officers to disrupt auto break-ins.

To shut down drug markets in the Tenderloin and South of Market, we coordinated every public safety agency you can name – local, state, and federal.

Sheriff Paul Miyamoto deployed deputies to conduct warrant sweeps.

I appealed to Governor Newsom, and he stepped up by sending the California Highway Patrol and National Guard investigators.

President Biden and Speaker Emerita Nancy Pelosi delivered the US Attorney and Drug Enforcement Agency to interrupt the sale and trafficking of fentanyl.

And these efforts have paid off.

We doubled the number of drug arrests in 2023.

Retail theft and car break-ins plummeted.

Our homicide arrest rate was 85% in 2023 – 25 points higher than the national average.

And now our crime rate is the lowest it's been in 10 YEARS!

Yes, these figures are accurate.

They coincide directly with the arrival of CHP, National Guard, US Attorney's Office, DEA, stepped up SFPD stings, and DA Jenkins' increase in prosecutions.

Now, I do recognize that some people don't FEEL the lower crime rate yet.

And if you, or someone you know, is the victim of crime, all the stats in the world don't matter.

I understand that, and I hear your concerns.

That's exactly why we're not letting up.

We will roll out 400 automated license plate cameras at 100 intersections across the city this month.

Thanks to voters for approving Proposition E on Tuesday, we will be:

Installing new Public Safety Cameras in high-crime areas;

Deploying Drones for auto thefts, car break-ins, and other crimes; and Changing Police Department rules so our sworn officers are out in the field, not behind a desk.

And, yes, we are adding more police officers.

Thanks to our efforts, San Francisco is now the best-paid major city in the region for starting police officers.

Retention is improving. Officers are transferring here.

We have the most Police Academy applicants in more than 5 years.

And the next Academy class will be the largest since before the pandemic, with 50 cadets.

With all of that, we will add 200 more officers in the next year, and get to full police staffing in three years.

At the same time, we are not sacrificing our reform work.

The San Francisco Police Department is on track to reach all 272 Department of Justice reforms by April of this year.

Thank you to those who led these efforts, including our Police Chief Bill Scott.

Of course, we can't talk about public safety without talking about our other health crisis: fentanyl.

This is a national tragedy happening in cities large and small, areas urban and rural.  It's awful and it's heartbreaking.

And while I am stepping up enforcement of our laws – because that's what our residents deserve and that's what our city needs – I remain absolutely committed to saving lives.

Our approach is about Accountability, Resources, and New Pathways.

This means arresting and prosecuting dealers, and when necessary, arresting users who are a danger to themselves.

It means expanding existing treatment options and creating new ones, like abstinence-based treatment.

Yes, offering people services is critical, but, frankly, we must compel some people into treatment.

We will have an additional tool to do so thanks to the voters who passed Proposition F on Tuesday.

And I have directed the Human Services Agency to create an action plan for Prop F's implementation.

If we can provide cash assistance to more than 5,000 people, then we can screen recipients for substance use disorder and get them into treatment.

And we have the services they need, including 15 free clinics across San Francisco that can administer buprenorphine on Day 1.

We are delivering on our goal of adding 400 new treatment beds.

And if Governor Newsom's Prop 1 passes, we have a real opportunity to add hundreds more.

We're not waiting.

We're doing the work now, with Supervisor Rafael Mandelman, so when the state opens the pipeline for new beds, San Francisco is first in line.

That brings me to homelessness, which also remains a key focus of our recovery.

Since I've been Mayor, we've helped over 15,000 individuals exit homelessness.

We were the only county in the Bay Area to see unsheltered homelessness go down in the last Point in Time count cycle.

We did it by increasing our shelter capacity by 66%,

And increasing housing for the formerly homeless by 50%.

My Office of Innovation, funded by Bloomberg Philanthropies, is developing new accountability tools to better coordinate data, track the outcomes and hold non-profits we fund accountable.

Our encampment teams are bringing people indoors and bringing down the tents…

despite attempts by the courts, and by some advocates, to obstruct our efforts– which City Attorney David Chiu has fought hard,

We've helped more than 1,500 people into shelter from encampments just last year alone.

The number of tents on our streets is down 37% in the last six months – at the lowest levels its been since before 2018.

The other day a gentleman asked me,

"How can we help so many homeless people but still have thousands more?"

Well, we know people fall into homelessness for many reasons, and that we have programs preventing homelessness for San Franciscans every day.

But we also know, we keep housing people, and people keep coming here from other places.

The advocates, and some elected officials, want you to believe San Francisco is not a destination.

They want you to believe people don't come here for drugs or other reasons.

We all know that's not true.

Of those arrested for public drug use in the Tenderloin and South of Market over the last year, only half were San Francisco residents.  HALF.

I've had enough of it.  And the voters clearly have too.

So we are not letting up.

We are continuing to add new housing, and new shelters.

We are setting a new goal of 1000 people a year for Homeward Bound, the program that provides unhoused people a ticket back to their home city.

And we have a new tool for those struggling with mental illness and addiction.

For decades state law has prevented us from compelling them into treatment, even when their families begged us to do so.

The people who are truly suffering … you see them walking into traffic, or screaming at nothing in particular … the people who desperately need help …

I have fought to change our state conservatorship laws for years, and finally we succeeded.

Now, we are implementing the changes faster than any other county in the state.

So far this year we've increased the number of people submitted for conservatorship by 170% compared to last year.

That is how we make change. That is how we save lives.

And, of course, there's the pandemic-related issue felt most acutely here in San Francisco –

our downtown recovery.

I have always believed we need to start with a question, and it's not:

"How do we make downtown the way it was?"

but rather…

"What do we want our downtown of the future to be?"

In 2022 and 2023, we worked with trade groups, business owners, builders, neighbors, and city departments to create the Roadmap to Downtown San Francisco's Future, a comprehensive plan for a dynamic, resilient Downtown with residents, nightlife, and businesses, a neighborhood that keeps going around the clock – Downtown 24/7.

The first year of our Roadmap focused on stabilizing: filling storefronts through our Vacant to Vibrant program, creating attractions, and delivering tax incentives.

We are recruiting new business and continuing to see new leases signed – led by AI, which alone is projected to add 12 million square feet of office space by 2030.

And it won't be AI alone.

This is one of the most beautiful urban environments in the world, with an unrivaled pool of talent, of builders and dreamers, and the largest collection of deployable capital in the country.

But Downtown can't just be about jobs.

We also need more people to live and study here.

So our new initiative: 30 by 30 – 30,000 more residents and students downtown by 2030.

To do that, first we need to create more housing downtown.

We've already passed local laws to remove and reduce fees and barriers for office conversions.

Our first office conversion is actually happening now – 34 new homes at the Warfield building that would not be happening if we hadn't stepped in.

And more are coming.

Now, we are working on state law changes with Senator Scott Wiener to spur conversions and speed up housing production Downtown.

So that's housing – but 30 by 30 is also about bringing in students. A lot of them.

We are working with thought leaders, business folks, and educational institutions to make Downtown a hub, a Center of Excellence.

We've invited the University of California and Historically Black Colleges & Universities to join us, and some are coming as early as this summer.

We're working with other universities, and our existing anchors, UC Law, USF and San Francisco State University.

Imagine that!

Students, professors, researchers, and employees walking from dorm room to classroom, from startup to conference space, from the Ferry Building to City Hall … cross-pollinating ideas, cross-pollinating companies.

We will be leading the way in AI, climate tech and biotech and things we haven't even yet imagined.

Housing, students, innovation – that's our future!

Tearing out the bike lanes on Market Street – going backwards – will not move us forward, and it won't magically revive Downtown,

But 30,000 more people living and going to school Downtown will.

Downtown has always been the economic engine that funds the services we care about.

And its post-pandemic difficulties are the driving reason for the deficit we face this year, we no longer have the luxury to penalize, we need to incentivize

So let me make two things clear:

One: the Board of Supervisors and I will close this deficit.

And we will NOT weaken our public safety to do so.

Two: I have a clear vision for Downtown's future and my administration will make it happen.

Our vision of Downtown is a vibrant, mixed-use neighborhood with transit, bars, restaurants and venues where people live, work, study, and play.

We are through the valley of Covid.

We've endured the slings and arrows of its recovery.

AND NOW WE RISE.

On housing, we are changing our reputation as the city of "No" to the city of yes!

yes to Reducing fees,

yes to Eliminating barriers,

And yes to any idea that overcomes obstruction,

And builds the new homes we desperately need.

Though there is one housing "No" I will commit to – any piece of anti-housing legislation that comes across my desk, I will veto.

Every single one.

We have a state mandate to meet –  so let's…

Build out projects like the Power Station, where we broke ground last year, and Treasure Island, where just this week we re-launched a new phase of housing.

Let's work with our Land Use Chair Supervisor Myrna Melgar to keep advancing pro-housing laws through the Board, and let's bring 30,000 residents and students to Downtown.

If we do that, more people in more neighborhoods will be able to afford to live here.

San Francisco will remain the city of yes, for our children, and their children.

And it's not just a vision – our work is delivering change.

Crime is at record lows.

San Francisco is the AI capital of the world, the birthplace of the next economic boom.

The LA Times reports that in 2022, San Francisco venture firms raised five times as much funding as all the companies in Florida and Texas COMBINED.

Our small business reforms, like First Year Free championed by Supervisor Hillary Ronen, are filling storefronts across the city.

We are a national leader in early childcare and education:

Doubling the number of kids getting care and subsidies since 2018,

And paying our educators a real wage that recognizes them for the work they do.

We just hosted leaders from around the world for APEC, the biggest global stage for San Francisco since the signing of the United Nations Charter in 1945.

Our parks are the best in the world, and we've massively expanded outdoor public areas, from JFK Drive to India Basin coming to our southern waterfront.

Muni is leading the Bay Area's transit recovery, carrying more riders than all the other regional transit operators combined.

We are on pace to hit our goal of zero greenhouse gas emissions by 2040.

We are launching a WNBA franchise, hosting the NBA All-Star Game, the Super Bowl, and the FIFA World Cup.

I envision a San Francisco of walkable, safe, thriving neighborhoods with great schools and a strong economy, where people get the help they need and where everyone is welcome.

I want to thank the voters for supporting this vision on Tuesday, by backing Propositions A, C, E, F, and G–and the strong rejection of Prop. B.

Thank you, Supervisors Joel Engardio and Matt Dorsey, for your work on algebra and police staffing.

Congratulations to Scott Wiener, Matt Haney, and Catherine Stefani on your impressive victories.

As well as to all those newcomers who bravely stepped forward to run for County Committee.

And let me say something to those in the press claiming Tuesday's election means "San Francisco is not a progressive city anymore."

Building homes and adding treatment beds is progressive.

Wanting good public education and an effective police force–valuing the safety of our seniors in Chinatown and the Bayview, our immigrant and working families in the Tenderloin –is progressive.

We are a progressive, diverse city–living together, celebrating each other:

LGBTQ, AAPI, Black, Latino, Palestinian and Jewish,

That has not changed and it will not change.

So, I don't know about you, but I am tired of the negativity.

I'm tired of the people who talk about San Francisco as if our troubles are inevitable and our successes a fluke.

Our successes are not a fluke, and they're not fleeting.

They're the product of years of hard work, collaboration, investment, creativity, and perseverance.

They're the output of thousands of people, in government and out, who believe in service not cynicism.

So I want to say something to those—inside San Francisco and out—who traffic in negativity to sell ads, to advance right wing causes, to tear others down, or simply to stoke fear for their political convenience.

I want to say this on behalf of the real people you have been disparaging.

On behalf of the nurses, gardeners, janitors, counselors and commissioners, engineers and emergency workers, teachers and transit operators who dedicate themselves to our city;

On behalf of our firefighters, 911 dispatchers, sheriff's deputies and police officers who do lifesaving work under difficult circumstances;

On behalf of the startup founders and engineers who are reimagining our local economy,

On behalf of the small business owners, the bartenders, and artists,

On behalf of the women here, who let women everywhere know that we trust them to make their own decisions, and offer them safe haven when they do;

On behalf of the YIMBY housing advocates who started a movement here that has taken root around the country,

On behalf of the transgender activists and their families—chosen or otherwise—who've made San Francisco an outpost of hope in a country of worrying hate;

On behalf of the city I've called home my entire life, which I am proud to serve every single day

I offer these words from our 26th president, Teddy Roosevelt.

"It is not the critic who counts; not the man who points out how the strong woman stumbles, or where the doer of deeds could have done them better.

The credit belongs to the woman who is actually in the arena who strives valiantly; who spends herself in a worthy cause."

To those outside the arena watching from the sidelines who offer only criticism.

I have a message for you, San Francisco is not wearing the shackles of your negativity any longer.

To the public servants who've been here during the city's most difficult time, doing the work all along, thank you.

We will continue to move our city forward to a city of yes!

No longer will we allow others to define who we are. Because we know who we are.

We are a city on the rise.

We are a dragon taking flight.

Now let's soar San Francisco, Let's Soar!

# **EXHIBIT 5**

# SAN FRANCISCO HOMELESS COUNT AND SURVEY

2022 COMPREHENSIVE REPORT



## ABOUT THE RESEARCHER

Applied Survey Research (ASR) is a social research firm dedicated to helping people build better communities by collecting meaningful data, facilitating information-based planning, and developing custom strategies. The firm was founded on the principle that community improvement, initiative sustainability, and program success are closely tied to assessment needs, evaluation of community goals, and development of appropriate responses.

### Locations

**Central Coast:**
55 Penny Lane, Suite 101
Watsonville, CA 95076
tel 831-728-1356

**Bay Area:**
1871 The Alameda, Suite 180
San Jose, CA 95126
tel 408-247-8319

**Sacramento:**
5440 Park Drive, Suite 104
Rocklin, CA 95765
tel 916-827-2811
5440 Park Drive, Suite 104
Rocklin, CA 95765
tel 916-8

www.appliedsurveyresearch.org

# TABLE OF CONTENTS

FOREWARD BY HSH................................................................................................4

ACKNOWLEDGEMENTS .................................................................................... 12

EXECUTIVE SUMMARY ...................................................................................... 14

INTRODUCTION................................................................................................. 16

POINT-IN-TIME COUNT....................................................................................... 18

    Number and Characteristics of Persons Experiencing Homelessness in San Francisco.............19

    Total Number of Unsheltered and Sheltered Homeless Persons by District ...................................20

HOMELESS SURVEY FINDINGS .......................................................................... 24

    Survey Demographics ...................................................................................25

    Living Accommodations ................................................................................30

    Duration and Recurrence of Homelessness ....................................................33

    Primary Cause of Homelessness ...................................................................35

    Services and assistance ................................................................................37

    Employment and Income ..............................................................................39

    Health .......................................................................................................41

    Domestic Violence and Partner Abuse ...........................................................42

    Criminal Justice System ...............................................................................43

SELECT POPULATIONS ....................................................................................... 44

CONCLUSION ................................................................................................... 53

APPENDIX A: METHODOLOGY ........................................................................... 54

    Overview ....................................................................................................54

    Street Count Methodology ............................................................................56

    Youth Street Count Methodology....................................................................58

    Shelter Count Methodology ..........................................................................59

    Survey Methodology ....................................................................................60

APPENDIX B: SUPPLEMENTAL POINT-IN-TIME COUNT DATA .................................. 63

    Supplemental Shelter Count .........................................................................63

    Supplemental Shelter Count Methodology .....................................................63

    San Francisco Unified School District Data ......................................................65

    Families in SRO Units or Doubled Up .............................................................66

APPENDIX C: GENERAL SURVEY DEMOGRAPHIC COMPARISON ......................... 67





# FOREWARD BY HSH
## 2022 POINT IN TIME COUNT: LOCAL CONTEXT

Every two years, the U.S. Department of Housing and Urban Development (HUD) requires that all communities receiving federal funding for homeless services conduct a Point-in-Time (PIT) Count of people experiencing homelessness. The PIT Count is the primary source of nationwide data on homelessness and identifies people living in unsheltered and sheltered settings.

The PIT Count provides a critical snapshot of people experiencing homelessness in our community and is useful for measuring trends over time.  Additionally, the PIT Count Increases our understanding of local needs, impacts funding for homeless services and meets federal reporting requirements, and informs program and policy decisions. While this report is critical, it does not take into account the changes, investments, and innovations happening locally.  HSH has drafted this forward to share some of the local context that has impacted the findings of the 2022 PIT Count and the changes we have seen since the last count in 2019.

The increasing housing affordability challenges and growing economic inequality in the Bay Area, along with other factors, have led to consistently high levels of homelessness in San Francisco over the last decade. The severe lack of affordable housing and sharp increases in rent continue to push more people into homelessness each year because housing costs have rapidly outpaced wage growth. One study found that residents of San Francisco's metropolitan area must earn an hourly wage of $61.50, the equivalent of 4.1 full-time jobs at minimum wage, to afford a two-bedroom fair market rent apartment.[1] San Francisco also faces a severe shortage of affordable housing, with only 33 affordable and available rental units per 100 extremely low-income households.[2] A history of structural racism and housing discrimination has disparately impacted People of Color, resulting in significant over-representation in people experiencing homelessness. To address this crisis, San Francisco has nearly tripled the budget of the Department of Homelessness and Supportive Housing (HSH) since its founding in 2016 to support significant program growth and reduce disparities.

