DAVID CHIU, State Bar # 189542
City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief Deputy City Attorney
WAYNE SNODGRASS, State Bar #148137
TARA M. STEELEY, State Bar # 231775
JOHN H. GEORGE, State Bar # 292332
KAITLYN MURPHY, State Bar #293309
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone:      (415) 554-4675 [Snodgrass]
                (415) 554-4655 [Steeley]
                (415) 554-4223 [George]
                (415) 554-6762 [Murphy]
Facsimile:      (415) 554-4699
E-Mail:         wayne.snodgrass@sfcityatty.org
                tara.Steeley@sfcityatty.org
                john.george@sfcityatty.org
                kaitlyn.murphy@sfcityatty.org

Attorneys for Defendant
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HASTINGS COLLEGE OF THE LAW, a public trust and institution of higher education duly organized under the laws and the Constitution of the State of California; FALLON VICTORIA, an individual; RENE DENIS, an individual; TENDERLOIN MERCHANTS AND PROPERTY ASSOCIATION, a business association; RANDY HUGHES, an individual; and KRISTEN VILLALOBOS, an individual, | Case No. 4:20-cv-3033-JST **DEFENDANT CITY AND COUNTY OF SAN FRANCISCO'S OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE STIPULATED INJUNCTION (DKT. 126)** Hearing Date:    May 23, 2024 Time:            2:00 p.m. Place:           Hon. Jon S. Tigar                  Oakland Courthouse                  Courtroom 6 – 2nd Floor                  1301 Clay Street                  Oakland, CA 94612 Trial Date:      Not Set |
| Plaintiffs, | |
| vs. | |
| CITY AND COUNTY OF SAN FRANCISCO, a municipal entity, | |
| Defendant. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ...................................................................................................................... 1

STATEMENT OF FACTS ......................................................................................................... 2

    I.      PLAINTIFFS' COMPLAINT ..................................................................................... 2

    II.     THE STIPULATED INJUNCTION ........................................................................... 3

    III.    SAN FRANCISCO'S EFFORTS TO REDUCE AND PREVENT
          HOMELESSNESS ..................................................................................................... 5

         A.     Services Designed To Support Those Experiencing Homelessness ............ 5

              1.     Healthy Street Operations Center ("HSOC") ................................. 6

              2.     Joint Field Operations ("JFO") ...................................................... 6

              3.     Bridge and Engagement Services ("BEST") Neighborhoods.......... 7

              4.     Night Navigators Program ............................................................. 7

              5.     DPH Street Medicine ..................................................................... 8

              6.     Street Crisis Response Team ("SCRT") ........................................ 8

              7.     Shelter-In-Place Hotels ................................................................. 9

          B.     Services Designed To Support Those Who Are Housed, But Are At Risk
              Of Becoming Homeless—The Homeless Response System .................... 10

              1.     Problem Solving Services .............................................................. 10

              2.     Homelessness Prevention ............................................................... 10

              3.     Supportive Housing ....................................................................... 10

    IV.    TENT COUNTS ...................................................................................................... 10

LEGAL STANDARD ............................................................................................................... 11

ARGUMENT ............................................................................................................................ 11

    I.      PLAINTIFFS SEEK TO ENFORCE TERMS THAT HAVE NO EFFECT
          NOW THAT THE COVID-19 EMERGENCY HAS ENDED. ............................. 11

    II.     SAN FRANCISCO MADE REASONABLE EFFORTS TO REDUCE THE
          TENDERLOIN TENT COUNT. .......................................................................... 14

         A.     The Reasonable Efforts Clause Does Not Require The Burden Plaintiffs
              Seek To Impose .................................................................................... 14

          B.     Plaintiffs' Limited Evidence Does Not Establish A Violation Of The
              Stipulated Injunction ............................................................................ 16

              1.     The Shrinking Tenderloin Tent Count Does Not Show a Lack of
                  Reasonable Effort ......................................................................... 17

              2.     Plaintiffs Misread The City's Shelter Bed Data. .......................... 19

3.     Plaintiffs Ignore San Francisco's Efforts To Reduce Homelessness.................................................................20

C.     "Reasonable Efforts" Does Not Include Violating Court Orders. .............22

CONCLUSION................................................................................................24

# **TABLE OF AUTHORITIES**

**Cases**

*Ambat v. City & Cnty. of San Francisco*
    No. C 07-03622 SI, 2011 WL 2118576 (N.D. Cal. May 27, 2011) ..........................................11

*Avalyn Pharma, Inc. v. Vincent*
    No. 3:20-cv-02267-RSH-KSC, 2023 WL 2731727 (S.D. Cal. Feb. 27, 2023) .........................16

*Bank of the W. v. Super. Ct.*
    2 Cal.4th 1254 (1992) ...............................................................................................................13

*Cal. Pines Prop. Owners Ass'n v. Pedotti*
    206 Cal. App. 4th 384 (2012) .............................................................................................15, 24

*Callie v. Near*
    829 F.2d 888 (9th Cir. 1987) ....................................................................................................11

*Citri-Lite Co. v. Cott Beverages, Inc.*
    No. 1:07-cv-01075 OWW DLB, 2011 WL 4751110 (E.D. Cal. Sept. 30, 2011).....................15

*Citri-Lite Co. v. Cott Beverages, Inc.*
    721 F. Supp. 2d 912 (E.D. Cal. 2010) .....................................................................................18

*Coalition on Homelessness et al. v. City & Cnty. of San Francisco*
    N.D. Cal. Case No. 4:22-05502 ...............................................................................................22

*Crawford v. Weather Shield Mfg., Inc.*
    44 Cal.4th 541 (2008) ...............................................................................................................14

*Goldsholle v. Internet Brands, Inc.*
    No. B256896, 2016 WL 826169 (Cal. Ct. App. Mar. 3, 2016) ...........................................15, 17

*Jennifer S. v. Super. Ct.*
    15 Cal. App. 5th 1113 (2017) ...................................................................................................15

*Lee v. City of Los Angeles*
    250 F.3d 668 (9th Cir. 2001) ....................................................................................................19

*Martin Bros. Constr., Inc. v. Thompson Pac. Constr., Inc.*
    179 Cal. App. 4th 1401 (2009) .................................................................................................14

*Redick v. Orlando Bathing Suit, LLC*
    No. 2:21-CV-06578-PA-KK, 2022 WL 522998 (C.D. Cal. Feb. 21, 2022)..............................16

*Robinson v. Cnty. of San Joaquin*
    No. 2:12-cv-2783 MCE GGH PS, 2014 WL 12917462 (E.D. Cal. June 27, 2014) .................15

*S'holder Representative Servs. LLC v. Alexion Pharms., Inc.*
    No. CV 2020-1069-MTZ, 2021 WL 3925937 (Del. Ch. Sept. 1, 2021) ...................................16

*Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys., LLC*
  842 F. Supp. 2d 502 (S.D.N.Y. 2012) ...............................................................15, 17

*United Com. Ins. Serv., Inc. v. Paymaster Corp.*
  962 F.2d 853 (9th Cir. 1992) ...............................................................11

**Statutes**
California Penal Code
  § 148(a) ...............................................................23
  § 647(e) ...............................................................23
  § 370 ...............................................................23
  § 372 ...............................................................23

**Rules**
20 C.F.R. § 416.912(b)(i)...............................................................15

**San Francisco Codes and Regulations**
San Francisco Police Code
  § 168 ...............................................................23
  § 169 ...............................................................23

**Internet References**
https://shou.senate.ca.gov/sites/shou.senate.ca.gov/files/Homelessness%20in%20CA%202020%20Nu
  mbers.pdf. ...............................................................2

## INTRODUCTION

San Francisco spends hundreds of millions of dollars every year uplifting its homeless and housing insecure residents. These efforts include more than a dozen programs that holistically tackle the nationwide homelessness crisis, from providing grants to housing insecure families, to directly offering shelter to those experiencing homelessness, as well as providing mental health and other resources to build trust and assist individuals that otherwise might not accept shelter when the City makes an offer. Hundreds of employees from across the City, many of whom have dedicated their professional careers to serving the City's homeless population, engage in these efforts daily. The City began this difficult and costly work long before Plaintiffs filed their lawsuit and will continue after this motion is resolved. The City even initiated several new programs since the Court entered the Stipulated Injunction ("Injunction"), such as Joint Field Operations, BEST Neighborhoods, and the Night Navigators Program, all of which operate in the Tenderloin to support persons experiencing homelessness, whether they live in a tent or entirely unsheltered.

