UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLLEGE OF THE LAW, SAN FRANCISCO et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>Defendant. | Case No. 20-cv-03033-JST<br><br>**ORDER DENYING MOTION TO ENFORCE STIPULATED INJUNCTION**<br><br>Re: ECF No. 126 |

Before the Court is College of the Law, San Francisco, Fallon Victoria, Rene Denis, Tenderloin Merchants and Property Association, Randy Hughes, and Kristin Villalobos' ("Plaintiffs") motion to enforce the parties stipulated injunction. ECF No. 126. The Court will deny the motion.

**I.    BACKGROUND**

In May 2020, Plaintiffs initiated this lawsuit against the City and County of San Francisco ("the City"), alleging that unsanitary and unsafe conditions in the Tenderloin neighborhood violated the rights of residents, employees of local businesses and their patrons, persons with disabilities, and others who were deprived of the safe use and enjoyment of its sidewalks and streets. ECF No. 1. Plaintiffs alleged that the COVID-19 pandemic exacerbated these conditions. *Id.* ¶ 6. Specifically, Plaintiffs alleged that the number of tents and makeshift shelters in the Tenderloin grew from 158 on March 3, 2020, to 391 on May 1, 2020, which "block[ed] the sidewalks in the Tenderloin, impeding pedestrians' travel" and "serve[d] as cover for drug dealers and others conducting nefarious activities." *Id.* ¶¶ 31–32.

In June 2020, the parties reached a settlement and entered into a stipulated injunction.

ECF No. 71. As part of the stipulated injunction, the City agreed to: "make all reasonable efforts to achieve the shared goal of permanently reducing the number of tents, along with all other encamping materials and related personal property, [in the Tenderloin] to zero"; "discourage additional people from erecting tents in the neighborhood"; "take action to prevent re-encampment"; and "employ enforcement measures for those who do not accept an offer of shelter or safe sleeping sites to prevent re-encampment." *Id.* at 3–4. At the parties' request, the Court dismissed the action but retained jurisdiction over the stipulated injunction. ECF No. 99.

On March 14, 2024, Plaintiffs filed this motion to enforce the stipulated injunction, contending the City has failed to make "all reasonable efforts" to bring the number of homeless encampments and tents in the Tenderloin neighborhood to zero. ECF No. 126 at 5–6. Specifically, Plaintiffs point to increasing tent counts by Urban Alchemy. That entity found that although the number of tents fell from 448 in May 2020 to 22 in October 2020, it increased to 71 in February 2024. *Id.* (citing Bailard Decl. ¶¶ 3–5, 7, ECF No. 126-1). Plaintiffs, relying on a City data dashboard, also note that there are approximately 300 unused shelter spaces. *Id.* Thus, they argue the City "has failed to make all reasonable efforts to relocate occupants of tents to these alternative locations as required by the Stipulated Injunction." *Id.*

The City, in response, argues the terms of the injunction Plaintiffs seek to enforce have expired. ECF No. 137 at 16–18. It also contends that Plaintiffs' evidence is insufficient to demonstrate its failure to utilize "all reasonable efforts." *Id.* at 19–29. For example, Plaintiffs' reliance on an increase in tents since October 2020 fails to consider that during the COVID-19 emergency, the City obtained significant additional federal funding to temporarily house those living in encampments to prevent the spread of COVID-19. *Id.* at 23 (citing Cohen Decl. ¶ 21, ECF No. 137–1). Additionally, the City contends that Plaintiffs misread the City's shelter bed data to mean there are 300 available beds when, as described on the relevant website, "[m]any unoccupied units are not immediately available for placement" because they "may need … repair or maintenance," or "might be temporarily held to support other initiatives" or "for referrals." *Id.* at 24 (quoting Murphy Decl. ¶ 2, Ex. A, ECF No. 137-12).

## II. JURISDICTION

The Court had jurisdiction under 28 U.S.C. § 1331 and retained jurisdiction over the stipulated injunction. ECF No. 99.