Since the 2019 PIT Count, HSH has focused on equitably expanding homelessness services. The Department's service expansion has primarily relied on the influx of local dollars from the Our City, Our Home (OCOH) Fund which San Francisco voters created in 2018 through the Proposition C ballot measure. OCOH funds became available for the City to spend in fiscal year 2020-21. In fiscal year 2021-22, OCOH funds comprised $299 million of HSH's $667 million budget. In fiscal years 2022-23 and 2023-24, HSH anticipates that OCOH will fund over a third of the Department's budget.

The COVID-19 pandemic has only exacerbated existing challenges for the City's unhoused people and low-income populations at risk of homelessness. However, the Mayor's Homelessness Recovery Plan has

---

[1] National Low Income Housing Coalition. (2022). *Out of Reach: The High Cost of Housing*. Retrieved from https://nlihc.org/oor
[2] National Low Income Housing Coalition. (2021). *The Gap: A Shortage of Affordable Rental Homes*. Retrieved from https://nlihc.org/gap



guided the City's response to COVID-19 to meet the needs of the most vulnerable residents. The Plan has leveraged the new OCOH, state and federal funding for an unprecedented increase in housing, shelter and homelessness prevention resources. The decreases in the 2022 PIT Count – 3.5% in overall homelessness and 15% in unsheltered homelessness - show the initial returns of the City's investments in these resources.

## Exits from Homelessness

Between the 2019 and 2022 Point-in-Time Counts, HSH helped more people than ever before in a three-year window exit homelessness through housing, prevention, or reunification with support systems. Over 8,000 households exited homelessness from January 2019 to January 2022 through Permanent Supportive Housing, Rapid Rehousing, Prevention and Problem Solving interventions (including relocation assistance).

However, HSH's placements to housing have not been able to keep pace with inflow of people who become newly homeless or return to homelessness throughout the year. HSH estimates that while 7,754 homeless individuals were observed on the night of the PIT Count, as many as 20,000[i] individuals may experience homelessness in San Francisco over the course of a full year. Analysis of these figures suggest that for every household San Francisco is able to permanently house through its Homelessness Response System, approximately four households become homeless. When the need exceeds available local resources, households unable to resolve homelessness on their own may need to leave San Francisco or remain homeless for long periods of time.



**HSH estimates 4 households become homeless for every 1 household housed**

**INFLOW**
Households who become newly homeless in San Francsco or return to homelessness

**ACTIVELY HOMELESS**
Households experiencing homelessness in San Francisco

**HOUSED**
Households HSH resolves homelessness for through problem solving or placements to permanent housing or rapid rehousing

## A SYSTEMIC RESPONSE TO REDUCE HOMELESSNESS

The City launched the Department of Homelessness and Supportive Housing (HSH) in 2016 to coordinate a systemic response to homelessness. In partnership with people experiencing homelessness, services



providers, and community partners, the Department shelters and houses over 15,000 homeless and formerly homeless people each day through the Homelessness Response System.

## Advancing Equity and Reducing Disparities

People of Color experience homelessness at disproportionately high rates as a result of historical and structural racism and failed policies across many systems, including discrimination in housing, health, education, employment, and criminal justice.

HSH and its community partners continue to become more intentional in advancing equity across the Homelessness Response System for overrepresented and underserved populations and to both ensure that homeless programs and systems are not contributing to disparate outcomes by race, ethnicity, sexual orientation, or gender identity and are reducing disparities by establishing goals focused on advancing equity.

To guide the City's homelessness response with a focus on equity, HSH hired the Department's first Chief Equity Officer and published its first HSH Racial Equity Action Plan in 2021. The Department has taken various other steps in 2022 to help ensure equity is a central factor in our decision-making and programming, including:

- Developing equity goals and setting benchmarks to reduce disparities as part of the Department's process of developing a city-wide five-year strategic plan to respond to homelessness in San Francisco;
- Engaging people with lived experience of homelessness, particularly people who are over-represented and underserved, in the design and evaluation of programs and systems;
- Engaging with a BIPOC provider working group; and
- Focusing on data reporting that provides insight on the demographics of the populations HSH serves, including publishing a dashboard on the demographics of Coordinated Entry and the housing process.

Since 2019, the Department has started several initiatives to improve equity in the Homelessness Response System. These projects include:

- Targeted scattered-site investments to provide permanent housing to people experiencing homelessness in Bayview Hunters Point, a neighborhood that has been historically marginalized and underserved and has high rates of homelessness among Black or African-American people;
- Administration of Emergency Housing Vouchers, over 40% of which were targeted to people who are experiencing homelessness in Bayview Hunters Point;
- A new Access Point focused on the Latinx community opening in the Mission District in fiscal year 2022-23;
- The new Taimon Booton Navigation Center, focused on serving the transgender and gender non-conforming community;
- An investment of significant resources in fiscal years 2022-23 and 2023-24 to advance the goal of ending transgender homelessness; and
- Securing a housing demonstration grant focused on reducing racial disparities in the justice and homelessness systems.



*2022 PIT Count: Local Context*

## The Homelessness Response System

There are six core components of the City's Homelessness Response System: Outreach, Coordinated Entry, Problem Solving and Prevention, Temporary Shelter, Housing, and Housing Ladder. These components are aligned to solve homelessness for people in need in an equitable way. The system's goal is to makes homelessness rare, brief, and one-time. Since 2019, HSH has expanded services in each of the core components of the Department's work.

## Outreach

The San Francisco Homeless Outreach Team (SFHOT) connects the most vulnerable individuals living outside with available and appropriate resources within the Homelessness Response System through outreach, engagement, and case management.

Over the past two years, the City has launched new Street Response Teams that work with paramedics, clinicians, and people with lived experience to address behavioral health, overdoses, or other urgent needs of primarily unsheltered individuals in San Francisco.  Street Response Teams are dispatched through 911 and provide an alternative to police response.  The teams engage and connect with the most vulnerable people and provide them with coordinated care and centralized access to services. Street Response Teams include:

- EMS-6
- Street Crisis Response Team
- Street Overdose Response Team
- Street Wellness Response Team

SFHOT is part of the Street Wellness Response Team, which responds to unhoused people in need of a wellbeing check and connects them to available resources. Visit the Citywide Healthy Streets page for more information on the Street Response Teams.

## Coordinated Entry

Coordinated Entry (CE) is the foundation of San Francisco's Homelessness Response System, serving as the "front door" for connecting households experiencing homelessness to the resources needed to resolve their housing crisis. Since the full launch of CE in 2019, CE has expanded to serve adults, families and youth through 11 geographically diverse Access Points throughout the City.

Additionally, in 2019 HSH launched the Access Point Partner Program so partners in the public health space could conduct Housing Primary Assessments in their existing settings and workflows. The Mental Health SF team identified initial Access Partners as key stakeholders that could help improve the rate of CE engagement with people with serious mental illnesses. These partners can leverage their existing skill sets and relationships with that population to improve the accuracy of the Housing Primary Assessment scores for that population. The San Francisco Homeless Outreach Team also serves as an Access Partner.



*2022 PIT Count: Local Context*

As part of HSH's Strategic Planning process, the Department launched a Coordinated Entry Reform and Evaluation process in 2022. This process examines the current CE framework and process through an equity lens to determine what needs to be changed, added, or eliminated. HSH will develop recommendations and strategies for a re-design of Coordinated Entry by November 2022. The Department will also develop an ongoing implementation plan based on input from multiple stakeholder groups, including nonprofit providers, clients, and City staff.

## Problem Solving

Problem Solving provides opportunities to prevent people from entering the Homelessness Response System, to help them exit the Homeless Response System quickly, and to redirect people who can resolve their homelessness without the need for ongoing support.

Since 2019, the City has made significant investments in the expansion of Problem Solving services, including flexible financial assistance, targeted homelessness prevention, and reunification. In fiscal year 2021-22, HSH helped approximately 800 households resolve their homelessness through Problem Solving and over 600 households diverted through homelessness prevention.

Especially with the impact of COVID-19, targeted homelessness prevention has been a critical tool to support households at imminent risk of homelessness to remain stably housed. HSH partnered with All Home to launch a regional prevention collaboration. The Department also partnered with the Mayor's Office of Housing and Community Development (MOHCD) to launch a citywide Prevention System during the height of the pandemic. In the spring of 2022, the City launched the Emergency Rental Assistance Program (ERAP). This program will provide ongoing rental relief for households facing imminent eviction following the sunset of state and federal rental relief programs stood up during the pandemic. As of August 2022, HSH's partners had disbursed $5.6 million to over 1,000 households through the ERAP program.

## Temporary Shelter

Shelter provides temporary places for people to stay while accessing other services to support a permanent exit from homelessness. Since 2019, HSH has expanded its traditional shelter portfolio and opened new program models. These changes were driven in part by the COVID-19 pandemic.  At the onset of the pandemic, congregate shelter capacity decreased by almost 70% due to public health guidance.  The City responded quickly by opening new non-congregate program models.

San Francisco's shelter system capacity increased by 24% (a net increase of 829 beds) between the 2019 and 2022 PIT Counts, as reported in the Housing Inventory Count (HIC). This investment in resources helped contribute to the 15% decline in unsheltered homelessness in the City.

**Navigation Centers:** This expansion included three new Navigation Centers, which are low-barrier shelters that focus on connecting clients to housing resources. In 2021, HSH opened the first Navigation Center to serve Transitional Age Youth and a new Navigation Center serving adults in the Bayview. In April 2022, after the HIC Count, HSH opened the first Navigation Center dedicated to serving transgender and gender non-conforming (TGNC) clients.

**Shelter-in-Place (SIP) Hotels:** As part of the response to COVID-19, the City leveraged state and federal emergency funding to provide non-congregate shelter in hotels to over 3,700 guests. At the program's



peak, the SIP hotels provided 2,288 rooms across 25 hotel sites. The program includes onsite wraparound services from the Department of Public Health and the Human Services Agency, such as medical and behavioral health, in-home support services, and benefits enrollment. This combination of services has helped many guests stabilize. The program began winding down in June 2021 and will end in 2022.

While the initial intent of the SIP program was to provide a safe place for people experiencing homelessness who were most vulnerable to the virus to shelter in place, the program provided a unique opportunity for the city to permanently house some of the most vulnerable individuals from shelters and the street.  As of August 2022, HSH has transitioned over 1,200 guests from the SIP hotel program into housing, and several hundred more will be permanently rehoused by the end of 2022.

**Non- and Semi-Congregate Shelter:** Drawing on the lessons of the SIP hotels, HSH has focused on expanding non-congregate and semi-congregate shelter options. These shelter types are more appropriate and attractive options for many unsheltered people.

At the time of the PIT Count, this expansion included:

- A non-congregate trailer program with 116 RV/trailers opened in the spring of 2020 as part of the COVID-19 response.
- A non-congregate cabin pilot program with 70 units.
- A new non-congregate family shelter with 59 units, including designated emergency units available 24/7 to families.
- Three hotel-based non-congregate emergency shelters providing approximately 300 units of shelter.

Two additional non- and semi-congregate shelter sites opened in the summer of 2022 providing approximately 430 additional shelter beds. A second cabin site is in the planning phase as of summer 2022.

**Safe Sleep and Vehicle Triage Centers:** The City also added Safe Sleep and Vehicle Triage Centers to the portfolio of available resources. These resources are considered unsheltered living situations per HUD's latest guidance and are not included in the Housing Inventory Count (HIC). However, they are valuable resources to increase the overall capacity of HSH's system of care and to provide options to populations with unique needs.

- **Vehicle Triage Centers** provide a safe place for people to stay in their vehicles while accessing services. The 2022 PIT Count found 24% of unsheltered homeless individuals were observed sleeping in vehicles, and 8% of unsheltered survey respondents indicated sleeping in vehicles. There is a continued need for resources to serve this population of people who are unlikely to leave their vehicles to stay in more traditional shelter options while working toward a permanent exit to homelessness.

  To meet this need, HSH piloted a Vehicle Triage Center program from 2019 to 2021 that offered guests a safe place to stay in or store their vehicle while accessing services. Following the success of that pilot, HSH opened a second Vehicle Triage Center in a highly impacted area in



the Bayview in January 2022 with a total capacity of 130 spots. The Department is actively seeking a second site to serve the west side of the city.

- At **Safe Sleep** sites, people sleep in tents at a safe distance from each other at sites that are off the public sidewalk and offer services. The City stood up Safe Sleep sites as part of the initial response to the COVID-19 pandemic. During the height of the pandemic when shelter capacity decreased, these sites provided a safe, clean place for people to sleep and access services and sanitation. Safe Sleep can also be a good resource for people who are not yet ready to move inside. At the program's peak, five sites operated with over 250 tent slots. As of August 2022, the City plans to maintain two sites with approximately 55 tent spaces.

## Housing and Housing Ladder

Through the Mayor's Homelessness Recovery Plan, San Francisco has invested in the largest expansion of supportive housing in 20 years. Housing provides permanent solutions to homelessness through subsidies and housing placements for adults, families and youth. HSH's portfolio of affordable housing includes:

- **Permanent Supportive Housing (PSH):** site-based and scattered-site permanently subsidized long-term housing with supportive services.
- **Rapid Rehousing (RRH):** time-limited rental assistance and services in scattered-site units.
- **Housing Ladder:** opportunities for tenants who have stabilized in supportive housing to move to subsidized housing inside or outside the Homelessness Response System with lower levels of support services.

Between the 2019 and 2022 Housing Inventory Counts, the City's stock of active housing for people experiencing homelessness expanded by 2,895 beds, a 25% increase. This increase includes 1,618 PSH beds and 1,277 RRH beds.

**Site-Based PSH:** As part of the Mayor's Homelessness Recovery Plan, HSH leased or acquired 2,918 units of Permanent Supportive Housing since July 2020 that were under contract with a non-profit provider by June 2022. An additional 274 units have also been approved for acquisition. Many of these units had not yet opened at the time of the PIT and are not reflected in 2022 HIC.

Drawing on lessons from the Shelter-in-Place hotels, HSH is expanding partnerships with other agencies like the Department of Public Health and the Human Services Agency at PSH programs. These agencies provide wrap-around services like nursing and in-home support services (IHSS) with daily activities like bathing and cooking. This additional support helps tenants in PSH remain stably housed.

**Scattered-Site PSH:** HSH has expanded scattered-site PSH to provide housing options for lower-acuity households with geographic equity across the City. In 2020, the Department launched the Flexible Housing Subsidy Pool. In this program, tenants use subsidies to live in private-market units that the City has identified through partnerships with landlords and nonprofits. HSH is currently working to implement over 1,700 units of FHSP.  In 2021, San Francisco received 906 Emergency Housing Vouchers (EHVs) from the federal government's American Rescue Plan that HSH is distributing in partnership with the San Francisco Housing Authority. The Department anticipate San Francisco will receive another round of federally funded vouchers in 2022.



**Rapid Rehousing (RRH):**  By leveraging local tax subsidy (Prop C) funding, HSH has provided extensions to RRH subsidies to give households more time to stabilize following the pandemic. HSH also increased funding for the Transitional Age Youth (TAY) RRH program, the Rising Up campaign, that will serve 400 TAY. Building off the adult RRH program pilot, in FY21-22 HSH expanded the adult RRH program to serve 350 single adults.

**Housing Ladder:** Housing Ladder supports existing tenants of Permanent Supportive Housing to enter the next chapter of their journey out of homelessness and opens units in the existing portfolio. Since the 2019 PIT Count, HSH opened a new Housing Ladder site that provides 59 units to adult households that have stabilized and need less intensive support services to maintain their housing. Over the next two fiscal years, HSH will serve at least 70 households with minor children through the new Family Housing Ladder program.

## Next Steps

The City plans to build on the progress made under HSH's first Five-Year Strategic Framework and the Mayor's Homelessness Recovery Plan in our second Five-Year Strategic Framework that will be published in December 2022.  This framework will guide HSH, our nonprofit partners, and our city partners as we work on addressing homelessness over the next five years.

Thank you to Applied Survey Research, our staff, the Local Homeless Coordinating Board and our volunteers for their work on the 2022 Point in Time Count.  This data will continue to inform our strategies for preventing and ending homelessness in San Francisco.

---

[i] These figures are estimated based on analyses of administrative data in HSH's Homeless Management Information System (HMIS) and data aggregated by the San Francisco Department of Public Health, as well as annual projections from the PIT Count and PIT Survey using methodology developed by CSH in their 2005 publication "Estimating the Need" (retrievable at www.csh.org/resources/estimating-the-need/) and subsequent adjustments suggested by the Economic Roundtable in 2018's "Estimating the Annual Size of the Homeless Population in Los Angeles Using Point-In-Time Data" (retrievable at https://economicrt.org/publication/estimating-the-annual-size-of-the-homeless-population/).



# ACKNOWLEDGEMENTS

The 2022 San Francisco Homeless Count and Survey planning team would like to thank the many individuals and agencies who contributed to this project. The participation of outreach workers, currently and formerly homeless individuals, and partner agencies was critical to the success of the count. Over 150 outreach workers and people with lived experience of homelessness, City and County employees, and local community-based organizations assisted with all aspects of the count, from the initial planning meetings to the night of the count.

The San Francisco Local Homeless Coordinating Board (LHCB), the coordinating body for the San Francisco Continuum of Care, provided oversight for the 2022 Homeless Count project. We thank the members of the LHCB for their valued input and guidance. Meetings of the LHCB also served as a forum for stakeholder and community input on the project.