Despite these efforts, Plaintiffs now complain – nearly four years after agreeing to the Stipulated Injunction – that San Francisco violated the Injunction by failing to make "reasonable efforts" to reduce the number of homeless people camping in the Tenderloin. Plaintiffs' Motion to Enforce the Stipulated Injunction (Dkt. 126, "Motion" or "Mot."), fails for two independent reasons.

First, the section of the Stipulated Injunction Plaintiffs move to enforce is no longer in effect. Every term Plaintiffs invoke as a basis for their Motion is in Section II, which applied only "[d]uring the COVID-19 emergency." Dkt. 71 at 2. The emergency, along with the City's obligations under Section II, ended in June 2023, when Mayor Breed terminated the COVID-19 state of emergency.

Second, Plaintiffs do not carry their burden to show San Francisco failed to take reasonable efforts to reduce the number of tents in the Tenderloin even if the "reasonable efforts" clause were still in effect. Plaintiffs have not identified why the City's efforts to reduce homelessness are *unreasonable* and have not identified a single reasonable effort San Francisco was required to, but did not take. Nor have Plaintiffs identified what other similarly situated cities and counties have done to reduce the number of people living in tents in their jurisdictions. This is fatal to the Motion because San

Francisco was only required to make efforts that were reasonable using the skill and diligence of a comparable municipality under similar circumstances.

Instead of providing sufficient evidence, or even a legal standard for interpreting the "reasonable efforts" clause, Plaintiffs base their motion on a single 2024 tent count. Their de-contextualized tent count does not and cannot demonstrate a violation of the Injunction because the Injunction's "reasonable efforts" clause requires efforts and *not* results. The tent count Plaintiffs cite shows that there are fewer tents in the Tenderloin now as compared to the months before the pandemic, and a vast reduction in the number of tents as compared to when the parties agreed to the Injunction. If anything, the reduction in tents, as well as the shelter occupancy data from the Department of Homelessness and Supportive Services ("HSH") website (the only other "evidence" Plaintiffs rely on), confirm San Francisco's more-than-reasonable efforts. Each data point shows San Francisco making progress on a difficult and long-term problem by implementing the many programs and services outlined below.

Homelessness is a complex and dynamic issue facing communities all across the country, and especially western states like California, which has more than half of the country's unsheltered population.[1] If there were a simple one-size-fits all solution, the problem would have already been solved. There is not. The City's efforts are comprehensive and tangible as the seven employee declarations San Francisco submits with this Opposition show. If the Stipulated Injunction's "reasonable efforts" clause were still in effect, San Francisco's efforts would well exceed the requirement. Plaintiffs' attempt to show otherwise, especially by reference to another lawsuit pending before Judge Ryu, falls flat. San Francisco respectfully requests the Court deny Plaintiffs' Motion.

## STATEMENT OF FACTS

### I.    PLAINTIFFS' COMPLAINT

On May 4, 2020, Plaintiffs UC College of Law, San Francisco *et al.* filed a complaint to address the "desperate crisis" caused by the COVID-19 pandemic. Dkt. 1 at ¶ 1. Although Plaintiffs alleged the Tenderloin neighborhood faced a disproportionate share of urban challenges that "confront

---

[1] https://shou.senate.ca.gov/sites/shou.senate.ca.gov/files/Homelessness%20in%20CA%202020%20Numbers.pdf.

the city at-large" even before the pandemic, Plaintiffs alleged that the pandemic "ominously exacerbated dangers and harms to those who live, work, and go to school in the Tenderloin." *Id.* at ¶¶ 3, 6. Specifically, Plaintiffs alleged that the number of tents and makeshift shelters on Tenderloin sidewalks grew from 158 on March 3, 2020, to 390 on May 1, 2020, and that those new tents "block the sidewalks in the Tenderloin, impeding pedestrians' travel" and "serve as cover for drug dealers and others conducting nefarious activities." *Id.* at ¶¶ 31-32. Plaintiffs alleged they witnessed a "drastic change in the conditions of the streets and sidewalks of the Tenderloin in recent months, and especially since the City enacted the emergency shelter-in-place ordinance in response to the COVID-19 pandemic." *Id.* at ¶¶ 43, 46, 48, 49, 50.

## II.     THE STIPULATED INJUNCTION

On June 30, 2020, this Court entered a Stipulated Injunction reflecting the parties' shared goal of improving living conditions in the Tenderloin during the pandemic. Dkt. 71 at 2. The five-page Injunction includes nine sections.

Through Section I, the parties recognized that "[t]he problems facing the Tenderloin are substantial and are not easily solved and have been exacerbated by the COVID-19 crisis. As the parties recognize that the COVID-19 crisis creates additional challenges to improving the Tenderloin neighborhood, this injunction is intended to *address the current situation*." Dkt. 71 at 1-2 (emphasis added).

Consistent with the parties' purpose set out in Section I, nearly all provisions of the Injunction state the City's obligations during the pandemic. Section II states that, "[d]uring the COVID-19 emergency, the City will reduce the number of tents and other encamping materials and related personal property on sidewalks and streets in the Tenderloin by offering alternatives to people living in those tents." Dkt. 71 at 2. Specifically, the City agreed to address the immediate crisis that existed in the Tenderloin by "caus[ing] seventy percent (70%) of the number of tents as counted on June 5, 2020 to be removed along with all other encamping materials and related personal property, and their occupants relocated to a hotel room, safe sleeping site, off-street sites, or other placement by July 20, 2020." *Id.* at 3. For the time period after July 20, 2020, until the end of the pandemic, the City agreed to "make all reasonable efforts to achieve the shared goal of permanently reducing the number of tents,

along with all other encamping materials and related personal property, to zero." *Id*. Section II explains that the City will accomplish those commitments by offering hotels rooms for unhoused individuals facing heightened health risks from COVID-19, safe sleeping villages outside the Tenderloin, and some "off-street sites in the Tenderloin (such as parking lots) to which tents can be moved so they are no longer on sidewalks or streets." *Id.* at 2-3. The parties agreed that the off-street sites "will be permanently removed within three months after the end of the COVID-19 emergency, defined as the time the Mayor lifts the emergency declaration," which ultimately happened in June 2023. *Id*. at 3; RJN Ex. A. Because the offers of hotel rooms and sleeping sites could have the "effect of encouraging additional people to come to the Tenderloin in the hope of securing a hotel room or placement at a safe sleeping site," the City agreed "during this process" to "discourage additional people from erecting tents in the neighborhood." Dkt. 71 at 3. The Injunction states that, while the City was "hopeful that most people offered an alternative location will be willing to accept it," the City agreed to "employ enforcement measures for those who do not accept an offer of shelter or safe sleeping sites to prevent re-encampment" "if necessary to comply with this stipulated injunction." *Id*.

Section III describes the City's obligations to offer COVID-19 testing in the Tenderloin. The City agreed to "work to establish a long-term testing site in the Tenderloin for the duration of the COVID-19 emergency." Dkt. 71 at 4.