## III. LEGAL STANDARD

When a court has issued an injunction, jurisdiction over the injunction is not a question of ancillary jurisdiction, but rather stems from the court's inherit authority to enforce its own orders. *See* United States v. Payne, No. 2:16-CR-46-GMN-PAL, 2017 WL 520640, at *2 (D. Nev. Feb. 7, 2017) (citing *Reebok Int'l Ltd. v. McLaughlin*, 49 F.3d 1387, 1390 (9th Cir. 1995)). Furthermore, "[i]t is well settled that a district court has the equitable power to enforce summarily an agreement to settle a case pending before it." *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987).

"A settlement agreement is treated as any other contract for purposes of interpretation" and enforcement is "governed by principles of local law which apply to interpretation of contracts generally." *United Com. Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992) (quotation marks and citations omitted). Under California law, the goal of contractual interpretation is to give effect to the mutual intention of the parties at the time the contract was formed. *AIU Ins. Co. v. Superior Ct.*, 51 Cal. 3d 807, 821–22 (1990). "Such intent is to be inferred, if possible, solely from the written provisions of the contract." *Id.* The written provisions should be examined "together, so as to give effect to every part, if reasonably practicable." Cal. Civ. Code § 1641. "If contractual language is clear and explicit, it governs." *Bank of the W. v. Superior Ct.*, 2 Cal. 4th 1254, 1264 (1992). When a contract is ambiguous, however, extrinsic evidence is admissible to "prove a meaning" to which the contract language is "reasonably susceptible." *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37 (1968). A contractual term is ambiguous when it is "susceptible of more than one reasonable interpretation." *Yahoo Inc. v. Nat'l Union Fire Ins. Co. etc.*, 14 Cal. 5th, 67 (2022).

## IV. DISCUSSION

Plaintiffs argue the City has failed to comply with the stipulated injunction, and therefore requests the Court order the City to resume full compliance with its terms. ECF No. 126 at 5.

3

Specifically, Plaintiffs point to Section II which states that "[d]uring the COVID-19 emergency,[1] the City will reduce the number of tents and other encamping materials and related personal property on sidewalks and streets in the Tenderloin by offering alternatives to people living in those tents," including: (1) offering shelter-in-place hotel rooms; (2) establishing safe sleeping villages outside the Tenderloin; and (3) making some off-street sites available in the Tenderloin to which tents can be moved.  ECF No. 71 at 2–3.  It specified that the City "shall cause seventy percent (70%) of the number of tents as counted on June 5, 2020, to be removed along with all other encamping materials and related personal property, and their occupants relocated to a hotel room, safe sleeping site, off-street site, or other placement by July 20, 2022" and "will take action to prevent re-encampment." *Id.* at 3.  It further states that "[a]fter July 20, 2020, the City will make all reasonable efforts to achieve the shared goal of permanently reducing the number of tents, along with all other encamping materials and related personal property, to zero." *Id.*

The parties dispute whether these portions of the injunction are still in effect.  The City contends that the entirety of Section II expired in June 2023, when Mayor Breed terminated the COVID-19 emergency proclamation.  ECF No. 137 at 16.  Plaintiffs, on the other hand, argue that only certain portions of Section II expired upon termination of the emergency proclamation and that the City's obligation to make "all reasonable efforts to achieve the shared goal of permanently reducing the number of tents . . . to zero" after July 20, 2020, continued beyond the pandemic.  ECF No. 139 at 7–11.

The Court agrees with the City that, by its terms, the obligations set forth in Section II were limited to the duration of the COVID-19 emergency as that period is defined in the parties' agreement.  In Section I of the injunction, the parties acknowledged that "[t]he problems facing the Tenderloin are substantial and are not easily solved and have been exacerbated by the COVID-19 crisis.  As the parties recognize that the COVID-19 crisis creates additional challenges to improving the Tenderloin neighborhood, this injunction is *intended to address the current situation.*"  ECF No. 71 at 2 (emphasis added).  Consistent with this stated purpose, nearly all of

---

[1] The injunction defines the end of the COVID-19 emergency to be the date the Mayor lifts the San Francisco emergency order.  ECF 71 at 2 n.1.