Thank you to the many city and federal partners who supported the 2022 San Francisco Point-in-Time Count, including:

- SF Department of Homelessness and Supportive Housing (HSH)
- U.S. Department of Housing and Urban Development (HUD)
- U.S. Department of Veterans Affairs (VA)
- U.S. Interagency Council on Homelessness (USICH)
- U.S. Park Police
- California Highway Patrol
- CalTrans
- SF Department of Public Health

- SF Human Services Agency
- SF Police Department
- SF Recreation & Parks Department
- SF Municipal Transportation Agency
- SF Office of Civic Engagement and Immigrant Affairs
- SF Public Utilities Commission
- SF Sheriff's Department
- SF Unified School District

We thank Mayor London Breed and Shireen McSpadden, Executive Director of the Department of Homelessness and Supportive Housing (HSH), for their leadership in this effort. We thank Supervisor Connie Chan, Supervisor Shamann Walton, Supervisor Catherine Stefani, Supervisor Rafael Mandelman, Supervisor Gordon Mar, Supervisor Hillary Ronen, SF Community College Board Member Thea Selby, California Assemblymember Phil Ting, and representatives from Mayor London Breed's office, Supervisor Aaron Peskin's office, Supervisor Dean Preston's office, Supervisor Ahsa Safai's office, Former Supervisor Matt Haney's office, California State Senator Scott Wiener's office, U.S. Senator Alex Padilla's office, House Speaker Nancy Pelosi's office, the Coalition on Homelessness, and All Home for participating in the count.

We thank Larkin Street Youth Services, Third Street Youth Center and Clinic, and Buena Vista Horace Mann K-8 Community School for providing use of their facilities as dispatch centers on the night of the count.

We thank Five Keys Charter Schools and Programs, Homeless Youth Alliance, Larkin Street Youth Services, San Francisco LGBT Community Center, and the Third Street Youth Center and Clinic who assisted with the recruitment, training, and oversight of the youth count enumerators.



We appreciate the following organizations that provided data for the shelter count:

## Participating Organizations

3rd Street Youth Center & Clinic · Abode Services · Asian Women's Resource Center · Asian Women's Shelter · At the Crossroads · Bayview Hunters Point Foundation for Community Improvement · Bayview Hunters Point Multipurpose Senior Services · Bridge Housing · Brilliant Corners · Catholic Charities · Center on Juvenile and Criminal Justice · Chinatown Community Development Corporation · Chinese Hospital · Community Forward SF · Community Housing Partnership · Compass Family Services · Conard House · CPMC · Curry Senior Center · Dignity Health · Dolores Street Community Services · The Epiphany Center · Episcopal Community Services · Federal Emergency Management Agency · First Place for Youth · Five Keys Charter Schools and Programs · Gene Friend Recreation Center · Glide Community Housing · GP/TODCO Inc. · Hamilton Families · HealthRIGHT 360 · Homeless Prenatal Program · Homeless Youth Alliance · Homerise · Hospitality House · Huckleberry Youth Alliance · Kaiser Permanente · La Casa de Las Madres · Larkin Street Youth Services · The Latino Commission · LGBT Center · Lutheran Social Services of Northern California · Mary Elizabeth Inn · Mercy · Metropolitan Fresh Start House · Mission Housing Development Corporation · North Beach Citizens · Openhouse · Phatt Chance Community Services · PRC Baker Places · Progress Foundation · Providence Foundation · Rafiki Coalition for Health and Wellness · Raphael House · Reality House West · Recovery Survival Network · The Salvation Army · San Francisco Housing Authority · San Francisco VA Health Care System · Sequoia Living · SF Department of Public Health · SF HOT · SF SafeHouse · St. James Infirmary · St. Vincent de Paul Society of San Francisco · Sutter Health · Swords to Plowshares · Tenderloin Housing Clinic · Tenderloin Neighborhood Development Corporation · UCSF Citywide · UCSF Health · United Council of Human Services · Urban Alchemy · Westside Community Services · Zuckerberg San Francisco General Hospital

Teams of trained, current and formerly homeless surveyors administered surveys on the streets of San Francisco and at various service locations. We thank them for their excellent work. We also thank Code Tenderloin, Downtown Streets Team, Homeless Youth Alliance, and Larkin Street Youth Services for their support in recruiting these surveyors.

Finally, we thank the staff of the Department of Homelessness and Supportive Housing (HSH) for providing feedback and assistance throughout the project on many aspects, including project methodology, survey development, participation in the count, data entry coordination, review of this report, and the presentation of findings.



# SAN FRANCISCO

## 2022 HOMELESS POINT-IN-TIME COUNT & SURVEY

Every two years, during the last 10 days of January, communities across the country conduct comprehensive counts of the local homeless populations in order to measure the prevalence of homelessness in each local Continuum of Care.

The 2022 City and County of San Francisco Point-in-Time Count was a community-wide effort conducted on February 23rd, 2022. San Francisco was canvassed by teams of volunteers. In the weeks following the street count, a survey was administered to 768 unsheltered and sheltered homeless individuals in order to profile their experiences and characteristics.

### 2017-2022 HOMELESS COUNT POPULATION

| | Total | Single Adults 25+ | Persons in Families | Unaccompanied Youth |
|---|---|---|---|---|
| 2017 | 6,858 | 4,983 | 601 | 1,274 |
| 2019 | 8,035 | 6,259 | 631 | 1,145 |
| 2022 | 7,754 | 6,067 | 605 | 1,073 |

### 2022 SHELTERED/UNSHELTERED POPULATION

**43%** SHELTERED n=3,357

**57%** UNSHELTERED n=4,397

### 2022 TOTAL SHELTERED/ UNSHELTERED POPULATION BY DISTRICT◇

SIX

TWO 158
THREE 391
ONE 221
FIVE 697
SIX 3,848
FOUR 81
EIGHT 287
TEN 1,115
SEVEN 163
NINE 664
ELEVEN 60

CONFIDENTIAL/SCATTERED SITE: 69

### HOUSEHOLD BREAKDOWN

**SINGLE ADULTS**
**40%** Sheltered | **60%** Unsheltered
7,063 Individuals in 6,138 Households

**FAMILIES**
**87%** Sheltered | **13%** Unsheltered
205 Families with 605 Members

**UNACCOMPANIED MINORS**
**5%** Sheltered | **95%** Unsheltered
86 Minors in 64 Households

### AGE

**5%** UNDER 18 YEARS

**13%** 18-24 YEARS

**81%** 25 YEARS+

### LGBTQ+ STATUS

**28%** OF SURVEY RESPONDENTS IDENTIFIED AS LGBTQ+

### SELECT POPULATIONS■

**CHRONICALLY HOMELESS**
**59%** Sheltered | **41%** Unsheltered
2,691 Individuals

**VETERANS**
**33%** Sheltered | **67%** Unsheltered
605 Individuals

**UNACCOMPANIED YOUTH**
**16%** Sheltered | **84%** Unsheltered
1,073 Individuals

### GENDER



**62%** MALE

**34%** FEMALE

**3%** TRANSGENDER

**1%** GENDER NON-CONFORMING (i.e not exclusively female or male)

### ETHNICITY

**30%** IDENTIFIED AS HISPANIC/LATINO

### RACE

**43%** WHITE

**38%** BLACK OR AFRICAN AMERICAN

**6%** MULTIPLE RACES

**6%** ASIAN

**4%** AMERICAN INDIAN OR ALASKA NATIVE

**3%** NATIVE HAWAIIAN OR ANOTHER PACIFIC ISLANDER

### COVID-19

**17%** SAID COVID-19 WAS RELATED TO THE CAUSE OF THEIR HOMELESSNESS

### RESIDENCE PRIOR TO HOMELESSNESS



San Francisco



**71%**



## AGE AT FIRST EPISODE OF HOMELESSNESS



**18%** UNDER 18 YEARS | **31%** 18-24 YEARS | **51%** 25 YEARS+

## FIRST EPISODE OF HOMELESSNESS



**23%** of survey respondents reported currently experiencing homelessness for the first time

## DURATION OF CURRENT EPISODE OF HOMELESSNESS



**12%** 30 DAYS OR LESS | **30%** 1-11 MONTHS | **59%** A YEAR OR MORE

## PRIMARY CAUSE OF HOMELESSNESS+

TOP 6 RESPONSES△

| **21%** LOST JOB | **14%** EVICTION | **12%** ALCOHOL OR DRUG USE |
| **9%** ARGUMENT WITH FAMILY OR FRIEND | **7%** MENTAL HEALTH ISSUES | **7%** INCARCERATION/ PROBATION AND PAROLE RESTRICTIONS |

## OBSTACLES TO PERMANENT HOUSING+

TOP 5 RESPONSES△

| **39%** CAN'T AFFORD RENT | **24%** NO JOB/NOT ENOUGH INCOME |
| **17%** NO MONEY FOR MOVING COSTS | **16%** HOUSING PROCESS TOO DIFFICULT | **15%** NO HOUSING AVAILABLE |

## SELF REPORTED HEALTH+

Current health conditions that may affect the housing stability or employment of those experiencing homelessness.

 **52%** DRUG OR ALCOHOL ABUSE

 **38%** POST-TRAUMATIC STRESS DISORDER (PTSD)

 **36%** PSYCHIATRIC OR EMOTIONAL CONDITIONS

 **22%** CHRONIC HEALTH PROBLEM

 **21%** PHYSICAL DISABILITY

 **13%** TRAUMATIC BRAIN INJURY

 **8%** AIDS/HIV RELATED ILLNESS

## DISABLING CONDITIONS



**39%** OF SURVEY RESPONDENTS REPORTED HAVING AT LEAST ONE DISABLING CONDITION

A disabling condition is defined by HUD as a developmental disability, HIV/AIDS, or a long-term physical or mental impairment that impacts a person's ability to live independently but could be improved with stable housing.

## LENGTH OF TIME IN SAN FRANCISCO



**17%** <1 Year | **32%** 1-4 Years
**16%** 5-9 Years | **35%** 10 Years+

## JUSTICE SYSTEM INVOLVEMENT

**23%** of survey respondents spent one or more nights in jail/prison in the past year

## GOVERNMENT SERVICES AND ASSISTANCE



**63%** of survey respondents reported receiving government benefits

## FOSTER CARE



**23%** of survey respondents have been in the foster care system

### BENEFITS CURRENTLY ACCESSING+ TOP 5 RESPONSES△

| **40%** Food Stamps/ SNAP/WIC/ CalFresh | **24%** GA/ CAAP/ CAPI | **15%** Medi-Cal/ Medicare Covered California | **11%** SSI/SSDI/ Disability | **7%** Social Security |

## ▪SELECT POPULATION DEFINITIONS

### CHRONICALLY HOMELESS

An individual with one or more disabling conditions or a family with a head of household with a disabling condition who:
» Has been continuously homeless for 1 year or more and/or;
» Has experienced 4 or more episodes of homelessness within the past 3 years.

### VETERANS

Persons who have served on active duty in the Armed Forces of the United States. This does not include inactive military reserves or the National Guard unless the person was called up to active duty.

### FAMILIES

A household with at least one adult member (persons 18 or older) and at least one child member (persons under 18).

### UNACCOMPANIED YOUTH

Youth under the age of 18 and young adults between the ages of 18 and 24 years old who are experiencing homelessness and living without a parent or legal guardian.

+ Multiple response question, results may not add up to 100%.
△ Only displaying top responses, all response data are available in full report.
◇ The map displays data per 2012 Supervisorial District lines.
Note: Percentages may not add up to 100% due to rounding.
Note: Information on population counts, demographic breakdowns, age, select populations, gender, race, and ethnicity combine information from the PIT Survey and administrative data systems. All other data points reflect PIT Survey results.

For more information about the San Francisco Department of Homelessness and Supportive Housing and the efforts to address homelessness in San Francisco, please visit HSH.SFGov.org
Source: Applied Survey Research, 2022, San Francisco Homeless Count & Survey, Watsonville, CA.

# INTRODUCTION

As required by the U.S. Department of Housing and Urban Development (HUD) of all receiving federal funding to provide homeless services, Continuums of Care (CoC) across the country report the findings of their local Point-in-Time (PIT) count in their annual funding application to HUD. Currently, the San Francisco CoC receives approximately $51 million dollars annually in federal funding.

Significantly, this research effort in 2022 was conducted during the COVID-19 pandemic and is the first full sheltered and unsheltered count since 2019. Like many communities, San Francisco sought an exception from HUD to postpone the 2021 unsheltered PIT count until 2022 due to COVID-19 health and safety concerns. In addition, the 2022 count took place at the end of February 2022 rather than the standard requirement to conduct the count at the end of January 2022. San Francisco was granted permission from HUD to postpone the count one month due to low staff capacity and public health concerns resulting from the COVID-19 Omicron variant surge.

San Francisco has partnered with Applied Survey Research (ASR) to conduct its Point-in-Time Census since 2009, maintaining a similar methodology to ensure as much consistency as possible from one year to the next. ASR is a locally based social research firm that has over 23 years of experience in homeless enumeration and needs assessment, having conducted homeless counts and surveys throughout California and across the nation. Their work is featured as a best practice in the standard process HUD publication*, A Guide to Counting Unsheltered Homeless People,* as well as in the Chapin Hall at the University of Chicago publication, *Conducting a Youth Count: A Toolkit.*

## Project Overview And Goals

In order for the 2022 San Francisco Point-in-Time Count and Survey to best reflect the experience and expertise of the community, ASR held planning meetings with local community members. These community members were drawn from City and County departments, community-based service providers, and other interested and informed stakeholders. These individuals were instrumental to ensuring the 2022 San Francisco Point-in-Time Count and Survey reflected the needs and concerns of the community.

The 2022 San Francisco Homeless Count and Survey planning team identified several important project goals:

- To preserve current federal funding for homeless services and to enhance the ability to raise new funds;

- To improve the ability of policy makers and service providers to plan and implement services that meet the needs of the local homeless population;

- To measure changes in the numbers and characteristics of the homeless population and track the community's progress toward ending homelessness;

- To increase public awareness of overall homeless issues and generate support for constructive solutions;

- To assess the status of specific subpopulations, including veterans, families, youth, young adults, and those who are chronically homeless; and

- To conduct the PIT count in such a manner that the health and safety of all participants was a primary operational consideration and all County Public Health recommended practices were followed in field work associated with the PIT count.



## Federal Definition of Homelessness for Point-in-Time Counts

This study uses the HUD definition of homelessness for the Point-in-Time Count. This definition includes individuals and families:

- Living in a supervised publicly or privately operated shelter designated to provide temporary living arrangements (including congregate shelters, transitional housing, and hotels and motels paid for by charitable organizations or by federal, state, or local government programs for low-income individuals); or

- With a primary nighttime residence that is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings, including a car, park, abandoned building, bus or train station, airport, or camping ground.

The City and County of San Francisco uses an expanded definition of homelessness which includes persons who are "doubled-up" in the homes of family of friends; individuals staying in jails, hospitals, or rehabilitation facilities; and families living in Single Room Occupancy (SRO) units. Historically, the City has made an effort to include individuals in these living situations by surveying known jails, hospitals, and rehabilitation facilities to identify individuals believed to otherwise be homeless; persons "doubled-up" and families living in SROs have not been included due to the difficulty of reaching these populations comprehensively and accurately. This data is included in *Appendix B: Supplemental Point-in-Time Count Data*.



# POINT-IN-TIME COUNT

The 2022 San Francisco Point-in-Time Count and Survey represents a complete enumeration of all sheltered and unsheltered persons experiencing homelessness. It consists of two primary components:

- **General Street Count**[1]**:** A nighttime count of unsheltered homeless individuals and families on February 23, 2022, from approximately 8:00 p.m. to midnight. This included those: sleeping outdoors on the street; at bus and train stations; in parks, tents, and makeshift shelters; and in vehicles and abandoned properties. Individuals staying in safe sleep sites and safe parking sites were included and considered as unsheltered per HUD guidance.

- **General Shelter Count:** A count of homeless individuals and families staying at publicly and privately operated shelters on the night of February 23, 2022. This included those who occupied emergency shelters, transitional housing, and domestic violence shelters. Shelter-in-Place (SIP) hotel and trailer sites launched as part of San Francisco's COVID-19 response were included.

The Point-in-Time Count and Survey also included the following supplemental and important components:

- **Targeted Street Count of Unaccompanied Children and Young Adults**[2]**:** A nighttime count of unsheltered unaccompanied children under 18 and unaccompanied youth 18-24 years old on February 23, 2022 from approximately 8:00 p.m. to midnight.

- **Targeted Waitlist Count of Unsheltered Families:** A count of families who were identified as unsheltered or unstably housed and eligible to be categorized as unsheltered per the HUD definition used for the count, verified by Compass Family Services for the night of February 23, 2022.

- **Homeless Survey:** An in-person interview of sheltered and unsheltered individuals conducted by outreach surveyors in the weeks following the general street count. Data from the survey were used to refine the Point-in-Time Count estimates.

This section of the report provides a summary of the results of the Point-in-Time Count and Survey. Results from prior years are provided to better understand the trends and characteristics of homelessness over time.