Section IV applies "[d]uring the time when the City is working toward removing at least 70% of the tents from the Tenderloin," a time period that ended on July 20, 2020, pursuant to the terms in Section II. Dkt. 71 at 3-4. In Section IV, the City agreed to advise unsheltered persons in the Tenderloin that tents and structures cannot block a doorway, exit, fire escape or come within five feet of a fire hydrant, and that tents and structures cannot make sidewalks impassable or impede traffic. *Id*. at 4. The City also agreed to "increase its enforcement efforts as the total number of tents is reduced and tents can more readily be relocated." *Id*. In addition, the City agreed to "discourage persons from erecting tents within 6 feet of a doorway to a business, residence or transit stop." *Id*.

Section V states "[n]arcotic sales and trafficking law violations shall be enforced by the SFPD consistently across the City." Dkt. 71 at 4.

In Section VI, the parties "recognize[d] that the current crisis is unprecedented," and established a dispute resolution process that can be used if either party believes the other is in breach of the Stipulated Injunction. Dkt. 71 at 4.

While Section II-VI set forth the parties' obligations during the COVID-19 emergency, Section VII applies after the COVID-19 emergency ends. That provision states in full: "After the COVID-19 emergency, the City will have options to help improve living conditions in the Tenderloin neighborhood that currently are not available due to constraints caused by the pandemic. The parties agree to work together to improve living conditions in the Tenderloin neighborhood for the long term." Dkt. 71 at 5.

## III.   SAN FRANCISCO'S EFFORTS TO REDUCE AND PREVENT HOMELESSNESS

San Francisco makes every reasonable effort its resources allow to end homelessness. Cohen Decl. ¶ 23; Dodge Decl. ¶ 26; Gaeta Decl. ¶ 10; Mazza Decl. ¶ 17; Mason Decl. ¶ 14; Papo Decl. ¶ 15; Weisbrod Decl. ¶ 10. This includes providing services to support people experiencing homelessness and those who are housed, but who are at risk of becoming homeless. Below are non-exhaustive examples of some of the City's programs, administered by employees with decades of relevant experience. *See e.g,* Gaeta Decl. ¶ 2; Dodge Decl. ¶ 2; Papo Decl. ¶ 2; Mazza Decl. ¶ 2; Weisbrod ¶ 2. The City devotes hundreds of millions of dollars annually toward these efforts. Cohen Decl. ¶ 5.

Unfortunately, creating sufficient housing for each of the City's unhoused residents is not possible. The effort would cost an hundreds of millions of dollars more than is currently spent and is no guarantee every person offered housing would accept it, or that homeless residents outside the City would not move to the area in response to the increased housing stock. Cohen Decl. ¶ 7.

### A.   Services Designed To Support Those Experiencing Homelessness

San Francisco already had services designed to support persons experiencing homelessness or living in tents before Plaintiffs filed their lawsuit and the City continues to offer those services.  In the intervening three and a half years, the City also implemented new programs, including some that target the Tenderloin neighborhood specifically, to support the City's mission around homelessness. These include: (1) Healthy Street Operations Center ("HSOC"), (2) Joint Field Operations ("JFO"), (3) Bridge and Engagement Services ("BEST") Neighborhoods, (4) Night Navigators, (5) Street

Medicine, (6) the Street Crisis Response Team ("SCRT"), and (7) the Shelter-In-Place Hotel Program. Each contributes to the City's efforts to reduce its tent count and operates in the Tenderloin neighborhood.

### 1.      Healthy Street Operations Center ("HSOC")

The HSOC program reduces the number of persons experiencing homelessness in San Francisco, and thus the number of tents and encampments, by providing offers of shelter and services. Dodge Decl. ¶ 17. HSOC performs two encampment resolutions a day at least five days a week all around the City. *Id*. at ¶ 10. HSOC bases the location of the engagements in part on the tent count and concentrates HSOC resolutions in the areas with the most need. *Id*. at ¶ 20. HSOC's goals are to: (1) conduct client outreach, (2) offer clients services and housing, (3) remove hazardous or abandoned tents, structures, and vehicles, and (4) clean and secure the site after campers relocate. *Id*. at ¶ 10.

HSOC teams may include an Incident Commander from the San Francisco Fire Department ("SFFD"), homeless outreach workers from the SF Homeless Outreach Team ("HOT"), clinicians from the Department of Public Health ("DPH"), police officers from the San Francisco Police Department ("SFPD"), street cleaners from the Department of Public Works ("DPW"), and parking control officers from the Municipal Transportation Agency ("MTA"). Dodge Decl. ¶ 11.

HSOC engagements are an avenue for shelter placements. If a client indicates they want shelter, staff confirm the individual is not already housed or sheltered and matches the person with a placement. Dodge Decl. ¶ 17. In 2023 alone, HSOC conducted over 480 engagements and referred more than 1,500 people to shelter from encampments. *Id*. at ¶ 15. In the Tenderloin specifically, HSOC performed 53 engagements and referred 246 people to shelter. *Id*.

### 2.      Joint Field Operations ("JFO")

The JFO program is another interagency street response program that started in January 2022. Mazza Decl. ¶¶ 8-9. JFO operates almost exclusively in the Tenderloin and maps the neighborhood into four quadrants, addressing issues in one quadrant per day. *Id*. at ¶¶ 8, 10. The program operates seven days a week, from 9 a.m. to 1 p.m. and can include staff from the Fire Department, HSH, Department of Emergency Management ("DEM"), DPH, DPW, SFPD, and MTA. *Id*. at ¶ 11. The

team offers wellness checks, referrals to substance use programs, and medical and mental health care resources. *Id.* at ¶ 14. It also offers street cleaning. *Id.*

DEM has collected data on the JFO program since May of 2023. From May 24, 2023 through April 2, 2024, JFO went into the field 245 days, for a total of 549 operations. Mazza Decl. ¶ 16. The program made 4,719 shelter offers that resulted in 371 shelter linkages. *Id.*

### 3. Bridge and Engagement Services ("BEST") Neighborhoods

The BEST Neighborhood Program provides street-based healthcare around San Francisco, including in the Tenderloin neighborhood. The program began in March 2023 and operates six days a week, from 8 a.m. to 6 p.m. Weisbrod Decl. ¶ 4. Clinicians and peer health workers perform street-based care to engage and support unhoused people who have the most complex healthcare needs. *Id.* at ¶ 5.

BEST Neighborhood had 7,082 encounters with people on the street from March 2023 through the end of the year, and for the first quarter of 2024, the program has already had an additional 1,880 encounters. Weisbrod Decl. ¶ 6. The team within BEST Neighborhoods that primarily focuses on work in the Tenderloin and South of Market ("SoMa") neighborhoods, performed the majority of that outreach, with 4,693 encounters from March of 2023 through the end of the year and 1,476 additional encounters for the first quarter of 2024. *Id.* at ¶¶ 7-8. These Tenderloin- and SoMa-specific service encounters include 89 shelter and housing linkages in 2023 and another 55 in 2024. *Id.*

The BEST Neighborhood Program helps reduce San Francisco's tent count by directly offering to refer clients to housing-based services and by offering healthcare that can stabilize some individuals who otherwise might refuse shelter when it is offered. Weisbrod Decl. ¶ 9.

### 4. Night Navigators Program

The City launched the Night Navigators Program in October 2023. Gaeta Decl. ¶ 5. The program operates primarily in the Tenderloin and provides care and referral service to persons experiencing homelessness in the evening hours between 7 pm and 3 am, when services are otherwise scarce. *Id.* at ¶¶ 5-6. The program provides outreach and services to persons experiencing homelessness who might be missed by daytime programs when for example, people are at work or inside a public building. In its first six months, the Night Navigators Program already engaged more

than 4,000 clients and made more than 2,000 referrals for services, 886 of which were referrals for shelter or housing. *Id*. at ¶ 7.