4

the provisions of the injunction state the City's obligations during the pandemic crisis. For example, Section III describes the City's obligations to offer COVID-19 testing in the Tenderloin in which the City agreed to "work to establish a long-term testing site in the Tenderloin for the duration of the COVID-19 emergency." *Id.* at 4. Section IV applies "[d]uring the time when the City is working toward removing at least 70% of the tents from the Tenderloin," which ended on July 20, 2020, pursuant to the terms of Section II. *Id.* In Section IV, the City agreed to advise unsheltered persons in the Tenderloin that tents and structures cannot block a doorway, exit, fire escape or come within five feet of a fire hydrant, and that tents and structures cannot make sidewalks impassable or impede traffic. *Id.* The City also agreed to "increase its enforcement efforts as the total number of tents is reduced and tents can more readily be relocated" and to "discourage persons from erecting tents within 6 feet of a doorway to a business, residence or transit stop." *Id.* And in Section VI, the parties "recognize[d] that the current crisis is unprecedented," and established a dispute resolution process that could be used if either party believed the other was in breach of the injunction. *Id.*

Section II is likewise limited to the COVID-19 pandemic. It states that "[*d*]*uring the COVID-19 emergency*, the City will reduce the number of tents and other encamping materials and related personal property on sidewalks and streets in the Tenderloin by offering alternatives to people living in those tents." *Id.* at 2 (emphasis added). It then specifies the alternatives that will be offered to unhoused persons and that 70% of the tents will be removed by July 20, 2020, after which the City will continue to make all reasonable efforts to reduce the number of tents to zero. *Id.* Contrary to Plaintiffs' assertion, the City's continuing obligation to make reasonable efforts to reduce the number of tents to zero was not of indefinite duration. Rather, Section II bifurcated the period of the pandemic, setting a specified numerical target of a 70% reduction in tents by July 20, 2020, and then requiring reasonable efforts to reduce this number to zero until the end of the emergency. Pursuant to the terms of the injunction, the emergency, along with the City's obligation to use "reasonable efforts to achieve the shared goal" of no tents in the Tenderloin, ended in June 2023. ECF No. 71 at 2 n.1 ("The end of the COVID-19 emergency is defined for purposes of this injunction as the date the Mayor lifts the San Francisco emergency order."); RJN

Ex. A, ECF No. 137-14[2].

This reading is further supported by Section VII, which states that "[a]fter the COVID-19 emergency, the City will have options to help improve conditions in the Tenderloin neighborhood that currently are not available due to constraints caused by the pandemic. The parties agree to work together to improve living conditions in the Tenderloin neighborhood for the long term." ECF No. 71 at 5. If Section II was not limited to the COVID-19 emergency, there would have been no need to include this section concerning post COVID-19 conditions. *See* Cal. Civ. Code § 1641 (written provisions should be examined "together, so as to give effect to every part, if reasonably practicable.") Accordingly, the Court finds the obligations set forth in Section II of the injunction, including that the City make all reasonable efforts to reduce the number of tents in the Tenderloin to zero, expired in June 2023, when Mayor Breed terminated the COVID-19 emergency proclamation.[3]

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to enforce the injunction is denied.

**IT IS SO ORDERED.**

Dated: October 30, 2024

JON S. TIGAR
United States District Judge

---

[2] The City's request for judicial notice of an excerpt of a spreadsheet of San Francisco Police Department Incident Report data, *see* ECF No. 173-13 at 2, is denied. The material in question is not "generally known within the trial court's territorial jurisdiction" and it cannot be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The document is not authenticated and, although counsel offers argument regarding the origin of the document, "[n]either the source of th[e] document nor its significance appear on the face thereof." *Teamsters Loc. 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 633 F. Supp. 2d 763, 778 (D. Ariz. 2009), *judgment vacated in part on other grounds,* 690 F. Supp. 2d 959 (D. Ariz. 2010). The Court grants the parties' remaining requests for judicial notice as unopposed.

[3] In light of this conclusion, the Court need not reach the parties' remaining arguments.