For more information regarding the research methodology, please see *Appendix A: Methodology.*

---

[1] For safety reasons, Golden Gate Park and Ocean Beach were counted on the subsequent morning of February 24th and McLaren Park in the afternoon. See Appendix A: Methodology for details.
[2] For safety reasons, Golden Gate Park, Buena Vista Park, Ocean Beach, Lake Merced, and Park Merced/Lakeside were counted on the morning of February 23rd. See Appendix A: Methodology for details.



# NUMBER AND CHARACTERISTICS OF PERSONS EXPERIENCING HOMELESSNESS IN SAN FRANCISCO

On February 23, 2022, there were 7,754 people experiencing homelessness in San Francisco, a 3% decrease over the 2019 Point-in-Time Count. The total number of unsheltered persons counted was 4,397. Of the 3,357 individuals included in the shelter count, 87% (2,933 people) were in emergency shelter programs while 13% (424 persons) were residing in transitional housing programs on the night of the count.

Persons in families with children, including the minor children, represented eight percent (8%) of the total population counted in the Point-in-Time Count, while 91% were individuals without children. In total, 5% of those counted on February 23, 2022, were under the age of 18, 13% were between the ages of 18-24, and 81% were over the age of 25.

Figure 1.    TOTAL NUMBER OF PERSONS EXPERIENCING HOMELESSNESS, 2017-2022



Figure 2.    TOTAL NUMBER OF PERSONS EXPERIENCING HOMELESSNESS BY SHELTER STATUS, 2017-2022





# TOTAL NUMBER OF UNSHELTERED AND SHELTERED HOMELESS PERSONS BY DISTRICT

The 2022 San Francisco Homeless Count data are presented below, organized by the 11 City and County Supervisorial Districts in San Francisco.

Figure 3.   UNSHELTERED AND SHELTERED POINT-IN-TIME COUNT RESULTS BY DISTRICT



*Note: An additional 69 persons were residing in confidential or scattered site sheltered locations in San Francisco on the night of the Point-in-Time Count.*
*Note: The map displays data per 2012 Supervisorial District lines.*



Figure 4.  COMPLETE HOMELESS POINT-IN-TIME COUNT POPULATION BY DISTRICT AND SHELTER STATUS, 2017-2022

| District | 2017 | | | 2019 | | | 2022 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sheltered | Unsheltered | Total | Sheltered | Unsheltered | Total | Sheltered | Unsheltered | Total |
| 1 | 61 | 370 | 431 | 41 | 204 | 245 | 26 | 195 | 221 |
| 2 | 0 | 53 | 53 | 0 | 171 | 171 | 49 | 109 | 158 |
| 3 | 65 | 293 | 358 | 63 | 278 | 341 | 215 | 176 | 391 |
| 4 | 0 | 31 | 31 | 0 | 34 | 34 | 13 | 68 | 81 |
| 5 | 230 | 143 | 373 | 180 | 183 | 363 | 353 | 344 | 697 |
| 6 | 1,601 | 1,723 | 3,324 | 1,666 | 1,990 | 3,656 | 1,952 | 1,896 | 3,848 |
| 7 | 17 | 74 | 91 | 27 | 141 | 168 | 4 | 159 | 163 |
| 8 | 24 | 236 | 260 | 22 | 295 | 317 | 106 | 181 | 287 |
| 9 | 242 | 281 | 523 | 386 | 257 | 643 | 142 | 522 | 664 |
| 10 | 107 | 1,101 | 1,208 | 313 | 1,528 | 1,841 | 428 | 687 | 1,115 |
| 11 | 0 | 48 | 48 | 0 | 99 | 99 | 0 | 60 | 60 |
| Confidential/ Scattered Site Locations in SF | 158 | 0 | 158 | 157 | 0 | 157 | 69 | 0 | 69 |
| Total | 2,505 | 4,353 | 6,858 | 2,855 | 5,180 | 8,035 | 3,357 | 4,397 | 7,754 |
| % of Total | 37% | 63% | 100% | 36% | 64% | 100% | 43% | 57% | 100% |

*Note: The table displays data per 2012 Supervisorial District lines.*
*Note: All of Golden Gate Park is included in the District 1 reporting for 2017 and 2019.*



Figure 5.     COMPLETE HOMELESS POINT-IN-TIME COUNT POPULATION BY DISTRICT, 2017-2022

| District 1 | District 2 | District 3 |
|---|---|---|
| 2017: 431, 2019: 245, 2022: 221 | 2017: 53, 2019: 171, 2022: 158 | 2017: 358, 2019: 341, 2022: 391 |

| District 4 | District 5 | District 6 |
|---|---|---|
| 2017: 31, 2019: 34, 2022: 81 | 2017: 373, 2019: 363, 2022: 697 | 2017: 3,324, 2019: 3,656, 2022: 3,848 |

| District 7 | District 8 | District 9 |
|---|---|---|
| 2017: 91, 2019: 168, 2022: 163 | 2017: 260, 2019: 317, 2022: 287 | 2017: 523, 2019: 643, 2022: 664 |

| District 10 | District 11 | Total |
|---|---|---|
| 2017: 1,208, 2019: 1,841, 2022: 1,115 | 2017: 48, 2019: 99, 2022: 60 | 2017: 6,858, 2019: 8,035, 2022: 7,754 |



22

Figure 6.    TOTAL UNSHELTERED HOMELESS POPULATION IN GOLDEN GATE PARK, 2017-2022

|  | 2017 | 2019 | 2022 |
|---|---|---|---|
| **Golden Gate Park** | 313 | 83 | 183 |

The map below depicts homeless population density by census tract, according to the 2022 San Francisco Point-in-Time Count.

Figure 7.    COMPLETE HOMELESS POINT-IN-TIME COUNT POPULATION BY CENSUS TRACT





# HOMELESS SURVEY FINDINGS

This section provides an overview of the findings generated from the survey component of the 2022 San Francisco Homeless Point-in-Time Count and Survey. Surveys were administered between March 4 and March 25, 2022, to a randomized sample of individuals experiencing homelessness. This effort resulted in 768 complete and unique surveys.

Based on a Point-in-Time Count of 7,754 persons experiencing homelessness, with a randomized survey sampling process, these 768 valid surveys represent a confidence interval of +/- 3.5% with a 95% confidence level when generalizing the results of the survey to the estimated population of people experiencing homelessness in San Francisco. In other words, if the survey were conducted again, we can be confident that the results would be within 3.5 percentage points of the current results. It should be noted that for the sheltered population, data from direct surveys to homelessness providers and data from San Francisco's Homeless Management Information System (HMIS) were combined to meet the HUD reporting requirements of the sheltered population. The count, demographic information and household compositions of unsheltered persons were primarily reported from survey data and basic observational data.

To respect respondent privacy and to ensure the safety and comfort of those who participated, respondents were not required to answer all survey questions. Missing values are intentionally omitted from the survey analysis. Therefore, the total number of responses for each question do not always equal the total number of surveys conducted.

For more information regarding the survey methodology, please see *Appendix A: Methodology*.



# SURVEY DEMOGRAPHICS

In order to gain a more comprehensive understanding of the experiences of individuals and families experiencing homelessness in San Francisco, respondents were asked basic demographic questions including age, gender, sexual orientation, and ethnicity.

## Age

One percent (1%) of survey respondents were under 18 years old and 20% were between 18 and 24 years old. Ten percent (10%) of respondents were 25 to 30 years old, 25% were 31 to 40 years old, 20% were 41 to 50 years old, 17% were 51 to 60 years old, and 8% were 61 or older.

Figure 8.   SURVEY RESPONDENTS BY AGE



*2017 n = 1,104; 2019 n = 1,054; 2022 n = 767*
*Note: Percentages may not add up to 100 due to rounding.*

In an effort to better understand the experiences and age distribution of those experiencing homelessness, respondents were asked how old they were the first time they experienced homelessness. Eighteen percent (18%) reported first experiencing homelessness as a child under 18 years old. Thirty-one percent (31%) first experienced homelessness as a young adult between 18 and 24 years old, and over half (51%) were age 25 or older.

Figure 9.   AGE AT FIRST EXPERIENCE OF HOMELESSNESS



*n = 696*



25

**Sexual Orientation and Gender Identity**

Seventy-three percent (73%) of survey respondents identified their sexual orientation as straight/heterosexual. Ten percent (10%) identified as gay, lesbian, or same gender loving, and 10% as bisexual. Four percent (4%) identified with a sexual orientation not listed in the survey, while 3% reported that they were questioning or unsure of their sexual orientation at the time of the survey.

Figure 10.   SEXUAL ORIENTATION



*n = 654*

When asked about their gender identity, the majority (58%) of survey respondents identified as male. Over one-third (34%) identified as female, 4% as transgender, 2% as a gender other than singularly female or male (e.g., non-binary, gender fluid, agender, culturally specific gender), and 1% were questioning their gender identity at the time of the survey.

Figure 11.   GENDER IDENTITY



*n = 745*
*\*(e.g., non-binary, gender fluid, agender, culturally specific gender)*
*Note: Multiple response question. Percentages may not add up to 100.*



Available survey data reveal that young people who identify as LGBTQ+ represent up to 40% of the approximately 4.2 million youth and young adults experiencing homelessness in the United States. LGBTQ+ young people also face higher levels of adversity than their non-LGBTQ+ peers, including discrimination and physical violence.[3] It is estimated that 12% of San Francisco's population identifies as LGBTQ+;[4] 28% of survey respondents identified as LGBTQ+. Among survey respondents identifying as LGBTQ+, 31% identified as gay, lesbian, or same gender loving; 29% as bisexual; 15% as transgender; 6% as a gender other than singularly female or male (e.g., non-binary, gender fluid, agender, culturally specific gender); 10% as questioning or unsure; and 2% as questioning.

Compared to all survey respondents who did not identify as LGBTQ+, respondents who identified as LGBTQ+ were more likely to report having experienced domestic violence (46% compared to 21%). Respondents who identified as LGBTQ+ also reported a higher incidence of HIV or AIDS related illness (14% compared to 4%). LGBTQ+ respondents were also more likely to report first experiencing homelessness as a youth or young adult than non-LGBTQ+ survey respondents (53% and 48% respectively).

Figure 12.   SEXUAL ORIENTATION AND GENDER IDENTITY



■ Does Not Identify as LGBTQ+
■ Identifies as LGBTQ+

72%

28%

*LGBTQ+ Status n = 767; Breakout of LGBTQ+ Respondents n = 218*
*Note: Multiple response question. Percentages may not add up to 100.*

| BREAKOUT OF RESPONDENTS ANSWERING YES | | |
|---|---|---|
| **Sexual Orientation** | **%** | **n** |
| Gay/Lesbian/Same Gender Loving | 31% | 67 |
| Bisexual | 29% | 64 |
| Questioning/Unsure | 10% | 22 |
| Other | 12% | 27 |
| **Gender Identity** | **%** | **n** |
| Transgender | 15% | 32 |
| A Gender Other Than Singularly Female or Male (e.g., non-binary, gender fluid, agender, culturally specific gender) | 6% | 13 |
| Questioning | 2% | 4 |

[3] Morton, M.H., Samuels, G. M., Dworsky, A., & Patel, S. (2018). Missed Opportunities: LGBTQ Youth Homelessness in America. Chapin Hall at the University of Chicago.
[4] City and County of San Francisco, Office of the Controller (May 2019). 2019 San Francisco City Survey Report. Retrieved from https://sfcontroller.org/sites/default/files/Documents/Auditing/City%20Survey%202019%20-%20Report.pdf



## Ethnicity and Race

Similar to the U.S. Census, HUD gathers data on race and ethnicity via two separate questions. Thirty percent (30%) of survey respondents identified their ethnicity as Hispanic or Latin(a)(o)(x); a higher rate when compared to the general population of San Francisco (16%)[5]. This represents a significant increase since 2019, when 18% of survey respondents identified as Hispanic or Latin(a)(o)(x).

Figure 13.   HISPANIC OR LATIN(A)(O)(X) ETHNICITY



*Homeless Survey Population n = 603*
*Note: Percentages may not add up to 100 due to rounding.*

When asked about their racial identity, greater differences between those experiencing homelessness and population estimates from the U.S. Census emerged[6]. A much higher proportion of survey respondents identified as Black, African American, or African (35% compared to 6%), a much lower proportion of survey respondents identified as Asian or Asian American (7% compared to 37%), and a lower percentage identified as White (42% compared to 51%). Most survey respondents identified as either White (42%) or Black, African American, or African (35%).

Figure 14.   RACE



*Homeless Survey Population n = 613*
*Note: Percentages may not add up to 100 due to rounding.*

---

[5] United States Census Bureau. (2021). Population Estimates, July 1, 2021 – San Francisco, CA. Quick Facts.
[6] United States Census Bureau. (2021). Population Estimates, July 1, 2021 – San Francisco, CA. Quick Facts.



## History of Foster Care

Nationally, it is estimated that at least one-third of foster youth experience homelessness after exiting care.[7] In the state of California, many foster youth are eligible to receive extended care benefits during their transition into adulthood, up until their 21st birthday. Implemented since 2012, the aim of extended foster care is to assist foster youth with the transition to independence and prevent them from experiencing homeless.

In San Francisco, 22% of all survey respondents reported a history of foster care, similar to survey findings in 2019 (18%). The percentage of youth under the age of 25 who had been in foster care was higher than adults aged 25 and older; 29% compared to 20%.

Figure 15.   YOUTH UNDER 25 WITH FOSTER CARE EXPERIENCE



*n = 140*
*Note: Percentages may not add up to 100 due to rounding.*

Figure 16.   ADULTS AGE 25+ WITH FOSTER CARE EXPERIENCE



*n = 578*

---

[7] Dworsky, A;, Napolitano, L.; and Courtney, M. (2013). Homelessness During the Transition From Foster Care to Adulthood. Congressional Research Services, Am J Public Health. 2013 December; 103(Suppl 2): S318−S323. Retrieved 2018 from 10.2105/AJPH.2013.301455.



# LIVING ACCOMMODATIONS

Where individuals lived prior to experiencing homelessness and where they have lived since impacts how they seek services and their ability to access support from friends or family. Previous circumstances can also point to gaps in the system of care and to opportunities for systemic improvement and homelessness prevention services.

While survey respondents reported many different living accommodations prior to becoming homeless, most reported living in or around the San Francisco Bay Area with friends, family, or on their own in a home or apartment.

## Place of Residence

Seventy-one percent (71%) of respondents reported living in San Francisco at the time they most recently became homeless. Of those, over one-third (35%) reported living in San Francisco for 10 or more years. Seventeen percent (17%) reported living in San Francisco for less than one year.

Four percent (4%) of respondents reported living out of state at the time they became homeless. Twenty-four (24%) reported living in another county within California. The California counties in which respondents reported living at the time they most recently became homeless included Alameda County (7%), Marin (3%), Napa County (2%), San Mateo (2%), and Santa Clara (2%).

Figure 17.   PLACE OF RESIDENCE AT TIME OF HOUSING LOSS



San Francisco          Other County in California          Out of State

*n = 706*
*Note: Percentages may not add up to 100 due to rounding.*



## Prior Living Arrangements

Similar to previous place of residence, the type of living arrangements maintained by individuals before experiencing homelessness can influence what types of homeless prevention services might be offered to help individuals maintain their housing.

Twenty-seven percent (27%) of respondents reported living in a home owned or rented by themselves or a partner immediately prior to becoming homeless. Thirty-one percent (31%) reported staying with friends or family. Eleven percent (11%) reported living in subsidized housing or permanent supportive housing, and 9% were staying in a hotel or motel. Eight percent (8%) of respondents reported they were in a jail or prison immediately prior to becoming homeless, while 4% were in a hospital or treatment facility, 3% were living in foster care, and 1% were in a juvenile justice facility.

Figure 18.   LIVING ARRANGEMENTS IMMEDIATELY PRIOR TO EXPERIENCING HOMELESSNESS (TOP SIX RESPONSES IN 2022)



*n = 636*
*Note: Not all response options are displayed above. Survey offers 9 response options. Percentages may not add up to 100.*





## Current Living Arrangements of Unsheltered Survey Respondents

While basic information on where individuals were observed during the general street count is collected, survey respondents are also asked about their usual nighttime accommodations. Understanding the types of places in which individuals experiencing homelessness are sleeping can help inform local outreach efforts.

The majority (80%) of respondents who were unsheltered reported living outdoors at the time of the survey. Thirteen percent (13%) reported sleeping in public buildings, foyers, hallways, or other indoor locations not meant for human habitation, and 8% reported sleeping in a vehicle.

Figure 19.   USUAL PLACES TO SLEEP AT NIGHT FOR UNSHELTERED SURVEY RESPONDENTS

■ 2017   ■ 2019   ■ 2022

| | 2017 | 2019 | 2022 |
|---|---|---|---|
| Outdoors/Streets/Parks/Encampments | 72% | 86% | 80% |
| A Structure or Indoor Area not Normally Used for Sleeping | 22% | 7% | 13% |
| Vehicle | 6% | 7% | 8% |

*2017 n = 967; 2019 n = 736; 2022 n = 506*
*Note: Percentages may not add up to 100 due to rounding.*

The current living arrangements of unsheltered survey respondents contrast with the location types of individuals observed during the general street count. While 24% of persons identified during the street count were sleeping in vehicles, a notably lower percentage of unsheltered persons surveyed report sleeping in vehicles. This discrepancy between the survey and the street count results may reflect challenges in sampling people living in vehicles in the survey or in accurately estimating the number of people living in vehicles. Survey respondents also report sleeping in structures or indoor areas not normally used for sleeping at a higher rate than observed in the general street count, which may reflect difficulties in visually observing this population during the night of the count. See Appendix A for more information on our methodology and challenges.