### 5. DPH Street Medicine

The Street Medicine team supports the City's goal of getting people into shelter, and thereby reducing street encampments and tents, by offering services to stabilize those in crisis. Papo Decl. ¶ 12. Once a person is in shelter, it is easier for DPH to address their healthcare needs, and once a person's health is looked after, they are often more interested in accepting an offer of shelter. *Id*.

In 2023 alone, the Street Medicine team had over 11,000 encounters with more than 3,000 unique patients. Papo Decl. ¶ 10. That includes more than 1,500 follow-up visits with more than 600 unique clients who previously experienced an overdose. *Id*. During the same period the Street Medicine team provided more than 700 people with referrals to treatment centers, which include medical care, mental health care, residential treatment, medical detox, and medications for opiate use disorder. *Id*. at ¶ 11. The Street Medicine team uses sustained visits with the same clients to build rapport and trust. *Id*. at ¶ 7.

DPH also supports the Maria X. Martinez Health Resource Center, which is located just one block outside the boundaries Plaintiffs set for the Tenderloin. Papo Decl. ¶ 13. The clinic provides urgent care, addiction medicine, behavioral health, dental, podiatry, and transitional primary care services. *Id*. The clinic provided these and other services in more than 20,000 visits in 2023 and focuses on serving people experiencing homelessness, many of whom live in the Tenderloin given the clinic's proximity to the neighborhood. *Id*.

DPH also provides health care services to those in shelters and permanent supportive housing locations, many of which are located in the Tenderloin neighborhood. Papo Decl. ¶ 14.

### 6. Street Crisis Response Team ("SCRT")

San Francisco launched SCRT in November 2020. Mason Decl. ¶ 7. The team responds to 911 calls and provides rapid, trauma-informed care to people in acute behavioral health crisis or who have needs that may not require an ambulance or transport to an emergency department. *Id*. SCRT operates City-wide, including in the Tenderloin neighborhood, 24 hours a day, seven days a week. *Id*. at ¶ 9.

SCRT provides linkages to services including shelter. Mason Decl. ¶ 10. Since rolling out in 2020, the program has received more than 38,000 calls for service and engaged with a person on-scene more than 20,000 times, including 8,403 dispatches for service in the Tenderloin. *Id*. at ¶ 11-12. In February 2024 alone, SCRT received more than 1,200 calls for service and engaged with a person on-scene 864 times. *Id*. at ¶ 11.

### 7.      Shelter-In-Place Hotels

One of the specific services named in the Stipulated Injunction was a program that offered hotel room placements through the City's Shelter in Place ("SIP") Hotel Program during COVID-19. Dkt. 71 at 2.

HSH reconfigured its congregate shelters during COVID-19 in order to comply with social distancing regulations, which resulted in reducing their capacity by 70 percent. Cohen Decl. ¶ 18. In response, the first SIP hotel sites opened in April 2020 to provide temporary non-congregate shelter for people experiencing homelessness. *Id*. At its highest capacity, the SIP Hotel Program provided 2,288 rooms across 25 sites serving primarily adults who were particularly vulnerable to COVID-19 due to their age or underlying health conditions. *Id*. at ¶ 19.

San Francisco was keenly aware that, as the SIP program drew down toward the end of the pandemic emergency, there could be a sudden corresponding increase in the number of homeless people living on the streets, including in tents in the Tenderloin, without significant intervention and effort. Accordingly, the City worked tirelessly to transition SIP Hotel Program guests to housing as they left the hotels. Cohen Decl. ¶ 20. San Francisco and its partners successfully helped three-quarters of guests exit to stable locations, including 1,835 who moved into housing, and therefore staved off a dramatic increase in unsheltered homeless people when the SIP Hotel Program concluded. *Id*.

The SIP Hotel Program cost more than $400 million and was only possible because of significant federal funding unlocked by the pandemic. Cohen Decl. ¶¶ 21-22. The SIP Hotel Program also came at considerable back-end costs to the City. Nine of the hotel sites brought claims to the City alleging that the otherwise unhoused guests caused millions of dollars' worth of damage. The City ultimately was required to pay more than $60 million to settle these claims. *Id*. at ¶ 22.

**B. Services Designed To Support Those Who Are Housed, But Are At Risk Of Becoming Homeless—The Homeless Response System**

HSH's Homeless Response System also contains programs designed to support those who are housing insecure, ensuring that these individuals do not lose their housing and become part of San Francisco's homeless population. These programs include, for example, (1) problem solving, (2) homelessness prevention, and (3) supportive housing services. Each is part of San Francisco's efforts to ensure people do not end up homeless and living on the City's streets.

**1. Problem Solving Services**

San Francisco's problem-solving services focus on clients who do not require ongoing support, but who can resolve their homelessness with a single timely intervention, such as a one-time flexible grant of money that can be used for vehicle repair, contributions to the household's rent, paying utility bills, or buying furniture. Cohen Decl. ¶ 15. The program also offers relocation assistance to reconnect clients with support networks they may have outside San Francisco. *Id.*

**2. Homelessness Prevention**

HSH operates its Homelessness Prevention Program in partnership with the Mayor's Office of Housing and Community Development. The City allocates millions of dollars each year to households needing assistance with back rent, future rent, and/or move-in costs. Cohen Decl. ¶ 16.

**3. Supportive Housing**

More than half of HSH's budget is devoted to offering permanent solutions to homelessness through supportive housing stock, including one if its newest supportive housing projects at 1064 Mission Street, which offers 256 units of supportive housing, with on-site services and a culinary training and education program. Cohen Decl. ¶ 17.

**IV. TENT COUNTS**

San Francisco performs routine tent counts around the City, which DEM uses as one factor in determining where to schedule an HSOC engagement. Dodge Decl. ¶ 20. The January 2020 count was the last count prior to COVID-19 and it shows a total tent count of 649, with a count in the Tenderloin of 103. *Id.* at ¶ 24.  The City considerably reduced that number by the time Plaintiffs filed their motion. In February 2024, the count shows a total tent count of 385, with a count in the Tenderloin of 48. *Id.* at ¶ 22. The February 2024 numbers also show the largest six-month reduction in tents since

the start of the pandemic. *Id*. at ¶ 23. That City-wide reduction is also apparent in the Tenderloin-specific data, where the tent count in February 2024 showed a 30 percent reduction as compared to the tent count six months earlier in July 2023. *Id*.

## LEGAL STANDARD

"It is well settled that a district court has the equitable power to enforce summarily an agreement to settle a case pending before it." *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987). The Stipulated Injunction also specifically contemplates the Court will retain jurisdiction over the Injunction. Dkt. No. 71 at 4.

"A settlement agreement is treated as any other contract for purposes of interpretation" and enforcement is "governed by principles of local law which apply to interpretation of contracts generally." *United Com. Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992) (citation omitted). California law applies here.

"Under California law, the goal of contractual interpretation is to give effect to the mutual intention of the parties. . . . The mutual intention of the parties is determined by examining factors including the words used in the agreement, the surrounding circumstances under which the parties negotiated or entered into the contract, and the subsequent conduct of the parties." *Ambat v. City & Cnty. of San Francisco*, No. C 07-03622 SI, 2011 WL 2118576, at *2 (N.D. Cal. May 27, 2011).