Figure 20.   TOTAL UNSHELTERED HOMELESS POPULATION BY LOCATION TYPE PER STREET COUNT



*2017 n = 4,353; 2019 n = 5,180; 2022 n = 4,397*
*Note: Percentages may not add up to 100 due to rounding.*

# DURATION AND RECURRENCE OF HOMELESSNESS

Unstable living conditions, poverty, housing scarcity, and many other issues often lead individuals to fall in and out of homelessness. For many, the experience of homelessness is part of a long and recurring history of housing instability. Seventy-seven (77%) of survey respondents reported experiencing prior episodes of homelessness.

Figure 21.   FIRST TIME EXPERIENCING HOMELESS (RESPONDENTS ANSWERING "YES")



*2017 n = 1,095; 2019 n = 1,011; 2022 n = 723*



## Duration of Homelessness

Regarding their current episode of homelessness, over half of respondents (59%) reported experiencing homelessness for a year or more at the time of the survey, a decrease from 2019 (65%). Twelve percent (12%) reported experiencing homelessness for less than one month. Among the 23% of respondents who reported experiencing homelessness for the first time, 42% had been homeless for a year or more and 12% had been homeless for less than a month.

Figure 22.   LENGTH OF CURRENT EPISODE OF HOMELESSNESS



*2017 n = 1,095; 2019 n = 1,042; 2022 n = 707*
*Note: Percentages may not add up to 100 due to rounding.*

## Recurrence of Homelessness

Many individuals who experience homelessness will do so numerous times, as people often cycle in and out of stable housing. Recurring homelessness is also an indicator of the homeless assistance and housing system's ability to address individuals' needs for stable, permanent housing.

Twenty percent (20%) of respondents reported experiencing homelessness more than once in the past year. One-third (33%) of respondents reported experiencing four or more episodes of homelessness over the past three years.



# PRIMARY CAUSE OF HOMELESSNESS

Widespread homelessness is the result of a severe shortage in affordable housing, a widening gap between rising housing costs and stagnant wages, and an insufficient safety net for individuals with disabling conditions. Though these drivers are structural and systemic, individuals often have one or multiple major events or factors that precipitate their homelessness. An inability to secure adequate housing can lead to an inability to address other basic needs, such as health care and adequate nutrition.

Over one-fifth (21%) of respondents identified job loss as the primary cause of their homelessness. Fourteen percent (14%) reported eviction. Twelve percent (12%) identified drugs or alcohol, 9% reported an argument with a friend or family member who asked them to leave, and 7% cited mental health issues as the primary cause of their homelessness.

In an effort to better understand immediate precipitants of homelessness, survey respondents were asked a follow-up question to identify if the primary cause of their homelessness was related to the COVID-19 pandemic or a California wildfire. Seventeen percent (17%) of respondents attributed their homelessness to the COVID-19 pandemic and 3% to a California wildfire.

Figure 23.   PRIMARY CAUSE OF HOMELESSNESS (TOP SIX RESPONSES EACH YEAR)

| 2017 | % | 2019 | % | 2022 | % |
|---|---|---|---|---|---|
| Lost Job | 22% | Lost Job | 26% | Lost Job | 21% |
| Alcohol or Drug Use | 15% | Alcohol or Drug Use | 18% | Eviction | 14% |
| Eviction | 12% | Eviction | 13% | Alcohol or Drug Use | 12% |
| Argument with Family or Friend Who Asked You to Leave | 13% | Argument with Family or Friend Who Asked You to Leave | 12% | Argument with Family or Friend Who Asked You to Leave | 9% |
| Divorce/Separation/ Breakup | 10% | Mental Health Issues | 8% | Mental Health Issues | 7% |
| Mental Health Issues | 6% | Incarceration | 7% | Incarceration/Probation and Parole Restrictions | 7% |

*2017 n = 1,073; 2019 n = 1,039; 2022 n = 706*
*Note: Not all response options are displayed above. Survey offers 18 response options. Percentages may not add up to 100.*



## Obstacles to Obtaining Permanent Housing

Many individuals experiencing homelessness face significant barriers in obtaining permanent housing. These barriers can range from housing affordability and availability to accessing economic and social supports (e.g., increased income, rental assistance, and case management) needed to access and maintain permanent housing.

Respondents were asked what prevented them from obtaining housing. Over one-third (39%) reported that they could not afford rent. Nearly one-quarter (24%) reported a lack of job or enough income, followed by 17% who cited having no money for moving costs. Most other respondents reported a mixture of other income or access related issues, such as difficulty with the housing process (16%) and lack of housing available (15%).

Figure 24.   OBSTACLES TO OBTAINING PERMANENT HOUSING (TOP FIVE RESPONSES EACH YEAR)



*2017 n = 1,056; 2019 n = 1,032; 2022 n = 689*
*Note: Multiple response question. Percentages may not add up to 100.*



# SERVICES AND ASSISTANCE

The City and County of San Francisco provides services and assistance to those currently experiencing homelessness through local, state, and federal funding sources. Government assistance and homeless services work to enable individuals and families to obtain income and support.



## Government Assistance

There are various forms of government assistance available to persons experiencing homelessness. However, usage of these supports is impacted by knowledge of services available, understanding of eligibility requirements, and perceived stigma of receiving governmental assistance.

Although the majority (63%) of respondents in 2022 reported they were receiving some form of government assistance, this was a decrease from 73% in the 2017 and 2019 surveys. The largest percentage of respondents (40%) reported receiving CalFresh (food stamps) and/or WIC (Special Supplemental Nutrition Program for Women, Infants, and Children). Nearly one-quarter (24%) of respondents reported receiving County Adult Assistance Program (CAAP) or General Assistance (GA) benefits. Eleven percent (11%) reported receiving SSI, SSDI, Disability or non-veteran disability benefits.

Figure 25.   RECEIVING GOVERNMENT ASSISTANCE



*n = 653*

Figure 26.   GOVERNMENT ASSISTANCE RECEIVED (TOP SIX RESPONSES EACH YEAR)



*2017 n = 999; 2019 n = 1,017; 2022 n = 653*
*Note: Multiple response question. Percentages may not add up to 100.*



Among those reporting not receiving government benefits, 56% reported not wanting government assistance. Ten percent (10%) did not think they were eligible for services, 7% reported they had never applied, 4% had applied and were waiting for a response, and 4% reported being turned down. Three percent (3%) reported that their benefits had been cut off.

Respondents also reported challenges applying for benefits; 15% reported not having the required identification, 6% reported no permanent address to use on their application, and 4% reported that the paperwork was too difficult. Four percent (4%) cited immigration issues as a barrier, and 4% reported they did not know where to go to seek assistance.

Figure 27.   REASONS FOR NOT RECEIVING GOVERNMENT ASSISTANCE (TOP FIVE RESPONSES EACH YEAR)



*2017 n= 259; 2019 n = 259; 2022 n = 227*
*Note: Multiple response question. Percentages may not add up to 100.*

## Services and Programs

In addition to government assistance, there are numerous community-based services and programs available to individuals experiencing homelessness. These services range from drop-in resource centers and meal programs to job training and health care.



Forty-one percent (41%) of respondents reported using free meal services. Over one-quarter (29%) reported using emergency shelter services. Sixteen percent (16%) of respondents reported using transitional housing. Thirteen percent (13%) reported using shelter day services and 12% reported using health services. Over one-quarter (29%) of respondents reported they were not using any services.

Figure 28.   SERVICES OR ASSISTANCE (TOP FIVE RESPONSES EACH YEAR)

| 2017 | % | 2019 | % | 2022 | % |
|---|---|---|---|---|---|
| Free Meals | 52% | Free Meals | 66% | Free Meals | 41% |
| Emergency Shelter | 39% | Emergency Shelter | 44% | Emergency Shelter | 29% |
| Health Services | 25% | Health Services | 30% | Transitional Housing | 16% |
| Mental Health Services | 19% | Mental Health Services | 17% | Shelter Day Services | 13% |
| Bus Passes | 18% | Bus Passes | 16% | Health Services | 12% |

*2017 n = 1,037; 2019 n = 1,015; 2022 n = 642*
*Note: Multiple response question. Percentages may not add up to 100.*



# EMPLOYMENT AND INCOME

While the majority of survey respondents reported being unemployed, 17% reported full-time, part-time, or sporadic employment and many indicated earning some form of income.

## Employment

The unemployment rate in San Francisco in February 2022 was 3 percent.[8] It is important to recognize that the unemployment rate represents only those who are unemployed and actively seeking employment. It does not represent all joblessness, nor does it address the types of available employment. In 2022, the jobless rate for homeless survey respondents was 83%, with 32% unemployed and looking for work, 32% not looking for work, and 20% unable to work. Seventeen percent (17%) of respondents reported working full-time, part-time, or with seasonal, temporary, or sporadic employment, compared to 11% in 2019.

All jobless respondents are asked to identify barriers to employment. In 2022, the primary barriers cited included an alcohol or drug issue (23%), no permanent address (21%), no phone (18%), and no identification (15%). Further, 14% of respondents cited a disability, 14% a lack of transportation, 12% mental health issues, and 12% a lack of available work or jobs. Twenty-one (21%) of respondents reported that they did not want to work.

Figure 29.   OBSTACLES TO OBTAINING EMPLOYMENT (TOP FIVE RESPONSES EACH YEAR)

| 2017 | % | 2019 | % | 2022 | % |
|------|------|------|------|------|------|
| No Transportation | 36% | No Permanent Address | 28% | Alcohol/Drug Issue | 23% |
| No Permanent Address | 36% | Disability | 24% | No Permanent Address | 21% |
| Need Education or Training | 22% | Alcohol or Drug Use | 19% | Don't Want to Work | 21% |
| No Jobs | 16% | Health Problems | 18% | No Phone | 18% |
| Don't Want to Work | 13% | No Transportation | 16% | No Photo ID or Social Security Card | 15% |

*2017 n = 45; 2019 n = 904; 2022 n = 586*
*Note: Multiple response question. Percentages may not add up to 100.*

---

[8] State of California Employment Development Department. (2022). Unemployment Rates (Labor Force). Retrieved from http://www.labormarketinfo.edd.ca.gov



## Income

Income from all sources varied between employed and unemployed survey respondents, but overall income was higher among those who were employed. Nearly half (48%) of unemployed respondents reported an income of $99 or less per month, in comparison to 6% of those who were employed. Alternatively, 45% of employed respondents reported making $1,100 or more per month, compared to 10% of unemployed respondents.

Figure 30.   EMPLOYMENT AND MEAN MONTHLY INCOME EACH YEAR

|  | 2017 | | 2019 | | 2022 | |
|---|---|---|---|---|---|---|
|  | Employed | Unemployed | Employed | Unemployed | Employed | Unemployed |
| $0-$99 | 13% | 33% | 11% | 36% | 6% | 48% |
| $100-$449 | 4% | 18% | 10% | 24% | 14% | 17% |
| $450-$749 | 26% | 16% | 23% | 15% | 24% | 17% |
| $750-$1,099 | 16% | 24% | 20% | 18% | 10% | 8% |
| $1,100-$1,499 | 24% | 6% | 22% | 4% | 22% | 6% |
| $1,500-$3,000 | 15% | 3% | 13% | 2% | 15% | 2% |
| More than $3,000 | 2% | <1% | 1% | 1% | 8% | 2% |

*2017 Employed n = 137, 2017 Unemployed n = 917; 2019 Employed n = 116, 2019 Unemployed n = 891; 2022 Employed n = 108, 2022 Unemployed n = 518*
*Note: Percentages may not add up to 100 due to rounding.*



# HEALTH

The average life expectancy for individuals experiencing homelessness is up to 36 years shorter than the general population.[9] Without regular access to healthcare and without safe and stable housing, individuals experience preventable illness and often endure longer hospitalizations. It is estimated that those experiencing homelessness are hospitalized at disproportionate rates for mental health needs, HIV/AIDS treatment and drug or alcohol use when compared to the general public.[10]

## Health Conditions

Sixty percent (60%) of respondents reported living with one or more health conditions. These conditions included chronic physical illnesses, physical disabilities, chronic substance use, and severe mental health conditions. Thirty-nine (39%) of respondents reported their condition limited their ability to hold a job, live in stable housing, or take care of themselves.

The most frequently reported health condition was drug or alcohol abuse (52%, which represents a 10 percentage point increase from 2019), followed by post-traumatic stress disorder (PTSD) (38%) and psychiatric or emotional conditions (36%). Twenty-two percent (22%) reported living with a chronic health problem, 21% a physical disability, 13% a traumatic brain injury, and 8% an AIDS or HIV related illness.

Figure 31.   HEALTH CONDITIONS



*2017 n = 1,027-1,061; 2019 n = 1,054; 2022 n = 754-764*
*Note: Multiple response question. Percentages may not add up to 100.*

## Food Security

Over half (51%) of respondents reported experiencing a food shortage in the four weeks prior to the survey, compared to 59% in 2019.

Figure 32.   FOOD SHORTAGE IN THE PAST FOUR WEEKS



*n = 636*
*Note: Percentages may not add up to 100 due to rounding.*

---

[9] Koachanek, M.A., et al. (2017). Mortality in the United States, 2016. NCHS Data Brief, no 293. Hyattsville, MD: National Center for Health Statistics. Retrieved from https://www.cdc.gov/nchs/data/databriefs/db293.pdf.
[10] Reese, P. (2019). California Hospitals See Massive Surge in Homeless Patients. Kaiser Health News. Retrieved from https://californiahealthline.org/news/california-hospitals-see-massive-surge-in-homeless-patients/



# DOMESTIC VIOLENCE AND PARTNER ABUSE

Histories of domestic violence and partner abuse are prevalent among individuals experiencing homelessness and can be the primary cause of homelessness for many. Survivors often lack the financial resources required for housing, as their employment history or dependable income may be limited.

Eight percent (8%) of all survey respondents reported currently experiencing domestic/partner violence or abuse. Twenty-three percent (23%) of all respondents reported experiencing domestic/partner violence or abuse during their lifetime.

Domestic violence varied by gender, with 12% of transgender respondents and 20% of respondents who identified with a gender other than singularly female or male (e.g., non-binary, gender fluid, agender, culturally specific gender) reporting current experiences of domestic violence, compared to 7% of males and 10% of females. Looking at domestic violence across the lifetime, 75% of questioning and 55% of respondents who identified with a gender other than singularly female or male (e.g., non-binary, gender fluid, agender, culturally specific gender) reported previous experiences of domestic violence, compared to 36% of female respondents, 33% of transgender respondents and 15% of male respondents.

Among those who experienced domestic violence, 14% cited a lost job as the primary cause of their homelessness. Among individuals in families, 38% had experienced domestic violence, 40% of whom attributed their homelessness to an argument with family or friends who asked them to leave.

Figure 33.   EXPERIENCE OF DOMESTIC VIOLENCE DURING LIFETIME



*n= 558*

Figure 34.   CURRENTLY EXPERIENCING DOMESTIC VIOLENCE, BY GENDER



*n = 659*
*(e.g., non-binary, gender fluid, agender, culturally specific gender)*



# CRIMINAL JUSTICE SYSTEM

Homelessness and incarceration are often correlative. One study indicates that formerly incarcerated individuals are almost ten times more likely to be homeless than the general public. [11]

## Incarceration

Twenty-three percent (23%) of survey respondents reported spending at least one night in jail or prison within the previous 12 months compared to 25% in 2019 and 20% in 2017.

Thirteen percent (13%) of respondents reported being on probation or parole at the time of the survey. Similarly, 11% of respondents were on probation or parole at the time they most recently became homeless.

Figure 35.   ON PROBATION OR PAROLE AT ONSET OF HOMELESSNESS



*2017 n = 1,039; 2019 n = 1,001; 2022 n = 628*
*Note: Percentages may not add up to 100 due to rounding.*

---

[11] Prison Policy Initiative. (2018). Nowhere to Go: Homelessness among Formerly Incarcerated People. Retrieved from https://www.prisonpolicy.org/reports/housing.html



# SELECT POPULATIONS

*Home, Together: The Federal Strategic Plan to Prevent and End Homelessness* outlines national objectives and evaluative measures for ending homelessness among all populations in the United States.

In order to adequately address the diversity within the population experiencing homelessness, the federal government identifies four subpopulations with particular challenges or needs, including:

- Chronic homelessness among people with disabilities;

- Veterans;

- Families with children; and

- Unaccompanied children and transitional-age youth.

Consequently, these subpopulations represent important reportable indicators for measuring local progress toward ending homelessness.

The following section examines the number and characteristics of persons included in each of these four subpopulations during the 2022 San Francisco Homeless Point-in-Time Count and Survey.



## Prevalence of Chronic Homelessness

Self-reported information in the Point-in-Time Count Survey related to health conditions and homelessness history is used to estimate the size of San Francisco's chronically homeless population. Based on these survey responses, an estimated 2,691 people (or 35% of the homeless population) were experiencing chronic homelessness in San Francisco on February 23, 2022, an 11% decrease since 2019. People experiencing chronic homelessness are more likely to be sheltered, with 59% sheltered compared to 43% of the total homeless population.