## ARGUMENT

### I.   PLAINTIFFS SEEK TO ENFORCE TERMS THAT HAVE NO EFFECT NOW THAT THE COVID-19 EMERGENCY HAS ENDED.

Plaintiffs' Motion fails because they only seek to enforce a provision of the Injunction that has no continuing force and effect. With respect to the tent count in the Tenderloin, which is the sole focus of Plaintiffs' motion, the injunction contains two relevant sections, Sections II and VII. Section II states the City's obligations "[d]uring the COVID-19 emergency." Dkt. 71 at 2. Section VII, by contrast, states the City's obligations "after the COVID-19 emergency." *Id*. at 5. Plaintiffs seek to enforce terms in Section II that expired in June 2023, when Mayor Breed terminated the COVID-19 emergency proclamation. *Id*. at 2 n.1; RJN Ex. A.

Plaintiffs reference four provisions of the Injunction in their Motion, but their argument only relies on one—the City's commitment to use "reasonable efforts" to reduce the tent count. In Section II, the City agreed to the following during the COVID-19 emergency:

> The City agrees that it shall cause seventy percent (70%) of the number of tents as counted on June 5, 2020 to be removed along with all other encamping materials and related personal property, and their occupants relocated to a hotel room, safe sleeping site, off-street sites, or other placement by July 20, 2020. The City will take action to prevent re-encampment. After July 20, 2020, the City will make all reasonable efforts to achieve the shared goal of permanently reducing the number of tents, along with all other encamping materials and related personal property, to zero. Dkt. 71 at 3.

The City agreed to achieve this commitment by offering SIP hotel rooms to people facing heightened health risks from COVID-19, establishing safe sleeping villages outside of the Tenderloin to which people can relocate, and making available some off-street sites in the Tenderloin (such as parking lots) to which tents can be moved so they are no longer on sidewalks or streets or blocking sidewalks or entrances to businesses and homes. Dkt. 71 at 2-3. The Injunction provides that the "off-street sites will be permanently removed within three months after the end of the COVID-19 emergency" *Id*. at 3. Because the offers of hotel rooms and sleeping sites could have the "effect of encouraging additional people to come to the Tenderloin in the hope of securing a hotel room or placement at a safe sleeping site," the City agreed "during this process" to "discourage additional people from erecting tents in the neighborhood." *Id*. The Injunction states that, while the City was "hopeful that most people offered an alternative location will be willing to accept it," the City would "employ enforcement measures for those who do not accept an offer of shelter or safe sleeping sites to prevent re-encampment" "if necessary to comply with this stipulated injunction." *Id*.

The paragraph quoted above, which contains the "reasonable efforts" clause, puts numerical obligations and aspirational goals on the street tent-reduction strategies described in the first part of Section II (SIP hotels, safe-sleeping villages, and off-street tent sites) and bifurcates the as-then-unknown COVID-19 emergency timeframe into (1) pre-July 20, 2020, and (2) July 20, 2020, until the end of the emergency. The emergency, along with the City's obligation to use "reasonable efforts to achieve the shared goal" of no tents in the Tenderloin, ended in June 2023.

In contrast to Section II, the City's obligations *after* the COVID-19 emergency ends are set forth in Section VII, which states in full:

> SECTION VII. After the COVID-19 emergency, the City will have options to help improve living conditions in the Tenderloin neighborhood that currently are not available due to constraints caused by the pandemic. The parties agree to work together to improve living conditions in the Tenderloin neighborhood for the long term. Dkt. 71 at 5.

Section VII does not require the City to meet any specific tent count or obligate it to make reasonable efforts. Nor did the Injunction require the City to continue to take the actions referenced in Section II, which reference the SIP Hotel Program, after the COVID-19 emergency ended. The City cannot do so because the hotel rooms and sleeping sites the City relied upon to achieve its commitments in Section II are no longer available now that the pandemic is over. Cohen Decl. ¶ 20. Because the parties recognized that the City's ability to address concerns in the Tenderloin after the pandemic would depend on the options and resources available at that time, the Injunction simply reflects the parties' agreement to continue to work together to improve conditions in the Tenderloin neighborhood after the COVID-19 emergency. Dkt. 71 at 5.

"The fundamental goal" of a court's role in ruling on a motion to enforce an agreement "is to give effect to the mutual intention of the parties." *Bank of the W. v. Super. Ct.*, 2 Cal.4th 1254, 1264 (1992). Plaintiffs do not dispute that the City complied with its obligations under Section II during the pandemic. Plaintiffs also do not dispute that the City is currently complying with its obligations under Section VII. Instead, Plaintiffs assert that the current tent count violates Section II of the Injunction, but the Injunction is a product of its time – the early days of the pandemic before a vaccine and before public health officials could estimate with confidence how long the emergency would last. Accordingly, Section II sets out what the City was obligated to do until the end of the emergency, including the obligation to make all reasonable efforts to reduce the tent count to zero. San Francisco never agreed to reduce the tent count to zero using *unreasonable* efforts and its obligation to use reasonable efforts ended, like the rest of Section II, on June 30, 2023, "the date the Mayor lift[ed] the San Francisco emergency order." Dkt. 71 at n.1; RJN Ex. A.

## II.   SAN FRANCISCO MADE REASONABLE EFFORTS TO REDUCE THE TENDERLOIN TENT COUNT.

Even if Section II of the Injunction remained in effect, San Francisco's efforts to address homelessness in the City generally, and the Tenderloin specifically, are reasonable accounting for all facts and circumstances, which is what the Injunction and the law require. The evidence Plaintiffs present is inadequate on its face. Plaintiffs do not engage with any of the context surrounding San Francisco's policy decisions or compare San Francisco's conduct to any similarly situated municipalities. Instead they make the illogical claim that a tent count that is *lower* than the months pre-COVID proves a total lack of reasonable efforts. The evidence shows just the opposite—that post-Injunction, San Francisco continued its existing programs to reduce the tent count, such as HSOC, and supplemented those efforts with new programs including JFO, BEST Neighborhoods, and Night Navigators, which collectively offered services and shelter to persons experiencing homelessness thousands of times.

### A.   The Reasonable Efforts Clause Does Not Require The Burden Plaintiffs Seek To Impose.

San Francisco has used and continues to use "reasonable efforts" to reduce the tent count. Cohen Decl. ¶ 23; Dodge Decl. ¶ 26; Gaeta Decl. ¶ 10; Mason Decl. ¶ 14; Mazza Decl. ¶ 17; Papo Decl. ¶ 15; Weisbrod Decl. ¶ 10. Plaintiffs argue the City breached this term of the Injunction without defining "reasonable efforts" or putting forward a single policy change they assert San Francisco should have made. Even Plaintiffs' proposed order requests that the Court require the City to comply word-for-word with the terms of the Injunction without identifying any specific action San Francisco must take to effect the Injunction's broad and general language. *See* Dkt. 126-3.

Caselaw shows the Court must view San Francisco's obligations in light of all relevant circumstances, taking into account what other similarly situated cities and counties have done. "Reasonable efforts" is an undefined term in the Injunction. California courts construe undefined terms "according to the generally accepted canons of interpretation." *Martin Bros. Constr., Inc. v. Thompson Pac. Constr., Inc.*, 179 Cal. App. 4th 1401, 1416 (2009). Words "are to be understood in their ordinary and popular sense." *Crawford v. Weather Shield Mfg., Inc.*, 44 Cal.4th 541, 552 (2008).

Although there is no one-size-fits all definition of "reasonable efforts," courts require far less than the herculean efforts Plaintiffs place on San Francisco here. In the context of family law, "reasonable efforts" requires more than "lackadaisical or half-hearted" efforts, but is "not synonymous" with solving the underlying issue. *Jennifer S. v. Super. Ct*., 15 Cal. App. 5th 1113, 1121 (2017) (citations omitted). To a pro per plaintiff, "reasonable efforts" to obtain counsel "mean that the plaintiff tried the appropriate legal aid offices and also at least two lawyers without success." *Robinson v. Cnty. of San Joaquin*, No. 2:12-cv-2783 MCE GGH PS, 2014 WL 12917462, at *1 (E.D. Cal. June 27, 2014) (citation omitted). In the context of an SSI application, the Commissioner's duty to use "every reasonable effort" to obtain the relevant treatment records means that the Commissioner made an initial request for evidence and one follow-up request. 20 C.F.R. § 416.912(b)(i).