The majority (98%) of people experiencing chronic homelessness were adults without children. Persons in families comprised 2% of all persons experiencing chronic homelessness. Five percent (5%) of chronically homeless persons were estimated to be unaccompanied youth under 25 years old.

Figure 36.   CHRONICALLY HOMELESS POPULATION ESTIMATES BY HOUSEHOLD TYPE, 2017-2022



Figure 37.   INDIVIDUALS EXPERIENCING CHRONIC HOMELESSNESS, BY SHELTER STATUS



*n = 2,691*

Figure 38.   PRIMARY CAUSE OF HOMELESSNESS, CHRONIC AND NON-CHRONIC COMPARISON (TOP FIVE RESPONSES IN 2022)



*Chronic n = 171; Non-Chronic n = 535*
*Note: Not all response options are displayed above. Survey offers 18 response options. Percentages may not add up to 100.*



## Demographics of Survey Respondents Experiencing Chronic Homelessness

The majority of chronically homeless survey respondents identified as male (61%), compared to 59% of non-chronically homeless survey respondents. A lower percentage (25%) of chronically homeless respondents identified as Hispanic or Latin(a)(o)(x) compared to non-chronically homeless respondents (31%). Chronically homeless respondents identified as White at a higher rate than non-chronically homeless respondents (53% compared to 38%), and identified as Black, African American, or African at a lower rate (25% compared to 38%). Six percent (6%) of chronically homeless respondents identified as Multi-Racial.

Figure 39.   ETHNICITY AMONG PERSONS EXPERIENCING CHRONIC HOMELESSNESS



*2017 n = 322; 2019 n = 334; 2022 n = 146*

Figure 40.   RACE AMONG PERSONS EXPERIENCING CHRONIC HOMELESSNESS



*2017 n = 335; 2019 n = 339; 2022 n = 154*
*Note: Percentages may not add up to 100 due to rounding.*
*Note: 2017 and 2019 data includes respondents who identified as "Other", which is no longer a response option in 2022.*



## Prevelance of Veterans Experiencing Homelessness

In 2022, there were an estimated 605 veterans experiencing homelessness in San Francisco. Sixty-seven percent (67%) of veterans surveyed during the Point-in-Time Count were unsheltered. Veterans were more likely to be sheltered in 2022 at a rate of 33% compared to 19% in 2019, and the total number of sheltered veterans increased by 72% from 2019 to 2022.

Figure 41.   VETERANS EXPERIENCING HOMELESSNESS BY SHELTER STATUS, 2017-2022

■ Unsheltered  ■ Sheltered

| | 2017 | 2019 | 2022 |
|---|---|---|---|
| Sheltered | 328 (48%) | 117 (19%) | 201 (33%) |
| Unsheltered | 356 (52%) | 491 (81%) | 404 (67%) |

## Primary Cause of Homelessness Among Veterans

The most frequently cited cause of homelessness among veterans was job loss (25%), followed by eviction (14%), alcohol or drug use (10%), incarceration or probation and parole restrictions (10%), and mental health issues (9%).

Figure 42.   PRIMARY CAUSE OF HOMELESSNESS AMONG VETERANS EXPERIENCING HOMELESSNESS (TOP FIVE RESPONSES IN 2022)



| Lost Job | Eviction | Alcohol or Drug Use | Incarceration/Probation and Parole Restrictions | Mental Health Issues |
|---|---|---|---|---|
| 25% | 14% | 10% | 10% | 9% |

*n = 69*
*Note: Not all response options are displayed above. Survey offers 18 response options. Percentages may not add up to 100.*



47

## Prevelance of Families With Children Experiencing Homelessness

There were 605 persons in 205 families identified during the 2022 count, similar to the 631 persons in 208 families identified in 2019. There were 19 families headed by a young parent between the ages of 18 and 24. Eighty-seven (87%) of families were residing in shelters or transitional housing programs.

Figure 43.   NUMBER OF FAMILIES WITH CHILDREN EXPERIENCING HOMELESSNESS, 2017-2022



Figure 44.   FAMILIES WITH CHILDREN EXPERIENCING HOMELESSNESS, BY SHELTER STATUS



*n = 205 Families with 605 Family Members*



## Primary Cause of Homelessness Among Families with Children

The most frequently cited cause of homelessness among survey respondents in families was job loss (23%). Fifteen percent (15%) reported an argument with a friend or family member who asked them to leave. Respondents in families attributed their homelessness to domestic violence at twice the rate of single individuals (8% compared to 4%).

Over one-quarter (27%) of respondents in families reported experiencing domestic violence in their lifetime, while 14% indicated experiencing domestic violence at the time of the survey.

Figure 45.   PRIMARY CAUSE OF HOMELESSNESS AMONG FAMILIES WITH CHILDREN (TOP 3 RESPONSES IN 2022)



*Families n = 13; Non-Families n = 693*
*Note: Not all response options are displayed above. Survey offers 18 response options. Percentages may not add up to 100.*
*Note: Results are based on a small sample size but consistent with previous years.*



## Prevlance of Unaccompanied Children and Transitional-Age Youth (TAY) Experiencing Homelessness

There were 1,073 unaccompanied children and transitional-age youth identified during the 2022 Point-in-Time Count, a 6% decrease from the 1,145 counted in 2019. Among unaccompanied youth experiencing homelessness, 987 were transitional-age youth between 18 and 24 years old while 86 were unaccompanied children under 18 years old. Eighty-three percent (83%) of transitional-age youth and 95% of unaccompanied children were unsheltered.

Figure 46.   NUMBER OF UNACCOMPANIED CHILDREN AND TRANSITIONAL-AGE YOUTH EXPERIENCING HOMELESSNESS, 2017-2022



Figure 47.   UNACCOMPANIED CHILDREN POPULATION BY SHELTER STATUS



*n = 86*

Figure 48.   UNACCOMPANIED TRANSITIONAL-AGE YOUTH POPULATION BY SHELTER STATUS



*n = 987*



## Primary Cause of Homelessness Among Unaccompanied Homeless Children and Transitional-Age Youth

Youth survey respondents reported some differences in cause of homelessness compared to respondents 25 years or older. Nearly one-quarter (23%) of youth reported a job loss as the primary cause of their homelessness, compared to 21% of individuals over 25. Fewer reported an argument with a friend or family member who asked them to leave as the primary cause of their homelessness compared to that of adults; 17% compared to 7%, respectively.

Figure 49.   PRIMARY CAUSE OF HOMELESSNESS AMONG UNACCOMPANIED CHILDREN AND
TRANSITIONAL-AGE YOUTH AND ADULTS 25 AND OLDER (TOP SIX RESPONSES IN 2022)





*Youth Under 25 n = 132; Adults 25 and Older n = 574*
*Note: Not all response options are displayed above. Survey offers 18 response options. Percentages may not add up to 100.*



**2022 San Francisco Youth Homeless Count and Survey Report**

The preceding section provides an overview of San Francisco HUD reported data on unaccompanied children and youth. The *2022 San Francisco Youth Homeless Count and Survey* report contains additional information on the number of unaccompanied children and transitional-age youth counted in the Point-in-Time Count using the City of San Francisco's expanded definition of homelessness, as well as additional information gathered in the youth focused survey effort. The report can be accessed online at hsh.sfgov.org.



# CONCLUSION

The 2022 San Francisco Homeless Count and Survey was performed using HUD-recommended practices for counting and surveying the homeless population. The 2022 Count was especially notable for being conducted during the COVID-19 pandemic and the need to safely engage the community in the middle of a public health crisis. The project team was able to stay consistent with methods used in previous PIT counts yet introduce several enduring innovations, including a GPS-enable smart phone application and interactive online route planning and management, adding value and accuracy to the effort. Additionally, the count planning team took a large step in reorienting the staffing of teams to include homeless outreach staff and persons with lived experience to complement the volunteer-centric approach used in previous years. This added valuable expertise into the street count process and will be a key component of future efforts.

Data summarized in this report provide many valuable insights about the unique and diverse experiences of homelessness in San Francisco. Key insights gleaned through the Count and Survey include:

- The number of people experiencing unsheltered homelessness decreased 15% from 2019 to 2022. This decrease corresponds with a significant increase in housing and shelter resources.

- Total homelessness (sheltered and unsheltered) decreased by 3.5% from 2019 to 2022, with a 9% reduction in homeless households.

- Over 49% of respondents experienced homelessness for the first time when they were under the age of 25. Twenty-two percent (22%) of all surveyed had a history of foster care. Data suggests the importance of earlier intervention in prevention efforts.

- The top two self-reported reasons for homelessness were economic with losing employment and eviction as top responses.

- Health issues continue to be a prevalent problem with 39% having a disabling condition and very high rates of mental health issues and substance use issues (52%).

- There was an 18% increase in people living in shelter from 2019 to 2022. This corresponds with a substantial increase of 24% in available shelter beds.

- The number of chronically homeless people decreased by 11% from 2019 to 2022, and the population was less chronically homeless in 2022 at a rate of 35% compared to 38% in 2019.

- Homeless families decreased by 1% since 2019, and parenting youth households decreased 47% since 2019.

In summary, the 2022 San Francisco Homeless Count and Survey provides valid and useful data that plays a critical role in developing a more comprehensive profile of those experiencing homelessness. Data presented in this report fulfill federal reporting requirements for the Continuum of Care, and will continue to inform service planning, and policy decision-making by local planning bodies over the year to come.



# APPENDIX A: METHODOLOGY

## OVERVIEW

The San Francisco Homeless Point-in-Time Count and Survey was designed and implemented through a collaborative CoC-wide effort that included various City departments and community-based organizations. COVID-19 related safety and public health issues were a key concern in planning from both a process and staffing perspective as we prioritized caution with the need for accurate, complete, and comparable information about the homeless population.

The 2022 San Francisco Homeless Point-in-Time Count and Survey was performed using HUD-recommended practices and using HUD's PIT Count definition of homelessness. The goal was to produce a point-in-time estimate of individuals and families experiencing homelessness in San Francisco, a region which covers approximately 47 square miles. Several primary data collection components were integrated to produce the total estimated number of persons experiencing homelessness on a given night. A detailed description of these components follows.

### Components of the Homeless Census and Survey

The methodology used in the 2022 Point-in-Time Count and Survey had four components:

- **General Street Count:** A nighttime count of unsheltered homeless individuals and families between the hours of 8:00 p.m. and midnight on February 23, 2022; at Golden Gate Park and Ocean Beach between 7:00 a.m. and 10:00 a.m. on the morning of February 24; and at McLaren Park between 12:00 p.m. and 3:00 p.m. on the afternoon of February 24. This included those sleeping outdoors on the street; at transit stations; in parks, tents, and other makeshift shelters; and in vehicles and abandoned or public properties, like parking garages and related locations. Individuals staying in safe sleep sites and safe parking sites were included and considered as unsheltered per HUD guidance.

- **Targeted Street Count of Unaccompanied Youth and Young Adults:** A nighttime count of unsheltered unaccompanied youth under 18 and young adults 18-24 years old on February 23, 2022 between the hours of 8:00 p.m. and midnight, and at Golden Gate Park, Buena Vista Park, Ocean Beach and Lake Merced between 7:00 a.m. and 10:00 a.m. on the morning of February 23. This was led by special youth teams who canvassed specific areas where unaccompanied children and youth were known to congregate. Upon completion, data from this targeted count was carefully reviewed against the results from the general street count to ensure that any possible duplicate counts were removed.

- **General Shelter Count:** A count of homeless individuals and families staying at publicly and privately operated shelters on the night of February 23, 2022. This included those who occupied emergency shelters, transitional housing, and domestic violence shelters. Shelter-in-Place (SIP) hotel and trailer sites launched as part of San Francisco's COVID-19 response were included.

- **Homeless Survey:** An in-person interview with 768 unique sheltered and unsheltered homeless individuals conducted by peer surveyors between March 4 and March 25, 2022 throughout San Francisco. Data from the survey were used to refine the Point-in-Time Census estimates, and then used to gain a more comprehensive understanding of the demographics and experiences of homeless individuals.



## The Planning Process

To ensure the success and integrity of the count, many City departments and community agencies collaborated on community outreach, volunteer recruitment, logistical plans, methodological decisions, and interagency coordination efforts. ASR provided technical assistance for these aspects of the planning process. ASR has over 23 years of experience conducting homeless counts and surveys throughout California and across the nation. Their work is featured as a best practice in the HUD publication, *A Guide to Counting Unsheltered Homeless People.*, as well as in the Chapin Hall at the University of Chicago publication, *Conducting a Youth Count: A Toolkit*.

## Community Involvement

Local homeless and housing service providers and advocates were valued partners in the planning and implementation of this count. The Local Homeless Coordinating Board (LHCB), the lead entity of San Francisco's Continuum of Care, was invited to comment on the methodology and subsequently approved it. The planning team was comprised of staff from HSH and consultants from ASR. Throughout the planning process, the planning team requested the collaboration, cooperation, and participation of several government agencies and nonprofit providers that regularly interact with homeless individuals and possess considerable expertise relevant to the count.

## COVID-19 Adjustments

The planning team remained in close consultation with the San Francisco Department of Public Health and monitored guidance from HUD and the CDC throughout the PIT count planning process in order to prioritize the safety of people experiencing homelessness, staff, and volunteers during the continued COVID-19 pandemic. HSH further coordinated with other Bay Area CoCs to develop and follow best practices to ensure both a safe and accurate count. Several adjustments were made, and new protocols adopted to adapt to the new circumstances.

In prior PIT count years, the street count was conducted primarily by hundreds of volunteers from the general public. PIT count teams were often assigned on-site during an in-person kick-off training on the night of the count. In 2022, the planning team made the decision, in consultation with the San Francisco Department of Public Health, to minimize the risks of COVID-19 transmission by limiting the team size and number of enumerators used. Teams were also asked to self-identify teammates they would work in close contact with to reduce interaction across households.

Additionally, a strategic goal of HSH and the LHCB was to integrate more skilled homeless outreach workers and more persons with lived experience of homelessness into the street count effort.  The planning team worked with the City and County of San Francisco and various nonprofit outreach partners to recruit homeless outreach workers as enumerators. People with lived experience were also recruited by outreach workers to join their enumeration teams and received a financial incentive for their participation. This led to a significantly higher rate of skilled and experienced enumerators who were able to canvas the city with fewer participants. A small number of volunteer teams were recruited from the general public, including city staff, to ensure full coverage.

Participation standards stipulated COVID-19 vaccination though proof was not mandated. Local department and agency public health and safety guidelines were followed, and health and safety protocols were distributed to all enumerators and surveyors in advance as part of their training materials. Masks and other PPE were required and made available for all enumerators, surveyors, and survey participants. Finally, in order to reduce the need for physical interaction between participants, a



mobile application was used (see "Methodological Improvements" below) to replace paper tally sheets, trainings were conducted virtually, and training materials were disseminated digitally.

# STREET COUNT METHODOLOGY

## Definition

For the purposes of this study, the HUD definition of unsheltered homeless persons was used:

- An individual or family with a primary nighttime residence that is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings, including a car, park, abandoned building, bus or train stations, airport, or camping ground.

## Methodology

Consistent with previous years, the 2022 street count methodology followed an established, HUD-approved approach commonly called a "blitz" method followed by a sample survey. This method combines a complete census to enumerate the total homeless population while applying a non-random, convenience sampling approach to generate necessary demographic information from the PIT survey.

As in 2019, gender estimates for unsheltered individuals were extrapolated from self-reported survey data. Observation-based gender data from the app-based tally sheet were only used for the purposes of deduplication. Age estimates for unsheltered individuals continued to be derived from street count observations.

## Enumeration Team Recruitment and Training

In 2022, the planning team outreached to nonprofit partners throughout the city with staff expertise in homeless service provision and street outreach. Nonprofit partners and program staff were also encouraged to recruit persons with lived experience to act as experienced guides on enumeration teams. Homeless guides were paid $20 for online training as well as $20 per hour worked on the day of the count.

Over 100 outreach workers and homeless guides participated in the general street count. A limited recruitment of additional volunteers was targeted towards city staff and staff of nonprofits homeless service providers. Approximately 50 volunteers were recruited to assist with lower-density routes and ensure enough coverage for a complete census.

In order to participate in the count, all volunteers and guides were requested to view a 20-minute training video before the count. Additionally, targeted trainings were held for multiple groups throughout the county who were able to convene a large enough group of attendees. Training covered all aspects of the count:

- definition of homelessness;
- how to identify homeless individuals;
- how to conduct the count safely and respectfully;
- how to use the smart phone app and also access the smartphone app training video;
- how to use the route maps to ensure the entirety of the assigned area was covered;
- tips to identify vehicles; and
- other tips to help ensure an accurate and safe count.



## Safety Precautions

Every effort was made to minimize potentially hazardous situations. Parks considered too big or densely wooded to inspect safely and accurately in the dark on the night of the count were enumerated by outreach teams on the mornings of February 23 and 24 and on the afternoon of February 24. Outreach workers were accompanied by SF Park Rangers in Ocean Beach and Golden Gate Park on the morning of February 24 followed by McLaren Park in the afternoon. Dedicated youth outreach teams enumerated Golden Gate Park, Buena Vista Park, Ocean Beach, Lake Merced and Park Merced/Lake on the morning of February 23. The majority of parks, however, were deemed safe and counted on the night of the count. Law enforcement agencies were notified of pending street count activity in their jurisdictions. In census tracts with a high concentration of homeless encampments, specialized teams with knowledge of those encampments were identified and assigned to those areas. Enumeration teams were advised to take every safety precaution possible, including bringing flashlights and maintaining a respectful distance from those they were counting.