When construing undefined "best efforts" clauses, California courts hold "the promisor must use the diligence of a reasonable person under comparable circumstances," but is not required to make "every conceivable effort . . . ignore its own interests, spend itself into bankruptcy, or incur substantial losses to perform its contractual obligations." *Cal. Pines Prop. Owners Ass'n v. Pedotti*, 206 Cal. App. 4th 384, 394 (2012) (citations omitted). Instead, a "best efforts" clause "requires a party to make such efforts as are reasonable in light of that party's ability and the means at its disposal and of the other party's justifiable expectations." *Id.* at 394-95 (cleaned up). Some courts have indicated that a "reasonable efforts" clause like the one here requires even less of a party than a "best efforts" clause like the one discussed in *California Pines Property Owners Association*. *See Citri-Lite Co. v. Cott Beverages, Inc.*, No. 1:07-cv-01075 OWW DLB, 2011 WL 4751110, at *4 (E.D. Cal. Sept. 30, 2011), aff'd, 546 F. App'x 651 (9th Cir. 2013). Regardless, neither efforts clause requires a party to be successful. *See Goldsholle v. Internet Brands, Inc.*, No. B256896, 2016 WL 826169, at *8 (Cal. Ct. App. Mar. 3, 2016) (holding neither best nor reasonable efforts obligated defendant "to guarantee success"); *Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys., LLC*, 842 F. Supp. 2d 502, 511 (S.D.N.Y. 2012) ("reasonable efforts to supply a product are not necessarily the same as actual success in supplying a product").

"Reasonable efforts" typically requires a party to use the effort and resources normally used by similarly situated entities to achieve the same objective, aware of all circumstances and factors. *See*

*e.g.*, *Avalyn Pharma, Inc. v. Vincent*, No. 3:20-cv-02267-RSH-KSC, 2023 WL 2731727, at *7 (S.D. Cal. Feb. 27, 2023) (citation omitted) (defining "commercially reasonable efforts" as "the use of reasonable, diligent efforts and resources . . . as normally used by similarly situated companies for the achievement of the same or a similar objective . . . taking into account all relevant factors"); *Redick v. Orlando Bathing Suit, LLC*, No. 2:21-CV-06578-PA-KK, 2022 WL 522998, at *2 (C.D. Cal. Feb. 21, 2022) (defining "reasonable efforts" to mean "readily achievable by a reasonable person or entity in Defendant's position"); *S'holder Representative Servs. LLC v. Alexion Pharms., Inc.*, No. CV 2020-1069-MTZ, 2021 WL 3925937, at *2 (Del. Ch. Sept. 1, 2021) (defining "commercially reasonable efforts" to mean "using such efforts and resources typically used by biopharmaceutical companies similar in size and scope," but "does not require that [companies] act in a manner which would otherwise be contrary to prudent business judgment" and "the fact that the objective is not actually accomplished is not dispositive evidence that [company] or any of its Affiliates did not in fact utilize its Commercially Reasonable Efforts in attempting to accomplish the objective.").

Here, Plaintiffs neither identify any similarly situated cities or counties nor demonstrate what policies those municipalities implement to reduce their tent count that San Francisco has not implemented, and explain why it was unreasonable for San Francisco to take a different approach.

### B.  Plaintiffs' Limited Evidence Does Not Establish A Violation Of The Stipulated Injunction.

Plaintiffs attempt to show that San Francisco used less than reasonable efforts based on (1) a home-grown tent count showing the number of tents in the Tenderloin on February 14, 2024 was 71— down from 448 when Plaintiffs filed their lawsuit in May of 2020; and (2) an HSH website showing that there are approximately 300 unused shelter spaces in the City. Mot. at 1:25-2:3; 2:8-9. Neither is convincing. This is especially true considering that many of the statistics on which San Francisco relies to oppose Plaintiffs' Motion and which Plaintiffs ignore were publicly available to Plaintiffs online before they filed their Motion. *See e.g.,* RJN Exs. A-C; Dodge Decl. ¶ 21; Mason Decl. ¶ 11; Murphy Decl. Ex. A.

### 1. The Shrinking Tenderloin Tent Count Does Not Show a Lack of Reasonable Effort.

Plaintiffs' tent count data shows the number of tents in the Tenderloin when Plaintiffs filed their motion to enforce (71) is 15 percent of what it was when Plaintiffs filed their lawsuit in 2020 (448). Mot. at 1:28-2:3. Said differently, for every six tents that were on Tenderloin streets in May 2020, San Francisco succeeded in removing five. Plaintiffs strain to characterize this as anything less than an overwhelming success. Their claim that this statistic is affirmative evidence San Francisco did not make "reasonable efforts" to reduce its tent count is not credible.

But just as importantly, there is only so much Plaintiffs can gain from a single statistic. This myopic focus on the number of tents – without any context – would only be demonstrative of a violation if San Francisco was obligated to reduce the tents to zero. It was not. San Francisco was obligated to make reasonable efforts, not achieve success. See Dkt. 71 at 3; *Goldsholle*, 2016 WL 826169, at *8 (no obligation "to guarantee success"); *Soroof Trading Dev. Co*, 842 F. Supp. 2d at 511 (same). Therefore, an alleged 71 tents on a single day in February 2024 does nothing to establish that San Francisco failed to make reasonable efforts to reduce the number of tents. The fallacy is demonstrated by the end of the SIP Hotel Program. Without San Francisco's significant efforts, the tent count in the Tenderloin would have exploded following the program's end. It did not. Cohen Decl. ¶ 20. The City "helped three-quarters of guests exit to stable locations, including 1,835 who moved into housing. *Id*. Accepting a final tent count to demonstrate what led up to it is as baseless as looking at the number in someone's bank account and concluding they did not exert reasonable efforts at their job without considering any of their other life circumstances.

Further, the "reasonable efforts" standard demands consideration of the effort and resources normally used by similarly situated entities to achieve the same objective. Plaintiffs provide no information about how San Francisco's numbers compare to other cities as would be required to meet their burden under a "reasonable efforts" clause. In fact, San Francisco was the only California county that reduced its overall number of persons experiencing homelessness between 2019 and 2022. Cohen Decl. ¶ 8.

The broader publicly available statistics do not support Plaintiffs' motion. San Francisco's most recent tent count—from February 2024—shows the largest City-wide reduction in tents over a

six-month period since the start of the pandemic. Dodge Decl. ¶¶ 22-23. In the Tenderloin, the count

dropped by 30 percent from 70 to 48. *Id*. at ¶ 23. Far from showing a lack of reasonable efforts, the

data shows San Francisco making continued progress on a difficult policy problem.

Plaintiffs also do not address that the October 2020 tent count cited in their motion was taken

during the height of the COVID-19 pandemic, which unlocked significant additional federal funding

to temporarily house those living in encampments to prevent the spread of a life-threatening virus.

Cohen Decl. ¶ 21. San Francisco reduced its tent count during the pandemic, in part, by operating a

SIP Hotel Program. Dkt. 71 at 2-3. The program provided thousands of rooms serving primarily

unhoused adults who were particularly vulnerable to COVID-19. Cohen Decl. ¶ 19. It is therefore no

surprise that the tent count was at its lowest during the SIP Hotel Program.