## Logistics of Enumeration

On the morning of the street count, teams of two persons and no more than three people were created to enumerate designated areas of San Francisco for the street count. Each team, typically any combination of outreach workers, lived experience guides and program staff, was provided with their assigned PIT route maps, access information and training materials for the smartphone application, and field observation tips and guidelines, including vehicle identification criteria. Each team was assigned a unique team number and instructed to text a central PIT count dispatch center to confirm they were on route and on task for enumeration of their route assignments.

All accessible streets, roads, parks, and highways in the enumerated routes were traversed by foot or car. The San Francisco Survey 123 smartphone app was used to record the number of homeless persons observed in addition to basic demographic and location information. Dispatch center staff also verified that teams had started their route assignments and checked out as soon as their routes were completed, and all data had been entered in the Survey 123 smartphone app. Teams covered the entirety of their assigned areas.

## Multipliers

As in 2019, updates were made to multipliers for persons living in tents, cars, RVs, and vans. Since the number of persons residing in tents and vehicles is not always visible to general street count teams on the night of the Point-in-Time count, a multiplier is applied to tents and vehicles where the number of persons was unknown. In 2022, the tent multiplier was derived from a March 2022 survey conducted by SF HOT in districts throughout San Francisco, along with responses in the 2022 PIT survey regarding living situation and household size. Due to the logistical difficulties and safety concerns involved in engaging individuals living in vehicles, a large-scale survey of individuals living vehicles could not be easily obtained. Vehicle multipliers were updating using information from the 2022 PIT survey, the 2019 PIT survey, as well as data on homeless households living in vehicles collected for a 2019 Vehicle Triage Center pilot program.

## Methodological Improvements

In 2022, a significant change was made in the transition from paper tally sheets to a mobile application to complete the general street count and youth street count. Enumerators used GPS-enabled smartphones to submit data in a mobile application called ESRI Survey 123 developed and customized



by ASR. This new process limited the need to exchange physical materials, met HUD's data collection requirements, and met HUD's COVID-19 safety recommendation.

Also, improvements were made in pre-planning efforts to assign and deploy enumeration teams virtually, thereby avoiding the need for centralized deployment centers where COVID-19 transmission risks would be greater. Outreach organizations and program staff were able to select routes for enumeration from an interactive GIS planning map tool that enabled planning for complete coverage of San Francisco. High-density homeless routes were prioritized for outreach workers and personnel with direct service experience alongside people with lived experience of homelessness, while general volunteers assisted with low-density routes. Outreach workers were encouraged to select routes they had familiarity within their regular street outreach work to leverage their expertise on specific locations observed when counting.

**Unsheltered Family Count**

Unsheltered families are a challenging population to visually identify during the street count and have long been suspected as an undercounted population. For the first time, the planning team was able to develop a new process to improve the accuracy of the unsheltered family count. HSH produced a by-name list of families recently identified as in need of shelter or prioritized for housing per HMIS data and enlisted the support of Compass Family Services to call and verify the housing status of households on the night of February 23, 2022. This process contributed to the count of unsheltered families in 2022 and shows promise for future efforts to better determine the prevalence of unsheltered family homelessness in San Francisco.

## Point-in-Time Count Challenges and Limitations

There are many challenges in any homeless enumeration, especially when implemented in a community as large and diverse as San Francisco. Point-in-Time Counts are "snapshots" that quantify the size of the homeless population at a given point during the year. Hence, the count may not be representative of fluctuations and compositional changes in the homeless population seasonally or over time.

The methods employed in a non-intrusive visual homeless enumeration, while academically sound, have inherent biases and shortcomings. Many factors may contribute to potential undercounts. For example:

- It is difficult to identify homeless persons who may be sleeping in vans, cars, recreational vehicles, abandoned buildings, or structures unfit for human habitation.

- Homeless families with children and unaccompanied homeless children, individuals and youth often seek opportunities to stay on private property, rather than sleep on the streets, in vehicles, or in makeshift shelters.

- Weather can impact a homeless person's likelihood of seeking a hotel, friend or family member's home, or other shelter source for a given evening.

In addition, HUD requires the Count to represent homelessness between sunset and sunrise. San Francisco conducts the bulk of its count between the hours of 8:00 p.m. and midnight, but there may be differences observed in other time windows.

# YOUTH STREET COUNT METHODOLOGY

The goal of the 2022 dedicated youth count was to improve representation of unaccompanied homeless children and youth under the age of 25 in the Point-in-Time Count. Many youth and young adults experiencing homelessness do not use homeless services, are unrecognizable to adult street count



teams, and may be in unsheltered locations that are difficult to find. Therefore, traditional street count efforts are not as effective in reaching youth.

### Research Design

Since 2013, planning for the 2022 supplemental youth count included homeless youth service providers and youth with lived experience of homelessness. Local service providers identified locations where homeless youth were known to congregate and recruited youth and young adults currently experiencing homelessness with knowledge of where to locate homeless youth to serve as guides for the count.

As in past counts, the locations corresponded to areas in the neighborhoods of the Haight, Mission, Tenderloin, Union Square, Castro, the Panhandle, Golden Gate Park, Buena Vista Park, Ocean Beach, Lake Merced, Park Merced/Lakeside areas, the Bayview, and the Embarcadero. Service providers familiar with the map areas identified in each neighborhood were asked to recruit currently homeless youth to participate in the count.

Youth workers were paid $20 per hour for their time, including time spent in training prior to the count. Youth and youth service provider staff members were trained on where and how to identify homeless youth as well as how to record the data.

### Data Collection

Youth worked in teams of two to three, with teams coordinated by youth street outreach workers. The youth count was conducted at the same time as the general street count, from 8:00 p.m. to midnight on February 23, 2022. Golden Gate Park, Buena Vista Park, Ocean Beach, Lake Merced and Park Merced/Lakeside were also covered by youth count teams between 7:00 a.m. and 10:00 a.m. on February 23.

### Street Count De-Duplication

Data from the supplemental youth count and general street count were compared and de-duplicated by assessing location, gender, and age.

## SHELTER COUNT METHODOLOGY

### Goal

The goal of the shelter count is to gain an accurate count of persons temporarily housed in shelters and other institutions across San Francisco. These data are vital to gaining an accurate, overall count of the homeless population and understanding where homeless persons receive shelter.

### Definition

For the purposes of this study, the HUD definition of sheltered homelessness for Point-in-Time Counts was used. This definition includes individuals and families living in a supervised publicly or privately operated shelters designated to provide temporary living arrangement, such as emergency shelters, transitional housing, or Safe Haven facilities.

### Research Design

The occupancy of emergency shelters, transitional housing programs, and safe haven programs with beds dedicated to individuals experiencing homelessness was documented for the night of February 23, 2022. Information was collected for programs operating in San Francisco and reportable per HUD guidance. Data was collected on household type, age, gender, race and ethnicity, veteran status, chronic status, and if individuals had certain health conditions.



**Data Collection**

To collect data on individuals staying in shelters, ASR worked with HSH staff. HSH collected data on all emergency shelters, transitional housing programs, and Safe Havens operating in San Francisco. Where possible, data on clients served in temporary housing situations was pulled from HSH's administrative data systems: the Online Navigation and Entry (ONE) System, San Francisco's HUD-compliant Homeless Management Information System (HMIS); and the SF COVID-19 Placement Tool, a database developed by RTZ Systems for SIP hotel shelter bed management.

Shelter programs that do not maintain client enrollment data in either the ONE system or the SF COVID-19 Placement Tool were asked to submit data. A dedicated staff person from each facility submitted their data for clients served on the night of February 23, 2022, via a web-based Shelter Count Survey administered by HSH. A designated staff person provided the count for each of these facilities; clients were not interviewed. For these programs, all persons experiencing homelessness were included in the Point-in-Time Count per HUD reporting requirements.

# SURVEY METHODOLOGY

**Planning and Implementation**

The data collected through the survey are used for the McKinney-Vento Continuum of Care Homeless Assistance funding application and are important for future program development and planning. The survey elicited information such as gender, family status, military service, duration and recurrence of homelessness, nighttime accommodations, causes of homelessness, and access to services through open-ended, closed-ended, and multiple response questions. The survey data bring greater perspective to current issues of homelessness and to the provision and delivery of services.

Surveys were conducted by peer survey workers with lived homeless experience who were referred by local service providers. Training sessions were facilitated by ASR and community partners. Potential interviewers were led through a comprehensive orientation that included project background information as well as detailed instruction on respondent eligibility, interviewing protocol, and confidentiality. In 2022, training materials and instructions included health and safety protocols to limit the risk of COVID-19 transmission, and face masks and hand sanitizers were provided to survey workers and surveyors as needed. Survey workers were compensated at a rate of $10 per completed survey.

Consistent with prior years, it was determined that survey data would be more easily obtained if an incentive gift was offered to respondents in appreciation for their time and participation. Socks and in some cases McDonalds gift certificates were provided as an incentive for participating in the 2022 Homeless Survey. The socks and cards were easy to distribute, had broad appeal, and could be provided within the project budget. The incentives proved to be widely accepted among survey respondents.

**Survey Sampling**

Based on a Point-in-Time Count estimate of 7,754 homeless persons, with a randomized survey sampling process, the 768 valid surveys represented a confidence interval of +/-3.5% with a 95% confidence level when generalizing the results of the survey to the estimated population of individuals experiencing homelessness in San Francisco.

The 2022 survey was administered in shelters, transitional housing facilities, and on the street. Strategic attempts were also made to reach individuals in various geographic locations and of various subset groups such as homeless children and youth, minority ethnic groups, military veterans, domestic violence survivors, and families. One way to increase the participation of these groups was to recruit



60

peer survey workers. The planning team worked closely with local service providers to identify their places of expertise and had survey locations correspond to the neighborhoods of peer survey workers.

As in past counts, the locations corresponded to areas in the neighborhoods of the Haight, Mission, Tenderloin, Union Square, Castro, the Panhandle, Golden Gate Park, Buena Vista Park, Ocean Beach, Lake Merced, Park Merced/Lakeside areas, the Bayview, and the Embarcadero. Service providers familiar with the map areas identified in each neighborhood were asked to recruit currently homeless youth to participate in the count. This was especially successful this year with the greater number of lived experience surveyors that were employed in 2022.

In order to increase randomization of sample respondents, survey workers were trained to employ an "every third encounter" survey approach. If the person declined to take the survey, the survey worker could approach the next eligible person they encountered. After completing a survey, the randomized approach was resumed. In more remote cases where respondents were sparser this survey interval was modified.

## Data Collection

Care was taken by interviewers to ensure that respondents felt comfortable regardless of the street or shelter location where the survey occurred. During the interviews, respondents were encouraged to be candid in their responses and were informed that these responses would be framed as general findings, would be kept confidential, and would not be traceable to any single individual.

## Data Analysis

The survey requested respondents' initials and date of birth so that duplication could be avoided without compromising the respondents' anonymity. Upon completion of the survey effort, an extensive verification process was conducted to eliminate duplicates. This process examined respondents' date of birth, initials, gender, ethnicity, length of homelessness, and consistencies in patterns of responses to other survey questions. This left 768 valid surveys for analysis. Due to the sensitive nature of the survey, respondents were not required to answer every survey question, and respondents were asked to skip questions that were not applicable. For this reason, the number of respondents for each survey question may not total 768.

## Survey Methodology Changes

To align with the new HUD FY2022 HMIS data standards, the race, ethnicity, and gender questions and the response options were updated, ensuring comparability with HMIS data. The following updates were made to the Point-in-Time Count Survey:

- **Race:** Changed question to "What race or races do you identify with?" in 2022. Respondents were able to self-identify with one or more of five different racial categories – Asian or Asian American; American Indian, Alaska Native, or Indigenous; Black, African American, or African; Native Hawaiian or Pacific Islander; and White. Previous versions asked, "Which racial group do you identify with most?" and required respondents to select one answer from six options – Asian; American Indian or Alaska Native; Black or African American; Native Hawaiian or Pacific Islander; White; and Other.

- **Ethnicity:** Changed question to "What ethnicity do you identify with?" in 2022. Respondents were asked to identify themselves as Hispanic/Latin(a)(o)(x) or non-Hispanic/Latin(a)(o)(x). Previous versions asked, "Are you Hispanic or Latino?".

- **Gender:** Changed question to "What gender do you identify with?" in 2022. Respondents were able to self-identify with one or more of five different gender categories – A gender other than singularly



female or male (e.g., non-binary, gender fluid, agender, culturally specific gender); female; male; transgender; and questioning. Previous versions asked, "What is your gender?" and required respondents to select one answer from five options – female; genderqueer/gender non-binary; male; transgender; and not listed.

Additionally, in an effort to better understand recent drivers of homelessness, survey respondents were asked if the primary cause of their homelessness was related to the COVID-19 pandemic or a California wildfire.

## Survey Challenges and Limitations

The 2022 San Francisco Homeless Survey methodology relies heavily on self-reported data collected from peer surveyors. While self-report allows individuals to represent their own experiences, self-reported data are often more variable than clinically reported data. However, using a peer-to-peer interviewing methodology is believed to allow respondents to be more candid with their answers and to help reduce the uneasiness of revealing personal information. Further, service providers recommended individuals who would be the best suited to conducting interviews and these individuals received comprehensive training about how to conduct interviews. Service providers also reviewed the surveys to ensure quality responses. Surveys that were considered incomplete or containing false responses were not accepted; the process included reviewing individual surveys submitted by surveyors and assessing patterns in survey responses for inconsistencies.

In 2022, COVID-19 presented additional challenges in recruiting and staffing survey efforts. As a result, the total number of valid survey responses collected was slightly lower than prior years. However, this only slightly reduced the margin of error of responses from +/-3% in 2019 to +/-3.5% in 2022 with a 95% confidence interval.

It is worth noting that while surveys are distributed to a broad geography, specific survey quotas were not set to represent the shelter status of respondents. The two previous counts in 2017 and 2019 resulted in 75% unsheltered respondents and 25% sheltered respondents while the 2022 effort yielded 85% unsheltered and 15% sheltered. This difference in 2022 was almost exclusively in a lower number of emergency shelter respondents as the transitional shelter respondents were consistent with previous years. Historically, unsheltered survey responses and emergency shelter survey responses have been very similar. The research team does not believe that weighting response data is warranted and the survey responses in the report are representative of the total population.

It is important to recognize that variations between survey years may result from shifts in the demographic profiles of surveyors and accessibility to certain populations. Survey confidence intervals presented indicate the level of variability that may occur from year to year when interpreting findings. While every effort was made to collect surveys from a random and diverse sample of sheltered and unsheltered individuals, the hard-to-reach nature of the population experiencing homelessness prevents a true random sampling. Recruitment of diverse and geographically dispersed surveyors was prioritized. However, equal survey participation across all populations may be limited by the participation and adequate representation of subpopulations in planning and implementation processes. This includes persons living in vehicles, who are historically difficult to enumerate and survey.

Consequently, survey data and data derived from survey responses may shift from year to year. It is for this reason Point-in-Time Count data should be used in conjunction with other community sources of data on individuals and families experiencing homelessness to gather a comprehensive understanding of the community.



# APPENDIX B: SUPPLEMENTAL POINT-IN-TIME COUNT DATA

## SUPPLEMENTAL SHELTER COUNT

The official Point-in-Time Count uses the HUD definition of homelessness, which includes individuals and families:

- Living in a supervised publicly or privately operated shelter designated to provide a temporary living arrangement; or

- With a primary nighttime residence that is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings, including a car, park, abandoned building, bus or train station, airport, or camping ground.

Historically, the City and County of San Francisco has expanded this definition to include persons who were "doubled-up" in the homes of family or friends; individuals staying in jails, hospitals, or residential facilities who are otherwise homeless; and families living in Single Room Occupancy (SRO) units.

Information on homeless individuals residing in jails, hospitals, and residential treatment facilities was gathered to provide broader context to the scope of homelessness experienced in San Francisco. The following table summarizes the total number of additional persons counted using the more expansive local definition of homelessness.

| | San Francisco Supplemental Point-in-Time Count Numbers | | |
|---|---|---|---|
| | 2017 | 2019 | 2022 |
| **Total number of persons** | 641 | 1,773 | 1,238 |
| Total number of individuals | 624 | 1,748 | 1,172 |
| Total number of families | 8 | 11 | 36 |
| Total number of persons in families | 17 | 25 | 66 |

Fewer individuals were reported as homeless upon entrance to these sites in 2022 with an overall reduction of 30%. However, the number of homeless families increased in 2022, primarily attributable to residential treatment centers and alternative sentencing program sites dedicated to women and children.

## SUPPLEMENTAL SHELTER COUNT METHODOLOGY

### Goal

The goal of the supplemental shelter count is to better understand the extent of the population currently residing in temporary institutional settings that may otherwise be homeless. These institutional settings are not reportable according to HUD requirements for the Housing Inventory Count (HIC) or Point-in-Time Count.



## Scope

For the purposes of the supplemental count, the San Francisco Supplemental Point-in-Time Count includes data from jails, hospitals, and residential treatment facilities. Due to challenges identifying and locating families living in SROs and persons "doubled-up" in the homes of family or friends, these individuals are not included in the scope of this count.