The SIP Hotel Program is not one San Francisco could credibly fund at this scale post COVID-

19. Cohen Decl. ¶¶ 21-22. Plaintiffs do not suggest San Francisco needed to continue the program at

its pandemic levels in order to show "reasonable efforts," and the program ultimately cost between

$400 and $500 million. *Id*. at ¶ 22.

Plaintiffs ignore this and argue that because the City's tent count is not at zero, that is proof

San Francisco has not used "reasonable efforts" to reduce the count. That is not what the law demands.

"Reasonable efforts" considers what other similarly situated municipalities have done and must

account for change over time. In *Citri-Lite Company v. Cott Beverages, Inc.*, 721 F. Supp. 2d 912

(E.D. Cal. 2010), the plaintiff advocated for a definition of "commercially reasonable efforts" that did

not permit the defendant to take into account all of the circumstances surrounding their conduct and

the district court handily rejected their position as one that "creates an absurdity and cannot be

adopted." *Id*. at 923-24. The court instead "consider[ed] all circumstances bearing on performance"

when assessing whether the defendant satisfied its obligation to use commercially reasonable efforts.

*Id*. at 926. The significant financial burden the SIP Hotel Program caused shows that it would take

more than "reasonable efforts" for a municipality to continue a program of this size and scope after the

end of COVID-19. Therefore, Plaintiffs' effort to compare the current tent count to the October 2020

count when the program was operational is not sufficient.

This is especially true when historic tent counts show that San Francisco's current Tenderloin tent count is significantly *lower than* the tent count from January 2020—the last count prior to the outbreak of COVID-19. Dodge Decl. ¶¶ 22, 24. In January 2020, the Tenderloin tent count was 103 compared to the tent count of 71 Plaintiffs cite in their motion, and the difference is even larger accounting for the fact that Plaintiffs' home-grown February 14, 2024 tent count of 71 is nearly double the publicly-available, official City tent count of 48 for February 2024. *Id.*; Dkt. 71 at 2. The tent counts Plaintiffs cite therefore cannot meet their burden here to show San Francisco has not used reasonable efforts under the circumstances and in fact affirmatively show the opposite, that San Francisco is using reasonable efforts to reduce homelessness.

### 2. Plaintiffs Misread The City's Shelter Bed Data.

Plaintiffs' claim that approximately 300 shelter beds are unoccupied each night also fails to show San Francisco used less than "reasonable efforts" to reduce the tent count. Plaintiffs submit no judicially noticeable evidence supporting their claim that 300 shelter beds are available, yet are not used. Plaintiffs cite to a website, but the Court cannot take judicial notice of the factual inferences Plaintiffs seek to draw from that website. *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001). Moreover, even if the Court does consider the statistic, the same website Plaintiffs cite contradicts Plaintiffs' interpretation of the data. Murphy Decl. ¶ 2, Ex. A.

Plaintiffs argue that because the website shows the occupancy of City shelters is approximately 300 lower than shelter capacity, that means there are 300 available and unused beds in San Francisco each night. This is wrong. The website states:

> Many unoccupied units are **not immediately available for placement**. At this time, our data system has limited ability to distinguish the status of vacant beds in greater detail. Reasons why beds or units may not be immediately available for placement include:
>
> - An individual unit may need to undergo repair or maintenance.
> - Referrals may be limited by provider capacity.
> - Beds might be temporarily held to support other initiatives, such as the demobilization or temporary closure of another program.
> - Some beds are held for referrals from specific program partners or have special eligibility criteria and must remain vacant until appropriate referrals are available. Murphy Decl. ¶ 2, Ex. A (emphasis in original).

Thus, it is not appropriate to assume—as Plaintiffs do—that each bed below capacity is available.

But even if San Francisco had 300 available and unused shelter beds, that does not prove the City's efforts to reduce the Tenderloin tent count fall below the "reasonable efforts" standard. As with the tent counts themselves, Plaintiffs ignore that even if San Francisco had 300 unoccupied shelter spaces, that means that its shelter occupancy is at more than 90 percent. Murphy Decl. ¶ 2, Ex. A (showing a capacity of 3,492 shelter beds). They make no effort to show how this statistic compares with similarly situated jurisdictions or explain why this occupancy rate is unreasonable. They simply assert—without any factual support—that the occupancy rate must be 100 percent if San Francisco were using reasonable efforts. Their assumption is incorrect. San Francisco needs some amount of vacant shelter bed space so that it can make offers of shelter during encampment resolutions and address urgent needs. A "no vacancy" requirement would eliminate the City's ability to offer shelter as a method to decrease the tent count.

Additionally, the total number of shelter resources available in San Francisco during 2023 was higher than at any other period in the past seven years, discounting the overflow shelter in place units temporarily made available during COVID-19. Cohen Decl. ¶ 9. Last year also saw the largest number of emergency shelter spaces made available in San Francisco. *Id*. Plaintiffs' motion ignores the resources San Francisco put into increasing its available shelter stock, which is one of the circumstances that Plaintiffs should have considered when assessing the "reasonable efforts" clause. This failure is fatal to their Motion.

### 3. Plaintiffs Ignore San Francisco's Efforts To Reduce Homelessness.

San Francisco makes considerable efforts to eliminate homelessness. Those efforts include City-wide programs as well as additional efforts specific to the Tenderloin. San Francisco spends hundreds of millions of dollars on programs staffed by employees who have spent their professional careers focused on issues surrounding homelessness, housing, and public health. Cohen Decl. ¶¶ 3, 5; Gaeta Decl. ¶ 2; Mazza Decl. ¶ 2; Dodge Decl. ¶ 2; Weisbrod Decl. ¶ 2. These programs operate during traditional and non-traditional hours, creating a web of programs operating seven days a week, 24 hours a day.  Dodge Decl. ¶ 10; Gaeta Decl. ¶ 5; Mason Decl. ¶ 9; Mazza Decl. ¶¶ 8, 11; Weisbrod Decl. ¶ 4.

The City's programs collectively register tens of thousands of encounters with persons experiencing homelessness, Dodge Decl. ¶¶ 14-16; Gaeta Decl. ¶¶ 7-8; Mason Decl. ¶¶ 11-12; Mazza Decl. ¶ 16; Papo Decl. ¶ 10; Weisbrod Decl. ¶¶ 6-8, resulting in thousands of shelter referrals. Dodge Decl. ¶¶ 14-16; Gaeta Decl. ¶¶ 7-8; Mazza Decl. ¶ 16; Weisbrod Decl. ¶¶ 7-8. Some of these programs, like JFO and Night Navigators, were designed for the Tenderloin specifically. Mazza Decl. ¶ 8; Gaeta Decl. ¶ 6. The Night Navigators Program alone, which has only been in place for six months has already engaged more than 4,000 clients and made 886 referrals specifically for shelter. Gaeta Decl. ¶ 7. This program did not exist when the Injunction issued and constitutes wholly additional efforts San Francisco has implemented since settling this case. *Id*. at ¶ 5.

Other programs, like HSOC, serve the entire city with an emphasis on areas that the data, including tent counts, show have the highest need. Dodge Decl. ¶¶ 13, 20. Even these programs devote a substantial share of their efforts to the Tenderloin neighborhood. In 2023 alone, HSOC conducted over 480 resolutions and moved more than 1,500 people into shelter from encampments, including 53 resolutions and 246 shelter referrals specifically in the Tenderloin. *Id*. at ¶ 15.