## Research Design

The following types of facilities were identified for inclusion the San Francisco Supplemental Point-in-Time Count:

- **Residential Treatment Facilities:** The San Francisco Department of Public Health and local agencies assisted in collecting counts of self-identified homeless persons staying in various residential treatment centers not specifically designated for homeless persons (e.g. mental health facilities, acute crisis or treatment centers, detox facilities, etc.) on the night of February 23, 2022.

- **Jail:** The San Francisco Sheriff's Department provided data on inmates who were in County Jail on the morning of February 23, 2022, and provided the number of persons who were experiencing homelessness at the time of arrest. The method for gathering jail data is explained further below.

- **Hospitals:** The San Francisco Department of Public Health assisted with the coordination of obtaining count numbers from hospitals. Staff from individual hospitals collected the number of persons who were self-identified as homeless in their facilities on the night of February 23, 2022. The numbers reported for the hospitals did not duplicate the inpatient mental health units.

- **Isolation and Quarantine Beds:** In 2022, the City and County of San Francisco operated hotel sites for certain populations with COVID-19 to recover. Beds exclusively dedicated to homeless clients were reported in HUD's Housing Inventory Count (HIC) and Point-in-Time Count, but homeless individuals served in beds otherwise not exclusively dedicated to homeless individuals are represented here.

For the City and County of San Francisco's expanded definition of homelessness, appropriate staff at hospitals and treatment centers were identified prior to the Point-in-Time Count and asked to complete the online shelter count survey detailing the number of homeless individuals they served on the night of February 23, 2022. A total of 61 hospital and residential treatment programs were represented in the supplemental count in 2022 accounting for 860 homeless persons identified. Three additional programs were surveyed but not reachable.

To obtain data from the county jails, HSH worked closely with the Sheriff's Office. As in previous years, the Sheriff's Department generated a list of all inmates in county jail facilities on the night of February 23, 2022. Demographic information including age, gender, gender identity, ethnicity, and veteran status (self-reported) were pulled from the Sheriff's Department's administrative data system (JMIS). In 2019, this data was further validated through a follow-up survey conducted by the Sheriff's Department to ask questions regarding living situation prior to arrest. Due to staffing challenges during the winter surge of the COVID-19 Omicron variant, this survey was not conducted in 2022 and all data reflect information from the JMIS.

In 2022, 366 inmates in San Francisco county jails were identified as homeless compared to 472 homeless inmates identified in 2019. While this represents a 22% decrease in the total number of homeless inmates identified compared to 2019, the rate of homelessness amongst inmates was higher (43% compared to 35%) as the total jail population reduced from 1,366 to 842.



**Challenges and Limitations**

Ensuring comprehensive representation of all relevant publicly and privately funded programs throughout the City remains a challenge each year. The supplemental count relies on the cooperation of many agencies not otherwise dedicated to homelessness or contracted through the San Francisco Department of Homelessness and Supportive Housing.

As most of these programs are not funded by HUD CoC grant programs and are not exclusively or explicitly dedicated to serving homeless individuals, it can be challenging to ensure that all agencies are identifying the homeless status of patients and clients at entry in a manner consistent with HUD or San Francisco definitions. Improved training and guidance in future counts may help to maximize the accuracy of the data collected.

# SAN FRANCISCO UNIFIED SCHOOL DISTRICT DATA

In addition to the supplemental shelter count, HSH considers data from local schools. The U.S. Department of Education requires that school districts receiving McKinney-Vento funds report on homeless children that "lack a fixed, regular, and adequate nighttime residence." [12] This definition is more expansive than the HUD PIT count definition and includes families that are doubled-up or living in motels/hotels as homeless. SFUSD's data reflect information collected on an ongoing basis throughout the schoolyear to meet the broader definition above for McKinney-Vento Act (MVA) compliance. The figures below reflect data as of October 1st of each year to roughly align with the beginning of the school years. Though these figures are more expansive than HUD's definition of homelessness for the PIT count and capture a broader time-frame than a single night, this serves as an important source of information and a key indicator of progress on reducing family homelessness.

Figure 50.   NUMBER OF STUDENTS IN SFUSD EXPERIENCING HOMELESSNESS (MVA DEFINITION)



---

[12] California Department of Education. Definition of Homeless. Retrieved from https://www.cde.ca.gov/sp/hs/homelessdef.asp#:~:text=The%20McKinney%2DVento%20Act%20defines,hardship%2C%20or%20a%20similar%20reason



# FAMILIES IN SRO UNITS OR DOUBLED UP

Data on families living in SRO units and individuals who are "doubled-up" is challenging to collect comprehensively and for a given night. While HUD does not count families in these living situations in the PIT Count, HSH serves these families per our local definition of homelessness and considers other data sources that may represent the scope of this population.

The SRO Families United Collaborative, a partnership of five community-based organizations, reported in 2020 that 431 families lived in SROs in Chinatown, Mission, Tenderloin and South of Market neighborhoods.[13] In addition, San Francisco's Housing Primary Assessment for families asks a question related to current living situation where "San Francisco Single Room Occupancy (SRO) unit" is a response option. In the year preceding the Point in Time Count, only one family of 931 assessments conducted selected this response option, which may indicate that few families in this living situation are seeking services through HSH.

Families "doubled up" and renting small spaces or rooms in the private market are also challenging to identify clearly in HMIS data. In the Housing Primary Assessment for families, respondents may indicate their current living situation is "With another family (excluding your parents or adult children) in a housing unit in SF and is not being asked to leave." In addition, clients with a program enrollment in the HMIS system are asked to identify their current living situation in accordance with HUD HMIS data standards. Families doubled up are likely to respond as:

- "Staying or living in a family member's room, apartment or house"

- "Staying or living in a friend's room, apartment, or house"

Over the course of the year preceding the PIT from February 23, 2021 to February 23, 2022, HMIS data indicates that 487 family households identified with one of the living situations cited above.

---

[13] San Francisco Controller's Office. SRO Families United Collaborative. Retrieved from https://sfcontroller.org/sites/default/files/Our%20City%2C%20Our%20Home/5c.i.%20Families%20in%20SROs%20Presentation.pdf



# APPENDIX C: GENERAL SURVEY DEMOGRAPHIC COMPARISON

| | | 2017 | 2019 | 2022 |
|---|---|---|---|---|
| Age | Less than 18 years | 2% | 1% | 1% |
| | 18 - 24 years | 19% | 18% | 20% |
| | 25 - 30 years | 11% | 6% | 10% |
| | 31 - 40 years | 17% | 18% | 25% |
| | 41 - 50 years | 19% | 22% | 20% |
| | 51 - 60 years | 21% | 25% | 17% |
| | 61 years or more | 11% | 10% | 8% |
| | | | | |
| What gender do you identify with?[14] | Female | 33% | 35% | 34% |
| | Male | 61% | 59% | 58% |
| | Transgender | 5% | 4% | 4% |
| | A Gender Other Than Singularly Female or Male (e.g., Non-Binary, Gender Fluid, Agender, Culturally Specific Gender) | -- | -- | 2% |
| | Questioning | -- | -- | 1% |
| | Don't know/Refuse | -- | -- | 1% |
| | Not Listed | 0% | 1% | -- |
| | Genderqueer/Gender Non-Binary | 1% | 1% | -- |
| | | | | |

---

[14] Survey question changed in 2022. Previous version asked, "What is your gender?" The answer choices to this question were also modified to align with HUD data collection standards on gender identity.



| What ethnicity do you identify with? [15] | Hispanic/Latin(a)(o)(x) | 22% | 18% | 30% |
|---|---|---|---|---|
| | Non-Hispanic/Latin(a)(o)(x) | 75% | 79% | 60% |
| | Don't know/Refuse | 3% | 3% | 11% |
| | | | | |
| What race or races do you identify with? [16] | American Indian, Alaska Native, or Indigenous | 3% | 5% | 6% |
| | Asian or Asian American | 4% | 5% | 7% |
| | Black, African American, or African | 34% | 37% | 35% |
| | Native Hawaiian or Pacific Islander | 2% | 2% | 5% |
| | White | 35% | 29% | 42% |
| | Multi-Racial | -- | -- | 6% |
| | Other | 22% | 22% | -- |
| | | | | |
| If you identify as LGBTQ+, what gender do you identify with? Do you consider yourself...? [17] | Bisexual | 41% | 26% | 29% |
| | Gay/Lesbian/Same Gender Loving | 39% | 50% | 31% |
| | Other | 11% | 7% | 12% |
| | Questioning/Unsure | -- | -- | 10% |
| | Transgender | 9% | 13% | 15% |
| | A Gender Other Than Singularly Female or Male (e.g., Non-Binary, Gender Fluid, Agender, Culturally Specific Gender) | -- | -- | 6% |
| | Questioning | -- | -- | 2% |
| | Queer | 11% | -- | -- |
| | Genderqueer/Gender Non-Binary | -- | 3% | -- |

[15] Survey question changed in 2022. Previous version asked, "Are you Hispanic or Latino?" The answer choices to this question were also modified to align with HUD data collection standards on ethnicity.
[16] Survey question changed in 2022. Previous version asked, "Which racial group do you identify with most? (shade all)" The answer choices to this question were also modified to align with HUD data collection standards on race.
[17] Survey questions changed in 2022. Previous version asked, "Which of the following best represents how you think of your sexual orientation?" The answer choices to these questions were also modified to align with HUD data collection standards on sexual orientation and gender identity.



| | | | | |
|---|---|---|---|---|
| Have you ever been in foster care? | Yes | 19% | 18% | 22% |
| | No | 81% | 80% | 75% |
| | Don't know | -- | 2% | 3% |
| | | | | |
| Do you experience any of the following? | Any chronic health problem or medical condition | 31% | 31% | 22% |
| | Post-Traumatic Stress Disorder | 29% | 37% | 38% |
| | Any psychiatric or emotional condition | 39% | 39% | 36% |
| | A physical disability | 23% | 27% | 21% |
| | A traumatic brain injury | 12% | 15% | 13% |
| | Drug or alcohol abuse | 41% | 42% | 52% |
| | An AIDS or HIV related illness | 11% | 7% | 8% |
| | | | | |
| How long have you been homeless this current time? | 7 days or less | 3% | 2% | 7% |
| | 8 – 30 days | 5% | 3% | 5% |
| | 1 – 3 months | 6% | 5% | 5% |
| | 4 – 6 months | 15% | 15% | 17% |
| | 7 – 11 months | 12% | 10% | 8% |
| | 1 year | 12% | 13% | 13% |
| | More than 1 year | 47% | 52% | 46% |
| | | | | |
| Is this the first time you have been homeless? | Yes | 25% | 31% | 23% |
| | No | 75% | 69% | 77% |
| | | | | |



| What do you think is the primary event or condition that led to your homelessness? [18] | Lost job | 22% | 26% | 21% |
|---|---|---|---|---|
| | Eviction | 12% | 13% | 14% |
| | Foreclosure | 2% | 1% | 2% |
| | Incarceration/Probation and Parole Restriction | 7% | 7% | 7% |
| | Alcohol or drug use | 15% | 18% | 12% |
| | Illness/medical problem | 7% | 6% | 3% |
| | Divorce/separation/break up | 10% | 5% | 6% |
| | Landlord raised rent | 4% | 5% | 4% |
| | Argument with family or friend who asked you to leave | 13% | 12% | 9% |
| | Family/domestic violence | 5% | 5% | 4% |
| | Mental health issues | 6% | 8% | 7% |
| | Hospitalization/treatment | 2% | 1% | 2% |
| | Aging out of foster care | 1% | 1% | 1% |
| | Reduced work hours | -- | -- | 3% |
| | Lost child care | -- | -- | <1% |
| | Someone in the house was ill, and I left to protect myself or my dependents | -- | -- | 1% |
| | Other | 8% | 7% | 8% |
| | Don't know/Decline to state | 6% | 5% | 17% |

---

[18] In 2022, the answer choices to this question were modified to align with local data collection standards on primary cause of homelessness.



# **EXHIBIT 6**



You are here: Home / About HSH / Research and Reports / Homelessness Response System Data / Documentation for HSH Data Reports / Documentation – Temporary Shelter and Crisis Interventions Inventory

# Documentation – Temporary Shelter and Crisis Interventions Inventory

This page provides documentation for the Temporary Shelter and Crisis Interventions Inventory Dashboard. Documentation includes the report's purpose, data source, reporting frequency, key terms, and metrics.

## Purpose

This dashboard provides current **capacity** and **occupancy** numbers at HSH shelter and crisis intervention sites.

## Data Source

Data in these dashboards is sourced from two HSH databases:

- The Online Navigation and Entry (ONE) System, a HUD-compliant Homeless Management Information System (HMIS).
- The SF COVID Placement Tool, a database developed by RTZ Systems and used for bed management of Shelter-in-Place Hotels and some other adult shelters.

## Reporting Frequency

The dashboard refreshes Monday – Friday at 10 AM.

## Data Notes

- Many unoccupied units are **not immediately available for placement.** At this time, our data system has limited ability to distinguish the status of vacant beds in greater detail. Reasons why beds or units may not be immediately available for placement include:
  - An individual unit may need to undergo repair or maintenance.
  - Referrals may be limited by provider capacity.
  - Beds might be temporarily held to support other initiatives, such as the demobilization or temporary closure of another program.

- Some beds, like the Emergency Shelter (Care Not Cash) beds referenced in the dashboard, are held for **referrals from specific program partners** or have special eligibility criteria and must remain vacant until appropriate referrals are available.

- For programs managing data in the ONE System, the occupancy status of a given bed or unit cannot be tracked. Occupancy in these programs is estimated based on the **number of guests or households enrolled in a program**. These programs may occasionally appear to have an occupancy greater than the capacity due to:
  - data quality issues in which guests are not exited from programs in a timely fashion;
  - adult couples enrolled in a program separately but occupying a single bed; or

3/20/24, 11:55 AM
Documentation for Temporary Shelter and Crisis Interventions dashboard
Case 4:20-cv-03033-JST Document 136-4 Filed 04/18/24 Page 111 of 115

- data quality issues in which guests within the same household are not appropriately linked in the ONE system and appear to represent multiple households.
- HSH is working with providers to minimize data quality issues.

- Historic capacity and occupancy data is not available.

## Key Terms

**Site Types:** For definitions of site types, see the listing below the dashboard on the Temporary Shelter and Crisis Interventions webpage.

---

**Congregate/Non-Congregate Sites:**

- **Congregate** programs serve guests in a common space with more than 5 beds.
- **Non-congregate** programs have private units. Some non-congregate programs can serve households with more than one person in a single unit.
- **Semi-congregate** programs can serve multiple households in a single unit with 2 to 5 beds. Some units in semi-congregate programs may be private but are counted as semi-congregate due to the site-level classification.

---

**Population:** Identifies programs by the population they serve.

| POPULATION | DEFINITION |
| --- | --- |
| Adult | Programs open to adult households without children under 18. |
| Family | Programs open to households with at least one adult and at least one child under 18, as well as |

| POPULATION | DEFINITION |
| --- | --- |
| | households with at least one pregnant person. |
| Young adults | Programs open to unaccompanied young adults. Most programs are for young adults ages 18 to 24, but some programs serve people up to the age of 27. |
| Minors | Programs open to unaccompanied minors under 18. |

## Metrics

| METRIC | DEFINITION |
| --- | --- |
| **Total Guests** | The **total number of people staying in shelter and crisis intervention programs** as of the report date. This number may vary from occupancy numbers, which reflect actual beds and units occupied. In certain circumstances, multiple individuals can occupy one bed or one unit. |
| **Capacity** | The number of beds or units in the system at the time of the report. Capacity of a program can vary over time based on a number of factors, including changes to COVID-19 spacing guidelines. |

| METRIC | DEFINITION |
|--------|------------|
| | **Congregate** and **semi-congregate settings**: capacity represents **beds**. |
| | **Non-congregate** settings: capacity represents **units**. |
| | The total number of beds or units occupied by guests on the date of the report. |
| Occupancy | **Congregate and semi-congregate settings:** occupancy reflects the number of beds occupied by at least one guest. For ONE System data, each guest is assumed to represent one occupied bed. |
| | **Non-congregate settings:** occupancy reflects the number of units occupied by at least one person. For example, a non-congregate family shelter unit will be counted with an occupancy of one if the unit is occupied, whether that unit is occupied by a single pregnant person or a family of four. For ONE System data, each household is assumed to represent one occupied unit. |
| Occupancy Rate | The **occupancy** divided by the **capacity**, not the count of total guests divided by the capacity. |
| | In certain circumstances, family congregate shelters may have limits on both the total |

| METRIC | DEFINITION |
| --- | --- |
| | number of individual guests that can be served and the total number of families that can be served. In these cases, programs that have some vacant beds but have reached the maximum number of families they can serve will be calculated at a 100% occupancy rate. |

## Questions?

- For general inquiries, contact hshexternalaffairs@sfgov.org

- For media inquiries, contact hshmedia@sfgov.org

- For technical issues related to this dashboard, contact hshdata@sfgov.org

Return to the Shelter and Crisis
Interventions Inventory Dashboard

Automatic Translation Disclaimer

440 Turk Street
San Francisco, CA 94102
Contact Us

Documentation Temporary Shelter and Crisis Intervention - ...

SEARCH

Search this website

© 2020-2024 San Francisco Department of Homelessness and Supportive Housing. All Rights Reserved.