In addition to shelter-specific services, San Francisco also supports public health outreach efforts offering clients much needed medical, mental health, and drug use care through programs like BEST Neighborhoods and Street Medicine. Papo Decl. ¶¶ 8-9; Weisbrod Decl. ¶¶ 4-5. These too are part of the City's efforts to reduce the tent count because public health and homelessness go hand in hand. DPH is better able to care for someone with medical issues when they are in housing and stabilizing medical services can often be the first step necessary to convincing a person experiencing homelessness to accept shelter. Papo Decl. ¶12; Weisbrod Decl. ¶ 9. Many people experiencing homelessness have a deep-seated distrust of authority figures, including City officials, and the work these public health and Street Medicine teams do earns trust through sustained service. Papo Decl. ¶ 7.

And the above-referenced programs only account for the work San Francisco does with persons experiencing homelessness. It does not include the work San Francisco does with its housing insecure residents, ensuring that these individuals do not lose their housing and add to the City's homeless population. HSH's homeless response system includes resources for those who are still housed, providing one-time flexible grants that can be used for expenses such as vehicle repair, utility

payments, purchase of furniture, or relocation assistance to reconnect clients with support networks they may have outside San Francisco. Cohen Decl. ¶ 15. The City also distributes millions of dollars per year to households who need assistance with back rent, future rent, and/or move-in costs. In addition, more than half of HSH's budget is devoted to offering permanent solutions to homelessness through supportive housing stock. *Id.* at ¶¶ 16-17. Reducing the City's tent count involves moving those currently at encampments into housing, but it also involves ensuring that those currently in housing do not fall into homelessness. Plaintiffs ignore the dynamic nature of the City's struggle with homeless. There is no doubt that the web of services San Francisco offers meets the "reasonable efforts" standard.

### C.      "Reasonable Efforts" Does Not Include Violating Court Orders.

Plaintiffs spend the majority of their eight-page motion focused on Judge Ryu's preliminary injunction against the City in *Coalition on Homelessness et al. v. City and County of San Francisco et al.*, N.D. Cal. Case No. 4:22-05502, issued on December 23, 2022. *Coalition* Dkt. No. 65. *Coalition* is the shadow side of this lawsuit. Both lawsuits challenge San Francisco's policies around homelessness. Plaintiffs in *Coalition* argue the City's policies are too tough and injure San Francisco's unhoused residents. Plaintiffs in this lawsuit argue San Francisco's policies are too lenient and injure San Francisco's housed residents. *Compare Coalition* Dkt. No. 135 with *Hastings* Dkt. No. 1.

Despite the relationship between the two lawsuits, the Court in this case can deny Plaintiffs' Motion without analyzing Judge Ryu's preliminary injunction because Plaintiffs fail to identify any specific reasonable effort they believe the Injunction requires San Francisco to take that San Francisco is not taking. This would be required before the Court could determine whether Judge Ryu's preliminary injunction prevented San Francisco from taking that same action. Further, Plaintiffs' challenges to Judge Ryu's order are irrelevant to this Motion because all of the programs described above collectively show San Francisco uses at a minimum "reasonable efforts" to reduce the City's tent count. None of these programs were discontinued in response to Judge Ryu's preliminary injunction. *Coalition* Dkt. No. 65.

Although San Francisco does not argue Judge Ryu's preliminary injunction order relieves it of any obligations that remain under the Injunction, any assessment of whether San Francisco used

"reasonable efforts" must account for all relevant circumstances, which would encompass changes to the law, including the law as stated in Judge Ryu's order. To the extent the Court accepts Plaintiffs' invitation to consider the effect of Judge Ryu's preliminary injunction on this case, this Court cannot and should not place San Francisco in a position of facing contemporaneous conflicting Court orders, especially after the Court declined to relate the *Coalition* case to this case based on San Francisco's fear of just such inconsistent rulings. Dkt. Nos. 116, 121.

Judge Ryu's *Coalition* order enjoined San Francisco from "enforcing or threatening to enforce, or using California Penal Code section 148(a) to enforce or threaten to enforce" five code sections "to prohibit involuntarily homeless individuals from sitting, lying, or sleeping on public property. *Coalition* Dkt. No. 65 at 50. The enjoined code sections included: California Penal Code sections 647(e), 370, and 372, and San Francisco Police Code sections 168 and 169. *Id*. Plaintiffs argue that this Court could order San Francisco to take actions that conflict with Judge Ryu's preliminary injunction and that this Court would "not be bound by" the preliminary injunction, Dkt. No. 126 at 7:19-21, quoting Judge Bumatay's dissent to the Ninth Circuit's order affirming Judge Ryu's preliminary injunction stating the injunction's "legal rulings are not the law of our court and they should be disregarded by other judges in this circuit." *Id*. at 7:21-24; *see also id*. at 8:7-9 ("Thus, to the extent the Stipulated Injunction and Judge Ryu's Order conflict, the Court can and should enforce the terms of the prior-in-time Stipulated Injunction."). A dissenting opinion is not a statement of controlling law.

Plaintiffs also argue this Court can require San Francisco to enforce the five enjoined code sections against individuals who are involuntarily homeless so long as those individuals can relocate to other public areas, such as "parks, beaches, or plazas," in the City, again relying on Judge Bumatay's dissent. Dkt. No. 126 at 3:3-11; 4:3-5; *id*. at 7:8-11 ("While the City waived this argument in Coalition on Homelessness, [Judge Tigar] is free to consider it here and to conclude that the City must comply with the Stipulated Injunction regardless of the availability of unused shelter spaces."). There is no such loophole in Jude Ryu's order. The conduct Plaintiffs suggest is flatly enjoined unless or until Judge Ryu modifies the injunction.

Plaintiffs also misconstrue San Francisco's amicus brief requesting the Supreme Court grant certiorari in *Grants Pass, OR v. Johnson* to claim that the City has not made reasonable efforts to reduce the number of unhoused people living in tents. *See* Mot at 4-5. Plaintiffs' assertion – unsupported by any authority – that City must issue more citations for violations of the laws subject to the *Coalition on Homelessness* injunction now as compared to before the parties agreed to the Stipulated Injunction is legally incorrect. Even a party subject to a "best efforts" clause does not have to make "every conceivable effort" and retains discretion in what it does to carry out its obligation, especially with respect to law enforcement activity. *Cal. Pines Prop. Owners Ass'n*, 206 Cal. App. 4th at 394. Plaintiffs are also factually wrong. San Francisco never conceded that it "has chosen not to enforce its laws in response to this problem [of homeless encampments]." Mot at 4. To the contrary, on October 18, 2023, SFPD issued Department Notice 23-166, which directed enforcement of the enjoined laws consistent with the *Coalition* injunction and the Ninth Circuit's September 2023 clarification of "involuntarily homeless." RJN Ex. B. The public citation data shows that since the Notice was issued, San Francisco has issued citations for lodging without permission at approximately the same rate as before the *Coalition* injunction was issued. RJN Ex. C. And Plaintiffs selectively quote from San Francisco's amicus brief. The full sentence that Plaintiffs quote half of remains true – "Without the ability to fully enforce its laws during the injunction, San Francisco has seen over half of its offers of shelter and services rejected by unhoused individuals, *who often cite the district court's order for their justification to permanently occupy and block public sidewalks*." Dkt. 126-2, Ex. A at 5 (emphasis added).

## CONCLUSION

For the foregoing reasons, Plaintiffs have not met their burden as the moving party seeking to enforce the Injunction. Accordingly, San Francisco respectfully requests the Court denied Plaintiffs' Motion.

Dated:  April 18, 2024

DAVID CHIU
City Attorney
YVONNE R. MERÉ
Chief Deputy City Attorney
WAYNE SNODGRASS
TARA M. STEELEY
JOHN H. GEORGE
KAITLYN MURPHY
Deputy City Attorneys


By:     /s/ Kaitlyn Murphy
KAITLYN MURPHY

Attorneys for Defendant
CITY AND COUNTY OF SAN FRANCISCO